IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*, | ) | |
| v. | ) | Case No. 2:05-CR-00011 |
| DARYL LAWRENCE,<br>*Defendant*. | ) | |

**DEFENDANT'S MOTION FOR COLLATERAL RELIEF,**

**TO VACATE, SET ASIDE, OR CORRECT SENTENCE,**

**AND FOR A NEW TRIAL**

Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender, District of MD
Connecticut Office
265 Church St., Suite 702
New haven, CT 06510
(301) 344-2337 (phone)
(301) 344-0019 (fax)

# TABLE OF CONTENTS


Preliminary Matters ........................................ 1

A. Statement Regarding Form ........................................ 1

B. Statement Regarding Citations ........................................ 1

STATEMENT OF THE FACTS ........................................ 3

PROCEDURAL HISTORY ........................................ 6

CLAIMS FOR RELIEF ........................................ 8

I. DUE TO COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EVIDENCE OF BRAIN DAMAGE AND TRAUMA AT THE PENALTY PHASE OF TRIAL, MR. LAWRENCE WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND OF FEDERAL LAW. ........................................ 8

A. Mr. Lawrence's Penalty Phase Proceeded without Evidence Fundamental to Who He Is. ........................................ 10

B. Mr. Lawrence's Trial Counsel Missed Readily Available Evidence of Brain Damage. ........................................ 35

C. Trial Counsel's Failure to Investigate and Present Evidence of Mr. Lawrence's Brain Damage and Trauma Prejudiced Him. ........................................ 42

D. Conclusion ........................................ 53

II. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE THE CIRCUMSTANCES OF THE OFFENSE, ADEQUATELY CHALLENGE THE GOVERNMENT'S ACCOUNT OF THE SHOOTING, AND PRESENT READILY AVAILABLE EVIDENCE IN SUPPORT OF AN ACCOUNT OF THE SHOOTING THAT WOULD HAVE REDUCED MR. LAWRENCE'S CULPABILITY AND RESULTED IN A LIFE SENTENCE ON COUNT 8, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ........................................ 54

A. The Record Developed At Trial ........................................ 57

B. The Postconviction Investigation ........................................ 61

C. Trial Counsel's Failure to Adequately Challenge the Government's Account of the Offense was Objectively Unreasonable. ........................................ 84

D. Mr. Lawrence Was Prejudiced By Trial Counsel's Deficient Performance. ...... 112

III. TRIAL COUNSEL DEPRIVED MR. LAWRENCE OF EFFECTIVE ASSISTANCE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WHEN THEY FAILED TO ASK FOR A CONTINUANCE OF HIS CAPITAL TRIAL DATE......... 124

A. Trial Counsel Asked for a Continuance Only Once, on the Friday before Mr. Lawrence's Trial Was to Commence Three Days Later, Relying Solely on the Government's Late Disclosures of Evidence. ........................................ 126

B. Mr. Lawrence's Mitigation Specialist Was Not Working During Critical Junctures of the Case. 127

C. Mr. Lawrence's Trial Counsel Were Juggling a Number of Serious Cases, Including Another Capital Case, While Preparing for His Capital Trial. 130

D. The Change of Mitigation Team Members Resulted in Inadequate Mitigation Investigation and Inadequate Preparation of Mitigation Witnesses. 131

E. The Failure to Seek Adequate Time Damaged the Guilt Phase Investigation. 133

F. Mr. Lawrence's Case Was Not Ready for Trial on February 13, 2006. 139

IV. THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY AND IMPEACHMENT MATERIAL, IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. 140

A. There is Compelling Record Evidence that the Government Did Not Comply with Its Obligation to Disclose Exculpatory and Impeachment Material. 142

B. The Government Failed to Disclose Material Exculpatory and/or Impeachment Information Pertaining to Michelle Johnson. 145

C. The Government May Have Shirked its *Brady* Obligations in Other Respects as Well. 150

D. Conclusion 153

V. THE GOVERNMENT PRESENTED FALSE AND MISLEADING EVIDENCE, AND ASKED JURORS TO RELY ON THIS EVIDENCE, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. 153

A. Introduction and Summary of Argument 153

B. The Government Made Representations to the Jury at Trial It Knew, or Should Have Known, Based on Interviews with Eyewitnesses to the Crime and Photographic Evidence, Were False or Left a False Impression with the Jury. 154

C. The Government Presented Forensic Evidence at Trial It Knew, or Had Reason to Know, Was False. 158

VI. THE DEVELOPMENT AND PRESENTATION OF EVIDENCE FOR THE PUNISHMENT PHASE OF MR. LAWRENCE'S TRIAL FELL SHORT OF CONSTITUTIONAL STANDARDS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. 162

A. Trial Counsel's Failure to Request and Obtain Readily Available Records and to Recognize Red Flags in Records They Did Obtain Undermined their Case in Mitigation. 162

B. Trial Counsel Failed to Insure Adequate Time to Investigate Mitigation. 169

C. The Trial Team Did Not Adequately Prepare Testifying Expert Dr. Mark Cunningham. 170

D. Trial Counsel's Failure to Adequately Prepare Testifying Expert Dr. Elijah Anderson Constituted Ineffective Assistance. 175

E. Trial Counsel's Penalty-Phase Ineffectiveness Includes Their Failure to Move for a Continuance in Order to Properly Prepare and Present a Case in Mitigation. . 183

VII. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO IMPROPER INSTRUCTIONS AND AN IMPROPER VERDICT FORM AT THE ELIGIBILITY PHASE OF THE PROCEEDINGS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ..... 188

A. The Verdict Form and Jury Instructions were Constitutionally Defective. ..... 189

B. Trial Counsel Unreasonably Failed to Object to the Improper Instructions and Verdict Form. ..... 192

C. Trial Counsel's Deficient Performance Was Prejudicial. ..... 193

VIII. TRIAL COUNSEL FAILED TO SECURE REASONABLY NECESSARY EXPERT ASSISTANCE TO CHALLENGE MR. LAWRENCE'S POST-ARREST STATEMENT ADMITTING GUILT FOR THE CHARGED OFFENSES, IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ..... 198

[redacted] ..... 203

X. TRIAL COUNSEL BELATEDLY OBJECTED TO THE PRESENCE OF UNIFORMED POLICE OFFICERS DURING JURY SELECTION, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ..... 204

A. Trial Counsel Failed to Timely Raise Their Objection. ..... 205

B. The Failure to Object in a Timely Fashion Was Prejudicial. ..... 206

XI. TRIAL COUNSEL UNREASONABLY FAILED TO OBJECT TO THE GOVERNMENT'S EVIDENCE THAT THE GUN USED IN THE SKY BANK ROBBERY AND THE FIFTH THIRD HOMICIDE WERE ONE AND THE SAME, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ..... 207

A. Counsel Failed to Subject Mr. Hardy's Testimony to Proper Scrutiny. ..... 207

B. The Failure to Exclude or Challenge Mr. Hardy's Testimony Prejudiced Mr. Lawrence at All Three Phases of Trial. ..... 211

XII. TRIAL COUNSEL FAILED TO TIMELY CHALLENGE THE COMPOSITION AND SELECTION OF THE GRAND AND PETIT JURY VENIRES IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ..... 212

A. Trial Counsel's Failure to Timely Challenge the Composition and Selection of the Grand and Petit Jury Venires Constituted Deficient Performance. ..... 212

**B. Mr. Lawrence Was Prejudiced by Trial Counsels' Failures Because the Process by Which Grand and Petit Juries are Selected Produces an Unconstitutional Under-representation of African Americans, Hispanics and Women, in Violation of The Fifth, Sixth, and Eighth Amendments.** ..... 214

C. At an Appropriately Scheduled Evidentiary Hearing, Mr. Lawrence Can Present Proof Sufficient to Establish a *Prima Facie* Showing of Underrepresentation. . 215

XIII. TRIAL COUNSEL'S ACTIONS DURING JURY SELECTION FAILED TO ENSURE A PROCESS THAT SAFEGUARDED MR. LAWRENCE'S RIGHTS TO A FAIR AND IMPARTIAL JURY AND A RELIABLE DETERMINATION OF GUILT AND PUNISHMENT, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ........ 218

XIV. APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO SEEK REVIEW OF ALL POTENTIALLY MERITORIOUS CLAIMS ON DIRECT APPEAL IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS. 221

XV. TRIAL COUNSEL FAILED TO ADEQUATELY PRESERVE ISSUES FOR APPEAL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ........ 222

XVI. TRIAL COUNSEL FAILED TO INVESTIGATE AND PROPERLY CHALLENGE AGGRAVATING EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ........ 223

XVII. THE PRESENTATIONS TO THE DEPARTMENT OF JUSTICE IN OPPOSITION TO AUTOHRIZATION OF A CAPITAL PROSECUTION WERE LACKING IN MEANINGFUL ADVOCACY, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ........ 224

XVIII. THE CUMULATIVE EFFECT OF COUNSEL'S INEFFECTIVENESS IN MR. LAWRENCE'S CASE, IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS, WARRANTS POSTCONVICTION RELIEF. ........ 226

XIX. THE CUMULATIVE EFFECT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL AND THE GOVERNMENT'S *BRADY* VIOLATIONS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, UNDERMINE CONFIDENCE IN THE RESULT OF MR. LAWRENCE'S TRIAL. ........ 228

[redacted]

XXI. THE PRESENCE OF NUMEROUS LAW ENFORCEMENT PERSONNEL IN AND AROUND THE COURTROOM DEPRIVED MR. LAWRENCE OF A FAIR TRIAL AND SENTENCING, AND AN IMPARTIAL JURY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ........ 232

[redacted]

XXIII. MR. LAWRENCE WAS DEPRIVED OF DUE PROCESS AND A FAIR TRIAL BY THE DENIAL OF HIS RIGHT TO BE PRESENT AT EVERY STAGE OF THE PROCEEDINGS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ..... 241

A. Mr. Lawrence Had a Fundamental Right to Be Present During Bench Conferences with Prospective Jurors. ..... 242

B. Mr. Lawrence's Right Was Violated. ..... 242

C. The Denial of This Right Was Prejudicial. ..... 243

D. Mr. Lawrence Was Deprived of His Right to Be Present at Bench Conferences During the Trial. ..... 243

E. Mr. Lawrence Was Deprived of His Right to Be Present at Pretrial Status Conferences and Hearings. ..... 244

XXIV. THE GOVERNMENT COMMITTED REVERSIBLE ERROR BY INFORMING THE JURY OF FALSE SCIENCE DURING CLOSING ARGUMENT IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ..... 245

XXV. THE STATUTE UNDER WHICH MR. LAWRENCE WAS CONVICTED DOES NOT CONSTITUTE A "CRIME OF VIOLENCE" AND CANNOT SERVE AS THE BASIS FOR THE DEATH SENTENCE THAT WAS IMPOSED ON HIM UNDER COUNT 8 OF THE INDICTMENT. ..... 246

A. Introduction and Summary of Argument ..... 246

B. The Residual Clause Found in 18 U.S.C. § 924 (c)(3)(B) Is Unconstitutionally Vague. ..... 248

C. Armed Bank Robbery, As Defined by 18 U.S.C. § 2113 (a), (d), and (e), Is Not a Crime of Violence Under the "Force" Clause of § 924(c)(3)(A), Because It Does Not Have As An Element, the Use, Attempted Use, or Threatened Use of Physical Force Against the Person or Property of Another. ..... 251

D. Conclusion ..... 257

XXVI. THE ARBITRARY NATURE OF THE DECISION TO CHARGE AND SEEK THE DEATH PENALTY IN FEDERAL COURT AGAINST MR. LAWRENCE VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ..... 258

A. The Process Whereby Mr. Lawrence Was Charged and the Decision to Seek Death Were Susceptible to Constitutionally Impermissible Factors. ..... 258

B. Mr. Lawrence's Federal Death Penalty Prosecution Was Driven by a Local, Rather Than a Federal Interest. ..... 261

C. Trial Counsel Failed to Raise an Eighth Amendment Challenge to the Decision to Charge and Seek the Death Penalty Against Mr. Lawrence in Federal Court. ..... 264

XXVII. MR. LAWRENCE'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS IMPERMISSIBLY BASED ON HIS RACE, *MCCLESKY V. KEMP*, 481 U.S. 279 (1987), IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ..... 265

XXVIII. THE IMPOSITION OF THE DEATH PENALTY ON DARYL LAWRENCE WAS BASED ON RACE AND GEOGRAPHY, TWO CONSTITUTIONALLY IMPERMISSIBLE SENTENCING FACTORS, IN VIOLATION OF HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS. ..... 268

A. The Attorney General's Decision to Seek the Death Penalty Based on Both Mr. Lawrence's Race and the Race of the Victim Violates His Constitutional Rights. ..... 268

B. The Attorney General's Decision to Seek the Death Penalty Based on Geographic Location Violates Mr. Lawrence's Constitutional Rights. ..... 269

XXIX. THE FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PROVIDE A SINGLE TRIBUNAL TO REVIEW DEATH SENTENCES, RESULTING IN ARBITRARY AND INCONSISTENT RESULTS NATIONWIDE, IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ..... 270

XXX. EXECUTING SOMEONE WITH BRAIN DAMAGE AND THE IMPAIRMENTS FROM WHICH MR. LAWRENCE SUFFERS WOULD VIOLATE THE EIGHTH AMENDMENT ..... 274

CONCLUSION ..... 277

PRAYER FOR RELIEF ..... 278

# TABLE OF AUTHORITIES

## Cases

*Giglio v. United States*, 405 U.S. 150 (1972) .......... 154
*Alcorta v. Texas*, 355 U.S. 28 (1957).......... 154
*Alexander v. Louisiana*, 405 U.S. 625 (1972).......... 215, 216
*Atkins v. Virginia*, 536 U.S. 304 (2002).......... 271, 276
*Barbee v. Warden*, 331 F.2d 842 (4th Cir. 1964) .......... 141
*Batson v. Kentucky*, 476 U.S. 79 (1986).......... 216, 220
*Berger v. United States*, 295 U.S. 78 (1935) .......... 158
*Brady v. Maryland*, 373 U.S. 83 (1963) .......... 140
*Bragan v. Morgan*, 791 F. Supp. 704 (M.D.Tenn. 1992) .......... 162
*Brown v. Allen*, 344 U.S. 443 (1953).......... 214
*Campbell v. Louisiana*, 523 U.S. 392 (1998) .......... 215
*Carter v. Jury Commission*, 396 U.S. 320 (1970) .......... 214
*Castaneda v. Partida*, 430 U.S. 482 (1977).......... 213, 214, 216
*Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d. Cir. 2003).......... 254
*Clark v. United States*, 289 U.S. 1 (1933) .......... 233
*Crawford v. Washington*, 541 U.S. 36 (2004) .......... 224
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).......... 208
*Descamps v. United States*, 133 S. Ct. 2276 (2013) .......... 251
*Diaz v. United States*, 223 U.S. 442 (1912) .......... 241
*Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015) .......... 247, 248, 250
*Dobbs v. Kemp*, 790 F.2d 1499 (11th Cir. 1986), *cert. denied*, 481 U.S. 1059 (1987) .......... 215
*Dobbs v. Zant*, 506 U.S. 357 (1993) .......... 204
*Dugas v. Coplan*, 428 F.3d 317 (1st Cir.2005).......... 228
*Duren v. Missouri*, 439 U.S. 357 (1979).......... 215
*Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998).......... 233
*Evans v. Zych*, 644 F.3d 447 (6th Cir. 2011) .......... 250
*Evitts v. Lucey*, 469 U.S. 387 (1985) .......... 222
*Fell v. United States*, 2014 WL 367810, *1 (D. Vt. July 24, 2014) .......... 240
*Fernandez-Ruiz v. Gonzales*, 466 F. 3d 1121 (9th Cir. 2006) (*en banc*).......... 250, 252
*Fields v. Brown*, 503 F.3d 755 (9th Cir. 2007) .......... 237
*Francis v. Franklin*, 471 U.S. 307 (1985).......... 192
*Garcia v. Gonzales*, 455 F. 3d 465 (4th Cir. 2006) .......... 252, 253
*Giglio v. United States*, 405 U.S. 150 (1972) .......... 140
*Gilson v. Sirmons*, 520 F.3d 1196 (10th Cir.2008).......... 48
*Godfrey v. Georgia*, 446 U.S. 420 (1980).......... 258
*Gonzales v. McKune*, 247 F.3d 1066 (10th Cir.2001) .......... 228
*Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982) .......... 213

*Green v. White,* 232 F.3d 671 (9th Cir. 2000) .......... 237
*Gregg v. Georgia*, 428 U.S. 153 (1976) .......... 270
*Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000) .......... 240
*Hennon v. Cooper,* 109 F.3d 330 (7th Cir. 1997) .......... 162
*Hernandez v. Texas*, 347 U.S. 475 (1954) .......... 216
*Holbrook v. Flynn*, 475 U.S. 560 (1986) .......... 232
*Hollis v. Davis*, 912 F.2d 1343 (11th Cir. 1990) .......... 213
*Illinois v. Allen*, 397 U.S. 337 (1970) .......... 241
*Irvin v. Dowd*, 366 U.S. 717 (1961) .......... 232, 233
*Jackson v. United States*, Case #:1:09-cv-01039-RC, ECF Doc. Nos. 174 & 175 (E.D.Tex. 5/26/2013) .......... 141
*Jimenez-Gonzalez v. Mukasey*, 548 F. 3d 557 (7th Cir. 2008) .......... 252
*Jobson v. Ashcroft*, 326 F. 3d 367 (2d Cir. 2003) .......... 252
*Johnson v. United States*, 135 S.Ct. 2551 (2015) .......... 248
*Johnson v. United States*, 559 U.S. 133 .......... 252, 254
*Johnson v. United States*, 860 F.Supp.2d 663 (N.D. Iowa 2012) .......... 227
*Jones v. Cooper*, 311 F.3d 306 (4th Cir. 2002) .......... 234
*Jurek v. Texas*, 428 U.S. 262 .......... 270
*Kennedy v. Cardwell*, 487 F.2d 101 (6th Cir. 1973) .......... 203, 229, 240
*Kennedy v. Louisiana*, 554 U.S. 407 (2008) .......... 276
*Kubat v. Thieret*, 867 F.2d 351 (7th Cir.1989) .......... 228
*Kyles v. Whitley*, 514 U.S. 419 (1995) .......... 140
*Lindstadt v. Keane*, 239 F.3d 191 (2d Cir.2001) .......... 228
*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) .......... 11, 36, 43, 45
*Lundgren* v. *Mitchell*, 440 F.3d 754 (6th Cir. 2006) .......... 227
*Machetti v. Linahan*, 679 F.2d 236 (11th Cir. 1982), *cert. denied*, 457 U.S. 1127 (1983) .......... 214
*McCleskey v. Kemp*, 481 U.S. 279 (1987) .......... 265, 266, 268
*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984) .......... 236
*Mooney v. Holohan*, 294 U.S. 103 (1935) .......... 154
*Morgan v. Illinois*, 504 U.S. 719 (1992) .......... 219, 234
*Napue v. Illinois*, 360 U.S. 264 (1959) .......... 154
*Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999) .......... 240
*Northcross v. Board of Ed. of Memphis City Schools*, 412 U.S. 427 (1973) .......... 249
*Oyebanji v. Gonzales*, 418 F. 3d 260 (3d Cir. 2005) .......... 252
*Parker v. Gladden*, 385 U.S. 363 (1966) .......... 233
*Payne v. Tennessee*, 501 U.S. 808 (1991) .......... 272
*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) .......... 141
*People v. Pennisi*, 563 N.Y.S.2d 612 (NY, 1990) .......... 204
*Peters v. Kiff*, 407 U.S. 493 (1972) .......... 215
*Phillips v. Woodford*, 2001 WL 1230674 (9th Cir. 2001) .......... 228

*Porter* v. *McCollum*, 558 U.S. 30 (2009) ............ 227, 275
*Powers v. Ohio*, 493 U.S. 1068 (1991) ............ 215
*Ramirez v. State*, 810 So. 2d 836 (Fla. 2001) ............ 208
*Remmer v. United* States, 347 U.S. 227 (1954) ............ 233
*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2007) ............ 228
*Rodriguez–Castellon v. Holder*, 733 F.3d 847 (9th Cir. 2013) ............ 249
*Roe v. Flores-Ortega*, 528 U.S. 470 (2000) ............ 222
*Rompilla v. Beard*, 545 U.S. 374 (2005) ............ 163, 175, 223, 275
*Roper v. Simmons*, 543 U.S. 551 (2005) ............ 276
*Rose v. Clark*, 478 U.S. 570 (1986) ............ 192
*Sandstrom v. Montana*, 442 U.S. 510 (1979) ............ 192, 197
*Schiro v. Summerlin*, 542 U.S. 348 (2004) ............ 247
*Sears v. Upton*, 561 U.S. 945 (2010) ............ 275
*Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002) ............ 208, 209
*Smith v. Berghuis*, 543 F.3d 326 (6th Cir. 2008), *rev'd on other grounds*, 559 U.S. 314 (2010). ............ 217
*Smith v. City of Jackson*, 544 U.S. 228 (2005) ............ 249
*Smith v. Mullin*, 379 F.3d 919 (10th Cir.2004) ............ 11
*Smith v. Phillips*, 455 U.S. 209 (1982) ............ 238
*Smith v. Robbins*, 528 U.S. 259 (2000) ............ 222
*State v. White*, 709 N.E.2d 140 (Ohio 1999) ............ 261
*Strickland v. Washington*, 466 U.S. 668 (1984) ............ 84, 176, 183
*Swain v. Alabama*, 380 U.S. 202 (1965) ............ 238
*Taylor v. Kentucky*, 436 U.S. 478 (1978) ............ 229, 232
*Taylor v. Louisiana*, 419 U.S. 522 (1975) ............ 214, 215
*Turner v. Louisiana*, 379 U.S. 466 (1965) ............ 233, 240
*United States v. Acosta*, 470 F.3d 132 (2d Cir. 2006) ............ 250
*United States v. Agurs*, 427 U.S. 97 (1976) ............ 141, 154
*United States v. Amparo*, 68 F.3d 1222 (9th Cir. 1995) ............ 250
*United States v. Armstrong*, 517 U.S. 456 (1996) ............ 265, 268
*United States v. Bagley*, 473 U.S. 667 (1985) ............ 140
*United States v. Barkett*, 530 F.2d 189 (8th Cir. 1976) ............ 161
*United States v. Bennett*, 678 F.2d 596 (4th Cir. 1982) ............ 256
*United States v. Boney*, 977 F.2d 624 (D.C. Cir. 1992) ............ 237
*United States v. Booker*, 644 F. 3d 12 (1st Cir. 2011) ............ 252
*United States v. Butler*, 496 Fed. Appx. 158 (3d Cir. 2012) ............ 250
*United States v. Chapa-Garza*, 243 F. 3d 921 (5th Cir. 2001) ............ 252
*United States v. Cruz-Rodriguez*, 625 F.3d 274 (5th Cir. 2010) ............ 257
*United States v. Cuchet*, 197 F.3d 1318 (11th Cir. 1999) ............ 242
*United States* v. *Dado*, 759 F.3d 550 (6th Cir. 2014) ............ 226

*United States v. Edwards*, 303 F.3d 606 (5th Cir. 2002)....231
*United States v. Foppe*, 993 F.2d 1444 (9th Cir. 1993)....253
*United States v. Ford*, 88 F.3d 1350 (4th Cir. 1996)....242
*United States v. Gagnon*, 470 U.S. 522 (1985)....242
*United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005)....161, 208, 209
*United States v. Hammer,* 404 F. Supp. 676 (M.D.Pa. 2005), *app'l dismissed*, 564 F.3d.628 (3d Cir. 2009)....145
*United States v. Higdon*, 832 F.3d 312 (5th Cir. 1987)....254
*United States v. Kain*, Crim No. 03-573-1 (E.D. Pa. 2004)....161
*United States v. Kattar*, 840 F.2d 118 (1st Cir. 1988)....161
*United States v. Kelley*, 412 F.3d 1240 (11th Cir. 2005)....253
*United States v. Lawrence,* 555 F. 3d 254 (6th Cir. 2009)....*passim*
*United States v. Lawrence*, 735 F. 3d 385 (6th Cir. 2013)....*passim*
*United States v. Martinez,* 14 F.3d 543 (11th Cir. 1994)....239
*United States v. Meinster*, 619 F.2d 1041 (4th Cir. 1980)....161
*United States v. Miller*, 562 Fed. Appx. 272 (6th Cir. 2014)....214
*United States v. Naughton*, --- Fed.Appx. ---, *7 (4th Cir. Sept. 2, 2015)....251
*United States v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998)....213, 214
*United States v. Palomino Garcia*, 606 F. 3d 1317 (11th Cir.2010)....252
*United States v. Perez-Vargas*, 414 F.3d 1282 (10th Cir. 2005)....254
*United States v. Portela*, 469 F. 3d 496, 499 (6th Cir. 2006)....252
*United States v. Ramos–Medina*, 706 F.3d 932 (9th Cir. 2013))....249
*United States v. Reyes*, 764 F.3d 1184 (9th Cir. 2014)....242
*United States v. Rios*, 579 F.2d 670 (1st Cir. 1978)....204, 205
*United States v. Roman*, 931 F. Supp. 960 (D.R.I. 1996)....265
*United States v. Royal*, 731 F.3d 333 (4th Cir. 2014)....251
*United States v. Rutherford*, 371 F.3d 634 (9th Cir. 2004)....204
*United States v. Sampson*, 820 F.Supp.2d 151 (D. Mass. 2011)....236
*United States v. Serafin,* 562 F.3d 1104 (10th Cir. 2009)....250, 251
*United States v. Torres –Miguel*, 701 F.3d 165 (4th Cir. 2012)....252, 254
*United States v. Torres-Villalobos*, 487 F. 3d 607 (8th Cir. 2007)....252
*United States v. Washington*, 705 F.2d 489, 497U.S. App. D.C. 184 (D.C. Cir. 1983)....242
*United States v. Whitfield*, 695 F.3d 288 (4th Cir. 2012)....256
*United States v. Woodrop*, 86 F.3d 359 (4th Cir. 1996)....254
*United States v. Yockel*, 320 F.3d 818 (8th Cir. 2003)....253, 254
*Vasquez v. Hillery*, 474 U.S. 254 (1986)....265
*Wainwright v. Witt*, 469 U.S. 412 (1984)....219
*Wiggins v. Smith*, 539 U.S. 510 (2003)....163, 227, 275
*Williams v. Taylor*, 529 U.S. 362 (2000)....10, 163, 227, 275
*Witherspoon v. Illinois*, 391 U.S. 510 (1968)....219

*Woods v. Dugger*, 923 F.2d 1454 (11th Cir. 1991)................................................... 204, 232
*Yates v. Evatt*, 500 U.S. 391 (1991)........................................................................ 193

**Statutes**

18 U.S.C. § 16(b)..................................................................................................... 249
18 U.S.C. § 1621....................................................................................................... 238
18 U.S.C. § 2113 (a), (d), and (e) ...................................................................... 252, 253
18 U.S.C. § 3591(a)(2).............................................................................................. 212
18 U.S.C. § 401......................................................................................................... 238
18 U.S.C. § 924....................................................................................................... *passim*
18 U.S.C. §§ 3591, 3592, 3593.................................................................................. 194

**Other Authorities**

Bowers, William J., Sandys, Marla, and Brewer, Thomas W., *Crossing Racial Boundaries: A Closer Look at the Roots of Racial Bias in Capital Sentencing When the Defendant Is Black and the Victim Is White*, 53 Dep. L. Rev. 1492 (2004)............................................... 268
*Compassion Fatigue: Coping with Secondary Traumatic Stress Disorder in Those Who Treat the Traumatized*, Charles R. Figley, ed. (New York: Brunner/Mazel, 1995), p. 210; Harkness................................................................................................................ 246
Gleeson, Hon. John, *Supervising Federal Capital Punishment: Why the Attorney General Should Defer When US Attorneys Recommend Against the Death Penalty*, 89 Va. L. Rev. 1697, 1716 (2003)........................................................................................................ 260
Leydie, Laurie; "Transgenerational Transmission of War Related Trauma" in *International Handbook of Traumatic Stress Syndrome*, eds. John P. Wilson and Beverley Raphael (New York: Plenum Press, 1993), p. 36. .................................................................... 246
McNally, Kevin, *Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse*, 53 Depaul L. Rev. 1615 (2004), at 1626 ........................................................ 270

Daryl Lawrence, through undersigned counsel, respectfully requests, pursuant to 28 U.S.C. § 2255 and Rule 2 of the *Rules Governing Section 2255 Proceedings in the United States District Courts*, that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence. Through counsel, Mr. Lawrence states the following grounds for granting this motion:

## PRELIMINARY MATTERS

### A. Statement Regarding Form

In accordance with Rule 2 of the *Rules Governing Section 2255 Proceedings in the United States District Courts*, this Motion sets forth only the facts and claims entitling Mr. Lawrence to relief. It contains minimal legal argument or citation. Mr. Lawrence will file separate pleadings regarding discovery, evidentiary development, and legal briefing later in the proceedings.

### B. Statement Regarding Citations

References to prior proceedings are as follows:

- References to the consecutively numbered volumes of trial transcripts: TT V x at x;
- References to hearing transcripts not consecutively numbered with the trial transcripts: TT. [date] [name of hearing] at x;
- References to documents filed with the court such as pleadings, motions, and orders that cite the docket number: ECF Doc. No. x;
- References to the exhibits to this Motion are by the exhibit number;
- All other references are self-explanatory or based on the Blue Book.

Redactions to this pleading and to the attached exhibits have been made in accordance with the requirements of Rule 49.1 of the Federal Rules of Criminal Procedure. Additionally,

references to pleadings, orders, and transcripts that were placed under seal at the time of trial and that remain under seal have also been redacted.

## STATEMENT OF THE FACTS

Daryl Lawrence was arrested on January 9, 2005 for the murder of Columbus Police Department Officer Bryan Hurst. Mr. Lawrence was found in the basement of a friend's house bleeding from where he had been shot during the attempted robbery of the Fifth Third Bank three days earlier. Prior to his apprehension, he had written out an admission of the crime. Upon arrest, he was interrogated at Columbus Police Department Headquarters where he confessed to the attempted robbery and shooting at the Fifth Third Bank on January 6 and to other bank robberies as well. The federal government, having assumed jurisdiction because the bank was FDIC-insured, took over the case and, working with the local authorities, soon announced a plan to pursue the death penalty against Mr. Lawrence for the officer's murder.

The question in this case was never whether Daryl Lawrence would be convicted in the shooting death of Bryan Hurst. The issue was punishment. After the local federal defender had to withdraw, the United States District Court for the Southern District of Ohio appointed attorneys Diane Menashe and Kort Gatterdam to represent Mr. Lawrence in what all expected to be a capital prosecution. Both attorneys had tried state capital cases successfully but neither had represented a federal defendant facing the death penalty.

The trial lawyers certainly dedicated a good deal of time to defending Mr. Lawrence. But they were outgunned from the start. The Government had at its disposal federal and state law enforcement agencies, prosecuting attorneys from the Southern District of Ohio, Franklin County, and Main Justice, and had broad access to investigators, experts and eyewitnesses. The defense lawyers had to rely on their own skill and determination and any assistance they could identify and obtain from the Court. On February 3, 2005, the Court set a trial date of February 13, 2006. Jury selection started on that date, just twelve months later.

The Government needed to spend little time establishing the identity of the perpetrator: it focused instead on how and why the offense took place. From the start of trial through its closing argument at the third and final phase, the prosecution maintained that Daryl Lawrence intended to kill the Columbus police officer in a relentless pursuit of the contents of the bank vault. The Government relied on evidence about the placement of bullet shell casings, images from bank surveillance cameras, and eyewitness testimony to argue that Mr. Lawrence planned to reach the vault at all costs; that he began shooting at Officer Hurst before the officer had an opportunity to unholster his own gun; and that he then ensured Officer Hurst's death by shooting him point-blank as he crouched defenselessly behind the teller counter. The issue of intent was the Government's key issue at the first phase, its entire focus at the second or eligibility phase and a large part of its argument for death at the third, and final, penalty phase.

The defense did not put on witnesses at the first phase. Through cross examination and argument, trial counsel posited that Mr. Lawrence, who had not encountered law enforcement at the prior robberies, was surprised to see an officer and panicked. Counsel argued that their client saw Officer Hurst pull out his gun and instantly reacted, shooting his gun only to protect himself and then fleeing. The jury convicted Mr. Lawrence of all charges.

Intent to kill was the cornerstone of the Government's eligibility phase evidence and argument. Evidence about the prior robberies was highlighted as showing a desire by Mr. Lawrence to get money from the vault at all cost. The prosecution then presented witnesses to show that Mr. Lawrence was motivated to steal to support a "lifestyle" of lavish spending. Government witnesses testified to luxurious trips to California, extravagant gifts for various women, and shopping sprees financed by Mr. Lawrence's prior bank robberies. The Government urged that Mr. Lawrence was singularly motivated by the desire for more free money prior to the

fatal offense and therefore was bent on removing any obstacle standing between him and the bank vault. The defense offered the testimony of a police officer who transported Mr. Lawrence upon arrest and who heard him speak of his remorse for costing Officer Hurst his life. The jury found all four “gateway” intent factors, and the statutory aggravating circumstances that Mr. Lawrence killed the officer for pecuniary gain and that he had put other lives at risk in doing so.

The third and final stage of the trial started on March 3, 2006. While the prosecution retained the burden of proof, this was the opportunity for the defense to prove why Mr. Lawrence’s life was worth saving. Unfortunately, the shortage of time between Mr. Lawrence’s arrest and his trial and the unavailability of the defense’s mitigation specialist during much of the pretrial year were abundantly evident in the last phase of trial. The lay witnesses who testified for Mr. Lawrence’s life were ill-prepared and presented only brief, superficial glimpses of his complicated social history. The prosecution handily discredited the testimony of experts Dr. Elijah Anderson and Dr. Mark Cunningham as based on uncorroborated generalities that bore no relevance to Mr. Lawrence. The jury was allowed to believe that Mr. Lawrence was an intact person who may have been born to criminals but was fortunate enough to have been adopted by a poor but loving family who sacrificed to send him to private schools and help him obtain office jobs, opportunities that Mr. Lawrence casually squandered in favor of robbing banks for easy money.

The truth the jury did not hear is that Daryl Lawrence is brain-damaged and his brain injury, his lifetime exposure to serious violence, and the impairments of his well-meaning caregivers converged to cause serious neurological and psychiatric symptoms that were directly relevant to his actions at the Fifth Third Bank on January 6, 2005 and that were central to any just assessment of whether he deserved the ultimate penalty.

None of Mr. Lawrence's impairments excuse the tragedy he caused. They do help explain it, however, especially when considered together with forensic and expert evidence that supports the scenario the defense has argued all along: Daryl Lawrence acted impulsively and reflexively when he fired at Officer Hurst in a desperate attempt to escape the bank with his own life.

This Court now has the opportunity to consider the evidence that the jury did not hear and to decide, on the basis of a much fuller record, whether Mr. Lawrence deserves to live or die.

## PROCEDURAL HISTORY

Daryl Lawrence was arrested on January 9, 2005, for an attempted bank robbery three days earlier that resulted in the death of Columbus Police Officer Bryan Hurst. Counsel from the Federal Public Defender Office was appointed to represent him that same day and a grand jury returned an indictment against him on January 20, 2005. Two counts of the eight-count indictment included death-eligible offenses pursuant to 18 U.S.C. § 2113(e) and 18 U.S.C. § 924(j)(1). Eleven days later, his appointed counsel filed a motion to withdraw due to his obligations in another federal capital case. This Court granted leave to withdraw and replaced him with CJA Panel Attorneys Diane Menashe and Kort Gatterdam. On February 9, 2005, Mr. Gatterdam and Ms. Menashe entered their official notice of appearance in Mr. Lawrence's case.

At a status conference on February 2, 2005, the Court set Mr. Lawrence's trial for February 13, 2006, a little more than a year from his lawyers' appearance. Although it was clear the Government was considering it to be a capital case, the formal notice of intent to seek the death penalty was not filed until September 6, 2005.

A single, oral motion for continuance was made one business day before trial commenced. The motion was denied and jury selection began as scheduled on February 13, 2006. Twelve jurors and four alternates were selected after three days of *voir dire*, and opening

statements began on February 22, 2006. Closing argument was presented in the guilt/innocence phase of the trial on February 28, 2006, and the jury returned a verdict the same day finding Mr. Lawrence guilty of all eight counts of the indictment.

All testimony in the eligibility phase of the proceedings took place on March 1, 2006, and the jury began deliberating the following day. After approximately four hours of deliberations, the jury sent out a note requesting certain pieces of evidence and asking “What if we are not in agreement on one of the intent factors?” Absent objection from either party, the Court referred the jury back to the instructions and verdict form. On March 3, the jury returned its verdict, finding all four gateway statutory intent factors, and both statutory aggravating factors: that the offense created a grave risk of death to more than one person and that the murder was committed for pecuniary gain.

The selection phase began on March 3, 2006, and concluded six days later. On March 10, 2006, the jury returned its verdict finding both non-statutory aggravating factors on Counts 7 and 8 and making various inconsistent findings about the 49 mitigating factors that were submitted identically for each count. The jury sentenced Mr. Lawrence to life without possibility of release on Count 7, and death on Count 8.

Mr. Lawrence was formally sentenced by the Court on August 10, 2006, and judgment was entered on August 11, 2006. Trial counsel filed their Notice of Appeal that same day, along with a sealed motion for new trial.

The Court granted, in part, the motion for new trial on November 16, 2006, vacating Mr. Lawrence’s death sentence on the basis of arbitrariness in the jury’s inconsistent findings and inconsistent verdicts on Counts 7 and 8. The Government appealed, and in an opinion dated

February 11, 2009, the Sixth Circuit reversed the grant of relief. *United States v. Lawrence*, 555 F.3d 254 (6th Cir. 2009).

Trial counsel, continuing to represent Mr. Lawrence, filed an appeal in the Circuit Court challenging other aspects of his case. The Sixth Circuit Court of Appeals denied all the claims and affirmed the convictions and sentences on October 22, 2013. *United States v. Lawrence*, 735 F.3d 385 (6th Cir. 2013). The Court denied a request for rehearing on February 3, 2014. Counsel filed a petition for a writ of *certiorari* in the Supreme Court on July 1, 2014 and *certiorari* review was denied on December 8, 2014.

## CLAIMS FOR RELIEF

### I. DUE TO COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EVIDENCE OF BRAIN DAMAGE AND TRAUMA AT THE PENALTY PHASE OF TRIAL, MR. LAWRENCE WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND OF FEDERAL LAW.

Daryl Lawrence has brain damage. It was caused by a combination of factors, including the serious blood disorder he has suffered from since childhood, which can result in a loss of oxygen to the brain; a series of blows to the head in childhood causing what are known as TBIs (traumatic brain injuries); and being born to a mother who ingested drugs and alcohol while pregnant. This damage to Mr. Lawrence's brain was compounded by the circumstances in which he was raised. These included exposure to an exceptionally high level of violence, both as a victim and as a witness, and the neglect of a loving but very poor and overburdened family unable to provide necessary medical support and attention his condition demanded. Because of counsel's deficiencies, the jury never learned about his longstanding brain injury, which manifested in significantly compromised cognitive and psychiatric functioning and affected all aspects of Mr. Lawrence's life, including the commission of the capital crime.

Few would dispute that where an individual has suffered from lifelong brain dysfunction, his capital sentencing jury should be made aware of it. Unfortunately, Mr. Lawrence's trial counsel did not investigate or present this evidence. Although they had signs in their client's medical records that he had unusual headaches and other symptoms as a young child, they did not seek out the services of a medical doctor to examine Mr. Lawrence or his records. Had they done so, a doctor would have recognized that Mr. Lawrence had been suffering since childhood from a serious blood disorder known to have neurological consequences. A medical doctor would have recognized that he suffers from polycythemia vera (PV), an affliction which, left untreated, as it was in this case, results in a loss of oxygen to the brain and disabling headaches that make daily living difficult, and can result in blood clots. A doctor would have conducted the physical and neurological examination necessary to establish that Mr. Lawrence has brain damage, including neuropsychiatric and cognitive deficits which have affected his thinking, judgment and behavior throughout his life.

Because trial counsel did not seek out a doctor's services – despite red flags in his childhood records and the fact that Mr. Lawrence was suffering from the effects of a gunshot wound when he confessed to this and other offenses – his jury did not learn about PV or his impaired brain. In fact, psychologist Dr. Mark Cunningham told the jurors that he could not identify brain damage as a factor in Mr. Lawrence's life because there were no "findings" to support it. TT V 17 at 107-108. Had counsel examined Mr. Lawrence's records and consulted with a medical doctor, there would have been findings to support brain damage.

Because counsel failed to investigate or consult a doctor, they were able to touch only superficially on Mr. Lawrence's difficulties. As a result, the jury heard only that Mr. Lawrence's behavior might have been the result of Attention Deficit Hyperactivity Disorder or of being

raised in his bad neighborhood. In truth, all his interactions with the world were affected by his organic neurological problems, which were diagnosable and corroborated by readily available records and life-history interviews. The Government pointed out that the defense expert's conjecture about brain-based behavioral issues was unsupported by reliable, objective data. The prosecution was able to persuade the jury that all of Mr. Lawrence's failures were the result of his own bad choices. The truth was that Mr. Lawrence's choices and behaviors were shaped and limited by his biology.

No accurate picture of Daryl Lawrence could have been presented without the central fact that his brain is damaged, and that that damage was exacerbated by his repeated exposure to trauma. Nor could his jury reliably assess his moral culpability – the very purpose of a capital sentencing proceeding – without knowing about these disabilities. Trial counsel's failure to investigate and present this essential information undermined the reliability of his death sentence. *See Williams v. Taylor*, 529 U.S. 362, 370 (2000).

**A. Mr. Lawrence's Penalty Phase Proceeded without Evidence Fundamental to Who He Is.**

The case the jury heard at Mr. Lawrence's punishment phase — from both the defense and the prosecution — rested on a faulty premise: that Mr. Lawrence engaged with the world with an intact, functioning brain. He did not. Had trial counsel sought guidance from an appropriate medical expert to interpret Mr. Lawrence's childhood medical records and other documents, they could have presented evidence that he had brain damage. Without this information about the physiological damage to his brain, the jury had no way to contextualize evidence of his other struggles in life or reason to conclude that they were anything but the result of his bad choices, as the prosecution contended.

Courts reviewing capital sentencing claims in habeas have acknowledged the unique importance of evidence of organic or physical brain injury:

> "Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect.... And for good reason—the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *See Victor Hooks,* 689 F.3d at 1205 (citations omitted). Because of its central significance, where the defendant's circumstances put it in play, ordinarily it would be "patently unreasonable for [counsel] to omit this evidence from his case for mitigation." *Smith v. Mullin,* 379 F.3d 919, 942 (10th Cir.2004); *see id.* (noting "evidence of [petitioner's] mental retardation, brain damage, and troubled background constituted mitigating evidence" and, indeed, is "exactly the sort of evidence that garners the most sympathy from jurors").

*Littlejohn v. Trammell*, 704 F.3d 817, 860 (10th Cir. 2013) (footnote omitted).

A qualified expert could have explained to the jury how a normal brain develops and how Mr. Lawrence's brain went awry.[1] Armed with this knowledge, the jury could have understood that the difficulties in Mr. Lawrence's life could not be overcome merely by choosing to work harder or doing things "the right way." For example, experts can explain the process by which a newborn's brain develops, that from the moment of birth, it begins to build pathways between neurons, connections that allow a child to take in information from the world and process it in an orderly fashion. Simple connections are built first and then more complex circuits are built on the simple ones. In a child born with a fully intact brain who is developing normally, these circuits are continually strengthened by a wide range of positive, supportive experiences leading the child to understand and interact with the world appropriately. By contrast, anything that

[1] Defense expert Mark Cunningham made several oblique references to brain development and "wiring," *see e.g.* TT V 16 at 107-08, 111, 126, but only as part of a tallying of the "risk factors" that would predict future criminal behavior. Without further context, the jury was most likely very confused by these references, particularly since Dr. Cunningham explicitly announced that he had no evidence of actual brain damage in Mr. Lawrence. *Id.* at 108. Furthermore, Dr. Cunningham is not a physician and thus lacks the medical training to recognize and diagnose physiological ailments.

negatively affects someone during early childhood—including head trauma, neglect, or prolonged stress, for example—will interfere with brain development.[2]

Experts could have also explained that these early years were critical for Mr. Lawrence's brain to develop proper emotional responses. In infancy and early childhood, a properly developing, intact brain learns to cope with anxiety and stress in a healthy way. When that development is interrupted, there are consequences.

Dr. Siddhartha Nadkarni, M.D., who is board certified in neurology and psychiatry, and who maintains a clinical practice and teaches neuroscience at the NYU School of Medicine, examined Mr. Lawrence in postconviction and concluded that his brain development was far from normal. Based on his neurological examination and review, Dr. Nadkarni has concluded to a reasonable degree of medical certainty that Mr. Lawrence is "markedly brain-injured and is disabled by diffuse brain damage." Exh. 3 at 14. Dr. Nadkarni has identified at least six factors that have contributed to Mr. Lawrence's brain dysfunction. *Id.* at 14-15. As Dr Nadkarni explains, Mr. Lawrence "suffers from several conditions that conspire to produce marked neuropsychiatric and cognitive deficits, which are primarily long-standing in origin, and which have affected his development and functioning as an adult." *Id.* at 10-11. "Mr. Lawrence has the multiple pathologies of environmental exposures which cause neurodevelopmental impairments, brain and behavior dysfunction, as well as multiple acquired brain injuries. In addition, he has neurological and psychiatric signs and symptoms of trauma and major mood disorder." *Id.* at 14.

A neurologist such as Dr. Nadkarni could have explained to the jury that Mr. Lawrence was beset by a perfect storm: he was predisposed at birth to neurological problems, besieged by subsequent environmental assaults, and lacking the supports such a damaged child requires to

---

[2] *See, e.g.*, Shonkoff and Phillips, *From Neurons to Neighborhoods: The Science of Early Childhood Development*, National Academy of Science Press, 2001, page 199.

function effectively in the world. Children are resilient, but only up to a point. At some point, the combination of obstacles – medical, physical and social – they are called upon to meet overwhelms their systems. However, most children, whether by virtue of their constitution or simple good luck, can withstand the negative experiences in their lives. They are fortunate enough to have mental and physical health, or continuity in their medical care, or a supportive school environment. Mr. Lawrence, unfortunately, experienced a degree of adversity beginning *in utero* that anyone with his damaged brain would have difficulty withstanding.

1. A doctor would have testified at trial about the medical vulnerabilities Mr. Lawrence was born with.

Daryl Lawrence was born uniquely vulnerable to the environmental assaults and obstacles he was soon to face. Even as an infant he exhibited symptoms of serious medical conditions which, because they were left untreated, had a profound effect on his development. Mr. Lawrence's biological makeup saddled him with a significant disadvantage right from the start of his life.

*a. Polycythemia Vera*

The jury never learned that Mr. Lawrence suffers from Polycythemia Vera (PV), a rare, chronic, progressive disease characterized by an overproduction of red blood cells which causes increased viscosity of the blood. PV can cause a host of other medical issues including "deep venous and arterial thrombosis ('blood clots'), poor venous drainage from tissues, damage to blood vessels, poor oxygenation of tissues, and increased blood pressure." Exh. 3 at 6, 11. Because trial counsel failed to consult with a medical doctor, this severe disease which Mr. Lawrence has had since childhood did not come to light pretrial.

PV significantly affected Mr. Lawrence's early brain development and caused symptoms that have plagued him all his life. Because the main feature of the disease impairs the operation

of the vascular system, it necessarily affects the central nervous system by depriving tissue, including brain tissue, of needed oxygen. Dr. Nadkarni explains in his report that the effect on the central nervous system has

> two primary presentations: acute ischemic events and chronic ischemia with resultant indolent neural function deterioration. Often, these patients suffer unilateral headaches over prolonged periods…hemi-sensorimotor deficits, peripheral neuropathies, and broad neuropsychiatric sequelae.

*Id.* In short, PV results in a restriction of blood to tissue depriving it of needed oxygen and causing damage to the nervous system and creating potential cognitive impairments. Because PV has such serious effects, including debilitating headaches, strokes and life-threatening blood clots, adults who suffer from the disease must undergo regular treatments. It is rare for children to suffer from the disease. For children, whose brains are at a critical stage of development, the short- and long-term consequences can be particularly devastating.

Mr. Lawrence's childhood medical records pointed to the fact that he had PV, something a review of those records and a neurological examination could have established. Dr. Nadkarni was able to confirm that "[r]ecords show that Mr. Lawrence had symptoms of PV since very early childhood."

> Mr. Lawrence had…headaches prior to diagnosis and treatment; from a very early age, he also had nosebleeds, hypertension and elevated hematocrit values, and his family took him to the hospital fearing sickle cell anemia which was ruled out; he has cognitive impairments (memory and abstraction) consistent with this disorder; and, he has motor weakness of the right face, hyperreflexia in the lower extremities, and a sensorimotor polyneuropathy mostly affecting his feet which may be associated with this condition.

*Id*. at 11.

Hospital records report that Mr. Lawrence was treated at Lutheran Medical Clinic at age 4 for a spontaneous, severe nosebleed and was seen the next day for follow up at Children's Hospital. Exh. 54. Intake notes show that Mr. Lawrence already had a history of nosebleeds and

that he had been diagnosed with high blood pressure. *Id*. At age 7, another Children's Hospital record notes that he "gets bad nose bleeds after heavy exercise" and that he is lethargic, another common complaint of patients with PV. *Id.*

In March of 1989, a 13-year-old Mr. Lawrence was again seen at Children's Hospital where it was noted "about 1-2 years ago he was told he had high BP when he came here for nosebleed and HA [headache]." Exh. 54. There are further notes that "Nosebleeds started 3 wks ago, very intermittent…Headaches – he has been having them for 2-3 wk; c/o [complains of] pain in R side temple area." *Id*. Seven months later, he was back in the hospital where it was noted that he had "2 nosebleeds since last visit" and he was suffering from a headache that persisted from the previous day. *Id.* Another note said that ever since Mr. Lawrence completed sports practice the previous day, he had a headache, dizziness, vomiting and high blood pressure "X3 hours continuously." Exh. 54. The records also reported that Mr. Lawrence had a "nosebleed early this week" and that he gets headaches "twice each week." *Id.* Four months later, Mr. Lawrence (now aged 14) returned to Children's Hospital; clinic notes record a history of headaches "occurring after working out hard (lifting wts, running)," a history of high blood pressure and a history of nosebleeds – "4 heavy bleeds 1 yr. diff to stop bleeding." *Id.*

Family members vividly remember how frightening these attacks were. Alana Robinson[3] recounts:

> From the time Daryl was a baby, and throughout his childhood, he was sick a lot.… He had high blood pressure and he often had nosebleeds….The nosebleeds were bad. Daryl often got bad headaches, and that's how we knew when a nosebleed was coming. When Daryl was sick with these headaches, he stayed in bed a lot and looked tired and worn down, like he had the flu…. Sometimes when he had nosebleeds, he bled all over his shirt. My mother would lay Daryl down,

[3] Mr. Lawrence was raised by his great-aunt, Eileen Lopez. Alana Robinson is Mrs. Lopez's biological daughter.

> put cold compresses on his neck and use towels to soak up the blood. If she did not lay him back, blood would drip all over.

Exh. 10.

Mr. Lawrence's jury should have heard that he suffered from this rare yet severe medical condition since at least 4 years of age. The jurors should have further learned that because the condition was never diagnosed during his youth, Mr. Lawrence never received treatment for PV until his incarceration. Mr. Lawrence did not have a family physician. Consequently, there was no doctor who treated him consistently or was in a position to note problems he had over time; his symptoms were all addressed as acute medical problems by whichever staff physician happened to be working in the emergency ward when Mr. Lawrence was brought in. Since PV is rare in adults, and extremely rare in children, it is unsurprising that a rotating roster of physicians failed to recognize and diagnose his illness during short ad hoc emergency room examinations.

As a result, for decades—throughout his childhood, adolescence, and adulthood —Mr. Lawrence suffered the effects of an undetected illness that, according to Dr. Nadkarni, led to "poor decision making, impulsivity, informational processing problems and other focal neurological and neuropsychiatric problems." Exh. 3 at 11. Because the disease deprives the brain tissue of needed oxygen and affects the central nervous system, it is highly likely that Mr. Lawrence's PV was a contributing factor to his brain damage.[4]

Although PV was crucial to an understanding of Mr. Lawrence, his struggles as a youth, and the damaging effects the disease had on his brain development, the jury never heard anything about this debilitating disease.

---

[4] After about the age of 17, there are very few medical records. One of the few later documents, however, is a hospital record from Mount Carmel Hospital eleven days before the capital crime for which Mr. Lawrence was sentenced to die. Exh. 55. Those records note that Mr. Lawrence exhibited lightheadedness and flu-like symptoms and had three episodes of vomiting. *Id*. The notes also describe him as "mildly depressed" and "anergic appearing" (meaning lacking energy or lethargic). *Id.* These are all symptoms entirely consistent with Mr. Lawrence's untreated PV.

*b.* In utero *exposure to drugs and maternal stress*

While she was pregnant with him, Mr. Lawrence's mother, Leondra Lawrence, suffered from drug and alcohol addiction, untreated mental illness, and stressors caused by her poverty and incarceration. While Dr. Cunningham noted that maternal drug and alcohol addiction can be risk factors for criminal behavior, his testimony missed the mark. A genuine trauma expert or neurologist could have explained the effects that maternal afflictions have on a fetus's developing brain. They could also have explained specifically how the negative effects, not just of her addictions, but also of her mental illness and distress interfered with the normal development of Mr. Lawrence's brain during this critical prenatal period.

The jury never heard this important evidence because trial counsel failed to provide evidentiary support for the one area they explored at trial about his prenatal development: his mother's addictions throughout her pregnancy. Dr. Cunningham admitted to the jury that, although alcohol is always "injurious" to the brain, he had no actual findings supporting brain damage in Mr. Lawrence. TT V 16 at 108.

Counsel failed to provide Dr. Cunningham with the evidentiary support that Ms. Lawrence used drugs and alcohol during the second half of her pregnancy while she was incarcerated. At trial, the only basis he could cite for his belief that she was abusing drugs during the second half of her pregnancy was a comment made by Florencia Walker, who expressed concern about the access Ms. Lawrence might have had to drugs in prison. Absent actual evidence of her drug use once incarcerated, Dr. Cunningham's testimony was vulnerable to challenge. Moreover, Dr. Cunningham did not explain to the jury that drug withdrawal can itself cause severe damage to the developing brain of the fetus. Counsel should have asked Dr. Cunningham to explain to the jury that at least four gestational factors could have damaged Mr.

Lawrence's brain: his mother's substance use, her drug withdrawal while incarcerated, her mental illness, and the stress of her incarceration.

Yet counsel also failed to present any evidence about the effects of Mr. Lawrence's biological mother's mental illness and prenatal distress. Most significantly, they touched on these prenatal problems as risk factors for Mr. Lawrence's later criminal conduct, instead of explaining how the prenatal damage was one element that conspired with environmental affronts he encountered immediately after birth to prevent his damaged brain from healing. An informed and qualified expert would have explained that an expectant mother's exposure to high levels of stress can impair normal neurological development.[5] In addition, trial counsel never obtained readily available records that Ms. Lawrence suffered from psychotic episodes, and at one point had been prescribed antidepressants and psychotropic medications, and had tried to commit suicide. Exhs. 30, 31. The jury never heard of the effects of mental illness on a developing fetus.

If the jury knew about the neurological findings that Mr. Lawrence was, in fact, brain damaged, jurors would have understood evidence regarding *in utero* exposure to toxins very differently. If counsel had provided the jury with expert testimony about the effects of maternal stress and mental illness, jurors would have had an even greater ability to understand why Mr. Lawrence could not withstand and overcome the environmental challenges and traumatic episodes he encountered from early childhood on.

Unfortunately, Mr. Lawrence's trial counsel missed the opportunity to educate jurors about the biological impacts of his mother's mental illness, distress, and substance abuse while she was pregnant with him. Instead, the superficial mitigation presentation was limited to evidence of Leondra Lawrence's criminality and addiction, void of context for why this mattered

---

[5] *See, e.g.*, DiPietro JA, et al. *Maternal Stress and Affect Influence Fetal Neurobehavioral Development*. Dev Psychol. 2002; 38(5):659–68.

to Mr. Lawrence, aside from the suggestion that he might have a criminal predisposition because of his mother's proclivities.

*c. Genetic predisposition*

Many generations of Mr. Lawrence's family is laden with mental illness. Mental health experts widely recognize that some psychiatric disorders have biological and genetic components. Certain disorders aggregate in clusters and there is strong evidence of the heritability of particular conditions. Exh. 3 at 13. Schizophrenia, for example, an affliction diagnosed in several of Mr. Lawrence's family members, carries a strong genetic risk and is also genetically "associated with other mental disorders, including bipolar disorder, depression, and autism spectrum disorder." Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) at 103. There is a strong genetic link in bipolar disorder, another mental illness in Mr. Lawrence's family. "There is an average 10-fold increased risk among adult relatives of individuals with bipolar I and bipolar III." *Id.* at 130.

At trial, Dr. Cunningham testified that, because of mental illness in his family, Mr. Lawrence had a genetic predisposition for "psychological as well as personality disorders." TT V 16 at 154. Dr. Cunningham was forced to acknowledge on cross examination, however, that trial counsel had provided him no mental health records to review "on any of the family members," TT V 16 at 262, and he was relying solely on oral accounts from Mr. Lawrence's relatives. The inherent weakness of basing an opinion of mental illness solely on this evidence was not likely lost on the jury given the prosecutor's closing argument, mocking Dr. Cunningham:

> He diagnosed the entire family, the extended family without testing, without evaluation, without looking at other people's records and reports. And he diagnosed them by relying on what they told him. You go to the doctor, and he says, what's wrong with you, Mike? I got cancer. You got cancer. Or more likely, you go to the doctor, and he says, what's wrong with you, Mr. Burns? I'm crazy. You're crazy. Don't you do some tests? Aren't you supposed to?

TT V 17 at 26.

Trial counsel's deficiency was not simply the result of failing to provide Dr. Cunningham with documented evidence of mental illness in Mr. Lawrence's family. Counsel failed in the first instance to investigate and collect these readily available records. As discussed later in this motion, such records exist for various family members, including but not limited to Mr. Lawrence's biological mother, Leondra Lawrence, maternal aunt, Florencia Walker, and maternal grandmother, Florence Perkins, and document their diagnoses and symptoms of serious mental illness. *See* Claim 6.

The medical vulnerabilities Mr. Lawrence carried into the world —the debilitating medical illness of PV, exposure to toxins while in the womb, maternal stress, and the extensive and severe mental illness in his extended family—were not simply risk factors to help calculate the likelihood he would commit a crime. These were the burdens his body—and especially his developing brain— had to bear, the disadvantaged starting place from which he had to make his way.

2. Mr. Lawrence's brain was further damaged during childhood by head injury and repeated exposure to traumatic events.

Mr. Lawrence never received the specialized care and support a child with brain damage needed. Worse, he experienced blows to the head and was the victim of, and witness to, repeated traumatic events from a very young age. Had counsel consulted with and presented the testimony of appropriate experts, these experts could have explained how these events further derailed the development of Mr. Lawrence's brain.

*a. Head injury*

Mr. Lawrence has suffered traumatic brain injuries (TBI). TBIs usually result from a violent blow to the head, but neurologists have long recognized that repeated milder jolts, even

where there is no loss of consciousness or other immediately obvious effect, can also have long-term consequences which only appear years after the head injury. In a person such as Mr. Lawrence, who already has brain damage before the TBI, the effects of head injury are magnified.

At trial, Dr. Cunningham told the jury that Mr. Lawrence had suffered several head injuries. TT V 16 at 139-40. The defense presentation, however, was undercut during cross-examination when Dr. Cunningham admitted that he was not a medical doctor and he could neither diagnose nor treat head injuries. TT V 16 at 263. In closing, the Government pointed out that the defense had failed to provide documentation of any head injuries except in one instance and charged that anybody on the jury with an older sister or brother "could have more concussions than that." TT V 17 at 59-60.

Trial counsel could have presented the jury with a much more compelling view of this evidence. First, two other specific head injuries were documented in school records that were in the possession of trial counsel, yet they were never mentioned to the jury. Exh. 113. More importantly, trial counsel should have consulted with, and presented the testimony of, a medical doctor who could have done a neurological examination of Mr. Lawrence. As mitigation expert Russell Stetler explains, "Dr. Cunningham might have been perfectly competent to provide an expert opinion about brain damage, for example, as a developmental risk factor, but trial counsel could not expect jurors to accept his belief that Mr. Lawrence was actually brain damaged absent evidence from a neuropsychologist, neurologist, or neuroradiologist." Exh. 1. Had they consulted a neurologist, the jury would have heard the testimony of a medical doctor, who, based on an

actual neurological examination of Mr. Lawrence, discovered "abnormal reflexes and cranial and peripheral nerve damage" indicating that he has a severe brain injury. Exh. 3 at 10.[6]

*b. Trauma/exposure to violence*

Had trial counsel collected and reviewed documents, taken the time to develop some level of rapport with Mr. Lawrence's relatives, and consulted with the relevant expert, they would have learned that their client's already damaged brain was also subjected to the effects of severe trauma during his childhood. Psychological trauma affects the way a person feels, thinks and interacts with the world; it has a profound impact on our biological, emotional and cognitive systems. Had trial counsel consulted with, and presented, the testimony of a trauma expert, the jury would have had the basis to contextualize the pervasive behavioral and cognitive effects of complex trauma, particularly on a person like Mr. Lawrence whose brain was already damaged.

At trial, the only mention of trauma was an oblique reference by Dr. Cunningham who described it as a risk factor that predicted criminality. Neither he, nor anyone else, explained to the jury the biological and emotional damage that trauma wreaks, especially in the brain. Nor was there any testimony describing or explaining the many traumatic incidents to which Mr. Lawrence was exposed and which unquestionably affected his functioning in the world.

As a cardinal example, the jury never heard the details of Mr. Lawrence's life in his adoptive home. Mr. Lawrence's relationship with Eileen Lopez, his adoptive mother, has been the most central in his life. Despite the great kindness and love she showed Mr. Lawrence and

[6] Trial counsel did, in fact, have some evidence to suggest possible traumatic brain injury. Prior to trial counsel consulted a psychologist, Dr. Bob Stinson, who administered a "limited battery," Exh. 3 at ¶ 11, of psychological tests to Mr. Lawrence (although as he was also not a medical doctor he, like Dr. Cunningham, could not diagnose or treat medical conditions). Dr. Stinson's testing nevertheless showed weaknesses consistent with the damage expected from head injuries. Exh. 3 at ¶ 12. Dr. Stinson also noted that his testing of Mr. Lawrence revealed "soft signs" of impairment. Exh. 2 at ¶ 11. As Dr. Stinson explains, a soft sign "indicates a potential abnormality but cannot itself establish a diagnosis or reveal its etiology" and therefore such signs "inevitably require further, more specific, evaluation and testing." *Id.*

the attempts she made to give him a good home, she was, unfortunately, ill-equipped to carry through with her good intentions. Mrs. Lopez was chronically burdened by financial stress after her husband's death when Mr. Lawrence was 6 years old. She also struggled with her own impairments. Family witnesses report that she was intellectually slow and had a hard time managing basic life skills, problems which became more pronounced after her husband's death when additional mental health issues emerged. She was unable to organize the house, and she developed a pattern of hoarding that escalated into domestic disarray.

By the time she took Mr. Lawrence in when he was only a few months old, Mrs. Lopez had already raised her own seven children, who were by then adults. One of her children, Aleta Lopez, who was severely mentally ill, continued to live with Mrs. Lopez. Mrs. Lopez was unable to protect herself from Aleta's physical and psychological abuse, much of which occurred in Mr. Lawrence's presence. As a result, Mr. Lawrence was continually exposed as a youngster to Aleta Lopez's assaults of Mrs. Lopez, his only present maternal figure. Daryl witnessed Aleta's regular attacks, such as coming into rooms to find Aleta striking and choking Mrs. Lopez. While he was still under the age of 10, Daryl was already intervening to protect Mrs. Lopez from Aleta's irrational, unpredictable assaults.

Mr. Lawrence was also a direct object of Aleta Lopez's paranoid rage and resentments, and she subjected him to physical and emotional abuse—something the jury only heard minimal details about.[7] Unbeknownst to Mr. Lawrence, Aleta Lopez had given birth in the years before Mr. and Mrs. Lopez took Daryl in, and Aleta had been forced to give up her baby. When Mr. Lawrence was brought into the family, Aleta Lopez deeply begrudged her mother for agreeing to

[7] Dr. Cunningham makes only brief mention of Aleta's abuse of Mr. Lawrence: "There is…some emotional and physical abuse he suffered from his adult stepsister, Alita [sic]." TT V 16 at 114.

raise Mr. Lawrence in her home after having been unwilling to raise Aleta's own child, Mrs. Lopez's grandchild. Aleta directed much of her anger at Mr. Lawrence, even though he was only a child.

Mr. Lawrence also witnessed and was the victim of serious violent crime, including gun-point robberies, homicides by shooting, and a friend's decapitation during a car accident, in the streets where he routinely spent days and nights without adult supervision. He witnessed numerous violent events in his neighborhood:

- When he was still in grade school, he returned home one day to find a large group of older boys fighting each other with chains until they all collapsed, bloody on the sidewalk and street by his house.
- Mr. Lawrence was robbed at gunpoint and shot at when he was age 11 or 12.
- He witnessed his cousin shot in the head with a pellet gun, running into the house with blood coming from his head.
- He saw people "beaten bloody" over money several times.
- When Mr. Lawrence was 10 or 11, he was walking to the corner store for a snack and saw someone get shot and killed; the perpetrator picked up the victim's body and threw him in a dumpster.
- When he was in middle school, he and his classmates heard a car accident outside their school and ran out to see a school friend thrown from the car and decapitated.
- He witnessed multiple people being shot.
- He was shot at in front of a pizza shop with AK's and handguns.

Exh. 3 at 4.

As part of the PowerPoint presentation Dr. Cunningham prepared for trial, he created a slide, Exh. 65, listing by name no fewer than fifteen friends of Daryl's who had been shot, killed in accidents (including the car wreck in which Daryl saw his friend decapitated), or murdered. However, during trial, counsel rushed Dr. Cunningham through this part of his presentation and

he did not get to testify about any of these events. Thus, jurors never heard about these traumatic events or their effects on Mr. Lawrence.[8] They also never heard anything of the interpersonal violence, sometimes at the muzzle of a gun, of which Mr. Lawrence was a victim at home and in the street.

In addition to learning about these horrific events in Mr. Lawrence's life, the jury should have been provided an explanation of why they mattered to their consideration of Mr. Lawrence's punishment. An expert in trauma, [redacted] could have explained to the jury what scientific research in the field has long shown: that traumatic events, and the resulting terror produced by such events, affect the development of a child's brain. The brain adjusts to patterned, repetitive experiences that are understood through the senses, changing the very structure of the brain itself. Normal brain development creates neural pathways which help us process what we learn, how we feel and what we do. A trauma expert could have explained how traumatic events interfere with this process and ultimately damage the brain, resulting in serious impairments to normal functioning such as dissociation, hyper-arousal, emotional dysregulation, memory problems, distortions in thinking, and impulsivity, and others. *See also* Exh. 3 at 7, 13 (noting Mr. Lawrence's impaired memory functioning and dissociative states, which "have been shown in the research literature to influence the developmental course and behavior[]").

An expert could also have informed the jury that repeated trauma, like that which Mr. Lawrence experienced, is particularly toxic to areas of the brain such as the hippocampus and the pre-frontal cortex, areas involved in the management of impulses, the capacity to consider the broad implications of one's actions, and the consolidation and integration of memory. Damage to

[8] TT V 16 at 204 (Ms. Menashe telling Dr. Cunningham "I don't want to go through all of those, but is it fair to say that Daryl knew people, friends, people in the community, that have been shot, stabbed, killed?").

these brain structures creates the memory disturbances so commonly seen in trauma survivors. Traumatic memory tends to be fragmented, poorly integrated and indelible, and it tends to drive behavior in ways that are distorted relative to current experience.

Moreover, trauma research, which was well-known and available in 2005-06, has shown that a child who witnesses the physical and emotional abuse of another – particularly someone who should be protecting the child or whom the child feels a responsibility to protect – is just as traumatic as being the direct victim of abuse and also negatively affects brain development. Mr. Lawrence experienced his own abuse and the abuse of the kindest person he knew, the woman he considered his mother, at the hands of another adult they lived with. By the time he was six years old, when Mrs. Lopez's husband died, Mr. Lawrence was left with no protector at all, and had to find ways to shield himself and defend his mother – an extraordinary burden for any child, let alone one who was already neurologically damaged.

An appropriate expert also could have explained to the jury how damage wrought by trauma may cause disorganized thinking, a symptom which prevented Mr. Lawrence from achieving short and long-term goals. In order for a person to function normally, his or her brain must be able to screen out distractions, to inhibit inappropriate ideas and impulses, to weigh alternative options, to delay gratification and to access one's sense of self in such a way that it can guide behavior. Unfortunately these are also the areas of the brain most vulnerable to the damaging influence of chronic stress of the sort Mr. Lawrence experienced throughout his childhood.

Such an expert could also have explained how trauma had a serious effect on Mr. Lawrence's ability to regulate his emotions. Traumatized people struggle with periods of too much emotion (e.g., overwhelming floods of anger, fear, grief, despair, shame) as well as periods

of too little emotion (e.g., the absence of certain expected feelings, numbness, an inability to access and express their feelings). Exposure to trauma causes a person to fundamentally alter how he perceives reality and how he thinks about himself, other people, and future aspirations. This problem is compounded when a young person has no adult caregiver to help explain difficult events or navigate complex emotional shoals. As explained in other sections herein, Mr. Lawrence, unfortunately, had no such consistent, functional caregiver.

As an expert could have explained to the jury, when the meaning of an event is too confusing to reconcile, or the emotions so intense that they cannot be approached and processed effectively, recovery from trauma tends to stall, leading to long-term impairment. Meaningful social support is critical to recovery from traumatic events. When one has to deal with trauma by one's self, without such meaningful support, traumatized people tend to develop narrow, flawed schemas (or neurological blueprints) that in turn lead to dysfunctional behavior.

The violence Mr. Lawrence was exposed to as a child had a particularly deleterious impact on his development because he was already impaired:

> Exposure to neighborhood and personal violence has well-known developmental and behavioral consequences that persist without treatment and support…
>
> As noted briefly above, Mr. Lawrence's social history points to an exceptional amount of exposure to violence, witnessed and experienced personally. During my clinical interview, I observed the flattened affect and emotional dysregulation which is common in people who have been exposed to repeated episodes of violence. Mr. Lawrence observed a number of extraordinary events (the decapitation of a friend and many beatings and shootings)…These experiences have resulted in lifelong symptoms, including dissociative states. These affective states, which result from exposure to violence and trauma, have been shown in the research literature to influence the developmental course and lifelong behavior adaptability.

Exh. 3 at 5, 13, 14.

1. During childhood, Mr. Lawrence lacked the supports that might have ameliorated the effects of his brain dysfunction.

Had trial counsel consulted an appropriately qualified expert and adequately investigated Mr. Lawrence's background, the jury would have understood the effects the neglect and abandonment Daryl Lawrence lived through had on his damaged brain and that neurologist Dr. Nadkarni observed firsthand in his neurological examination.

Mr. Lawrence's counsel had Dr. Cunningham tell the jury about "protective factors" but limited that testimony to the context of whether those factors "reduce the likelihood of criminally violent outcome." TT V 16 at 120. Even though Mr. Lawrence was eventually taken in by his loving adoptive parents, he experienced real neglect throughout his childhood. The jury heard little about it. Shortly after Mr. Lawrence's birth, he was taken from his biological mother and placed in the care of his 23-year-old maternal aunt, Florencia Walker. Ms. Walker was living on public assistance and was already caring for her own three children, aged four, three and one, and was six-months pregnant with another. She also often had responsibility for two of Leondra Lawrence's other children. Ms. Walker also likely struggled with untreated mental illness at the time, although she was not officially diagnosed with bipolar disorder until years later. Exh. 9 at ¶ 29. It would have been difficult for any young pregnant woman with a mood disorder with five other children under foot to care for a newborn under these circumstances, let alone to care for a child who barely slept, was in extreme pain, and had constant need of comfort, attention, and special care. The burden on this young woman was beyond Ms. Walker's ability to handle. She reports that she "nearly lost her mind trying to care for Daryl," that she begged God to give her ten minutes of sleep, cried constantly, and felt overwhelmed. *Id.* As a result, this placement, which may have sounded fortunate for Mr. Lawrence on paper, was in fact a further assault on his damaged nervous system. The inadequacy of Ms. Walker's care, coupled with the extreme

physiological needs, deprived newborn Daryl of the support he required to heal or thrive, and instead intensified the effects of his damaged brain. After about two months, Ms. Walker could no longer handle the situation and passed Mr. Lawrence off to other family members. *Id*.

Although neglect is often thought of as a result of loveless caregivers, this is not always the case. Well-intentioned and loving caregivers can also be neglectful, simply by lacking the intellectual or emotional ability to provide for the needs of a child. Although Dr. Cunningham suggested at trial that Eileen Lopez was overwhelmed and not a great disciplinarian, TT V 16 at 114, 123, 175-76, 177-78, readily available evidence existed demonstrating that the two primary adults in the home where Mr. Lawrence grew up—Eileen and Aleta Lopez—actually had seriously impairments. This context relating to Mr. Lawrence's home environment would have helped the jury understand that Mr. Lawrence was not just "too much" for his kind, elderly adoptive mother, but that her own lifetime impairments left her unable to meet the demands of caring for a child whose brain damage required extra support for him to successfully manage the world, at home, at school, and in the community.

Eileen Lopez had endured incredible adversity in her life. She became a mother at age eighteen, raised seven children, sometimes alone, worked multiple jobs to make ends meet, and lived through a tumultuous, traumatic, and complicated relationship with her late husband without support from her parents or siblings. Mrs. Lopez is also intellectually and adaptively limited, and her deficits had consequences for her children and Mr. Lawrence. Placed in a special school due to her disability during her childhood, Mrs. Lopez has always had great difficulty reading and writing, and depended heavily on her children to take care of the household and themselves when they were growing up:

> Before Daryl was born, I was basically a single mom taking care of seven children. I needed to work to support my family because my husband was an

> alcoholic and he couldn't hold a job when he lived at home. I had my first child when I was eighteen years old. My children helped me take care of things in the house. I was working more than one job. I worked a lot of factory jobs because they paid the most. I was on welfare from time to time but I wanted to work. I depended a lot on my daughters, Aleta and Alana. They were the oldest of my kids. I needed them to take care of my other children while I worked. I did not have a choice. I left the children at home with coloring books, paper dolls, or whatever I could find for them while I was gone. My children knew not to leave the house. Aleta and Alana took care of things. Exh. 11 at ¶4.
>
> I have always had a hard time reading and writing. When I was around ten years old doctors told my mother I needed to go to a special school. I couldn't get up with all my grades; I was too far behind. My sisters were smarter than I was. The school was downtown off of 3rd St. I didn't stay in that school very long. My mother took me out and she helped me at home. I went back to school in junior high school, but I stopped again because they did not have any classes for slower kids like me. I never graduated high school.

*Id.* at ¶6.

As her eldest daughter, Alana Robinson, who could have testified about Mrs. Lopez's limitations and the impact they had on her own life, has explained:

> [My mother] has told me about how when she was a child, her classmates and older family members picked on her and called her stupid. Her mom and sisters used to tease her because she was slow. Mom resorted to fighting or just avoiding school activities.
>
> My mother struggled with basic reading and math. Dating back to when I was in elementary school, she couldn't help me with schoolwork and I was left to do much of it on my own. It was the same for my siblings and for Daryl.
>
> My mother learned things by watching what other people did or someone showing her how to do something because she couldn't read well. If you showed her how to do something, she would have a better chance of being able to figure it out. She could cook, bake, and can vegetables but she did not read books. She got her first checkbook when she was sixty-five years old and me or my siblings have always managed her checking account for her. Before that she paid for everything in cash. I remember her once getting pick-pocketed because she was carrying all her money in one envelope in her coat pocket. This was right around the Christmas season and we didn't have a holiday that year because the Christmas money was stolen. I paid my mother's car insurance and handled all of the registration requirements and fees, not just because she didn't have money for them, but because it was easier than having her try to handle it. When bills needed to be paid, my mother went directly to an office to pay. Over time, I assumed responsibility for several of her major monthly bills – like her insurance and

> mortgage payments – to ensure they would be paid on time. My mother had difficulty budgeting for household needs like food. For example, back when I lived with her, there were times she sent me to the store with one dollar and expected me to return with enough food to feed seven children. I did the best I could but we ate a lot of tomato paste and rice, and bologna growing up.
>
> When I was thirteen or fourteen years old, my mother started making me go to important appointments and meetings with her so that I could listen and explain things to her again once we got home. After one of my parents' separations (there were several), she made me come with her to doctor appointments so I could listen to what the doctor had to say and explain it to her later. This included at least one time when the doctor diagnosed my mother with a serious but embarrassing problem that I had to explain to her when we got home. I remember her bringing me to a meeting with my younger brother Ricky's school psychologist when he was doing poorly in the second or third grade…
>
> Aleta and I were responsible for cooking, cleaning, and doing just about everything for our younger siblings. I got my first job at fourteen in order to help support the family and also earn a little extra money to buy clothes. Years later, after I had my own family and was financially secure, I was on vacation in Mexico and I saw a family of five children walking around town. They were just like we were in those early years—the oldest child was in the front managing the group with no parents around. Seeing that family reminded me of how me and my brothers and sisters were when we were children. That pattern continued when Daryl came to live with us, except by then, those of us who had the ability to be independent had left home, gotten jobs, and started families.

Exh. 10 at ¶¶ 14-16, 18-19.

Mrs. Lopez's impairments also meant that, throughout his developmental years, Mr. Lawrence had no one to help him with his homework or to advocate for him when he was punished in school for "acting out." As Alana Robinson put it:

> My mother just did not get it when it came to Daryl's difficulties in school—she couldn't help him with his homework and she couldn't push the school administrations to help him… Compared to how my mother did in school, she thought Daryl was not doing poorly.

Exh. 10 at ¶¶ 14, 18.

Neglected children routinely have experiences that are emotionally and cognitively overwhelming but have no adult to provide the necessary emotional support or cognitive understanding of the experience. This leaves the child with feelings of terror, helplessness and

abandonment and nowhere to turn for comfort or explanation. Notwithstanding her love for him, Mrs. Lopez was not intellectually or physically equipped to meet the needs of a brain-damaged child like Mr. Lawrence. *See* Exh. 3 at 12 (noting that Mr. Lawrence's caregivers never identified him as suffering the effects of TBI and "therefore never provided him with appropriate treatment and intervention").

Mr. Lawrence also grew up in the care of Mrs. Lopez's daughter, Aleta, who has struggled with severe mental illness for decades and has been in and out of hospitals, including Ohio State Wexner University Medical Center, Twin Valley Behavioral Healthcare Hospital, Riverside Methodist Hospital among others. Trial counsel never obtained these records although they were available. Those records, including probate and medical records, chronicled a rich history of her severe mental illness. Exh. 28-29. Aleta Lopez was a risk to herself and others, physically aggressive towards her mother, Mr. Lawrence, and others, and acutely manic at times.

Family members vividly describe symptoms of Aleta Lopez's mental illness. Alana Robinson, one of Aleta's sisters, recalled:

> Aleta stole things from our mother's house like jewelry or bed sheets. When Aleta came for a visit and brought an empty duffel bag with her, everyone knew to watch his or her belongings. Aleta was also violent towards my mother. Aleta heard voices. She heard the voices of different spirits commanding her to do things and she believed spirits were living in the house. She had a fascination with pyramids and believed if you put a glass of water on the mantle it would keep evil spirits away. She tried to convince me to leave a glass of water out around my house. Aleta's behavior scared my children and it scared Daryl. She was unpredictable, and the kids never knew when she might turn on them.

Exh. 10 at ¶42.

Mr. Lawrence's childhood with Aleta was an unrelenting nightmare:

> Aleta, who has suffered a lot of mental breakdowns over the years and still lives with mental illness, lived at the Winner Avenue house with Daryl and my mother. Daryl was on the receiving end of a lot of her cruelty. She said mean and nasty things to him. Aleta called Daryl a "crack baby" and told him his mother was on drugs. Aleta also told Daryl, "You're not my mom's son." Aleta blamed Daryl for

> breaking or stealing things. Sometimes when she was in the middle of one of her episodes she would give household items away, and when she was called out on it, she would say Daryl took it. Things like this happened to Daryl almost every single day they lived together.

Exh. 10 at ¶41.

Trial counsel never elicited history like this from Mr. Lawrence's family members. Nor did they obtain readily available medical records that contain similar accounts:

> According to [Aleta's] mother and brother in recent weeks she has been hearing voices. She is yelling at people that aren't there. She sometimes has been incontinent of urine and her self care has diminished. She has lost a good deal of weight in the past year or so. She has been religiously preoccupied. She has felt that she was a religious prophet. She reportedly intentionally bumping into a man at church causing him to fall down the steps. She reportedly has written bad checks. She has been bothering neighbors by cleaning and being up at night. They have called the police because of her behavior.
>
> It's also reported that she was aggressive toward the Netcare pre-screener. She has been delusional saying that she has a job when she doesn't. She has been wandering the streets at night. At Netcare she was talking incessantly. She required restraints because she wanted to leave and was physically combative.

Exh. 28 at 13.

An expert could have explained how trauma and neglect, particularly when they occur in childhood or over a long period of time as was the case with Mr. Lawrence, are unique in their potential to change and damage the major systems necessary to human functioning: they disrupt how people manage and interpret emotions, leading to impulsivity and depression; they change and narrow how people process information, leading to distortions in how they interpret and respond to experience; and they alter the brain and the physiological systems that control human responses to threat, creating problems with emotional self-regulation, impulsivity, perception, planning, and memory.

Moreover, severe childhood developmental trauma, such as Mr. Lawrence experienced, is clinically different from trauma people experience as adults.

> Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. For example, Pittman (1995) showed that people who developed PTSD secondary to child abuse had more profound physiological dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults.

Van Der Kolk, B., *Traumatic Stress: The Effects of Overwhelming Experience on Mind, Body, and Society*, 184-185 (Guilford Press, 1996).

An expert could have explained to Mr. Lawrence's jury that repeated trauma that occurs during childhood, often referred to as "complex trauma," is one of the most consistently damaging influences a child can endure.

Another feature of trauma was critical to understanding Daryl Lawrence. Unfortunately, no one on his defense team recognized it, and therefore the jury never heard about it. As a trauma expert could have explained, it is often difficult, both for victims of traumatic experiences and for observers who are not specifically trained, to discern the damage that results from complex trauma because the harm is woven into the individual's self (i.e., his basic biology, neurological pathways, characteristic emotional responses and habitual ways of functioning). As such, the results of exposure to trauma and neglect can look like an inherent part of an individual's personality, rather than the pathological outcome of exposure to damaging life circumstances.

With the testimony of a trauma expert, the jury could have understood that distorted patterns of thought and perception may well be active and observable under stressful or traumatic conditions but may be relatively quiet and undetectable in less stressful conditions. Thus, in calm settings where danger is not apparent, a person suffering from complex trauma like Mr. Lawrence might show no clearly observable symptoms. Yet, as an expert would have explained, in conditions that are or feel similar to the conditions which caused (or retrigger) the trauma, higher-order thinking takes a backseat to automatic responses. Thus, an expert in trauma could

have explained to the jury how in situations where Mr. Lawrence perceived threat, for example, his traumatic experiences would skew the way he saw or reacted to things.

Testimony from a medical or trauma expert would have given the jury a very different and far more complete picture of who Daryl Lawrence is, rather than the distorted portrait the prosecution painted of an intact, greedy person who simply turned away from available opportunities and toward a life of crime.

**B. Mr. Lawrence's Trial Counsel Missed Readily Available Evidence of Brain Damage.**

Although Mr. Lawrence's lawyers worked hard on his case, they failed to ensure that they had enough time to properly investigate potential mitigation. As pled elsewhere, s*ee* Claims 3 and 6, *infra*, Mr. Lawrence's case proceeded to trial thirteen months after counsel were appointed and Mr. Lawrence also lost nearly a month of that time when his initially-appointed lawyer withdrew. This compressed time was also exacerbated by trial counsel's numerous other commitments in other serious criminal cases, including at least two other capital ones. The defense team's mitigation specialist did no work on Mr. Lawrence's case for many months of that pretrial year, forcing attorney Diane Menashe to don the hat of mitigation specialist while also working to prepare many other parts of the case.

During this stressful time, counsel unfortunately overlooked numerous red flags in the records they collected and failed to collect other relevant records that would have signaled the need to consult with a medical doctor, the one type of expert who could have detected Mr. Lawrence's PV and brain damage. They rushed interviews with Mr. Lawrence's family members, conducting most of them in the weeks leading up to trial rather than spending the necessary time developing those relationships. As mentioned previously, these witnesses could have provided information about aspects of Mr. Lawrence's social history which would have

corroborated and explained his brain damage and trauma, including the root causes, signs and symptoms of Mr. Lawrence's impairments. Given that brain damage is uniquely mitigating, trial counsel's failures to detect it in Mr. Lawrence, despite readily available signs, were particularly inexcusable:

> ...where there are credible, reasonably discernable clues that a capital defendant's circumstances will support a mitigation theory based on organic brain damage, it is at the core of a defense counsel's constitutional responsibilities to conduct a reasonable investigation into the existence of evidence to validate or bolster such a theory and, ordinarily, to present such evidence to the jury, if it is found. Given the powerful mitigative effect of such evidence, reasonably competent counsel would not have settled for *some* mitigation case based on mental-health evidence such as presented here, regarding largely behavioral abnormalities, if the organic-brain-damage option was available; not only is this behavioral-abnormality evidence different in kind from evidence concerning organic brain damage, but, critically, in most instances it also will be of significantly lesser mitigative value.

*Littlejohn v. Trammell,* 704 F.3d 817, 860 n. 23 (10th Cir. 2013).

1. Trial counsel failed to recognize red flags relating to Mr. Lawrence's brain damage and trauma in records they obtained.

Trial counsel overlooked significant red flags in the records they obtained, which indicated a need for further investigation relating to brain damage and trauma. Children's Hospital Records document years of medical issues during Mr. Lawrence's childhood and adolescence. Although trial counsel noted a hospital visit reporting an early head injury, they appear to have overlooked other medical issues that demanded closer scrutiny, including persistent headaches, childhood hypertension, and nosebleeds so severe they necessitated trips to the emergency ward. Exh. 54. Mr. Lawrence's school records are also full of leads signaling the need for further investigation, which corroborate lay witness accounts of Mr. Lawrence's behavior and functioning, and indicate myriad academic and behavioral problems, including weeks of absences from school—usually a cardinal sign of trauma or neglect. These school records also documented head injuries. Exh. 113.

2. Trial counsel failed to obtain readily available records relating to Mr. Lawrence's brain damage and trauma.

Trial counsel failed to obtain readily available records relating to Mr. Lawrence's brain damage and trauma. As discussed elsewhere herein, *see* Claim 6 *infra*, trial counsel requested only a limited set of records for Mr. Lawrence, and appears to have confined their efforts to collecting records about family members almost exclusively to those that documented their criminality.

As a result, they missed documented evidence of serious mental illness among family members, including Mr. Lawrence's biological mother, maternal aunt, and maternal grandmother. Social service and probation records documenting evidence of Leondra Lawrence's mental illness were critical to understanding damaging influences—maternal distress and mental illness—Mr. Lawrence was exposed to at, and prior to, birth. As mentioned previously, these readily available records showed Leondra Lawrence had been afflicted with psychosis, had been prescribed antidepressants and psychotropic medications, and tried to commit suicide. Exh. 30, 31. There were also readily available records documenting the diagnoses and symptoms of serious mental illness among Mr. Lawrence's other family members, including his maternal aunt, Florencia Walker, and maternal grandmother, Florence Perkins, which would have verified the evidence of mental illness in the family and which highlighted Mr. Lawrence's genetic predispositions and could have explained some of his own symptoms. *See* Exh. 3 at 13 ("Mr. Lawrence was at high risk to develop a major psychiatric disorder, as a number of close family members have been diagnosed with conditions which have a high genetic load and aggregate in families…the pattern of functional impairment and serious symptoms of psychiatric and neurological disorder are present in Mr. Lawrence."); *id.* ("Mr. Lawrence has a long history of behavioral symptoms which include mood lability (sustained depression and brief

periods of elevated mood); hypomania or mania (binges of spending, gambling, heightened sexuality and exuberance); prolonged anxiety states; and periods of self-injurious and reckless risk-taking. These symptoms are consistent with a psychiatric illness such as a major mood disorder.”).

Counsel also failed to collect available records relating to Mr. Lawrence’s caregivers’ impairments. These records were important for understanding the absence of protective factors in Mr. Lawrence’s home life. Records pertaining to one of those caregivers, Aleta Lopez, for example, documented her struggles with severe mental illness and her physical aggressiveness towards her mother. Exh. 28, 29.

3. Trial counsel’s approach to witness interviews failed to elicit critical evidence of Mr. Lawrence’s impairments and the factors contributing to them.

On the eve of trial, the consequences of counsel’s failure to properly interview potential mitigation witnesses should have been evident. Counsel had not built rapport with family members; had not gathered important social history data; and had not retained appropriate experts. The trial team’s failure to properly interview potential mitigation witnesses was evident in the abbreviated, shallow lay witness trial testimony. *See* Exh. 1 at ¶¶ 31-32, 46-51, 134-35, 139. Had counsel taken an approach to interviewing Mr. Lawrence’s family members in line with prevailing professional norms, with a consistently available skilled mitigation specialist, in person, and in appropriate settings such as their homes, they could have collected social history relevant to Mr. Lawrence’s impairments and functioning that were necessary to an accurate and reliable evaluation by appropriate experts. They also could have presented credible, compelling testimony both to support expert findings and to present evidence of Mr. Lawrence’s brain damage and traumatic life experiences.

The men and women who lived with and around Mr. Lawrence during his childhood—Alana Robinson, Florencia Walker, Eileen Brown, Eileen Lopez, Kim Moore, and others—were witnesses to his agonizing first few months of life and could have provided rich detail to validate expert opinions relevant to brain damage and exposure to trauma from his earliest days. These family members and others, such as his cousins Kevin Robinson and Bonita Valdes, witnessed the ways Mr. Lawrence's impairments looked in his day-to-day existence and how his impairments set him apart from peers—in the classroom, on the job, and in his neighborhood. Former girlfriends saw his capacity to love, and could have attested to the problems he had functioning normally as an adult, facts that would have been relevant both to the experts and to the jurors. Many of Mr. Lawrence's family members the defense team cursorily interviewed, including those mentioned above, as well as Dwight Lopez and Ricco Lawrence, were witnesses to the mental illness afflicting members of Mr. Lawrence's extended family.

4. Mr. Lawrence's lawyers failed to consult with necessary experts, including a medical doctor who could have discovered Mr. Lawrence's brain damage and an expert in trauma.

There were two experts indispensable to an accurate evaluation of Daryl Lawrence's culpability: a medical doctor and a trauma expert. As noted previously, because Mr. Lawrence's lawyers failed to consult with a trauma expert, Mr. Lawrence's jurors heard nothing of the effects of complex trauma on his functioning and behavior, including at the time of the offense. Jurors also remained ignorant of major medical problems that damaged his brain. As a result, jurors learned nothing of the behavioral effects of these insults: they distorted Mr. Lawrence's ability to perceive unexpected events as they unfolded and impaired his judgment; and they harmed his ability to make sound decisions and to control his impulses.

As noted previously, counsel also failed to heed multiple red flags in Mr. Lawrence's social history and medical records that he had been exposed *in utero* to alcohol and drugs, had suffered a number of head injuries, experienced high blood pressure as a child, and had nosebleeds and headaches requiring medical attention. The very fact that Mr. Lawrence had sustained injuries during the instant offense, and required medical treatment at the time of his police interrogation, should have caused trial counsel to move for funding for or hire a medical doctor to evaluate Mr. Lawrence and review his medical records. Exh. 1 at ¶ 141.

5. Trial counsel themselves failed to recognize signs of trauma, another factor that damaged Mr. Lawrence's brain and affected his behavior in profound ways.

Numerous facts signaled that Mr. Lawrence was subjected to trauma from his earliest days, beginning literally during gestation and extending through his childhood. Much of this evidence included unthinkable acts of violence in the neighborhoods and streets in which Daryl Lawrence spent his formative years.

The defense recognized that the violence to which Mr. Lawrence was exposed had significance: in her opening statement, Ms. Menashe told the jurors, "if you drove through the neighborhood where Daryl grew up, you would drive through and wouldn't stop and get out. And that's just the reality." TT V 13 at 135. Nevertheless, trial counsel [redacted] *cf.* [redacted] and therefore depended exclusively on Dr. Cunningham's passing reference to community violence on his laundry list of risk factors. In addition, although trial counsel apparently collected limited crime statistics from the mid-1990s to the mid-2000s for one of the areas in which Mr. Lawrence lived, they failed to investigate and present evidence to jurors about the high level of violence occurring in the neighborhoods in

which Mr. Lawrence grew up and to which he was routinely exposed as a child, one of the factors that compounded the effects of his brain damage.

Trial counsel also failed to develop meaningful evidence of Mr. Lawrence's dire poverty and its effect on him in the context of his brain damage. In her opening statement at the penalty phase proceedings, Ms. Menashe told jurors that soon after he was born, Mr. Lawrence was shuffled from place to place and grew up in "pure and utter poverty." TT V 13 at 128. She promised jurors they would hear about this pervasive poverty. TT V 13 at 130. They did not, however, put this evidence into a context that would have shown how the poverty in which he grew up exacerbated his neurological and psychological symptoms and left him without adequate support that would have ameliorated them and given him a fighting chance at a normal life. *See* Exh. 3 at 13-14.

6. Trial counsel failed to provide Dr. Stinson with critical records relating to brain damage.

Trial counsel did retain the pretrial services of psychologist, Dr. Bob Stinson, Ph.D., but never supplied him with a complete set of the records they had obtained. As a result, Dr. Stinson was not in a position to notice red flags that would have enabled him to provide counsel with the expert advice they needed. Although trial counsel provided Dr. Stinson with some of Mr. Lawrence's educational, medical, and employment records, they inexplicably neglected to provide him with at least one set of medical records from Children's Hospital that was replete with notations about head injuries and medical conditions that Mr. Lawrence exhibited repeatedly in childhood.

The records from Children's Hospital indicated an unusual constellation of symptoms – childhood hypertension, headaches, and nosebleeds – of what was later diagnosed as a serious medical disorder. These records also documented head injuries he suffered. While the defense

team were in possession of these records as of May 31, 2005, Exh. 21, they failed to share them with their expert, either at a subsequent and final meeting with him on October 24, 2005 or at any other time. Exh. 2 at ¶¶ 9-10. This failure fell well below the standard of representation that they should have provided, Exh. 1 at ¶ 141, and this failure prejudiced Mr. Lawrence. Had Dr. Stinson had these records, he would have recommended that counsel retain a medical doctor and consider a full neurological workup of Mr. Lawrence, assessments that are outside his area of expertise. Exh. 2 at ¶ 15-16.

Mr. Lawrence's trial team unfortunately missed a number of opportunities to discover his brain damage, by failing to:

- conduct appropriate social history interviews;
- notice red flags in the records they had;
- collect multigenerational medical and social services records;
- provide at least one expert with all the records he would need to do the job they hired him to do;
- recognize the need to hire a medical doctor;
- and discover readily available evidence of the multiple factors that conspired to damage Mr. Lawrence's brain and leave him severely impaired in a number of areas relevant to his conduct leading up to and during the instant offense.

These errors fell below prevailing capital defense representation standards and prejudiced the outcome of Mr. Lawrence's trial.

### C. Trial Counsel's Failure to Investigate and Present Evidence of Mr. Lawrence's Brain Damage and Trauma Prejudiced Him.

#### 1. Mr. Lawrence's brain damage and traumatic life experiences were the most powerful mitigation defense counsel could have presented.

Had trial counsel investigated and presented evidence of Mr. Lawrence's lifelong brain dysfunction, neurocognitive deficits, and trauma, the entire defense mitigation presentation

would have looked markedly different. Jurors would have had the opportunity to assess Mr. Lawrence's moral culpability in the context of his brain damage which is, as courts have acknowledged, among the most powerful types of mitigating evidence available. *Littlejohn v. Trammell*, 704 F.3d 817, 865 (10th Cir. 2013). Moreover, if the jury could have viewed the evidence of the violence he experienced at home and in the streets, the impairments of his caregivers, and the privation he endured in conjunction with his brain injuries, there is a reasonable probability that at least one juror would have found that his background and circumstances weighed in favor of sparing Mr. Lawrence's life.

*a. Mr. Lawrence's actions inside the bank*

Probably the most contested issue in this case – not just at the guilt/innocence phase, but at every step in this capital prosecution – was Mr. Lawrence's level of intent at the time of the shooting. Had the jurors been informed that Mr. Lawrence has brain damage, they would have had a different context available to them in which to consider his actions in the Fifth Third Bank on January 6, 2005. Especially when considered in conjunction with the new facts relating to the attempted robbery that have been developed in postconviction, *see* Claim 2, *infra,* information about Mr. Lawrence's compromised executive functioning, which affected his ability to control his impulses, make sound decisions and reasonably assess unexpected circumstances, may very well have made the difference, for at least one juror, between life imprisonment and death. *See United States v. Lawrence*, 555 F. 3d 254, 266 (6th Cir. 2009) (Sixth Circuit finding likely and reasonable that jury considered mens rea element critical in choosing death).

*b. Dr. Elijah Anderson's testimony*

To the extent that Dr. Elijah Anderson's testimony might have played any role in a mitigation presentation that centered on Mr. Lawrence's brain impairments and chronic trauma, jurors could have examined it in a new light as well. Dr. Anderson discussed the inner-city

crime and violence that limited legitimate economic opportunities for African-American boys and men in urban neighborhoods around the country. With this new information about his medical limitations, the jury might have understood that Daryl Lawrence had unique impairments which set him apart from disadvantaged but higher-functioning peers. Jurors did not, however, have an opportunity to consider Dr. Anderson's testimony about poverty, opportunity, and role models in the context of Mr. Lawrence's PV and other neurological and cognitive challenges. With this new evidence, the jury would have been able to apply Dr. Anderson's broad and general testimony more directly to Mr. Lawrence himself and recognize that there was good reason that the role models and private school education the prosecution emphasized in its cross-examination of Dr. Anderson would not have provided the same recipe for success for Mr. Lawrence, who was brain-damaged, as they might for a disadvantaged but intact child. *See* Exh. 1 at ¶ 35 ("Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same environment turn out differently.").

*c. Dr. Mark Cunningham's presentation*

As noted previously, Dr. Cunningham was the main witness at Mr. Lawrence's penalty phase. He was presented as the final witness who would connect seemingly disparate pieces from Mr. Lawrence's life and explain to the jury how Mr. Lawrence ended up before them. TT V 16 at 96-97. Unfortunately, because Dr. Cunningham's testimony lacked solid evidentiary support, it was eviscerated by the Government and rejected by the jury that sentenced Mr. Lawrence to die. Had the defense discovered evidence of Mr. Lawrence's brain damage, what the jurors heard from Dr. Cunningham and how they would have understood Mr. Lawrence would have been very different.

Without evidence of brain damage, the defense approach was to use Dr. Cunningham to plug what evidence they had about Mr. Lawrence's life into a template of "risk factors" that Dr. Cunningham would describe as predictive of criminality. *Id*. at 105-06. Rather than attempt to discover if any of Mr. Lawrence's behaviors (such as impulsivity) might be attributable even in part to underlying physiological illness or defect, the model the lawyer asked Dr. Cunningham to present to the jury merely catalogued behavior in an attempt to show that that particular collection of behaviors demonstrated a "likelihood of delinquency and violence." *Id*. at 107. Among other things, this approach failed to explain Mr. Lawrence as a unique individual with diverse frailties; rather, it simply told the jury that a person with similar behavioral characteristics would be likely to be maladaptive, delinquent, and violent.

Had defense counsel known and presented evidence about Mr. Lawrence's brain impairment, the jury's understanding of Mr. Lawrence would have been radically altered. The recent Tenth Circuit opinion in *Littlejohn v. Trammell*, 704 F.3d 817, 865 (10th Cir. 2013) is instructive. In *Littlejohn*, just as here, postconviction counsel consulted a neurologist who discovered evidence of brain damage that had been missed at trial. In examining the *Strickland* claim, the circuit court noted that trial counsel hired a Ph.D., Dr. Draper, who had degrees in child development and genetic epistemology, and presented a mitigation case. *Id.* at 861. At trial, Dr. Draper:

> presented a socio-psychological report on Mr. Littlejohn, concluding essentially that his development "stifled around age ten,"[ ] and that, while he understood the difference between right and wrong, he lacked "sensitivity" to it [ ]. Further, evidence was offered detailing various aspects of Mr. Littlejohn's "troubled" childhood, including testimony indicating that he "had difficulty making friends and knowing appropriate boundaries," [ ], and that he had a rough home life, [ ].
>
> Furthermore, the jury heard testimony suggesting that Mr. Littlejohn's mother used narcotics during the duration of her pregnancy with him. [ ] Indeed, his mother, Ceily Mason, opined that he "had to be ruined from the womb ... [because

> she] took so much dope till ... [she] delivered, [she] didn't even know [she] delivered till the next day." [ ] Dr. Draper talked about the effect of a mother's substance abuse on a fetus. [ ] (noting that substance abuse "is considered to be a very significant intrusion on the development of the fetus").

*Id*. (internal citations omitted).

Despite the fact that the jury heard this evidence, the Tenth Circuit reversed the district court's denial of relief specifically because of the unique mitigating nature of brain damage. The Tenth Circuit also rejected the suggestion that the new evidence was cumulative of the trial expert's testimony:

> Dr. Draper did testify regarding the "very significant intrusion," [ ] on fetal development that could have been caused by the drug abuse of Mr. Littlejohn's mother. This testimony suggested the possibility that Mr. Littlejohn suffered physical brain damage—a possibility that we have noted *supra* that reasonably competent counsel would have investigated. And her testimony bears slight superficial resemblance to some of [the postconviction neurologist] Dr. Saint Martin's declaration averments regarding the implications for Mr. Littlejohn of the substance abuse of his mother. *However, it is critical to note that Dr. Draper did not offer any opinion regarding whether Mr. Littlejohn in fact suffered pre-natal brain injuries and, indeed, she would not have been equipped to do so. Dr. Draper was not a psychiatrist—like Dr. Saint Martin—or any other type of physician, for that matter. Therefore, she could not offer the jury any reliable and persuasive evidence on the question of whether Mr. Littlejohn suffered from an organic brain injury that could adversely affect his behavior*.

*Id*. at 865-66 (emphasis added). Absent evidence about his conduct being related to physical causes that were treatable, the prosecution was able to argue that Mr. Littlejohn was "violent" and "always [has] been." The prosecutor was also able to belittle what evidence was presented: "Does the fact that he was born to a drug addicted mother in some way reduce his accountability for his actions in 1992[?]" *Id.*

The jury in Mr. Lawrence's case was expected to decide his fate based on a markedly similar picture. As has been discussed elsewhere in this motion, Mr. Lawrence was portrayed as someone who had been irretrievably corrupted by his troubled home life, his violent community and his mother's substance abuse. As the Government told the jury in closing, "The Doctor

seemed to suggest that the defendant was almost predestined to kill, again, because of this litany of things claimed in his background." TT V 17 at 11-12. Dr. Cunningham also opined that Mr. Lawrence had ADHD and suggested as well a personality disorder such as antisocial personality disorder or "personality-related maladjustment criminality issues." TT V 16 at 154-57.

Evidence that Mr. Lawrence has physiological brain damage would have undermined that testimony and presented the jury with a different view of Mr. Lawrence in two important ways. First, the finding of brain damage undercuts Dr. Cunningham's implication that Mr. Lawrence has a personality disorder or ADHD. As neurologist Dr. Nadkarni states, the effects of a brain injury "can often be misdiagnosed as ADHD or certain types of behavioral problems." Exh. 3 at 12. Moreover, the Diagnostic and Statistical Manual, Fourth Edition (the edition of the DSM that Dr. Cunningham referred to in his testimony, TT V 16 at 253), explicitly rules out diagnosis of a personality disorder when the behavior is due to "a general medical condition (e.g. head trauma)." *Id*. at 633.

More importantly, the evidence of Mr. Lawrence's brain damage would have challenged the assumption that Mr. Lawrence would always be violent. The picture of Mr. Lawrence that Dr. Cunningham's testimony put before the jury was essentially as the Government told the jury: he was predestined to be violent. Evidence of brain damage shows this prediction of future violence to be false because although brain damage is irreparable, it is treatable. As the *Littlejohn* court wrote:

> [E]vidence [of brain damage] could have been used to powerful mitigating effect, indicating that Mr. Littlejohn's criminal past is a product of a physical condition that is treatable, such that his criminal past is not an accurate predictor of his future. That is, it could have indicated to a jury that Mr. Littlejohn was not a continuing threat. *See Victor Hooks,* 689 F.3d at 1205 ("Diagnoses of specific mental illnesses ..., which are associated with abnormalities of the brain and can be treated with appropriate medication, are likely to [be] regarded by a jury as more mitigating than generalized personality disorders...." (alterations in original)

> (quoting *Wilson*, 536 F.3d at 1094) (internal quotation marks omitted)); *cf. Gilson v. Sirmons*, 520 F.3d 1196, 1249–50 (10th Cir.2008) (holding that evidence of organic brain disorder—seemingly with no evidence as to possible treatment—would not have altered the jury's prejudice analysis because the "presentation of th[e] evidence would likely have weighed against [the petitioner] by erasing any lingering doubts that may have existed as to his role in [the underlying] murder, and by confirming the jury's conclusion that he represented a continuing threat, even if confined in prison for life").

*Littlejohn*, 704 F.3d at 33-34.

2. Evidence of Mr. Lawrence's brain damage and traumatic life experiences would have significantly undermined the Government's case against him.

The Government's efforts to secure a death sentence for Mr. Lawrence were based on showing jurors, at every stage of the proceedings, that he acted with and made deliberate "choices" that established his extreme culpability. The *Littlejohn* decision is instructive here as well about the power of the mitigating evidence trial counsel failed to discover. Without the evidence of brain damage at trial:

> [T]he prosecution was able to frame the mitigation defense as a mere collection of the social circumstances of Mr. Littlejohn's upbringing—circumstances that, while unfortunate, do not excuse murder. In this regard, the prosecutor stated, "It is unfortunate that children are raised in [rough] environment[s], but it doesn't make them killers. Choices make people killers."

*Littlejohn*, 704 F.3d at 864-65.

In Mr. Lawrence's case, prosecutors assembled a narrative of events inside the Fifth Third Bank in which Mr. Lawrence, upon entering the bank and encountering Officer Hurst, made a calculated move to charge towards the officer and shoot him at point-blank range while he was in a defenseless crouching position behind his security station. In both the eligibility and sentencing phases of the proceeding, the Government emphasized aspects of Mr. Lawrence's "choices" and his character, and, by design, painted a portrait of the defendant as nothing more than a greedy menace to society who wanted easy money, squandered good opportunities, and

turned his back on a family who, despite difficult circumstances, loved and cared for him. The Government also used evidence of Officer Hurst's hardscrabble background to further aggravate, in a comparative light, the picture of Mr. Lawrence. These were the pillars of the Government's case for the death penalty, and each of them would have been significantly undermined with evidence of Mr. Lawrence's lifelong impairments. The evidence of brain damage would have unsettled the whole foundation of the Government's case.

*a. "Choice" and character*

The Government's entire presentation focused extensively on volition, and the decisions Mr. Lawrence made, inside the bank when he saw Officer Hurst, and effectively throughout his adult life.

According to the Government, Mr. Lawrence was a man in control, who, upon encountering Officer Hurst, made a deliberate, premeditated decision to charge the officer instead of fleeing to avoid the encounter. TT V 10 at 27, 30; V 12 at 9, 17-18, 20. According to the Government, Mr. Lawrence was going to get to the money in the vault any way he could, and there was a moment in time when Mr. Lawrence decided, "I need to kill this police officer in order to get to the vault because he's the only thing between me and the money." TT V 10 at 29-30. At one point in closing arguments at the guilt phase of the trial, the prosecution described the encounter from the perpetrator's point of view:

> [U]h oh, my fourth bank robbery in a year, and the first time there is an officer here, and it is time for me to turn around, to back out, to leave, to run like hell to my car and get in that car and get away. He chose intentionally not to leave, not to back out. He chose to fight—not flight. He chose to charge.

TT V 10 at 27-28. The Government made similar arguments at the eligibility phase about Mr. Lawrence's calculated decision to go forward with his plan after running into the bank employees in the corridor rather than abandoning it. TT V 12 at 9, 18, 48.

If jurors had been provided with the evidence of Mr. Lawrence's brain damage, this theory of intent would have been significantly less persuasive and would have established reasonable doubt that he killed Officer Hurst deliberately and intentionally.[9] *See* Exh. 3 at 11-12.

Mr. Lawrence's impairments, while not excusing his actions, would have provided another context in which to assess them. *See* Exh. 3 at 11 ("Chronic increased intracranial pressure can lead to cognitive slowing, poor decision making, impulsivity, informational processing problems and other focal neurological and neuropsychiatric problems. Mr. Lawrence has experienced all of these symptoms.").

*b. The Government's false comparison between the choices available to Officer Hurst and to Mr. Lawrence*

The Government reiterated its central theme of choice by drawing an unfavorable comparison between Officer Hurst and Mr. Lawrence, both of whom grew up under adverse circumstances. The Government put on eight witnesses in penalty phase, all of whom provided victim impact evidence, including testimony about Officer Hurst's rough childhood and the good life choices he had made. In closing, the Government tied these together effectively:

> As a son. You heard Carolyn [Bryan's mother] testify. Her loss. Itemize that. Put her weight, the weight of her loss in that cup. Bryan was a bright, active and happy little boy, even though he was through the product of a very brief and abusive marriage and raised by a working mother. I worked for minimum wage in a restaurant, and we lived in an apartment with no heat or air conditioning. Talk about poverty. Bryan's biological father barely visited him. I thought I protected Bryan the best I could his entire life until now. Put that in a cup. A husband. Marissa told you she thought that they did all of right things. They thought they did the things they were supposed to do.

TT V 17 at 66.

> Marissa [Bryan's wife] testified that we suddenly went from two incomes to one and Bryan did what he had to do in order to support his family. Bryan never

[9] Taken together with the challenges defense counsel could have mounted to the physical and eyewitness evidence of the January 6 offense, jurors would have been left with a completely different picture of events from the one the Government painted. *See* Claim 2, *infra.*

> complained. He had been working hard his entire life and this was no different. I didn't like that Bryan was gone so much. He was not getting to spend enough time with Malia, and I knew it affected him, but he still did what he had to do and dealt with our circumstances. Bryan and I did things the so-called the right way. We got our educations, we got jobs, we got married, we had Malia when we could financially provide for our child. It was all taken away in the bank that day.

TT V 17 at 67.

> Everyone in life is dealt their hand of cards, but it is your choice how you play them. Bryan was born in West Virginia and was not born into money. Bryan's biological father was nonexistence [sic] in his life. Bryan knew that college was not going to be a freebie and he wasn't going to be handed anything by anyone. Bryan went into the Marine Corps in order to pay for college and then he got out. Those are the choices that we have to make.

TT V 17 at 67.

The evidence of Mr. Lawrence's brain damage would have given jurors a profoundly different lens through which to view Mr. Lawrence's life circumstances and would have enabled them to understand why the Government's comparison was a false one. Officer Hurst and Mr. Lawrence might both have faced adversity in their lives, but that is where the similarity ended. Mr. Lawrence was born with debilitating impairments that were exacerbated by his environment and which his caregivers, themselves impaired, were not in a position to ameliorate. Mr. Lawrence's opportunities and routes out of poverty would all be limited by his biology and by conditions that were founded in him before he was even born, conditions over which he had no control. This was the opposite of choice, and this is why the jury should have been presented with the evidence that would have permitted them to understand that any such comparison between Daryl Lawrence and Bryan Hurst was unjustly incongruous.

*c. The Government's co-opting of defense lay witness testimony and discrediting of defense experts*

Evidence of Mr. Lawrence's brain damage and chronic trauma would have hampered the Government's ability to turn defense lay witness testimony against Mr. Lawrence; it would have

also prevented the prosecution from so effectively dismantling the credibility of the defense experts who testified at Mr. Lawrence's sentencing.

As noted elsewhere, trial counsel offered the testimony of several of Mr. Lawrence's family members in the punishment phase. Many of them were men who grew up around Mr. Lawrence and despite difficult circumstances in their backgrounds, made a stable life for themselves after serving in the military, or held down legitimate jobs that helped them take care of their families. Other members of his family did not have the opportunities Mr. Lawrence had, such as going to private schools. The Government, on cross examination of these witnesses, was able to successfully use their example to argue to the jury that Mr. Lawrence simply wanted the easy way out to live his lavish lifestyle. Witness Kevin Robinson, for example, was cross examined extensively on the topics of his service in the military, a previous job he held at Merck, which he kept because he needed the money to support himself, and his home ownership. TT V 14 at 52-55. Similarly, Mr. Lawrence's half-sibling, Ricco Lawrence, on cross examination stated that he had been in prison but had been able to stay out of trouble and get a job, and he never went to private school. TT V 14 at 92-93. The Government, in closing, argued effectively that:

> Many of those cousins who lived in the same neighborhood, without their fathers, have real jobs and are productive members of the community. They are not out robbing banks to get money. They go to work and earn an honest living, something that the defendant has never chosen to do even before he had a record. He never worked.

TT V 17 at 15-16.

The Government would not have been able to so easily co-opt the testimony of Mr. Lawrence's family members if the jury had put his difficulties succeeding in private schools and holding down jobs in the context of the symptoms of his deficits, including his inability to concentrate and focus that spanned his entire life. These impairments followed Daryl Lawrence

from the grade-school classroom to the customer service center at which he later worked, and set him apart from his family members who were able to make it out of the violent neighborhoods and impoverished circumstances of their childhoods and make better lives for themselves. *See* Exh. 1 at ¶ 35 (noting difference in life trajectory when one family member has brain damage).

The repeated comparisons the Government made to Mr. Lawrence's peers in rebuttal of Dr. Cunningham's presentation would have been significantly diminished had the jury been provided evidence of Mr. Lawrence's medical conditions and related symptoms. The prosecution in closing arguments at one point told jurors that Dr. Cunningham "contradicted what you heard from a number of the family members because it didn't fit the power point. The defendant's aunts, uncles, cousins all grew up in the same neighborhood and had the same influences, and yet none of them rob banks and committed murder." TT V 17 at 28. Jurors, with evidence of his impairments, as well as a more accurate understanding of the challenges Mr. Lawrence's adoptive family and biological family faced—including, for example, their impoverished circumstances and history of serious mental illnesses—would likely have seen through the Government's attempts to undermine the defense's key expert, and placed greater weight on Mr. Lawrence's family background. They would have seen Mr. Lawrence in a light that set him apart from his aunts, uncles, and cousins, and they would have had a more accurate understanding of the challenges his adoptive family and biological family faced as they related to Mr. Lawrence's own development.

**D. Conclusion**

None of this new evidence would have excused Mr. Lawrence's robberies or, most especially, his taking the life of an officer charged with protecting the Fifth Third Bank. But had the jurors known that Daryl Lawrence's functioning was compromised from birth, that he suffers

from brain damage, and that his environment compounded rather than ameliorated his genetic impairments, there is a reasonable probability that at least one juror would have voted to spare his life.

## II. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE THE CIRCUMSTANCES OF THE OFFENSE, ADEQUATELY CHALLENGE THE GOVERNMENT'S ACCOUNT OF THE SHOOTING, AND PRESENT READILY AVAILABLE EVIDENCE IN SUPPORT OF AN ACCOUNT OF THE SHOOTING THAT WOULD HAVE REDUCED MR. LAWRENCE'S CULPABILITY AND RESULTED IN A LIFE SENTENCE ON COUNT 8, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

At the outset of his opening statement to the jury on the first day of trial, trial counsel told the jury:

> Ladies and gentlemen, this is not a who-done-it case. Daryl Lawrence did shoot Bryan Hurst and was shot by Bryan Hurst. Daryl Lawrence did admit, when he was arrested, that that's what he did. This case is about how it happened, why it happened, and what Daryl Lawrence's intent was when the incident happened on January 6, 2005.

TT V 6 at 32-33. Trial counsel were correct; there was no question that Mr. Lawrence committed the offense. However, the manner in which the shooting occurred – "how it happened, why it happened" – was an issue that would have ramifications beyond that first phase of the proceedings, and would bear on findings that the jury would be required to make during the eligibility phase, as well as during its ultimate sentencing determination during the penalty phase.

At issue were two different accounts of how the shooting occurred, each of which implicated the nature of Mr. Lawrence's intent in materially different ways that were germane to the jury's eligibility phase and penalty phase deliberations. According to the Government, Mr. Lawrence entered the bank with the intent to get to the vault at all costs, even if that meant having to kill someone to do so; when Mr. Lawrence saw Officer Hurst behind the teller counter, Mr. Lawrence immediately started shooting and charged the teller counter, lunged over it, and

shot Officer Hurst at "point blank range" while the officer was crouched behind the teller line, still struggling to get his gun out of his holster when Mr. Lawrence fatally shot him. TT V 6 at 24-25, 27; TT V 10 at 21-25, 27-31, 61-64, 67. According to the Government, Officer Hurst then fired seven rounds, two of which struck Mr. Lawrence. TT V 6 at 25. The Government contended that it was only at this point, after he had already fatally shot Officer Hurst, that Mr. Lawrence abandoned his plan to rob the bank, and then fled. TT V 6 at 25-26; TT V 10 at 62-64. Officer Hurst then stumbled out into a hallway area adjacent to the teller area, where he was later found lying on the ground and bleeding from the fatal shot that struck him. TT V 6 at 26.

The defense attempted to present an alternate account of the shooting: that Mr. Lawrence did not expect a security guard to be in the bank and was surprised when he saw Officer Hurst behind the teller line; that when Mr. Lawrence saw Officer Hurst draw his weapon, Mr. Lawrence put his free hand up and pleaded with the officer to put his weapon down;[10] and that after Officer Hurst started firing, Mr. Lawrence panicked and returned fire in order to escape, having already abandoned his plan to rob the bank. TT V 6 at 34-36, 38; TT V 10 at 39-40, 42-45, 52. According to the defense, the fatal shot was not fired with the intent to remove the only obstacle between Mr. Lawrence and the bank vault, but as the tragic result of a chaotic exchange of gunfire lasting mere seconds, during which Mr. Lawrence did not intend to kill, but sought to

[10] *See* TT V 12 at 23 ("I submit to you –and although the way this picture is up now, it's hard to tell—when you look at it closely, Daryl Lawrence's left hand is up in this motion. And I submit to you, when he saw Bryan Hurst with a weapon drawn on him, he is pleading with him to put the weapon down."); *id.* at 26-27 ("[W]hen he's coming in, in fact, he has got the gun up, and he's got his left hand up until he gets shot, saying, 'Put it down. Put it away.' That's what Amanda Goodman says. Marian Large says, 'Put your hands up. Put your hands up.' He says that. So, he is attempting to diffuse the situation."); *id.* at 35: He never went to the vault, never tried to go to the vault. He tried to disarm Bryan Hurst, and shots were fired, and he tried to leave with his life.").

give himself cover to retreat. TT V 6 at 35-36; TT V 10 at 47-48. The defense specifically contested that Officer Hurst was killed at close range. TT V 10 at 48-50.

As both the Government and the defense understood, the circumstances of the offense had relevance beyond the guilt phase proceedings, and consequently the manner in which the shooting occurred was also a central theme of the eligibility phase and penalty phase proceedings. As is discussed in more detail in Section D, *infra*, a focal point of the arguments at both of these subsequent stages of the proceedings was whether the circumstances in which the shooting occurred proved the statutory gateway intent factors under 18 U.S.C. § 3591(a), the pecuniary gain statutory aggravating factor, and, ultimately, whether Mr. Lawrence deserved to be sentenced to death. Thus, the dispute about the manner in which the shooting took place and whose account was more credible is one that went to the heart of the jury's sentencing determination.

In the sections that follow, Mr. Lawrence will demonstrate that the account of the shooting which the Government presented at trial was not supported by the evidence and that trial counsel were ineffective for failing to adequately challenge the Government's account. Had trial counsel conducted a competent investigation, they would have uncovered readily available evidence that fundamentally disputed the Government's version of the shooting, and would have supported an account of the shooting that reduced Mr. Lawrence's culpability. Counsel's failure to do so was objectively unreasonable, as this readily available evidence was consistent with the defense that counsel chose to advance at trial, so they had no reason not to pursue it. Moreover, in light of the central role that the circumstances of the offense played in the jury's decision to sentence Mr. Lawrence to death on Count 8, trial counsel's ineffectiveness was prejudicial.

### A. The Record Developed At Trial

The Fifth Third Bank branch was a small stand-alone building, surrounded by a parking lot, with a drive-up teller window along the east side of the bank. The bank had two entrances, one through a foyer on the north side of the bank and one through a foyer on the west side. Each entrance had a double set of glass doors. Inside the westside foyer, a staircase with a landing led down to rooms in the basement, one of which was being used on the day of the robbery for a training event for employees from different branches of the bank. In addition to the west foyer doors, there were two small enclosed offices on the west wall, just south of those doors. The south end of the bank had two offices with no walls separating them from the lobby of the bank, giving their occupants an unobstructed view of the lobby and the customer side of the teller line. There was also an enclosed third office in the southeast corner of the bank. The teller area in the bank began at the northern wall of the bank and ran along most of the east wall. The drive-through window was at the north end of the wall. Exh. 72.[11]

---

[11] This is a scale diagram of the interior of the Fifth Third Bank that was created by the FBI and that was produced to trial counsel in discovery.




The Government's account of the shooting at trial was that immediately upon entering the west entrance of the bank into the lobby area, Mr. Lawrence forced three individuals (Heather Clifton, Andrea Ross and Warren Cox) onto the floor of the lobby, pointed his gun at Officer Hurst, who was stationed behind the teller area, and charged east toward the teller counter. TT V 6 at 24. According to the Government, Mr. Lawrence lunged over the teller counter and fired at least three shots at point-blank range at Officer Hurst while the officer was squatting down behind the teller counter and attempting to unholster his gun. TT V 6 at 24-25; TT V 10 at 67. One of those shots was the one that struck Officer Hurst and eventually killed him. TT V 10 at 28-29. After being shot, Officer Hurst returned fire, managing to shoot Mr.

Lawrence in the hand and the shoulder. TT V 10 at 62, 64. Officer Hurst fired an additional five shots. TT V 6 at 25. After being shot, Mr. Lawrence abandoned his plan to rob the bank and fled. TT V6 at 25-26. Officer Hurst then stumbled out into the hallway and collapsed. TT V 6 at 16. The entire incident lasted less than ten seconds.

None of the eyewitnesses in the bank actually saw the moment when Officer Hurst was shot; they were each on the ground, taking cover. However, the Government did offer testimonial evidence suggesting that Mr. Lawrence fired first, and did so while Officer Hurst was crouched behind the teller line, trying to unholster his gun. Specifically, the Government presented the testimony of Marian Large, a bank employee who was in the teller area with Officer Hurst when the shooting started. Ms. Large testified that she saw a hand with a gun reach over the teller counter while Officer Hurst was crouched and trying to unholster his gun. TT V 6 at 228. Ms. Large also testified that she heard shots fired right before she heard the sound of Velcro; this was significant, because Officer Hurst's gunbelt had a Velcro compartment near the holster, and the Government asked the jury to infer that what Ms. Large heard was Officer Hurst accidentally touching the Velcro compartment while unholstering his gun. TT V 6 at 228-229.

The Government relied on three key pieces of physical evidence to support its account of the shooting. First, the Government noted that based on stippling observed on Officer Hurst's face, it was likely that he was shot from close range, since such stippling patterns are only produced on skin when the muzzle of the gun is less than three feet from the target. TT V 10 at 21, 30-31, 68. Second, spent shell casings from Mr. Lawrence's gun were found in the teller area; according to the Government, the only plausible explanation for the location of those casings was that they had been deposited there when Mr. Lawrence was lunging over the teller line and firing his gun. TT V 10 at 29-30, 66-67. Third, the prosecution relied on the bank

surveillance footage, which showed Mr. Lawrence approaching the teller line, and then leaning over it with both hands. Although Mr. Lawrence's hands are not visible, and Officer Hurst is not visible in the frame either, the Government argued that the image of Mr. Lawrence leaning over the teller counter was the moment when he fatally shot Officer Hurst at point-blank range while the latter was crouched below the teller counter. TT V 10 at 28-29.

For its part, the defense argued that Mr. Lawrence did not intend to kill Officer Hurst, and was, in fact, surprised that there was even an armed security officer in the bank. TT V 10 at 48, 52. When Mr. Lawrence entered the bank, Officer Hurst was alert to the threat and drew his weapon. TT V 10 at 41-42. Mr. Lawrence shouted at Officer Hurst to put his gun down, but the officer began firing, and Mr. Lawrence panicked and returned fire. TT V 10 at 39-40, 47-48. His intent at that point was not to kill Officer Hurst in order to get to the bank vault and complete the robbery, but simply to give himself cover to get out of the bank. TT V 11 at 43-44. The defense highlighted the fact that from the moment that Mr. Lawrence entered the bank until the moment he exited, approximately seven seconds had elapsed. TT V 12 at 37. Given this short span of time, the defense argued that Mr. Lawrence could not have formed the intent to kill, and that Officer Hurst's death was the tragic result of a chaotic shootout that unfolded quickly, rather than a deliberate killing. TT V 10 at 48; TT V 11 at 43-44; TT V 12 at 29.

The defense relied primarily on its cross examination of the Government's witnesses to support its theory. [redacted] the defense did not call any expert witnesses or otherwise present any forensic evidence of its own about how the shooting might have taken place. Instead, it asked the jury to draw inferences in Mr. Lawrence's favor from the

evidence presented by the Government, and to hold the Government to its burden of proof beyond a reasonable doubt. TT V 10 at 44, 48, 57.

**B. The Postconviction Investigation**

The postconviction investigation has uncovered evidence that strongly suggests that Officer Hurst was not shot at point-blank range while crouched behind the teller counter. Subsection 1 will review the main pieces of physical and forensic evidence upon which the Government relied at trial to argue its theory of how the shooting occurred. Subsection 2 will discuss evidence that was not previously presented which 1) undermines the Government's theory of a point-blank range shooting, and 2) establishes a more plausible account that is more consistent with the physical evidence and Mr. Lawrence's post-arrest statement, that the fatal shot was fired as part of a chaotic exchange of gunfire in which Mr. Lawrence shot his weapon in an attempt to give himself cover to flee.

1. Weaknesses in the Government's evidence presented at trial

None of the eyewitnesses inside the bank actually saw the moment that Officer Hurst was shot; thus, there was no testimonial evidence that Officer Hurst was shot at point-blank range. Instead, the Government relied primarily on the following three pieces of evidence to make its case to the jury: (1) the presence of stippling on Officer Hurst's face; (2) the location of three spent shell casings ejected from Mr. Lawrence's gun; and (3) the bank surveillance footage.

a. *The presence of stippling on Officer Hurst's face.*

When a gun is fired, gunpowder particles are emitted along with the bullet, and travel in a cloud of gas at a high velocity and high temperature. Exh. 4 at ¶ 18. When those particles come into contact with skin, they can embed themselves and create what appears to be a tattoo-like pattern on the skin, which is called stippling. *Id.* at ¶ 19. Stippling is typically produced at close range, when the distance of the muzzle to the target is three feet or less from the target. *Id.*

Officer Hurst had stippling on his face, suggesting that he was within three feet of the muzzle of a gun that was fired. The Government argued that the presence of stippling was strong evidence from which the jury could infer that Officer Hurst was shot at close range. TT V 10 at 21. As argued by defense counsel at trial, and agreed to by Dr. Patrick Fardal, the medical examiner who performed the autopsy, the stippling on Officer Hurst's face was not necessarily related to the fatal shot; it could have been produced by a different gunshot that travelled past Officer Hurst's face, but that did not strike him. TT V 8 at 124.[12] The critical question, then, was whether there was evidence of stippling at the site of the fatal wound.

Officer Hurst was shot in the chest, but since he was clothed, stippling would not be present on the skin surrounding the bullet wound. However, similar to the way that gunpowder particles produce stippling on skin, gunpowder particles will also produce a stippling-like pattern on clothing if the gun is fired at close range, i.e., three feet or less from muzzle to target. Exh. 4 at ¶¶ 18-19. Thus, one can examine the fabric surrounding a bullet hole for evidence of gunpowder particles to determine whether a shot was fired at close range. TT V 8 at 38, 76.

Mark Hardy, the Columbus Police Department firearms examiner, performed a "distance determination" test on the shirt that Officer Hurst was wearing when he was shot. TT V 9 at 38, 76. This test involved using a microscope to look at the area surrounding the bullet hole for the presence of soot and gunpowder particles. If such particles are present, that evidence is consistent with a close-range gunshot. If such particles are not present, that constitutes evidence

[12] The fatal shot and the shot which produced the stippling on Officer Hurst's face were likely two different shots. *See also* Exh. 5 at ¶ 10; Exh. 6 at ¶ 13. Contrary to the Government's assertions at trial, the presence of stippling does not conclusively establish that Officer Hurst was fired upon while in a crouched position. The stippling could have also been produced as a result of a shot that was fired while both men were standing on opposite sides of the counter and firing, i.e., the muzzle to target distance would have been within the range for a stray bullet to produce stippling. This scenario is also consistent with Mr. Lawrence returning fire in order to give himself cover to flee, which is supported by other evidence, and which is explained in more detail below.

that the gunshot was not fired at close range. In this case, Mr. Hardy examined the officer's shirt both macroscopically (using his eyes) and microscopically, observed no evidence of soot or gunpowder, and wrote a pretrial report concluding that there was no evidence of a close gunshot:[13]

CRIME LABORATORY REPORT

Log # 162-05 Property # 05-370 Date Received: 01-19-05

Investigating Officer: J. McCoskey Date Completed: 07-10-05

**RESULTS OF EXAMINATION:**

The bullet hole and surrounding area in the white uniform shirt, PR# 05-370, was macroscopically and microscopically examined. No evidence of a "close" gun shot wound was observed.

When he took the stand during the Government's case-in-chief, however, Mr. Hardy testified that the absence of soot or gunpowder particles did not, in fact, mean that the gunshot was not fired at close range. TT V 8 at 39. Instead, he testified on both direct- and cross examination that the reason he did not observe gunpowder particles on the shirt was because the particles might have fallen off when the shirt was removed from Officer Hurst's body and collected as evidence. TT V 8 at 39, 78. He further testified that although gunpowder particles emitted from close range would burn at a high enough temperature to produce burn marks on the fabric, he did not know whether those burn marks could also have been shaken off the shirt because there were "too many variables" and it "might depend on how hard the shirt was shaken or if it was hit or whatever." TT V 8 at 78.

Mr. Hardy's testimony was at best misleading, and at worst false. The particles expelled from a fired handgun typically have sharp edges, so when they make contact with a piece of

[13] Exh. 73.

fabric within two to three feet from the muzzle, the particles will become embedded and trapped in the weave of the fabric. Exh. 4 at ¶¶ 18-19. It is implausible that the process of removing Officer Hurst's shirt and preserving it in evidence would have caused all the particles to fall off. *Id*. at ¶ 18; Exh. 5 at ¶ 9. Even if one used a substantial amount of force to shake the shirt for a sustained period of time – which one cannot imagine why any of the persons who handled Officer Hurst's shirt would have done – one would not shake off all the gunpowder particles embedded in the weave of the fabric. Exh. 4 at ¶ 19. Also, due to the burning effect caused by the high temperature of the particles, even if it were theoretically possible for all of the gunpowder particles to fall off, the burn marks would remain on the fabric and would be visible to an examiner. *Id*. at ¶ 19. There were neither gunpowder particles, nor burn marks, on Officer Hurst's shirt; thus, the forensic evidence overwhelmingly supports the fact that Officer Hurst was shot at a distance of greater than three feet, and certainly not at point-blank range.

Notably, the jury never heard any evidence countering Mr. Hardy's false testimony. The only evidence they heard on this matter came from Mr. Hardy, who the Government emphasized was the only expert witness the jury heard from on matters related to firearms and ballistics. TT V 10 at 19. And, according to Mr. Hardy's expert opinion, the lack of stippling on Officer Hurst's shirt was entirely consistent with the Government's theory that he was fatally shot at point-blank range.

b. *The location of spent shell casings from Mr. Lawrence's gun*

Mr. Lawrence used a 40 caliber Mini Firestorm semiautomatic handgun during the shooting, and Officer Hurst used a 45 caliber Smith and Wesson semiautomatic handgun. When handguns such as these are fired, they eject shell casings out of a port at the side of the gun. TT V 8 at 87. The Government argued that based on the location where certain 40 caliber shell

casings were found, it was common sense that Mr. Lawrence fatally shot Officer Hurst from point-blank range. TT V 10 at 29-30, 66-67. Specifically, the Government was referring to three 40 caliber shell casings that were recovered in the teller area:[14]




The prosecution presented no evidence about the manner in which a 40 caliber Mini Firestorm semiautomatic handgun ejects spent shell casings. Rather, the Government argued that "common sense" dictated that the spent 40 caliber shell casings were deposited there from shots fired when Mr. Lawrence's hands were over the teller counter. TT V 10 at 29-30, 66-67. The Government's argument was incorrect.

A competent firearms and ballistics examiner can conduct what is known as an ejection pattern analysis to determine the manner in which a firearm ejects spent shell casings. Exh. 4 at ¶ 4, 11. The examiner need not use the actual gun that was used in a shooting incident because a

[14] This is a portion of Government Exhibit 4E, showing the teller area and hallway on the east side of the bank.

gun of the same brand and model will produce reliable, representative data as to the manner in which spent shell casings will be ejected. *Id.* at ¶ 11.

An ejection pattern analysis was conducted of a 40 caliber Mini Firestorm semiautomatic handgun by a firearms and ballistics expert retained by trial counsel. *Id.* at ¶¶ 5-9. That ejection pattern analysis demonstrated that if Mr. Lawrence had been firing his gun in the manner that the Government claimed – holding the gun with two hands and firing at a downward angle – the gun would have ejected its casings up, backwards and to the right. *Id.* at ¶8. That is, the shell casings most likely would have been ejected behind Mr. Lawrence, into the lobby area, and not forward into the teller area, where they were actually found. In other words, the location of the shell casings behind the teller counter actually undermined the Government's theory that Mr. Lawrence was firing his gun while leaning over the teller counter. The jury never heard this evidence, however, because trial counsel did not present it.

c. *The bank surveillance footage*

The video surveillance footage from inside the bank had some obvious problems in terms of presenting an accurate picture of the incident. First, all the cameras inside the bank were pointed in the direction of the lobby area, so there was no footage of the teller area, and no footage that actually captured Officer Hurst's movement behind the teller area or the moment he was shot. Second, the cameras only recorded images at a rate of two frames per second. A typical video camera will record images at a rate of 30 frames per second, so what the bank cameras recorded was more akin to stop-motion footage, where there are large gaps in the action, rather than a typical videorecording. Third, the recordings did not contain any audio, so they did not capture the sound of gunshots or anything that anyone inside the bank said during the shooting.

Despite these flaws, the Government argued that the surveillance camera footage demonstrated that Mr. Lawrence charged the teller counter with the intent to get to the vault, and that Mr. Lawrence fatally shot Officer Hurst while he was crouched behind the teller counter and trying to unholster his gun. TT V 10 at 28-29. The key image upon which the Government relied was this one, from the Teller 5 camera that was time-stamped 10:35:20 (frame two):



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

The Government claimed that it was in this moment that Officer Hurst was shot. TT V 10 at 28-29. The Government's claim was incorrect, as can clearly be seen when one compares this frame side-by-side with a frame that was simultaneously taken by a different camera:



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)




Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

The second image was taken from the Front Door camera, which was pointed at the doors from which Mr. Lawrence entered. When enlarged, one can clearly see in that frame that the glass in the left door has been shot and has splintered:




Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

This can be seen even more clearly when one looks at the frames immediately prior to and after this one in sequence:



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

Front Door Camera

10:35:26 – frame one



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

Front Door Camera

10:35:26 – frame two



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)

Front Door Camera

10:35:27 – frame one

When juxtaposed, the surveillance footage from both cameras demonstrates that Officer Hurst could not have been crouched and still attempting to unholster his gun when Mr. Lawrence

.

is at the counter because Officer Hurst had clearly already fired his gun and shot the glass door behind Mr. Lawrence at that point:



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)




Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

As will be explained in the next section, when closely examined, the surveillance footage is consistent with a very different scenario from the one that the Government argued at trial.

2. Previously Unpresented Evidence

a. *Medical evidence*

It is indisputable that prior to the shooting, Officer Hurst was behind the teller area, and that after the shooting, his body was found outside the teller area, in a hallway that leads out into the lobby area:[15]

[15] Detective William Snyder testified that he created this diagram of the Fifth Third Bank. TT V 7 at 76-77. It was later admitted at trial as Government Exhibit 4F.




The Government's account was that after Officer Hurst was mortally wounded while in a crouched position, he managed to stand up and also fire seven shots from his 45 caliber Smith and Wesson handgun before stumbling out of the teller area and collapsing in the hallway. The Government's explanation of what Officer Hurst did and how he moved after being fatally shot, however, is extremely improbable given the nature of the injury he sustained.

The bullet that killed him severed every major blood vessel surrounding his heart: the ascending aorta, which extends out of the heart and carries oxygenated blood to every part of the body; the superior vena cava, which returns deoxygenated blood from the arms and the head to the right atrium of the heart; the pulmonary artery, which carries deoxygenated blood from the heart to the lungs; and the pulmonary vein, which returns oxygenated blood from the lungs to the heart to be pumped throughout the body. Exh. 5 at ¶ 12. Once these blood vessels were ruptured, Officer Hurst's blood pressure would have dropped immediately and precipitously. *Id.* Additionally, his right lung, which was also pierced by the bullet, would have collapsed. *Id.*

Having suffered this type of gunshot injury, Officer Hurst would have almost certainly collapsed immediately after being shot. *Id*. at ¶ 14. In other words, from a medical standpoint, the location where Officer Hurst's body was found – the hallway – was also almost certainly the same location where he was positioned in the bank when he was shot. *Id*. at ¶¶ 13-14.

Conversely, the notion that, after having sustained this type of injury, Officer Hurst would have been able to perform all the actions the Government described is, from a medical standpoint, extremely unlikely. *Id*. With every heartbeat, Officer Hurst was losing enormous amounts of blood, and his blood pressure would have dropped instantly. TT V 9 at 114. According to the Government's theory, Officer Hurst would have had to stand up from a crouched position, absorb the recoil of shooting a 45 caliber handgun seven times in a row, and then stumble out into the hallway. Nor could the officer simply have collapsed into the hallway from the teller area: the door leading from the teller area to the hallway opened *into* the teller area, so Officer Hurst would have had to turn the door handle and open the door in order to land in the hallway. This series of actions would have required him to exert an enormous amount of effort that, given the nature and severity of his gunshot wound, was extremely unlikely from a medical standpoint. Exh. 5 at ¶¶ 13-14.

b. *The eyewitness account of Michelle Johnson*

This medical evidence is corroborated by an eyewitness account. The Government was aware of this eyewitness, as well as her account, but did not call her as a witness at trial, and the jury never heard her recollection. The eyewitness was Michelle Johnson, a bank manager who was in her office, located at the south end of the bank, during the shooting:




This is the view one would have of Ms. Johnson's office if one were standing in the lobby and facing south into her office; there is no wall separating the front of her office from the rest of the bank or obstructing the view:[16]

[16] The following photo was admitted at trial as Government Exhibit 4B-36. TT V 7 at 33.



The following two photographs show the view one would have from inside Ms. Johnson's office, facing north; one can use the TV on the TV stand from the prior image as a reference point:[17]

[17] These two photographs were admitted at trial as Government Exhibits 4B-24 and 4B-23. TT V 7 at 29-30.





Ms. Johnson's account of the shooting is that during the exchange of gunfire, Officer Hurst came out from behind the teller area, emerged from the hallway, and then assumed a shooting stance in front of the teller line, in the area where customers would ordinarily be.[18] She

[18] Ms. Johnson gave this account in 2014 as part of an interview with a local Columbus TV news program. A copy of that interview is attached as Exh. 110. Ms. Johnson was interviewed as part of the postconviction investigation and confirmed that she gave this same account to law enforcement investigators in 2005, days after the shooting. Exh. 7 at ¶¶ 9-10. In the television interview, this is how Ms. Johnson describes what she witnessed:

> Bryan was behind the teller line initially, and um, after the first shots were fired -- and I had talked about the silence that I had heard and I came out from under my desk, *I had looked around and I did see Bryan out from behind the teller line, um, in front of the teller line where the customers would be and he was aimed and ready*. You know, he was in that, that stance. And so, okay, I thought, Bryan's out there, we're okay. We're going to be okay. He's out there. I'm going to go back under my desk. We're going to be okay. *And I saw him, I saw him ready*. So I knew, in my heart, I knew that he was there protecting us and I just went back under the desk. I don't want to sound like a coward but that's – I didn't want to get in his way. He was the one that's prepared to handle these situations, not me. And so I went back under my desk. *But I did see him out from behind*

described Officer Hurst as ready, alert, and responding to the threat in the bank. Her description gave no indication that Officer Hurst was wounded or that he stumbled out into the hallway and collapsed.

c. *Reconstruction of Officer Hurst's movement based on ballistics evidence*

Ms. Johnson's account of Officer Hurst's movement in the bank was consistent with the other forensic evidence collected at the scene. Specifically, the Columbus Police Department documented the location of the seven spent shell casings that were ejected by Officer Hurst's 45 caliber weapon as he fired:[19]

---

> *the teller line in that ready position,* ready to do what he needed to do to make sure we were safe.

(Emphasis added).

[19] Detective Snyder testified that he created a sketch of the bank, which was introduced as Government Exhibit 4E, and that the numbers on the sketch correspond with evidence that was collected. TT V 7 at 76-78. The diagram above is a close-up of the teller area of the sketch. Items 11, 12, 14, 15, 16, 17 and 38 were all determined to be spent 45 caliber shell casings that were ejected from Officer Hurst's gun. TT V 7 at 79; TT V 8 at 47.




The locations of the shell casings are consistent with the officer moving from his initial position, in front of the desk, in a southern direction toward the hallway. Exh. 8 at 16, 29. The location of two of the shell casings (items 11 and 12) are consistent with Officer Hurst firing his weapon while in the hallway area or just west of it – which is around the location where Ms. Johnson saw him assume a shooting stance. *Id*.

If Officer Hurst had been firing his weapon from that location, one would expect that bullets from his gun and bullet strikes from his shots would be in the north and northwest areas of the bank, in the direction of where he would be shooting. And, indeed, there were:




Spent bullets and metal fragments identified as having originated from a 45 caliber weapon were recovered north and northwest of the location where Ms. Johnson saw Officer Hurst standing. TT V 8 at 58-59. Additionally, bullet strikes were identified in the northwest corner of the bank. TT V 7 at 70.

d. *Other forensic evidence corroborating Ms. Johnson's account*

Ms. Johnson's account is also consistent with the autopsy results of the trajectory of the bullet's path through Officer Hurst's body. The bullet entered his chest, and exited out his back at a point four inches lower than the entry point. TT V 8 at 122; Exh. 6 at ¶ 6. That trajectory is consistent with being shot while standing and leaning forward in a shooting stance. Exh. 6 at ¶ 9, 11-12; Exh. 5 at ¶ 11.

If Officer Hurst had been shot while he was in the location where Ms. Johnson saw him, the gunshot would not have been a close-range gunshot. This is because, based on the bank

surveillance camera footage, it is clear that Mr. Lawrence never moved south of his position at the teller line, which was near the check writing station:




The notion that Officer Hurst was shot from a distance, rather than at close range, is also consistent with the forensic examination of the area around the bullet hole in the shirt the officer was wearing when he was shot. As noted previously, the lack of gunpowder particles on Officer Hurst's shirt is compelling forensic evidence that he was not shot at close range.

e. *Reconstruction of Mr. Lawrence's position based on ballistics evidence*

The ejection pattern analysis that was discussed previously not only disputes the Government's claim that the 40 caliber shell casings were deposited behind the teller line when Mr. Lawrence's hands were over the teller counter, but it also provides evidence that is consistent with Mr. Lawrence's shooting south in the direction of the hallway, as in the previous diagram.

.

The ejection pattern analysis demonstrated that a 40 caliber Mini Firestorm has a peculiar ejection pattern when the gun is held at 90 degrees, or what is sometimes referred to as "side grip," as illustrated below:



Rather than eject casings up, to the right and to the rear, the casings are ejected *up and to the left* when the gun is fired at 90 degrees. Exh. 4 at ¶ 7. If Mr. Lawrence had been holding his gun at 90 degrees while firing toward the south end of the bank, his shell casings would have ejected up and to the left – that is, over the teller line, which as can be seen in the diagram below, would have been to Mr. Lawrence's left while firing south:



In fact, evidence collected at the scene indicates that Mr. Lawrence *did* fire several shots toward the south end of the bank, as there were bullet strikes located in those areas. TT V 7 at 61, 65. Thus, it was entirely plausible that the shell casings landed behind the teller line as they were ejected from Mr. Lawrence's gun as he was shooting toward the south end of the bank, rather than as the result of shots fired while his gun was over the teller line. Exh. 8 at 7-11, 29-30. In other words, the location of the shell casings behind the teller line were not indisputable evidence of shots fired at point-blank range while Officer Hurst was crouched behind the teller line.

f. *The bank surveillance footage*

The bank surveillance footage is also consistent with Mr. Lawrence shooting toward the south end of the bank – specifically, the image taken by the Teller 5 camera at time-stamp 10:35:27 (frame two):



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)

Although this image does not show Mr. Lawrence's right hand, it is entirely plausible that he is shooting toward the south at this moment, and doing so with his gun held at 90 degrees. Exh. 8 at 7-11, 29-30. This is particularly so if one begins at one frame before this one, and then

follows the sequence of Mr. Lawrence's movement as he exits the bank, from the Teller 5 camera to the Front Door camera:



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)

Teller 5 camera

10:35:27 (frame one)



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)

Teller 5 camera

10:35:27 (frame two)



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:28 AM (Eastern Standard Time)

Teller 5 camera

10:35:28 (frame one)



Teller 5 camera

10:35:28 (frame two)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:28 AM (Eastern Standard Time)



Front Door camera

10:35:29 (frame one)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:29 AM (Eastern Standard Time)



Front Door camera

10:35:29 (frame two)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:29 AM (Eastern Standard Time)

As the sequence of photos demonstrates, it begins with Mr. Lawrence holding the gun at 90 degrees, then moving his shooting arm until it is out of the frame, then swinging his shooting arm back around into the frame as he begins to turn toward the lobby doors to flee. This sequence is consistent with Mr. Lawrence firing his gun in the frame where his right arm is not

visible, and it also suggests another important fact: that Mr. Lawrence was shooting in order to give himself cover in order to flee the bank. Exh. 8 at 29-30. In other words, when Mr. Lawrence fired the fatal shot that hit Officer Hurst as he was standing near the hallway, his intent was no longer to get to the vault and complete the robbery, but rather to use suppressive fire to give himself cover to run out of the bank. *Id*.

### C. Trial Counsel's Failure to Adequately Challenge the Government's Account of the Offense was Objectively Unreasonable.

Trial counsel's performance in this case fell below the reasonable standard of performance in a capital case. But for trial counsel's deficient performance, a reasonable probability exists that Mr. Lawrence would not have been sentenced to death. *Strickland v. Washington,* 466 U.S. 668 (1984). In this case, trial counsel's failures to investigate and to present a genuine defense were so serious that they deprived Mr. Lawrence of a reliable result at sentencing. *Id.* at 687.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

In other words, trial counsel themselves made clear what effective counsel needed to do "to be effective" in challenging the Government's case and that it was "imperative" that they rely on expert assistance in these areas to prepare to meet the Government's case.

1. Trial counsel unreasonably failed to present medical evidence that would have undermined the Government's account of the shooting.

As noted previously, the Government's account of Officer Hurst's alleged movement and actions after being fatally shot while crouched behind the teller line are highly improbable given the nature of the injury that he suffered. It was objectively unreasonable for trial counsel to fail to

---

[redacted]

challenge the Government's account. Given the nature of the injury that Officer Hurst suffered, as documented in the Coroner's Report, and the fact that his body was found in the hallway, and not behind the teller area, there were red flags that counsel needed to investigate whether it was likely that Officer Hurst was shot in the hallway, rather than behind the teller line. Counsel talked to Dr. Fardal, the forensic pathologist from the Franklin County Coroner's Office who conducted the autopsy on Officer Hurst, but does not appear to have raised this question with him. In any case, competent trial counsel would have retained a defense forensic pathologist so they could have explored these matters in the context of confidential consultations. Had Mr. Lawrence's trial counsel done so, they would have been able to present readily available evidence rebutting the Government's contention that Officer Hurst was shot point-blank while crouched behind the teller counter, *see* Exh. 5 at ¶¶ 11-14, and could have presented the countervailing explanation that the path of the bullet through his body was consistent with Officer Hurst standing and leaning forward in a shooting stance. *See* Exh. 6 at ¶¶ 9-12.[21]

Moreover, had counsel consulted with their own forensic pathologist, they would have been in a better position to tailor their questions of Dr. Fardal on cross-examination to support their own theory as to where and how Officer Hurst was shot.

---

[21] At trial, defense counsel inexplicably went out of her way to establish through her cross examination of Dr. Fardal that Officer Hurst would not have died immediately and would have been able to engage in conscious and purposeful movement after having sustained the fatal wound. Dr. Fardal agreed this was possible, though he could not say that had been the case with Officer Hurst. TT V 8 at 122. Dr. Charles V. Wetli, a forensic pathologist, and Mr. R. Robert Tressel, a crime scene reconstruction expert, were consulted as part of the postconviction investigation, and both experts disagree with Dr. Fardal's testimony based on their training, knowledge and experience, suggesting that while it may be true that anything is possible in the realm of the human body, the wound Officer Hurst sustained would almost certainly have caused him to collapse on the spot. Exh. 5 at ¶ 14, Exh. 8 at 16. Counsel were deficient for undercutting their own defense by introducing such evidence, which even the Government had not elicited from Dr. Fardal during its direct examination.

### 2. Trial counsel unreasonably failed to adequately challenge the Government's evidence of a close-range gunshot based on Officer Hurt's shirt.

As noted above, at trial, the Government's firearms expert, Mr. Hardy, was allowed to testify that the absence of gunpowder particles on Officer Hurst's shirt did not rule out the possibility of a close-range gunshot because such particles could have fallen off during the process of removing his shirt and preserving it as evidence. He was also allowed to testify that burn marks on the shirt created by the particles might also have fallen off. Although trial counsel attempted to cross examine Mr. Hardy about these issues, he never conceded that his opinion was incorrect, and the jury was left with only his expert testimony on the matter.

Given trial counsel's line of cross examination, their failure to present a defense expert on this issue who could have provided affirmative evidence in support of their theory was objectively unreasonable. Counsel had even retained a firearms expert of their own, John Nixon, who could have provided expert testimony that conclusively rebutted Mr. Hardy's opinion. Specifically, Mr. Nixon was prepared to testify to the facts recounted previously concerning how gunpowder particles embed themselves in fabric; how burn marks are produced on the fabric; and the fact that it is "implausible" that all the gunpowder particles and burn marks could have fallen off, even if the shirt had been subjected to a significant and sustained amount of shaking. *See* Exh. 4 at ¶¶ 18-20. Trial counsel's failure to present readily available evidence to impeach Mr. Hardy's testimony was objectively unreasonable. The lack of gunpowder particles on Officer Hurst's shirt was compelling evidence that he was not fatally shot at close range, and would have provided the defense with powerful objective forensic evidence contradicting the Government's account of the shooting.

Moreover, counsel could have used expert evidence to more effectively demonstrate to the jury that the stippling on Officer Hurst's face was likely caused by a bullet other than the one that caused the fatal wound. If the same bullet had caused the fatal wound, one would have expected to see gun particles embedded in Officer Hurst's shirt around the entrance wound. Exh. 8 at 13, 16-17, 29; Exh. 5 at ¶¶ 5, 8-10; Exh. 6 at ¶ 13. According to the ballistics report and trial testimony of Mr. Hardy, however, he was unable to detect any when he examined the shirt macro- and microscopically.

3. Trial counsel unreasonably failed to rebut the ballistics evidence regarding the location of Mr. Lawrence's spent 40 caliber shell casings.

At trial, the Government asked the jurors to rely on their "common sense" to conclude that the location of the spent 40 caliber shell casings in the teller area proved that Mr. Lawrence fired the fatal shot while leaning over the teller counter. TT V 10 at 29. Trial counsel unreasonably failed to challenge this claim. Trial counsel had retained Mr. Nixon to perform an ejection pattern analysis on the type of gun that Mr. Lawrence used. That analysis demonstrated that: (1) if Mr. Lawrence had fired the gun in the manner that the Government claimed, the spent shell casings would have likely ejected up, right, and to the rear of Mr. Lawrence – that is, into the lobby, not the teller area; and (2) if Mr. Lawrence had been holding his gun at 90 degrees counterclockwise while shooting toward the south end of the bank, as the surveillance footage suggested he did, the spent shell casings would have likely ejected up and to the left – that is, into the teller area. Exh. 4 at ¶ 7; Exh. 51; Exh. 8 at 7. In other words, the position of the shell casings was counterintuitive and not what a lay person untrained in ballistics analysis might conclude based on "common sense."

It was objectively unreasonable for trial counsel to fail to present evidence that would have countered the Government's unscientific "common sense" approach. The location of the

spent 40 caliber shell casings was a critical piece of physical evidence in the Government's account of the shooting. Indeed, trial counsel recognized this fact and argued that the location of the shell casings did not prove that Mr. Lawrence fired his gun while leaning over the teller line. TT V 10 at 50. Counsel's only argument, though, was that the shell casings could have gotten into the teller area after the fact, due to first responders and witnesses moving through the bank after the shooting. *Id*. The Government ridiculed this explanation as implausible. TT V 10 at 66-67 ("Now, the defense wants you to believe that somehow it was kicked by the tellers or the medical personnel back into here (indicating) and they were all really out here. Well, there is one problem with that. There is something in the way and that's a dying police officer. What are they going to do? Kick it over him, somehow bounce off the walls, get back in here maybe, somehow kick it up and then it will land on top of the teller table? One of the shell casings was actually on the top of the line.").[22] Counsel had readily available to them a much more compelling explanation to make their point, one based on expert analysis rather than on the Government's "common sense" conjecture, which was unrooted in fact and contradicted by readily available forensic evidence. It was objectively unreasonable for trial counsel to fail to present this expert evidence to the jury.

Similarly, trial counsel could have used this expert explanation to rebut another contention made by the Government: that Mr. Lawrence must have fired his gun as he entered the bank because there are three spent 40 caliber shell casings in a formation to the left of the door through which he entered. The ejection pattern of the spent shell casings, however, shows that the casings would have been ejected twelve feet to Mr. Lawrence's *right*, if he had been firing on his way into the bank – that is, south of the doors where he entered. Even if the casings

---

[22] *See also* TT V 12 at 10-11 ("The defendant is over the counter, firing. He got three shell casings over the counter. They want you to believe, apparently, that somebody soccer kicks those over the counter.").

had been stopped by a wall or other obstacle, the casings would not have naturally wound up to the *north* of that doorway.[23] Exh. 4 at ¶ 6; Exh. 8 at 7.

4. Trial counsel unreasonably failed to present ballistics evidence demonstrating that Officer Hurst moved out from behind the teller before he was fatally shot and that Mr. Lawrence was shooting toward the south during the exchange of gunfire.

As noted previously, the location of Officer Hurst's shell casings behind the teller area were consistent with a path moving from the desk to the hallway area outside the teller line. Similarly, bullets, bullet fragments, and bullet strikes located in the north and northwest corners of the bank were consistent with Officer Hurst's shooting from the hallway area toward Mr. Lawrence. Trial counsel failed to investigate and present such evidence. Trial counsel's failure to do so was unreasonable.

Trial counsel were readily aware of the need for a crime scene reconstruction expert to assist in making sense of the firearm and ballistics evidence recovered at the scene. Counsel, however, failed to actually pursue such an investigation or consult with such an expert on this issue. If counsel had, a crime scene reconstruction expert would have been able to provide an opinion that the evidence at the scene was consistent with Officer Hurst moving out from behind the teller line before he was fatally shot. *See* Exh. 8 at 29. It was objectively unreasonable for trial counsel not to pursue such evidence, especially considering that they identified the need to develop such evidence early on in the case. Moreover, such evidence would have supported the defense theory that trial counsel had already chosen to pursue at trial: that Officer Hurst was not shot at close range, and that the fatal shot had been fired during a chaotic exchange of gunshots in Mr. Lawrence's panicked attempt to flee the bank. TT V 6 at 35-36, 38; TT V 10 at 47-50, 52;

[23] This result is also entirely consistent with the report of witness Brian Dickerson, who trial counsel never interviewed or called to testify at trial. See subsection C.5, *infra*.

TT V 11 at 42-44. Trial counsel's failure to investigate and present such evidence is objectively unreasonable.

A crime scene or ballistics expert could have also lent additional support to results of the ejection pattern testing by pointing out several additional pieces of evidence demonstrating that Mr. Lawrence fired his gun in a southerly direction. One of the bullet strikes identified by law enforcement after the shooting was in the upper wall south of the teller line. The bullet from that shot was recovered in the attic and was a 40 caliber shot. Another 40 caliber bullet went through the south wall of the hallway and landed in one of the south offices. Both of these appear to have been fired by Mr. Lawrence in a southerly direction, and would account for two spent shell casings that had been ejected to the left and into the teller area.[24] Exh. 8 at 8.

There was readily available evidence to establish that the trajectory of the fatal shot through Officer Hurst's body was consistent with Mr. Lawrence's having fired a shot in a southerly direction towards Officer Hurst if, as Michelle Johnson reported, Officer Hurst had come out from behind the teller desk and leaned forward to fire his gun. This has been confirmed with postconviction experts in crime scene reconstruction and forensic pathology, as well as with Dr. Patrick Fardal, the forensic pathologist who conducted the autopsy on Officer Hurst and testified as a Government witness at trial. Exh. 8 at 15; Exh. 5 at ¶ 11; Exh. 6 at ¶¶ 9-12. Trial counsel were ineffective for failing to present this readily available evidence to the jury.

[24] Images from the bank surveillance cameras would also have supported this evidence, all consistent with what the defense hoped to show: that Mr. Lawrence had not begun shooting on his way into the bank; that Mr. Lawrence had been firing his gun on his way out of the bank in an attempt to suppress Officer Hurst's gunfire; and that Mr. Lawrence had fired the fatal shot, not at point-blank range while Officer Hurst was crouched behind the teller desk, but from a distance, after Officer Hurst had come out into the hallway next to the teller desk.

Specifically, a still image from the surveillance camera shows Mr. Lawrence shooting in a southward direction even though his head is turned away from the arm with the gun and is in the crook of his left arm. He is still crouched below the teller counter, and the next four frames show his right hand stretched out behind him, which is consistent with his continuing to shoot as he retreated. *See* Subsection B.2.f, *supra*, and Subsection C.7, *infra*.

5. Trial counsel unreasonably failed to investigate and present other eyewitness accounts of the shooting.

As noted previously, Ms. Johnson was a bank employee who was present on the day of the shooting and who had a clear vantage point of the hallway, the teller line, and the lobby from her office. She saw Officer Hurst come out from behind the teller area, emerge from the hallway appearing ready and alert, and assume a shooting stance. Ms. Johnson's eyewitness account fundamentally contradicts the Government's theory that Officer Hurst was fatally shot behind the teller line, and then stumbled into the hallway area and collapsed. It was objectively unreasonable for trial counsel to fail to interview Ms. Johnson and present her account to the jury.

Trial counsel were at least partially aware of Ms. Johnson's potential testimony based on her handwritten statement, which they had in their files, in which she wrote: "The police officer came out from behind the line with his gun pointed." Exh. 77.[25] The fact that the statement noted that she saw Officer Hurst come out from the teller line, ready to fire, was a red flag that, consistent with the evidence previously discussed, he was shot in the hallway area, rather than at point-blank range while crouched behind the teller desk. Trial counsel had an obligation to investigate and present Ms. Johnson's account of the shooting. It does not appear, however, that

[25] Based on the timestamp created by the fax machine at the top of the document, it appears that this document was provided to defense counsel on February 10, 2006. To the extent that trial counsel's ability to identify, interview, and develop evidence based on Ms. Johnson's account might be attributable to the Government's failure to comply with its constitutional obligation to disclose material exculpatory and impeachment information, that issue is raised in another claim in this Motion.

Ms. Johnson has confirmed to postconviction counsel that she had a sit-down interview with a law enforcement investigator within days of the offense and that the account she gave the investigator was the same account she had given in the past two years in an interview to a local TV news station in Columbus about the incident. Ms. Johnson could not recall if the investigator with whom she spoke was an FBI agent or an employee of the Columbus Police Department. The failure of the Government to produce this interview with law enforcement pretrial forms the basis for one of Mr. Lawrence's *Brady* claims. *See* Claim 4, *infra*. The false description of Officer Hurst's condition as he came out into the hallway constituted prosecutorial misconduct. *Napue v. Illinois*, 360 U.S. 264 (1959).

trial counsel made any genuine efforts to interview Ms. Johnson, and she herself has confirmed that she was never approached by any member of Mr. Lawrence's trial team. Exh. 7 at ¶ 13. Trial counsel's failure to investigate and present Ms. Johnson's eyewitness account of the shooting was objectively unreasonable.

Nor did trial counsel interview or call Brian Dickerson as a witness. Mr. Dickerson was a bank customer who saw the tail-end of this incident. Mr. Dickerson provided a handwritten statement in which he said he saw a man running to the west side door of the bank, shooting behind himself. Consistent with the video images, Mr. Dickerson said he saw the man run into the door, "busting" the glass. Exh. 74. In an FBI interview Mr. Dickerson gave the following week, he said he was about to enter the bank when he heard approximately six shots and observed someone running from the teller area towards the west exit doors. Mr. Dickerson observed the person firing back towards the teller line and attempting to exit the bank, and saw him crash through the entrance door and fall down, before picking himself up and running off. Exh. 75.

Mr. Dickerson was the only witness to the shooting who had this view of events and who was not lying on the floor or crouching beneath a desk. What he reported seeing was completely consistent with the images captured on the surveillance camera – Mr. Lawrence firing his gun *as he was leaving the bank* – and completely at odds with the inferences the Government asked the jury to make. That is, the Government urged the jury to use its "common sense" when looking at the placement of spent shell casings in the bank, which would tell them that Mr. Lawrence must have been firing his gun on the way into the bank, because shell casings were located near and to the north of the door through which he entered.

As has been described previously, the ejection pattern for a 40 caliber Mini Firestorm would have sent these shell casings a dozen feet to the south of the entrance if Mr. Lawrence had been shooting on his way into the bank. The placement of the spent shell casings was instead consistent with Mr. Lawrence firing his gun on his way out of the bank, as he appears to be doing in the surveillance images and as Mr. Dickerson clearly saw him doing. In other words, consistent with what the defense sought to prove, Mr. Dickerson's eyewitness report would have supported their argument that Mr. Lawrence was firing his gun in an attempt to cover himself so he could get out of the bank – not so he could force his way to the vault.

6. Trial counsel unreasonably failed to adequately challenge the probity of the bank surveillance footage.

Counsel were deficient for not trying to limit the Government's use of videos captured on the bank's surveillance cameras or for helping the jury understand the limitations of these videos.

At the time of this incident, the bank had five operating video cameras. Each was trained in a different direction; all were positioned to capture activity in the lobby and at the west and north entrances to the bank. No camera captured anything that happened behind the teller desk (that is, east of the teller line) or on the south side of the bank. In other words, there is no footage showing what Officer Hurst was doing during the offense.

In addition, all five cameras operated in similar fashion, recording only two frames per second, producing results that, while appearing to show continuous movement, have significant gaps during which the action is not being recorded.[26]

For example, while Mr. Lawrence was in the bank, he was shot twice. One of the shots hit him in the left shoulder and exited through his back. The other shot hit his left hand, travelled through his palm in a collinear fashion, and lodged in his forearm. There is no moment on the

[26] This contrasts, for instance, with typical videocameras which record 30 frames per second.

surveillance video, however, where one can see either of these shots happen or can even see Mr. Lawrence react to them. Although there is reason to believe Mr. Lawrence was shot at least once as he was approaching the teller desk, because this is the only point at which his left arm appears to be extended in front of him (consistent with a collinear path from fingertip to forearm), the moment at which he is struck is not captured on the video.

Thus, while these cameras had some value in having captured still images, playing the videos *as* videos produces a false sensation that viewers are seeing a continuous image when they are not. Nevertheless, using the videos, the Government told the jury that it could see for itself what transpired during the offense, and the defense did little to dispel that misimpression.

One of the experts the defense secured substantial funds for pretrial was Scott Roder, a media expert whose specialty was multimedia and video evidence. Mr. Roder could have explained to the jury the limitations of the bank surveillance videos. But defense counsel made no attempt to use his services for this purpose and never called Mr. Roder to testify at trial.[27]

7. Counsel were deficient for failing to use the still images from the videos to demonstrate the Government's narrative was false.

While not seeking to limit the Government's use of the videos *as* videos, or putting their limitations in context, counsel also failed to use the still images from the videos to support its theory of defense or counter the Government's narrative. This also constituted deficient performance.

For example, the Government argued in closing at the guilt-innocence phase of the trial that Mr. Lawrence had come into the bank, immediately began firing his gun, reached the teller desk, leaned over it and shot Officer Hurst at "point-blank range," while Officer Hurst was crouched beneath the teller counter and before Hurst had even unholstered his gun. The

[27] Although defense counsel had Mr. Roder produce video animations of the events at the bank, they did not use these, either.

Government even identified the exact frame that they claimed showed Mr. Lawrence shooting Officer Hurst at point-blank range while he crouched defensively behind the teller counter, i.e., the image from the Teller 5 camera of Mr. Lawrence on the teller counter. TT V 10 at 28-29. Had counsel compared video frames side by side, however, they would have been able to put the lie to this argument. As noted previously, the side-by-side still images from the Teller 5 camera and the Front Door camera completely contradict the Government's assertion that Mr. Lawrence shot Officer Hurst before he had unholstered his own gun; the glass behind Mr. Lawrence has already been struck by a bullet in that moment from a bullet fired by Officer Hurst. This by itself would have demonstrated that the Government was wrong in its assertion that Mr. Lawrence had fired at him at close range before Officer Hurst had even unholstered his gun, while he was crouched and most vulnerable.

Additionally, as the attached report from R. Robert Tressel, a qualified crime scene reconstruction expert, demonstrates, the still images from the bank surveillance footage can be used to support a very different account of the shooting, and one that is consistent with Mr. Lawrence's firing the fatal shot from a distance as suppressive fire in a panicked attempt to flee the bank. Exh. 8 at 8-10, 14-15, 18-28.

Defense counsel could also have used these still images to point out to the jury that, once Mr. Lawrence reached the teller desk, he constantly had his face turned away from where his gun was pointing – in other words, he did not appear to be aiming his gun. In the frame after the glass first shatters, one can see Mr. Lawrence crouched below the teller desk with just his right hand resting on top of the desk at a 90 degree angle. His head is below the desk level.



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)

**[10:35:27 Frame One – Teller 5 camera]**

Next, he can be seen, still crouched down, with his left arm resting against the teller desk but not on top of it and his face buried in the crook of his left elbow.



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)

**[10:35:27 Frame Two – Teller5 camera]**

In the next frame, Mr. Lawrence has his right arm extended at an angle in a south-easterly direction, but his head is turned away, and facing north – again, he is not facing the same direction his gun is pointing.



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:28 AM (Eastern Standard Time)

**[10:35:28 Frame One – Teller 5 camera]**

In the next three frames, Mr. Lawrence can be seen running in a north westerly direction, with his back to the teller desk, bent from the waist. His right arm appears to be extended behind him.



Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:28 AM (Eastern Standard Time)

**[10:35:28 Frame Two – Teller 5 camera]**




Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:29 AM (Eastern Standard Time)

**[10:35:29 Frame One – Front Door camera]**




Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:29 AM (Eastern Standard Time)

**[10:35:29 Frame Two – Front Door camera]**

He then appears to trip over the stanchion in the lobby and falls forwards towards the door with the broken glass. In the next two frames, he can be seen actually having fallen through the door.




Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:30 AM (Eastern Standard Time)

**[10:35:30 Frame One – Front Door camera]**




Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:30 AM (Eastern Standard Time)

**[10:35:30 Frame Two – Front Door camera]**

At no time during these frames does Mr. Lawrence look in the direction of his gun hand.[28]

[28] From the moment Mr. Lawrence appeared in a frame in the foyer until the moment he landed back on the floor of the foyer, the elapsed time is 10 seconds. From the time he entered the bank lobby until he fell through the glass door, the elapsed time is just 6 seconds.

In other words, in contrast to the illusion created by the running video, the still images provide a picture of a man who is employing gunfire to cover his retreat from the bank. This is still criminal behavior, but it is not evidence of a deliberate and intentional killing, and it counters the argument that Mr. Lawrence killed Officer Hurst while he still had the intent to rob the bank – a necessary element to establish the "pecuniary gain" aggravating factor.

If defense counsel had reviewed these surveillance videos carefully, they would have been able to see, understand, and present this argument. Had defense counsel relied on the crime scene or video experts they retained, these experts would have explained the use to which these videos could be put and could have helped counsel shape and present this powerful counter to the Government's theory of Mr. Lawrence's culpability. Exh. 8 at 8-10, 14-15, 18-30.

8. Trial counsel failed to impeach the Government's reliance on the placement of evidence that was unreliably documented at the scene and explain why the jury could not rely on its common sense when reviewing it to understand when and from where Mr. Lawrence had fired his gun.

The Government argued inferences about Mr. Lawrence's intent in this case based on the placement of physical evidence at the scene. These inferences were unsupportable, as expert testimony from the defense expert would have demonstrated. Counsel failed to introduce this expert evidence at trial.

It is a fundamental tenet of crime scene reconstruction that evidence must be precisely located in place before it is removed from the scene. Exh. 8 at 3. The Government failed to memorialize the crime scene with any degree of precision. Items of ballistics evidence were listed as being on the floor of the lobby, or on the teller desk, and drawn on sketches prepared by police officers, but they were not identified by reference to any fixed points. Bullet holes were photographed in walls but the location of the holes was not measured in relation to fixed points. Dowel rods were employed at the scene, purportedly to determine the trajectory of bullets. The

dowel rods were photographed in place, and shown to the jury, but police did not calculate the angles of incidence of the rods or use centering cones to fix the rods in place, so the defense could neither challenge the trajectories nor use them to support their own arguments. Exh. 8 at 5.

The teller desk itself extended due south, approximately 16 feet away from and parallel to the east wall. Although the teller counter figured prominently in this shooting, law enforcement officers never measured the height of the teller desk. TT V 7 at 91. Officer William Snyder, who oversaw the collection of evidence at the bank, testified that he did not think the height of the teller counter would have any relevance to the investigation. TT V 7 at 91.

No one from law enforcement at the scene even appears to have noted the precise location at which Officer Hurst was found after he collapsed.

Despite this lack of precise measurements, the Government introduced into evidence photographs of ballistics items and of the dowel rods, and, as noted previously, urged the jury to rely on "common sense" when looking at the pictures and thinking about where Mr. Lawrence must have been when he fired his gun.

To their credit, defense counsel cross examined law enforcement officers to show that in the immediate aftermath of the offense, so many people walked across the bank lobby that items of ballistics might have been moved from the places they originally landed. Defense counsel also established that the lobby floor was made of tile and that spent shell casings might have bounced or rolled on such a floor.[29] But this very attempt on the part of defense counsel to make

[29] First responders arrived on the scene minutes after Mr. Lawrence left the bank, including police officers, three medic crews and one EMS crew. TT V 6 at 250, 252; TT V 7 at 5-6, 12. Officer David Love, from the Reynoldsburg Division of Police, was the first to arrive on the scene. Bank employees pointed Officer Love towards the southeast of the bank, where he noticed Officer Hurst lying on the ground. TT V 6 at 250. He and his partner began administering CPR, until fire medics arrived and took over rescue efforts. TT V 6 at 251. As medics wheeled Officer Hurst out of the bank, he was in cardiac arrest. TT V 7 at 6.

sure the jury was aware that ballistics items might have been in locations other than where they would otherwise have landed underscores that it was important to establish that ballistics evidence might look deceptive in photographs or on diagrams and cause the jurors to draw conclusions they should not draw.

Defense counsel could have, but did not, put on expert testimony to impeach the Government's collection of evidence. Defense counsel's failure to do this left the Government free to draw its own false conclusions about the significance of ballistics evidence around the bank, and to ask the jury to adopt the same flawed inferences.

9. Counsel failed to undertake adequate steps pretrial to identify or interview eyewitnesses to the offense.

In addition to Mr. Lawrence and Officer Hurst, there were seven people inside and on the main floor of the bank at the time of the attempted robbery. Marian Large, Amanda Goodman, and Angela Karst, all bank tellers, were behind the teller desk when Mr. Lawrence entered. TT V 6 at 223-24, 206, 234. Managers Deborah Rader and Michelle Johnson were at their desks, at the south end of the bank. Exhs. 76, 77. Andrea Ross, Heather Clifton, and Warren Cox, three employees from other branches of the bank who had been attending a training program in a classroom in the basement, had finished the class and were in the west foyer at the time. TT V 6 at 189; 141-42; 172-73.

Two additional bank employees, Erica Arnold and Heather Kinney, had been in a basement classroom during the offense and had heard shouting and gun shots. Exhs. 78, 79. Brian Dickerson, the bank customer who was outside the bank, saw Mr. Lawrence running away

---

By Officer Love's account "many" officers were on the scene by this time, possibly a dozen or more. TT V 6 at 251, 252. It was only at this point that he was able to grab his scene tape and rope off the area. TT V 6 at 251.

from the teller counter and out of the west doors. He called 9-1-1 and reported what he had seen and heard. Exh. 74.

The defense team spoke with Jody Stewart, a manager who worked out of the downtown main office of the Fifth Third Bank on April 7, 2005, when they visited the bank. From Mr. Stewart, they learned that all of the bank employees had been interviewed twice, one of those times not long before defense counsel's crime-scene visit. The defense team also learned that some of the employees were still going to counseling, that most had gone back to work the day after the incident and wanted to get the bank up and running again, and that one of the employees had still not returned to work.

Rather than undertaking investigative efforts to figure out for themselves who the eyewitnesses might have been, the defense team contacted the managers of the banks Mr. Lawrence was accused of robbing, and of the Fifth Third Bank, and asked permission to interview employees. By mid-August, the bank managers had told the defense team that they would not grant permission for their employees to be interviewed without a court order, and that the employees had told them they did not want to be interviewed.

As is clear from several motions filed with the trial court on August 29, 2005, trial counsel understood the importance of interviewing witnesses pretrial and knowing what these witnesses had reported about the crime. Counsel requested a bill of particulars with the names of the witnesses, ECF Doc. No. 39; counsel asked for early disclosure of Jencks statements from testifying witnesses, ECF Doc. No. 38; and counsel asked that the Government be required to provide its witness list 30 days prior to trial, noting specifically that three days was insufficient time for defense counsel to interview witnesses before trial. ECF Doc. No. 46. But many witness

names and statements were not turned over by the prosecution until February 10, 2006, days before trial was set to begin.

Counsel knew or should have known they were unlikely to receive this information from the Government much in advance of trial. Federal rules, and their application in the Sixth Circuit, do not require this information to be turned over substantially in advance of trial. Thus, it was incumbent on defense counsel to use more initiative to investigate than bare reliance on Government disclosure of witnesses information or on the hope of non-required Court-ordered disclosure.

This was a case that ought to have been relatively easy to investigate. Counsel knew most of the witnesses were likely to have been bank employees, given that the attempted robbery happened during normal business hours. Gathering names from name tags and placards would likely have yielded witness names. The trial team does not appear to have undertaken any such efforts, despite its recognition that interviewing these witnesses was a critical investigative need.

Instead of engaging in this direct investigative technique, the defense team allowed bank management to be the gatekeeper limiting access to witnesses. Counsel made little effort after this to find or interview eyewitnesses after bank management said that witnesses did not wish to be interviewed. In fact, inexplicably, even after counsel received the names of eyewitnesses, they failed to seek them out and interview them.

10. Once provided with witness names and statements, counsel failed to interview witnesses, to fully cross examine those who testified at trial about the inconsistencies between their pretrial statements and their trial testimony, or to call witnesses that had provided eyewitness accounts that supported the defense.

In the discovery the Government provided to the defense pretrial were handwritten statements from most of the bank employees who witnessed the offense from inside the bank,

dated January 6, 2005, the date of the offense. In addition, the Government provided statements from Brian Dickerson, the bank customer who was outside the bank and saw Mr. Lawrence's retreat from the teller counter, and Erica Arnold and Heather Kinney, who had been in a basement classroom during the offense. Exhs. 75, 77-84. Ms. Goodman, Ms. Ross, Ms. Rader, Ms. Kinney, Ms. Arnold, and Mr. Cox were interviewed the same day by the Columbus Police Department ("CPD"). Exhs. 76, 85-87, 91, 92. Ms. Karst, Ms. Clifton, Ms. Large, and Mr. Dickerson were interviewed by the FBI on January 13, 2005. Exhs. 75, 88-90. Michelle Johnson appears to have been the only witness for whom a law enforcement interview was not produced.

Of these eleven witnesses, only six – Ms. Goodman, Ms. Ross, Ms. Karst, Ms. Large, Ms. Clifton, and Mr. Cox – were called to testify as Government witnesses at trial. TT V 6 at 206; 188; 234; 139; 221; 169.

11. Counsel Failed to Adequately Cross Examine Eyewitnesses About Their Inconsistent Pretrial Statements or to Argue these Inconsistencies in Closing.

As with every witness that the Government called at trial, defense counsel failed to effectively cross examine them about their testimony. Several eyewitnesses called by the Government gave substantially different versions of events at trial from those they had given in their early handwritten and police reports. These new witness accounts all more strongly supported the Government's case than did the written statements provided immediately after the offense. Defense counsel were deficient for failing to cross examine these witnesses and impeach them with their previous statements.

At trial, Heather Clifton, one of the three witnesses who had been in the foyer when Mr. Lawrence entered the bank, testified that she heard the first gunshot going off on the right side of her ear, "coming from the suspect," just as she, Ms. Ross and Mr. Cox made it through the

doorway into the bank. TT V 6 at 143, 158. She testified she heard three gunshots before she had even gotten down on the ground. TT V 6 at 144. She said she then heard a lot of shots – that she had counted a total of 15 in her head. TT V 6 at 145. She also testified that, even though she had been in this branch of the bank before, the first time she realized an officer was in the bank or that anyone else in the bank had a weapon was when she heard people saying, “There’s an officer down, an officer down.” TT V 6 at 147-48, 158.

Counsel cross examined Ms. Clifton on the fact that in her FBI statement, she said she had heard 4 to 5 shots, not the 15 she testified to. (In the FBI statement, she actually said she heard 5 to 6 gunshots.) TT V 6 at 159-60. When she excused her mistake by saying she had given the FBI statement five minutes after the event, Mr. Lawrence’s counsel did not point out that the FBI interview was conducted a week after the offense. Nor did counsel challenge the fact she had also said this in her handwritten report.

Of greater significance, counsel did not challenge Ms. Clifton about the fact that she had never mentioned hearing gunshots while she was coming through the door or in her right ear in either her handwritten report or her FBI interview. To the contrary, in her handwritten statement, she said she had been made to get on the ground and put her head down, that she had not looked at all, but heard 4 or 5 shots. In her FBI statement, she said she was forced to lie down on the lobby floor and that only afterwards did she hear somewhere between five and six gunshots. Exhs. 83, 89.[30]

---

[30] Trial counsel spent the bulk of his cross examination of Ms. Clifton, pointing out that she had not used a very strong expletive when describing what Mr. Lawrence had said when telling her and others to get on the floor and not look at him. Counsel had Ms. Clifton review both her handwritten statement and the interview she gave to FBI Agent Trombitis to challenge her on this point. TT V 6 at 157-58, 162-64. Thus, it was clearly not his strategy to go easy on her so as not to appear brutish with the jury.

At trial, Andrea Ross testified that she heard the first shots "from behind me. Over my right shoulder." TT V 6 at 196, 199. In her hand-written statement, provided to bank officials on the day of the offense, Ms. Ross noted that she heard a variety of noises as she was trying to get down on the floor, including gun shots and glass shattering, but "had no idea where the sound was coming from." Exh. 82. In her statement to the CPD on the day of the offense, she said nothing about the direction or source from which she heard gun shots. She also did not know an officer had been in the bank until the shooting stopped. Exh. 86. [31]

Failing to cross examine on this point was significant because the Government based its assertion that Mr. Lawrence had fired his weapon first, and had fired it immediately upon walking into the bank, on the accounts of witnesses who said they heard shots coming from him, or from behind them, when they first walked through the door.

Marian Large's trial testimony was perhaps the most damning of any of the eyewitnesses. She was behind the teller desk at the time of the offense. She testified that she was able to see "just one arm with the gun" over the counter, and that at that point, Officer Hurst was "struggling" to take his gun out of the holster. TT V 6 at 228. She also said she heard something that sounded like Velcro being pulled apart and she believed she heard a gunshot before Officer Hurst ever pulled his gun from the holster. TT V 6 at 230.

Trial counsel's cross examination was limited to establishing what Ms. Large was doing while all this was happening, where she was, and what her vantage point was. TT V 6 at 230-233.

---

[31] A qualified crime scene expert would also have alerted counsel to the fact that the perceptions of people who are involved in shooting incidents are often distorted. When shots are fired indoors, even people accustomed to hearing gunfire often mistake the direction from which it is coming. A witness will often misattribute the direction the sound of gunfire is coming from to the location from which he or she expects it to come. This phenomenon has been documented and studied for many years and was well-established at the time of Mr. Lawrence's trial. Exh. 8 at 12.

Yet Ms. Large's trial testimony differed dramatically from the handwritten report she gave on the day of the offense and from her FBI interview. In her handwritten report, Ms. Large never mentioned seeing Officer Hurst crouched behind the counter and recalled that Officer Hurst "ripped" his gun from his holster. Exh. 81. In her FBI account, Ms. Large said she heard a commotion near the front door, heard yelling, and "the next thing" she saw was Officer Hurst pulling his gun and firing at the suspect. She reported that she then "saw both the suspect and Hurst firing at each other from a short distance and over the top of the teller counter. They were 'face to face, gun to gun.'" The FBI interview noted specifically, "Large *did not know who fired first nor did she see the suspect. The only thing Large focused on were the guns.*" Exh. 90.

Notwithstanding this gross inconsistency, defense counsel failed to cross examine Ms. Large on any of these points which would have critically impeached her testimony in that her original statements, given the day of the offense and a week after the offense, were completely different from her account at trial. Moreover, the details that changed all changed in the Government's favor – that Mr. Lawrence had fired the first shots, that Mr. Lawrence had shot Officer Hurst while he was crouched and "struggling" to get his gun unholstered, and that she had heard shots before hearing the sound of Velcro – aural support for her claim that Officer Hurst was still trying to unholster his gun.

Because the defense failed to cross examine Ms. Large on these points, the jury had no way to know that in her original accounts of the offense, she said she had no idea who fired first; had never mentioned hearing Velcro; had never recounted seeing Officer Hurst in a crouch; and had in fact seen him rip his gun from his holster and begin shooting at Mr. Lawrence through the counter before even getting the gun to counter height.

It is clear from defense counsel's closing argument and questioning of other witnesses that their strategy was to dispel the Government's insistence that it had proved beyond a reasonable doubt that Mr. Lawrence had fired his gun first. For example, when cross examining Angela Karst, counsel made the point with her that she had not known at the time whether the shots were coming from Officer Hurst or Mr. Lawrence. TT V 6 at 247. There was every reason for the defense to make this point at every opportunity, and they had no strategic reason not to.

This was deficient performance, the result of which was that the jury never got to hear original eyewitness accounts that supported the defense theory and undermined the Government's theory in exactly the ways defense counsel were trying to promote.

12. Counsel failed to take adequate steps to guard against the jury's hearing eyewitness accounts of the offense that had been contaminated by pretrial interviews, video screenings, and other corrupting influences.

Counsel learned in April 2005 that bank witnesses had been interviewed more than once by law enforcement, including in March or early April. Counsel also learned in April 2005 that a number of bank witnesses were still in therapy as the result of witnessing this incident. Counsel could have anticipated the Government would show the bank surveillance videos to witnesses pretrial, and either taken action to prevent this or moved in limine for the witnesses to be limited when they testified to the substance of accounts they had given in the first weeks after the incident, before they were exposed to influences that might have corrupted their memories.

Had this failed, counsel should have taken steps to present expert testimony from someone trained in best police investigative practices, explaining the well-documented phenomenon of confabulation -- that memories can become contaminated as a witness recounts the event under suggestive influences such as law enforcement interviews, repeated therapeutic and group counseling, or if he or she is provided with additional information about an incident,

as one would be in viewing videos. Exh. 8 at 11-12. Such an expert could have explained that, through no bad faith on the part of the witness, a witness may incorporate new details into his or her own memories and exhibit no signs he or she is remembering incorrectly. Exh. 8 at 11. The effect of the memory taint is especially pernicious because, while the memories may now lack accurate content, and are therefore unreliable, the witness nonetheless appears credible because the witness has come to endorse this memory.[32]

Counsel were further deficient when they learned during the course of trial that the Government had, in fact, shown the surveillance videos to witnesses, and took no corrective action at that time, either. *See, e.g.*, TT V 6 at 139, 177, 197.[33]

In sum, understanding what effective counsel needed to do, trial counsel nevertheless failed to:

- Take steps to preserve physical evidence;
- Ensure the memories of eyewitnesses were preserved or presented without distortion;
- Impeach the testimony of eyewitnesses when their trial testimony differed from earlier statements they had given;
- Impeach the testimony of Government experts when it failed to comport with scientific standards;
- Cross examine Government expert testimony in ways that supported, and did not undermine, the defense theory;
- Make serious efforts to interview eyewitnesses pretrial;
- Retain defense experts in a timely manner or seek continuances if they could not;

[32] The Supreme Court has long noted that reliability, not credibility, is the linchpin of admissibility. *Manson v. Brathwaite*, 432 U.S. 98 (1977).

[33] In fact, the prosecutor specifically noted that Ms. Ross had watched the surveillance video with him. TT V 6 at 197. Prosecutor DeVillers met with Heather Clifton a year before trial, and he, along with prosecutors O'Brien and Burns all met with Ms. Clifton again two weeks before trial and showed her some film clips of the episode that took place at the bank. TT V 6 at 139.

- Use appropriate expert witnesses to rebut the Government's arguments and support a theory of the case consistent with Mr. Lawrence's statement to the police;
- Explain or challenge the Government's interpretation of video images from bank surveillance cameras;
- Discover available evidence impeaching Government lay witnesses;
- Discover available evidence impeaching Government expert witnesses.

**D. Mr. Lawrence Was Prejudiced By Trial Counsel's Deficient Performance.**

It was singularly critical that trial counsel effectively challenge the Government's contention that Mr. Lawrence shot Officer Hurst at point-blank range while he was crouched defensively behind the teller line. The Government's account painted the picture of an execution-style shooting committed for pure greed. Trial counsel had available to them evidence which would have painted a substantially different picture from the one presented to the jury, one in which the fatal shot that killed Officer Hurst was the result of a tragic and panicked attempt by Mr. Lawrence to flee the bank, rather than a cold-blooded murder committed to complete a robbery. If trial counsel had presented this readily available evidence at trial, there is a reasonable probability that at least one juror would have weighed the case differently, and that the outcome of the proceeding would have been different.

1. The manner in which the shooting occurred was a focal point in the Government's arguments to the jury for why a death sentence was warranted.

Throughout the trial, the Government argued that the manner in which the offense occurred – that is, the intentional and deliberate nature of the fatal shot delivered at close range while Officer Hurst was defenseless – was a fact that warranted greater punishment and a sentence of death on Counts 7 and 8. At the outset of the eligibility phase, the Government stated that it would rely on all of the evidence already admitted at the guilt-phase proceedings about the circumstances of the offense to establish the statutory intent factors under 18 USC § 3591(a)

with respect to Mr. Lawrence's actions.[34] The Government also highlighted for the jury that what it had established regarding Mr. Lawrence's intent also proved the statutory aggravating factor of pecuniary gain – that Mr. Lawrence deliberately shot Officer Hurst in order to get to the bank vault and complete the robbery. TT V 11 at 38 ("The money is kept in these banks in the vault, and the murder of Officer Hurst was done by the defendant in order to get the vault.… He needed to kill Officer Hurst to get to the vault and get the money to support the lavish, the lavish life-style that he was living with the proceeds of the money taken from the vaults in the previous robberies.").[35]

In its closing arguments at the eligibility phase, the Government repeatedly emphasized its account of the manner in which the shooting took place – that is, that Mr. Lawrence lunged over the counter and fatally shot Officer Hurst at point-blank range before the officer had even unholstered his gun – and specifically stated that the defense theory of the shooting was implausible given the physical evidence:

According to the defendant, he said, when he saw Bryan's gun, he just shot. Excuse me? That isn't what the physical evidence shows, that he just shot. There were seven shots fired from that 40-caliber that day, all of the shots that it had, all in less than 20 seconds according to the surveillance video, probably less than 15. One of those shots was fired within three feet of Bryan

[34] TT V 11 at 34 ("One of the first things the prosecution expects to do in this phase is to ask the Court to admit into the record, into evidence, the evidence already presented in the first phase.… And all of that evidence, as I submitted to you in closing argument in the trial phase, all of that evidence establishes beyond a reasonable doubt that the defendant intentionally killed Officer Bryan Hurst on January 6th of 2005.").

[35] *See also* TT V 11 at 39 ("That is why the pecuniary value and the expectation of it was so important to the defendant and the circumstantial evidence of why he murdered Officer Hurst: because he needed to get into the vault to support that life-style."); *id*. at 40 ("So that evidence, we submit, we'll be able to present to you and establish beyond a reasonable doubt, as if our common sense doesn't tell us that the reason Officer Hurst was killed was to get to the money in the vault. That evidence will show that that life-style was necessary for him to get to the vault and necessary for him to get to the money and kill Officer Hurst in the meantime.").

Hurst's face. One of those shots fired within three feet. One of them hit the officer in the chest, right above the vest, went up to down, front to back.

> If the defendant just shot – you've seen the defendant. Officer Hurst was five foot nine. How did he just shoot and have the bullet go front to back, up to down, in someone that was five foot nine? Over the counter, in the chest.
>
> The officer was doing what he was trained to do. He's backing and taking cover, trying to get his weapon out as Marian Large said. The defendant is over the counter, firing. He got three shell casings over the counter.

TT V 12 at 10. Moreover, the Government emphasized the fact that this was a *close-range* shooting that proved that Mr. Lawrence intentionally killed Officer Hurst. TT V 12 at 12 ("Of course this is an intentional killing. One of those shots, three feet away.").

The Government made similar arguments during the penalty phase proceedings. At the very outset of its closing, it reminded the jury that based on its finding with respect to the pecuniary gain aggravating factor, that alone was sufficient to justify a sentence of death,[36] and it specifically highlighted the fact that the circumstance of the offense – that it was a close range shot – warranted a death sentence:

> Any one of the aggravating factors, if you find it sufficiently outweighs the mitigation, can justify the death penalty.
>
> Those aggravating factors, we have already discussed. On January 6th of 2005, the defendant entered the Fifth Third Bank, armed with a loaded and cocked pistol, forced three bank tellers to the ground, and he then charged Officer Bryan Hurst, who was behind the teller counter, while the three tellers behind the counter ran for cover. As the tellers are taking cover, the defendant initiates a gun battle with the officer and he kills him. Fourteen shots are fired in all. *One of those is less than three feet from Bryan's face.*

TT V 17 at 30 (emphasis added). Additionally, the Government emphasized that the defense theory of how the shooting occurred had never been proven and was not supported by the

[36] TT V 17 at 8; *id*. at 65 ("Pecuniary gain. Money. That's why Bryan Hurst is dead. Bryan Hurst is dead for this reason. So this man (gesturing) can have his cars and his trips and his $4,000 watch.… Why else did Bryan Hurst have to die? So this guy had his money, his trips, his clothes, his cars. Itemize that.").

physical or forensic evidence.[37] There was compelling and readily available evidence that would have allowed defense counsel to effectively rebut the Government's arguments; defense counsel's failure to do so clearly prejudiced Mr. Lawrence.

2. Defense counsel's arguments similarly recognized that the manner in which the shooting occurred was a critical factor in the jury's sentencing determination.

The defense well understood that the manner in which the shooting occurred would be relevant to the jury's sentencing deliberations, as is evident in its arguments during the eligibility and penalty phases of the proceedings. In its opening statement of the eligibility phase, the defense argued:

> The evidence will show that, unlike the other robberies which you have found him guilty of, this incident on January 6, '05, was different because Lawrence encountered people in the vestibule area, was startled, and then, when he came in the door, encountered Bryan Hurst. He panicked, and when he saw a weapon drawn on him, he attempted to get to Hurst to get him to put the weapon down and to not engage in a gunfight. Unfortunately, that gunfight ensued, and Mr. Hurst was shot, and Daryl Lawrence was shot twice.
>
> Daryl Lawrence returned fire in an effort to escape the situation alive, not to kill Hurst. In this phase, you will hear evidence of Daryl Lawrence's intent. You will hear from a police officer who was present when Daryl Lawrence was arrested and will attest to him saying that he had no intent to kill this officer. You will also hear played for you Daryl Lawrence's confession to Detective McCoskey and Special Agent Trombitis. He specifically stated that he didn't want to hurt Hurst and he didn't intend to kill him. And you will also hear the responses of Detective McCoskey and Special Agent Trombitis to the statements that Daryl Lawrence made.

[37] TT V 17 at 20 ("He said that he just shot when he saw the officer come up with his gun. That's not true according to the eyewitnesses, the physical evidence or the surveillance tape from inside the bank. If you look at the surveillance tape, you can see Bryan Hurst's hat in one part of one of those surveillance tapes. You can see the counter in front of him, but you never see Bryan's gun up over the counter. It is not true."); *id*. at 21 ("You saw the surveillance. None of the news showed what the defendant said happened. The only person who went over the counter with a gun that day was the defendant, when he fired the shots that burned Bryan Hurst's face and killed him."); *id.* at 55 (stating that "the defense still hasn't given up on Officer Hurst shooting first" and arguing that the evidence does not support the defense theory).

TT V 11 at 43.[38] As counsel summarized its theory for the jury: "Daryl Lawrence's actions were a reaction to a situation, a situation that started and was over in 20 seconds. It was not planned out or an intentional killing." *Id*. at 44.[39]

The defense repeatedly emphasized this alternate account of the shooting – that Mr. Lawrence panicked and simply reacted rather than intentionally killing Officer Hurst – in its closing argument during the eligibility phase:

> Daryl Lawrence's intent was to get out of there alive. He didn't intend to cause, inflict, serious bodily injury, didn't intend to harm anybody, tried to get him down, tried to put the weapon away. He reacted to being confronted with a gun and being shot himself.
>
> His intent, as shown by the past, is not to have conflict. And I ask you to remember what we talked about in voir dire. Don't armchair quarterback the situation when you're back in the comfort of the jury room. Look at it from Daryl Lawrence's perspective at the time it was all happening.

TT V 12 at 36.[40]

> I didn't see a cop in the times I went by the bank. I got scared. And that goes to intent. There is people there at the door. So, now he has something different to focus on. There is people there at the door. What do I do?
>
> He's not focused on a security person because he doesn't know there is a security person there until he is still dealing with the people, getting them down on the ground, and then sees that there is somebody who has drawn a bead on him with a firearm.

---

[38] *See also* TT V 11 at 45 ("Again, the evidence will show that Lawrence didn't know he would encounter Hurst, and when he did, he sought to get him to put his weapon away and not to kill him. The evidence will also show, shows and will show, that he didn't then continue, after the gunshots, to the bank vault, that after the gunfire erupted, Daryl Lawrence left the bank within a matter of several seconds."); *id*. at 42 ("We believe the evidence will show, and has already shown in the first phase of this case, that Daryl Lawrence had no intent to harm, much less kill, Bryan Hurst when he entered the bank. One of the primary reasons for that is that he didn't expect Bryan Hurst or any police officers, security personnel, to be there. Had he known that, he would not have picked that bank to rob, as is evidenced by the other three robberies which you found him guilty of, none of which had a security officer in the bank.").

[39] *See also* TT V 11 at 46 ("This is a situation where there was a killing at the spur of the moment that was not intentional.").

[40] *See* also TT V 12 at 37 ("Daryl Lawrence was confronted with an officer, who had a weapon, drawing a bead on him. Shot and returned fire. He reacted at the spur of the moment to get out alive. This is not an intentional killing, and the aggravating factors have not been proven beyond a reasonable doubt.").

> I didn't know what to do. I just panicked. That's what he said. I submit to you that's what the evidence shows. I wanted to stop him from getting his gun. Put it, Put it away. Amanda Goodman supports what Daryl Lawrence told the police. I didn't want to shoot him. I never wanted to hurt anybody.

TT V 12 at 29-30.[41] And even as late as the closing arguments of the penalty phase, the defense again returned to this theme that the shooting did not happen as the Government claimed, and that Officer Hurst fired and struck Mr. Lawrence first, and that Mr. Lawrence fired back in a panicked response to being shot. TT V 17 at 46-47 (arguing that, based on the medical evidence about the direction of the bullet into Mr. Lawrence's hand and forearm, Mr. Lawrence was shot before he got to the teller counter).

Throughout its arguments to the jury, defense counsel referred to the physical and forensic evidence and urged the jury to draw reasonable inferences about the evidence in Mr. Lawrence's favor.[42] Counsel, however, should not have simply relied on personal appeals about

---

[41] *See* TT V 12 at 22 ("He is not looking for conflict. He doesn't intend to do harm to anybody, and the other bank robberies didn't have security personnel. And as you know, the Fifth Third was the first bank robbery. So, no security personnel, no officer, the first time. He had every reason to believe no officer, no security personnel, the second time."); *id*. at 28 ("'Put it down. Put it away.' That's the evidence of intent. And then, yes, there is further evidence of intent. It's Daryl Lawrence's video-taped statement to the police and his journal. When he talked to the police -- you heard it yesterday first of all, when he was arrested, what did he say? You heard the testimony. You heard that there was a loaded Mossberg shotgun in the basement. Did Daryl Lawrence, this guy with this intent to kill, come up with a loaded shotgun? No. He came up and said, 'Don't shoot. Don't shoot. It's me.' He apologized. He said, 'I didn't mean to kill the officer.'"); *id*. at 36-37 ("I talked to you about 20 seconds in the beginning of this closing argument, and it's been referenced throughout. I urge you to play that tape, again, frame by frame by frame. The reality is, the intent issue is 4.5 seconds. And the reason that is, ladies and gentlemen, is there is 20 seconds from the time Daryl Lawrence enters the vestibule area until the time he leaves the vestibule area. Four point five seconds is the time in which Daryl Lawrence enters the bank, steps foot in the bank, and encounters Bryan Hurst before he turns to leave, four point five seconds, and they say he formed all this intent, thought about all these things before, put all that in his mind, and decided he had to kill Bryan to get to the vault and he did so intentionally. He's actually only inside the bank, not counting the vestibule area, a total of seven seconds, 4.5 seconds coming in, 2.5 seconds coming out. Think about those four point five seconds when you're deliberating. First, do it in peace, with no distractions. Think for 4.5 seconds. Then throw into the mix three people in the lobby. Then throw into the mix bank tellers. Then throw into the mix your vision obscured by a mask, a hood, and a T.V. set, and perhaps somebody sitting on a chair. Then add gunshots to the equation. Then add getting shot. You react.").

[42] TT V 10 at 45-46 (arguing that inference could be drawn that since no 40 caliber shell casings were found in the west foyer, Mr. Lawrence did not shoot first); *id* at 48-50 (arguing that Mr. Hardy's expert

the inferences to be drawn; there was readily available evidence that supported the defense's contention about how the shooting occurred that Mr. Lawrence's attorneys could have presented at the trial that both rebutted the Government's theory and supported their own. In other words, trial counsel could have made a compelling case to the jury that was based on actual physical and forensic evidence that corroborated the defense theory, rather than simply asking the jury to make unsupported conjectures to the benefit of Mr. Lawrence.

3. There is a reasonable probability that if trial counsel had presented readily available evidence of Mr. Lawrence's reduced moral culpability, at least one juror would have voted differently on Count 8.

The jury's sentencing decision was a close one, as evidenced by the jury's split verdict: it voted for life on Count 7, and death on Count 8. In other words, the Government clearly failed to persuade the jury that the evidence it heard throughout the trial amounted to an overwhelming case for death. Evidence that the fatal shot was not an intentional shot fired at point-blank range reasonably could have made a difference in the jury's sentencing determination on Count 8.

Indeed, as the Sixth Circuit noted in its opinion, the split verdict reflected the fact that "the degree of criminal culpability involved in the two offenses differed." *United States v. Lawrence*, 555 F.3d 254, 268 (6th Cir. 2009). As the Court further explained,

> the Count Eight offense implicated greater moral culpability than the Count Seven offense. Under Count Eight, the jury found that Lawrence, while using or carrying a firearm during an attempted armed bank robbery, *murdered* Bryan Hurst (i.e., with malice aforethought). Under Count Seven, the jury found that Lawrence,

---

testimony that Officer Hurst may have been shot at close range, despite lack of gunpowder particles on his shirt, should not be credited); *id*. at 50 (hypothesizing that 40 caliber casings could have gotten behind the teller area because they were "kicked" there by first responders); TT V 12 at 23 (arguing based on the location of bullet strikes from Mr. Lawrence's gun inside the bank, one could infer lack of intent); *id*. at 23-25 (arguing that inferences to be drawn from Mr. Lawrence's gunshot wound established that Officer Hurst fired first); *id*. at 25 (arguing that inferences to be drawn from still images of the bank surveillance footage was that Mr. Lawrence was "not looking to shoot"); *id*. at 26 (arguing that inferences could be drawn that 40 caliber shell casings "could easily have bounced into" the areas where they were found, or could have been moved there by the witnesses moving through the bank after the fact).

> during an attempted armed bank robbery, placed another's life in jeopardy and *killed* Bryan Hurst. The Count Eight malice aforethought element, according to the instructions, required proof beyond a reasonable doubt that Lawrence either killed Hurst "deliberately and intentionally" or acted "with callous and wanton disregard for human life." JA 116. The jury was not required to find malice aforethought to find Lawrence guilty under Count Seven.

*Lawrence*, 555 F.3d at 265-66 (emphasis in original).

In other words, Count Eight required that the jury find that Mr. Lawrence displayed a greater level of intentionality in his conduct than Count Seven. Clearly, if the aforementioned physical and forensic evidence at counsel's disposal had been presented at trial, there is a reasonable probability that at least one juror would have made the same determination on Count 8 as was made on Count 7 – that Mr. Lawrence's conduct did not rise to the level of "moral culpability" necessary to warrant a death sentence because the shooting was not a cold-blooded killing at point-blank range, but rather was the tragic result of Mr. Lawrence's panicked response during a chaotic exchange of gunfire. While that alternate scenario would not have absolved him of blame for his conduct, it is reasonably probable that it would have warranted – as on Count 7 – a sentence less than death.

Indeed, the manner in which the shooting occurred directly implicated one of the statutory aggravating factors which the jury weighed in reaching its ultimate sentencing determination: pecuniary gain. In order to prove that factor beyond a reasonable doubt, the Government was required to prove that the pecuniary gain was "expected to follow as a direct result of the murder." *United States v. Lawrence*, 735 F.3d 385, 411 (6th Cir. 2013). As the Sixth Circuit explained in its opinion on direct appeal:

> Here, in evaluating whether the pecuniary gain factor was proven, the jury had to determine whether Lawrence shot Hurst in order (a) to remove an obstacle to the attempted bank robbery, or (b) to abort the bank robbery attempt and secure his escape. If the jury were to find the former, then the pecuniary gain factor would

> have been established; if the latter, then the pecuniary gain factor would not have been established.

*Id*. at 414. But for counsel's deficient performance, the Government could not have proved that Mr. Lawrence killed Officer Hurst to remove an obstacle to the bank robbery. And defense counsel could have shown instead that Mr. Lawrence had aborted his attempt and was shooting in order to make a panicked attempt to flee the bank, thus removing one factor from the side of the scale that tilted toward death.

Additionally, counsel's failure to effectively challenge the Government's account of the shooting also implicated the mitigating factors that the jury weighed. By failing to mount a defense that convincingly supported the explanation Mr. Lawrence gave in his statement to the police – that, once in the bank, and confronted with an armed officer, he had panicked and started firing, for which he had great remorse – trial counsel gave the Government an opening to argue that Mr. Lawrence was lying about what he said his reaction in the bank had been, and to accuse him of lying about his remorse, as well. Indeed, the Government argued that the very fact that Mr. Lawrence contested the Government's account of the shooting demonstrated that he did not genuinely take responsibility for his actions or have remorse for what he had done. TT V 17 at 23 ("It was even claimed -- even claimed during the course of the trial that Officer Hurst shot first and the defendant returned fire. And he has accepted responsibility?").[43] Had counsel supported Mr. Lawrence's explanation, with forensic science, expert opinions, physical evidence, witness testimony, and images captured by the surveillance cameras, as they could

[43] *See also* TT V 17 at 22 ("They also claim the defendant has great remorse for his actions. What it really means is that the defendant is sorry that his actions have put him in that chair. He is sorry he got caught. Do you think Daryl Lawrence, the Daryl Lawrence that Dr. Cunningham described for you, would have had any remorse if he killed Bryan Hurst and not been injured himself? If he had gotten away clean?").

have, jurors would have had reason to believe Mr. Lawrence's account of the crime and the sincerity of his remorse, as well.

4. But for counsel's ineffectiveness, they could have presented readily available evidence to the jury based on expert forensic evidence that rebutted the Government's account of the shooting and supported their own.

Trial counsel had the opportunity to investigate and present readily available evidence that could take into account all the physical and forensic evidence that was collected from the crime scene and resulting autopsy, and provide a very different picture of how the shooting transpired, one that mitigated Mr. Lawrence's culpability. Had they followed through on their original plan to subject the crime scene evidence to scrutiny and utilize the assistance of a crime scene reconstruction expert, trial counsel could have offered an account of the shooting that not only was plausible but that better fit the forensic and crime scene evidence than the Government's own theory did:

> Daryl Lawrence entered the bank that morning with the intention of robbing it, unaware an armed officer was in the bank. After getting inside the bank, he saw Officer Hurst with his weapon raised and told him to put it down. Officer Hurst began firing at him, as Mr. Lawrence moved towards the teller desk, shooting out the window in the west foyer and hitting Mr. Lawrence with a bullet that penetrates from his left hand into his left forearm, and another that went through his left shoulder.[44] At this point, Mr. Lawrence begins firing back to create cover so he can get out of the bank, including firing one shot at close enough range that, although it misses Officer Hurst, it leaves stippling on his face.[45] Mr. Lawrence then continues firing almost blindly, keeping his head down and in the opposite direction from his shooting arm. He continues to return fire, as he runs out of the bank.

[44] It appears from diagrams this distance is roughly 30 feet. Unfortunately, law enforcement officers do not seem to have taken precise measurements of the bank floor plan or of Mr. Lawrence's path across it.

[45] In her FBI statement, dated 1/13/2005, Marian Large said that she saw "both the suspect and Hurst firing at each other from a short distance and over the top of the teller counter. They were 'face to face, gun to gun.'" This could have been the moment when a shot fired by Mr. Lawrence passed by Officer Hurst, creating stippling on his face. Because of the angle at which they were firing, this could not have been when the fatal shot was delivered.

For his part, Officer Hurst has spotted Mr. Lawrence as he enters the bank and understands Mr. Lawrence intends to rob the bank. Officer Hurst also sees that Mr. Lawrence has a gun, so begins to fire at him once the three people from the foyer are out of harm's way. Officer Hurst retreats toward the hallway as he is firing in order to get out from behind the teller line. The pattern of shell casings from his gun seems to be consistent with Officer Hurst shooting as he is moving south towards the hallway…. By this point, Mr. Lawrence has ducked down on the other side of the teller desk and is firing his gun only with the aim of being able to get out of the bank without getting shot. With his head turned away from his own line of sight on his gun, Mr. Lawrence fires his gun in the direction he thinks shots are coming from. He then begins to charge out the bank, firing behind himself. Officer Hurst is now in the hallway, shooting at him from the end of the teller desk. The location of at least two of Officer Hurst's spent shell casings is consistent with Officer Hurst firing from the corner of the hallway, by the front of the teller line, where Michelle Johnson saw him in a shooting stance. One of the shots Mr. Lawrence fires while he is retreating, strikes Officer Hurst in the chest. Mr. Lawrence then falls through the door and continues running away.

This explanation is consistent with:

- the initial statements and police interviews given by bank eyewitnesses, including Amanda Goodman and Michelle Johnson;
- the police statement given by bank customer Brian Dickerson;
- the stippling on Officer Hurst's face;
- the lack of gun residue on Officer Hurst's shirt;
- the bullet strikes in places like the upper window behind the teller desk and the upper wall towards the south of the bank;
- the bullet strikes (presumably from Officer Hurst's gun) in the west wall and north wall of the bank;
- the video surveillance footage, when lined up for frame by frame comparison;
- the ejection pattern of the Mini Firestorm;
- the location of spent shell casings from both Mr. Lawrence's and Officer Hurst's guns;
- the trajectory of the fatal bullet through Officer Hurst's body;
- the location and position of Officer Hurst's body (on his back) in the hallway when he collapsed.

> …[T]hat this explanation is not only plausible and consistent with the physical evidence and witness statements, but that it is more plausible than the narrative the Government offered at trial, the support for which could have been seriously undermined and rebutted by a qualified forensic pathologist, supplied with adequate materials to understand the crime scene; a qualified firearms expert; and a crime scene expert.
>
> This alternate explanation provides reason to believe that Officer Hurst was not fatally shot at point blank range while crouched behind the teller line, and that he could have been shot from a distance after he came out from behind the teller line. This alternate explanation also provides reason to believe that Mr. Lawrence did not fire his weapon with the intent to kill Officer Hurst, but rather that Mr. Lawrence panicked in the moment and that the exchange of gunfire was chaotic rather than deliberate. This alternate explanation also provides reason to doubt that Mr. Lawrence killed Officer Hurst in order to get to the bank vault and instead provides reason to believe he engaged in suppressive fire. In other words, it appears that Mr. Lawrence shot Officer Hurst in the course of his attempt to cover his retreat from the bank, not to continue a forward drive towards the bank vault.

Exh. 8 at 29-30.

If trial counsel had presented the readily available evidence discussed above, trial counsel could have effectively mitigated Mr. Lawrence's culpability to a sufficient degree that it is reasonably probable that at least one juror would have found that he deserved the same sentence on Count 8 as he received on Count 7.

Instead, counsel employed a scattershot approach to attacking the Government's case based on little more than asking the jury to believe its own analysis of the evidence. Trial counsel could have used science and expert testimony to demonstrate that the ballistics evidence supported their assertions that Mr. Lawrence had fired the fatal shot from a distance, that he had not been firing his gun as he ran towards the teller desk, and that he had not fired three shots over the teller desk at close range. They could have challenged the false illusion created by the surveillance videos of an aggressive attack, and instead shown that by the time Mr. Lawrence reached the teller desk, Officer Hurst had shot out the window in the west foyer, proving that he had his gun unholstered and was already firing it. They could have also shown with these images

that Mr. Lawrence was not firing with deliberation or the intention to kill; for most of the six seconds he was inside the bank lobby, he was firing without looking, shielding his face in his arm, with his head turned away from his gun, and then trying to get out of the bank. Trial counsel could have corroborated this with testimony from Michelle Johnson who saw Officer Hurst come from behind the teller desk, not staggering and near death, but upright and still firing his weapon; and from Brian Dickerson who, consistent with the ballistics and photographic evidence, saw Mr. Lawrence firing his gun in his attempt to get out of the bank. Trial counsel's failure to present an alternate account of the shooting that mitigated Mr. Lawrence's culpability constituted ineffective assistance, and Mr. Lawrence was thereby prejudiced.

## III. TRIAL COUNSEL DEPRIVED MR. LAWRENCE OF EFFECTIVE ASSISTANCE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WHEN THEY FAILED TO ASK FOR A CONTINUANCE OF HIS CAPITAL TRIAL DATE.

Jury selection for Mr. Lawrence's trial began on February 13, 2006, thirteen months after his arrest on January 10, 2005 and just five months after the Justice Department's notice that it would seek the death penalty. In federal capital cases, the average time between indictment and trial is approximately 28 months. The average time between the indictment and the Government's notice of intent is 13 months, the same amount of time Mr. Lawrence's team was given to prepare their case for trial and sentencing. Federal capital defense teams have on average 16 months between DOJ's notification and commencement of trial, a period more than three times longer than that available to defense counsel here.[46] *See* Declaration of Kevin

[46] Counsel who tried the case in fact had less than thirteen months. Then-federal defender Steven Nolder was initially appointed to represent Mr. Lawrence the day he was arrested, January 10, 2005. ECF Doc. No. 3. On January 31, Mr. Nolder moved to withdraw because he was scheduled to try another federal capital case, *United States v. Mayhew*, on August 1, 2005 and would not have been able to conduct the fact and mitigation investigation in Mr. Lawrence's case before the meetings with the local USA or the DOJ's Capital Case Committee. ECF Doc. No. 12; Exh. 32. The Court appointed Mr. Gatterdam and Ms. Menashe the same day, January 31, 2005, three weeks after Mr. Nolder had been appointed. ECF Doc.

McNally Regarding Pre-Trial Preparation Time, *available at* http://www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=98&folder_id=2496, Declaration re Time to Trial (McNally 2014), last checked 11/23/15.

This comparatively foreshortened pretrial preparation time might have been enough to give Mr. Lawrence's counsel pause. On top of that, however, events specific to the Lawrence case cost his counsel crucial time and made a motion for continuance essential: Mr. Lawrence's initial counsel withdrew three weeks after his appointment; his mitigation specialist did no work on the case for several months of the year leading up to trial, leaving attorney Diane Menashe to attempt to fill the dual roles of mitigation specialist and appointed counsel; both of Mr. Lawrence's lawyers, Ms. Menashe and Kort Gatterdam, were preparing for more than one other capital case and serious felony cases during the same time period; and essential tasks had yet to be completed by the start of trial, including testing by guilt phase experts, follow-up with testifying mitigation witnesses, and preparation of penalty phase experts.

Each of these events alone would have called for a continuance in this, Mr. Gatterdam and Ms. Menashe's first federal capital trial. Had they at any time presented evidence of the reasons their preparation for Mr. Lawrence's trial was hampered, the Court would have had a fuller and timelier opportunity to consider whether a continuance was actually warranted. However, by the time the defense raised its first and only argument for a continuance, three days before jury selection was set to begin, the wheels of trial were set in motion, and the Court denied the request.

Had they asked for a continuance, supported the request (with reasons other than the Government's belated disclosure of discovery), and been granted the necessary time, the

---

No. 13. On February 2, 2005, the Court held a status conference. Minute Entry 2/2/05. On February 3, the Court entered a scheduling order setting Mr. Lawrence's case for trial on February 13, 2006. ECF Doc. No. 14. Jury selection in fact began on that date.

omissions cited elsewhere in this motion would not have occurred and the outcome of this case would have been different.[47]

### A. Trial Counsel Asked for a Continuance Only Once, on the Friday before Mr. Lawrence's Trial Was to Commence Three Days Later, Relying Solely on the Government's Late Disclosures of Evidence.

The first and only time counsel moved for a continuance was on February 10, 2006, the Friday before the Monday that jury selection was set to begin. Mr. Gatterdam's argument[48] for a continuance hinged on the fact that the Government had within the previous two weeks bombarded the defense with what Mr. Gatterdam described as an "avalanche of discovery on the eve of trial." TT 2-10-2006 Discovery Hearing at 3. Indeed, Mr. Gatterdam asserted that but for that avalanche, the defense "thought we were ready to go forward." TT 2-10-2006 Discovery Hearing at 25.[49]

Counsel structured his argument as a point-by-point complaint about the Government's disclosure of certain items. Mr. Gatterdam referred to eleven hours of phone calls the defense previously did not think would be introduced but which they now would have to listen to; a

[47] The prejudice that resulted from trial counsel's failure to move for a continuance earlier in the pretrial year is further pled in the individual claims detailing the lapses in preparation and is incorporated herein.

[48] At the February 10 hearing, Mr. Gatterdam appeared alone for the defense. Ms. Menashe was "trying to interview some witnesses on the government's theory on pecuniary gain." TT 2-10-2006 Discovery Hearing at 52.

[49] When Mr. Gatterdam formally moved for a continuance, he acknowledged the effect of his eve-of-trial request for a postponement, while also clearly stating that the alternative would be devastating to the defense's trial preparation:

> I don't think there is any possible way, with this new evidence, when you lump it all together, that we can be prepared to deal with this come Monday morning.
>
> I recognize how inconvenient that is to everything that's gone on, and I don't take this lightly. . . I'm not up here just . . . making a record just to make a record. We really have thought long and hard about this and what's come in. We thought we were ready to go forward, and then this stuff keeps coming in and coming in, and there is only so many hours in a day, and there is only two of us to prepare to defend Mr. Lawrence, and I don't see any way that we can deal with this.

TT 2-10-2006 Discovery Hearing at 22.

montage of photos of Officer Hurst which the Government sought to introduce and whose admissibility the defense was forced to devote time to researching; the recent disclosure of a knit cap that needed to be subjected to DNA testing and which the defense had no time to present to its DNA expert for testing; a last-minute disclosure of a witness with potentially exculpatory information. TT 2-10-2006 Discovery Hearing at 8, 14, 17; *see also id*. at 20-24. Defense counsel contended that because of the prosecution's belated disclosure of various items, he and Ms. Menashe were spending their time "scrambling" to research issues that had just come up, line up rebuttal witnesses, and digest discovery "instead of preparing for trial." TT 2-10-2006 Discovery Hearing at 4.

Presented with an argument about single items of belatedly disclosed evidence, the Court was easily able to address each in turn and obtain Mr. Gatterdam's admission that no single item's disclosure was prejudicial to the defense. TT 2-10-2006 Discovery Hearing at 63-94. The Court then addressed counsel with a single query: "The issue we're here today for is not whether you've gotten the evidence untimely, because you will admit the evidence is all there and has been there for quite some time. It's the manner in which they intend to use it or the relevance of that, right?" TT 2-10-2006 Discovery Hearing at 94. Mr. Gatterdam agreed, and the motion was denied. TT 2-10-2006 Discovery Hearing at 94-95.

But there were many more reasons why a postponement was imperative.

**B. Mr. Lawrence's Mitigation Specialist Was Not Working During Critical Junctures of the Case.**

[redacted] The correspondence between Ms. Phillips and Ms. Menashe establishes that Ms. Phillips was not working at all on Mr. Lawrence's case during months of the year leading up to his trial. On March 25, 2005, Ms. Menashe assigned

tasks to Ms. Phillips and other team members. Exh. 33. A month later, on April 25, Ms. Phillips reported to the attorneys on the status of her to-do list. In her email, she said that she had interviewed three of nine witnesses[50] on her list. Exh. 34. [redacted]

The attorneys then wrote Ms. Phillips in late July reminding her to visit Mr. Lawrence and another of their capital clients in order to build rapport and "obtain additional mitigation information." Exh. 12. In the same email, Mr. Lawrence's lawyers noted that both cases were likely to go to trial. *Id.* Ms. Phillips responded saying, "Yeah, I've been bad about the visits. Sorry. I'll try to get down there to see them in the next 2 weeks." Exh. 12. [redacted] In September, Ms. Menashe contacted Ms. Phillips again to urge her to set up GED classes for Mr. Lawrence. Three weeks later, on October 6, 2005, having heard nothing from the mitigation specialist, Ms. Menashe wrote her that it was "imperative" that she follow up on these issues and noted, "We are already just four months out from trial." Exh. 37. By mid-November, Ms. Menashe's emails to Ms. Phillips make Ms. Phillips's abdication of her work on Mr. Lawrence's case plain: "I know you are [on] trial with Kort but there are a couple of things that need to be done by the time [trial expert Dr. Mark] Cunningham arrives . . . Overall, I have realized today that the mitigation presentation of this case is very far from being complete." Exh. 13. Trial was less than three months away. On November 18, 2005, Ms. Menashe noted in an email to Ms. Phillips the tasks she would need her help with during Dr. Cunningham's imminent two-day visit to Columbus. Exh. 37. In the same email, Ms. Menashe said that she would be available most of the times Dr. Cunningham would be in town, except for a sentencing she had

---

[50] Of the remaining witnesses, one was deceased, one Ms. Phillips "talked to" but did not say she interviewed, and one claimed via voicemail not to remember Mr. Lawrence.

one of the afternoons and that Mr. Gatterdam was likely to be in a death penalty trial, so "Martha, it is you and me." Exh.37.

Notwithstanding this warning, nine days later, on November 27, 2005, Ms. Menashe was again compelled to email Ms. Phillips about her unavailability at an important juncture of trial preparation, this time about providing information to Dr. Cunningham. Exh. 12. Ms. Phillips replied to Ms. Menashe the following day, admitting that she had been out of town and had "really screwed up" by failing to provide Ms. Menashe with a mitigation timeline that counsel intended to provide to Dr. Mark Cunningham. Exh. 12. Ms. Menashe was forced to spend a day producing the timeline herself. Exh. 12. By November 29, 2005, Ms. Menashe appeared to have given up on expecting work from her mitigation specialist. On that day, she emailed Mr. Gatterdam and Ms. Phillips a list of nine key mitigation tasks that she had accomplished or planned to accomplish herself; these ranged from obtaining records, to interviewing witnesses, to constructing a family tree for trial, to completing jail paperwork for Dr. Cunningham to be able to interview Mr. Lawrence. Exh. 25.

By early December, Ms. Phillips had all but been dismissed from Mr. Lawrence's case. On January 10, 2006, a month before the start of trial, the Court entered a sealed, ex parte order concerning defense witness expenses and attaching defense counsel's accounting of expert expenditures to date. [redacted] Ms. Phillips did not participate in the trial, leaving Ms. Menashe to prepare for the penalty phase alone while trial was underway.

### C. Mr. Lawrence's Trial Counsel Were Juggling a Number of Serious Cases, Including Another Capital Case, While Preparing for His Capital Trial.

Another reason Mr. Gatterdam and Ms. Menashe should have moved for a continuance is their ongoing commitments to other clients in serious criminal matters, including at least one other capital client whose case they were preparing at the same time as Mr. Lawrence's. Their correspondence is rife with references to their busy dockets. For example, Ms. Menashe wrote to Mr. Lawrence on April 25, 2005 that she was to start a federal trial that day that was expected to last two weeks and that when that trial concluded, she would start a rape case in Licking County and then another rape case in Franklin County, which were "literally set back to back." Exh. 38. Mr. Gatterdam was also busy representing clients in serious matters, including other capital cases, in the year leading up to Mr. Lawrence's trial. On August 26, 2005, he wrote Ms. Menashe that he planned to move for a continuance for filing motions on Mr. Lawrence's case because he was headed to Mansfield to visit a client who wanted to go to trial on a rape case. Exh. 39. Both Ms. Menashe and Mr. Gatterdam were also representing another capital client, Marty Baxter, who was facing capital charges stemming from an October 2004 incident. *See* Jim Burroway, Daniel Fetty Doesn't Count, Box Turtle Bulletin, Jan. 9, 2006 (describing Mr. Baxter's avoiding the death penalty by pleading guilty to aggravated murder charges on September 23, 2005). Moreover, as noted previously, Ms. Menashe wrote to Ms. Phillips on November 18, 2005, nearly two months after Mr. Baxter's plea, stating that Mr. Gatterdam would likely be in yet another capital trial in early December 2005, when Dr. Cunningham would be in Columbus. Exh. 37. Indeed, in an email reply to defense expert Scott Roder who had written Ms. Menashe inquiring whether she had downloaded a video he had sent, Ms. Menashe wrote that she had not. Exh. 40. Ms. Menashe went on to explain, "no. i am . . . swamped w/work. my co-counsel is in a death penalty case so I am doing everything on

lawrence plus running my own practice without a secretary." Exh.40. In addition, Ms. Menashe wrote testifying expert Dr. Elijah Anderson on December 1, 2005, apologizing for the delay in responding to a November 19 message from him, that she "was out of town and then [she] was tied up in trial until just recently." Exh.17.

Yet, notwithstanding the fact that both Ms. Menashe and Mr. Gatterdam had other serious cases on their dockets, and that Ms. Phillips had been largely unavailable to work on Mr. Lawrence's case, they failed to seek a continuance for their first federal capital trial. The results were apparent from the last-minute preparation of witnesses and evidence during Mr. Lawrence's trial.

**D. The Change of Mitigation Team Members Resulted in Inadequate Mitigation Investigation and Inadequate Preparation of Mitigation Witnesses.**

Martha Phillips's lack of work on Mr. Lawrence's case for the better part of the spring, summer, and fall of 2005 and Dr. Mark Cunningham's joining the defense team in late October 2005 resulted in an eleventh-hour mitigation search for essential facts and last-minute preparation even of testifying witnesses. The majority of mitigation witnesses were interviewed for the first time two months before trial started, and some were not interviewed at all before they testified. At least as early as December 2005, when Ms. Menashe was setting up witness interviews for Dr. Cunningham, it was apparent that no one from Mr. Lawrence's defense team had talked with many of those witnesses before. This was yet another good reason and missed opportunity to file a motion for adequate time. Exh. 1 at ¶¶ 75, 78.

Ms. Phillips conducted nine of her thirteen total mitigation interviews between February and April 2005. Between late April and early October 2005, she conducted a single mitigation interview, which took place in July. The vast majority of mitigation interviews took place in or after December 2005, after Dr. Cunningham joined the team. Diane Menashe first reached out to

Dr. Mark Cunningham in July 2005 to request his mitigation services in Mr. Lawrence's case. Exh. 41. [redacted] With that decision, Dr. Cunningham became the principal mitigation witness and social historian in Mr. Lawrence's case. He did not, however, receive records that would allow him to begin working on Mr. Lawrence's case until November 4, 2005. Exh. 45.

Dr. Cunningham also did not begin interviewing witnesses or meet with Mr. Lawrence until December 8 and 9, 2005. [redacted]

Moreover, Ms. Menashe had, as late as February 13, 2006, the day trial started, repeatedly communicated to Dr. Cunningham that his testimony would take place sometime the week of March 20, 2006. Exh. 47; Exh. 48. In fact the trial unfolded such that Dr. Cunningham testified on March 8. TT V 16 at 90. This timing meant that Dr. Cunningham, the principal mitigation expert and witness, spent at best three days with witnesses before he testified.

[redacted]

[redacted] This clearly last-minute preparation of critical penalty phase witnesses demonstrates that, as Ms. Menashe recognized in late November, the mitigation case was "very far from being complete," a problem that remained even after the start of trial, at which point it was far past time to seek a continuance. Exh. 13.

**E. The Failure to Seek Adequate Time Damaged the Guilt Phase Investigation.**

[redacted]

On November 15, 2005, Ms. Menashe terminated Mr. Rini's work in the case.[51] [redacted] Trial counsel did not seek to replace Mr. Rini with another expert until January 9, 2006 – roughly a month before jury selection was set to begin. [redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] Mr. Rini had left the case, however, on November 15, 2005. Other than the hours he had spent, the investigation into this matter—correctly described by counsel as "imperative"—remained at a standstill a month from trial.

This was indeed a critical area of inquiry for the defense. Fourteen different shots were fired inside the Fifth Third Bank on January 6, 2005, leaving behind a number of spent shell casings, spent bullets, metal fragments, and bullet strikes. Witnesses in the bank gave conflicting statements about the shooting, and the bank surveillance cameras—which operated at only two frames per second and did not contain any audio—were not pointed at the area behind the teller line and failed to capture any images of Officer Hurst being shot. Thus, it was critically important for trial counsel to receive the assistance of qualified experts to reconstruct the shooting, as neither the witness statements nor the surveillance videos provided a definitive account of the incident. As trial counsel correctly recognized, the manner in which the shooting took place would have significant bearing on all phases of the trial, so absent the assistance of their own experts, they would neither be able to rebut the Government's account of the offense, nor put on favorable evidence of their own.

With little over a month remaining before the commencement of trial, counsel should have moved for a continuance to allow Mr. Nixon adequate time to review all the crime scene evidence, and to allow themselves the time necessary to properly consult with their new expert about how best to critique the Government's case, as well as develop rebuttal evidence consistent with the defense theory of the case. In the absence of a continuance, counsel were in the unenviable position of having to consult with an out-of-state expert who, before he could conduct any testing of his own, first had to digest a large amount of Government discovery and

learn the case from scratch. Moreover, as noted above, counsel were already overburdened in the month before trial by waves of new discovery from the Government.

The Government's belated disclosure of important evidence presented its own significant challenge. Mr. Gatterdam described as an example the problems presented by the Government's February 7 disclosure that a former bank employee, Amanda Goodman, had given a potentially exculpatory statement that could have rebutted an intent element. TT 2-10-2006 Discovery Hearing at 17. Counsel explained that they could not get access to the tellers but that Ms. Goodman's status as a former employee might have made her accessible to him and Ms. Menashe. TT 2-10-2006 Discovery Hearing at 17. Yet, the Government's belated disclosure of her as a potential witness put the defense at a great disadvantage, and Mr. Gatterdam described how prejudicial it was for the defense to have to find and interview witnesses that close to the beginning of trial:

> Now when we're trying to prepare for trial and deal with the government's evidence, to send somebody out to deal with this now, it's just difficult to do, and I don't think it's certainly in the spirit of the constitutional right to present a defense that we're chasing people down, trying to get them in here, when we haven't even talked to them yet.

TT 2-10-2006 Discovery Hearing at 18, 19 (describing investigator Matt Sauer's attempts to locate Ms. Goodman). Mr. Gatterdam went on to enumerate a number of additional instances in which the Government's disclosure of evidence in the preceding two weeks would hamper the defense's ability to interview witnesses or analyze physical evidence. TT 2-10-2006 Discovery Hearing at 20-24.

Similarly, Ms. Menashe—who was the main point of contact with Mr. Nixon—was herself overwhelmed with work in the month before trial because, as noted above, she had to assume the extra duty of conducting mitigation interviews and preparing the penalty phase

presentation after Martha Phillips effectively dropped the case. Simply put, trial counsel had very little time available to work closely with Mr. Nixon or devote much attention to that aspect of the defense. Consequently, key pieces of Government evidence went unrebutted.[53]

For example, one of the key issues in the case was whether the fatal shot was fired at point-blank range. The Government argued that the fact that several .40 caliber shell casings were found behind the teller line were proof that Mr. Lawrence fired the fatal shot while he was leaning over the teller counter, and while Officer Hurst was crouched behind the teller line. TT V 10 at 29-30, 31; *id*. at 66. Trial counsel's only argument in response was that the casings might have gotten moved into that area by first responders and witnesses at the scene after the fact, *see e.g.*, TT V 10 at 50, which the Government ridiculed as implausible throughout the trial. *See, e.g.*, TT V 10 at 67; 12 at 10-11 ("The defendant is over the counter, firing. He got three shell casings over the counter. They want you to believe, apparently, that somebody soccer kicks those over the counter. If you remember, the only way to get behind that counter was down that little hallway and through that doorway. The problem was that down that hallway and through that doorway, after the shooting stopped, laid Bryan Hurst. And somebody kicked those shell casings back there?"). Had trial counsel had adequate time to investigate the crime scene evidence in consultation with their expert, however, they would have had a solid, plausible explanation to offer about how the shell casings landed behind the teller counter—and one that was backed up by data and expert testimony.

Specifically, the type of gun that Mr. Lawrence used has a peculiar ejection pattern when it is held at 90 degrees, or what is sometimes referred to as "side grip."

[53] Counsel's omissions with respect to the investigation and presentation of guilt phase evidence are discussed in more detail in Claim 2.

Rather than eject casings up, to the right and to the rear, the casings are ejected *up and to the left* when the gun is fired at 90 degrees. Exh. 4 at 2. If Mr. Lawrence had been holding his gun at 90 degrees while firing toward the south end of the bank, his shell casings would have ejected up and to the left – that is, over the teller line, as discussed in Claim Two, would have been to Mr. Lawrence's left while firing south.

In fact, evidence collected at the scene indicates that Mr. Lawrence *did* fire several shots toward the south end of the bank, as there were bullet strikes located in those areas. TT V 7 at 61, 65.[54] Thus, it was entirely plausible that the shell casings landed behind the teller line as they were ejected from Mr. Lawrence's gun as he was shooting toward the south end of the bank, rather than as the result of shots fired while his gun was over the teller line. In other words, the location of the shell casings behind the teller line were not indisputable evidence of shots fired at point-blank range while Officer Hurst was crouched behind the teller line, the theory the Government offered the jury in its case for guilt and for imposition of the death penalty.

This alternative explanation about the location of the shell casings is based on the ejection pattern analysis conducted by Mr. Nixon. Unfortunately, because he was retained so late, Mr. Nixon was unable to produce his final report on this matter until February 22, 2006 – the day of opening statements and the first day of evidence at trial. It appears that trial counsel did not have adequate time to make good use of its results. Indeed, the Government's expert, Mr. Hardy, testified two days later, and although trial counsel cross-examined him about the fact that a gun held at 90 degrees ejects shell casings *differently* from a gun held in a traditional firing grip, counsel did not ask in what direction the casings would be ejected, nor did counsel elicit

---

[54] As is explained in more detail in Claim 2, postconviction counsel have discovered evidence that suggests that Officer Hurst ran south and came out from behind the teller line toward the lobby area during the shooting and fired shots from that position, which would explain why Mr. Lawrence would have pointed his gun toward the south end of the bank and shot in that direction.

more specifically that the casings would eject up and to the left, a fact highly relevant to the question of intent. TT V 8 at 60. Similarly, trial counsel did not call Mr. Nixon as a defense expert to testify about his results or proffer affirmative evidence about the ejection pattern of Mr. Lawrence's gun. Thus, trial counsel was without any recourse to rebut the highly damaging argument upon which the Government relied to claim that the location of the shell casings proved that Mr. Lawrence fired his gun at Officer Hurst at point-blank range while he was crouched behind the teller counter. The Government's interpretation of the evidence—the only interpretation the jury heard—was that the location of the shell casings meant a point-blank shooting and thus a highly aggravated intentional murder.

This was not a situation where evidence did not exist to rebut the Government's forensic crime scene experts; such evidence was readily available—indeed, in the case of the ejection pattern analysis, it was even in trial counsel's possession—but trial counsel left themselves too little time to be able to adequately investigate and present such evidence effectively, or at all. As is explained more fully in Claim 2, Mr. Lawrence was prejudiced by counsel's inadequate preparation, as the failure to effectively rebut the Government's contention that Mr. Lawrence shot Officer Hurst at point-blank range while he was crouched defensively behind the teller line had a negative impact on the jury's deliberations in all three phases of the trial.

### F. Mr. Lawrence's Case Was Not Ready for Trial on February 13, 2006.

Counsel should have candidly informed the Court about the status of their guilt phase investigation as of January 2006, as well as the myriad reasons why they were understandably unable to prepare both the guilt phase and mitigation phase presentations by the February 2006 trial date. This case was already moving quickly for a federal death penalty prosecution. The trial court should have been made aware of the particular set of circumstances here that would

conspire to leave even the best and most committed attorneys unprepared: the inadequacy and ultimate loss of a mitigation specialist; a late replacement of a key forensic expert; a penalty phase expert who did not have time to conduct the necessary mitigation interviews adequately, all on top of the belated discovery disclosure that was raised at the hearing on the very eve of trial. The failures to investigate and present compelling mitigating evidence and to defend properly against the Government's theory of the offense prejudiced Daryl Lawrence in the manner discussed throughout this motion.

## IV. THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY AND IMPEACHMENT MATERIAL, IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

Disclosure of exculpatory and impeachment information is part of the constitutional guarantee to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of such information when it is "material"[55] to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Because *Brady* and *Giglio* impose constitutional obligations on the prosecution, *Brady* and *Giglio* material must be disclosed regardless of whether the defendant makes an explicit request for exculpatory or impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 432-433 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985). In death penalty cases, the undisclosed facts may be material to the punishment phase alone. *See, e.g.*, *Jackson v. United States*, Case #:1:09-cv-01039-RC, ECF

[55] Exculpatory and impeachment information is "material" if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). To satisfy the "reasonable probability standard," there must be "a probability sufficient to undermine confidence in the outcome." *Id.* A defendant need not show that an acquittal would have necessarily resulted with the disclosure of the withheld evidence. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Significantly, the materiality of the suppressed evidence must be considered collectively, rather than item by item. *Id.* at 435-436 ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

Doc. Nos. 174 & 175 (E.D.Tex. 5/26/2013) (death sentence vacated where Government inadvertently failed to turn over evidence of client's schizophrenia).

Recognizing that it is sometimes difficult to assess the materiality of evidence, the Supreme Court has counseled that prosecutors should err on the side of disclosure. *Kyles*, 514 U.S. at 439; *see also United States v. Agurs*, 427 U.S. 97, 108 (1976) ("The prudent prosecutor will resolve doubtful questions in favor of disclosure."). Accordingly, the Government has an affirmative duty to search for, learn of, and disclose exculpatory and impeachment information in the possession of the members of the prosecution team, which includes federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant. *Kyles*, 514 U.S. at 437-438.[56] Moreover, "the duty to disclose is ongoing." *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987).

Based on information learned as part of the postconviction process, Mr. Lawrence has a good faith basis to assert that the Government did not comply with its obligation to disclose material exculpatory and/or impeachment information. Specifically, the Government failed to disclose information that contradicted the account of the 2005 shooting at the Fifth Third Bank that it presented at Mr. Lawrence's trial. The failure to disclose this information was prejudicial because it would have provided a plausible alternative account of the shooting rebutting the Government's contention that Mr. Lawrence intentionally shot Officer Hurst at point-blank range in order to get to the bank vault. This alternative account would have supported the defense theory that Mr. Lawrence was not expecting an armed officer when he entered the bank, that he panicked when Officer Hurst drew his weapon, and that in the chaotic exchange of rapid gunfire

[56] *See also Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964) ("[T]he police are also part of the prosecution, and … the taint on the trial is no less if they, rather than the State's attorney, were guilty of nondisclosure.").

that ensued, Mr. Lawrence shot Officer Hurst from a distance in an attempt to give himself cover to flee the bank, rather than as part of an "execution-style" shooting to kill a security officer so that he could then complete the robbery.

### A. There is Compelling Record Evidence that the Government Did Not Comply with Its Obligation to Disclose Exculpatory and Impeachment Material.

On August 29, 2005, trial counsel moved for the disclosure of exculpatory and impeachment material. ECF Doc. No. 43. At a September 26, 2005, hearing on the motion, the Government represented that it understood its continuing obligation to provide such information to trial counsel, and would make disclosures as soon as it came into possession of any such materials. *See* TT 9-26-05 Motion Hearing at 80 ("Of course, *Giglio* we'll provide to defense counsel as we get it."); *id*. at 83 ("*Brady* material we'll disclose, quite frankly, as we get it.").

On February 10, 2006 – the Friday before jury selection was set to begin – the Court convened a hearing at trial counsel's request to discuss issues related to the "avalanche of discovery" that the Government was providing for the first time on the eve of trial. TT 2-10-06 Hearing at 3. One such piece of discovery was a previously undisclosed statement by Amanda Goodman, an eyewitness at the 2005 Fifth Third Bank robbery, which constituted *Brady* material.

Specifically, Ms. Goodman gave a statement to police on the day of the shooting in which she stated that she heard Mr. Lawrence shout "Put it down. Put it away." before any shots were fired. *Id*. at 16-17. As trial counsel explained, this statement was exculpatory on the issue of intent and the pecuniary gain statutory aggravating factor because it demonstrated that Officer Hurst had already drawn his weapon when Mr. Lawrence entered the bank, which: (1) rebutted the Government's theory that upon entering the bank Mr. Lawrence immediately shot at Officer Hurst before he had unholstered his weapon in order to get to the vault and complete the robbery,

and (2) supported the defense theory that Mr. Lawrence was surprised to see an armed officer in the bank, abandoned the plan to rob the bank, and instinctively returned fire in a panicked attempt to flee. TT 2-10-06 Hearing at 16-17.

In response, the Government argued that it did not consider Ms. Goodman's statement to constitute *Brady* material, and that it was not even sure that it would call Ms. Goodman as a witness:

> MR. DEVILLERS: As far as Ms. Goodman's summary, Your Honor, we did not call Diane Menashe and say, Hey, we've got *Brady* material for you. We called Ms. Menashe and said, We have a summary that we think you should look at. And that is Summary 16, which the defense marked as A.
>
> And, Your Honor, we interviewed everybody at the bank, except for Ms. Goodman, recently. And Ms. Goodman was fired from her job, and she has some emotional problems. We intended to put her on as a witness, but because of that, we decided we're not going to; we have enough. But as we read her summary, she does say at one point that she hears the defendant say, "Put it down. Put it away." None of the other witnesses say that. I will say that now.
>
> So, we, being cautious and being fair, gave *Jencks* material two weeks before the opening statement. And that's what this is, is potential *Jencks* material if she was going to testify. We realized we're not going to put her on; they may want to. So we provided it to them.
>
> THE COURT: You characterize it as *Jencks* material, as opposed to *Brady* material?
>
> MR. DEVILLERS: Your Honor, I have no idea how Mr. Gatterdam gets from this summary to it being exculpatory to go to intent. If you believe everything in this summary, she heard the suspect say something like, "Put it down, put it down," and then shots being fired.
>
> How is that exculpatory? How does that go to intent? The defendant fired seven shots, one of them in the chest of Officer Hurst. I don't see how telling somebody to put it down and then shooting them is exculpatory or goes to intent at all. I don't see any logical leap there. I don't see how it goes to sentencing. We have all the mitigating factors. There is nothing to do with this as far as mitigating factors, but we provided it anyway, and, Your Honor, we provided it two weeks before opening statement.
>
> And we may use it, Judge. We may put her on.
>
> THE COURT: You may put her on?
>
> MR. DEVILLERS: We may put her on.

TT 2-10-06 Hearing at 30-32.

The Government's response was telling because it demonstrated a failure to comply with its obligations to disclose exculpatory and impeachment information. As an initial matter, with respect to impeachment information, it is notable that despite identifying Amanda Goodman as a trial witness on the list it provided to defense counsel on January 20, 2006,[57] as of February 10, 2006, the Government had yet to disclose to trial counsel that Ms. Goodman suffered from "emotional problems" that were so severe that the Government was undecided as to whether to call her as a witness.[58] The failure to disclose this information was particularly significant given that: (1) trial counsel's pretrial motion for disclosure of impeachment material specifically requested information regarding evidence of any "mental disease or defect … of any witness whom the government intends or contemplates calling at trial." ECF Doc. No. 43 at 5-6; and (2) the Government had previously assured the Court and trial counsel that it would provide impeachment material to defense counsel "as we get it." TT 9-26-05 Motion Hearing at 80.[59]

Despite the fact that Ms. Goodman's statement was made on January 6, 2005, the Government did not turn it over to defense counsel until February 7, 2006 – approximately six days before jury selection. TT 2-10-06 Hearing at 33. Given the Government's theory of the case, Ms. Goodman's statement was clearly exculpatory for the reasons articulated by trial counsel at the hearing. But regardless of whether the Government agreed that the statement

---

[57] *See* TT 1-20-06 Status Conference at 15-16 (noting that Government had provided its witness list to trial counsel); TT 2-10-06 Hearing at 33 (noting that Ms. Goodman is listed as a witness on the Government's witness list); Exh. 64.

[58] In that same February 10th hearing, the Government noted: "Our victim/witness coordinator has been attempting to locate Ms. Goodman for some weeks now because our victim/witness coordinator is aware of the fact that she has had some psychological problems, possibly due in part to what happened in January of '05, and there is apparently a program that she wanted to try to put her in touch with." TT 2-10-06 Hearing at 83.

[59] The Government's disclosure here also appears to have been inadvertent, as the prosecutor mentioned it off-hand at a hearing that was convened at the last minute based on a request made by trial counsel. TT 2-10-06 Hearing at 27.

constituted exculpatory *Brady* material, it should have recognized its potential impeachment value with respect to the other bank witnesses given the Government's concession that "[n]one of the other witnesses" mentioned that Mr. Lawrence had shouted to Officer Hurst to put his gun away before the shooting started. TT 2-10-06 Hearing at 31.

### B. The Government Failed to Disclose Material Exculpatory and/or Impeachment Information Pertaining to Michelle Johnson.

Mr. Lawrence has a good faith basis for asserting that the Government failed to disclose relevant exculpatory and/or impeachment information with respect to Michelle Johnson, an eyewitness to the 2005 Fifth Third Bank robbery. Ms. Johnson was not called as a witness at the trial, and – with the exception of a short handwritten statement that was faxed to defense counsel on the Friday afternoon before jury selection was to begin – the Government never provided defense counsel with any documents memorializing any statements that Ms. Johnson gave to law enforcement regarding what she witnessed. *See United States v. Hammer*, 404 F. Supp. 676, 801 (M.D. Pa. 2005, *app'l dismissed*, 564 F.3d.628 (3d Cir. 2009) (penalty phase relief granted in federal capital case where Government failed to disclose FBI 302 reports relevant to its version of how the offense occurred, including premeditation).

#### 1. Ms. Johnson's account of the shooting

Ms. Johnson was in her office during the incident, which was located at the south end of the bank, and she had a view of both the lobby and the teller line. On or around the date of the incident, Ms. Johnson gave an account of the shooting in a handwritten statement that appears to have been provided to the bank as part of its internal investigation into the incident. Exh. 77.[60] In

[60] Although Ms. Johnson's handwritten statement is undated, it appears that it was likely written on the day of the shooting, as several other witnesses also provided handwritten statements to the bank about what they witnessed, and those statements appear to have been written on January 6, 2005. Based on the header at the top of the document that was created by the fax machine that received it, it appears the

her statement, she wrote that she saw Officer Hurst "come out from behind the [teller] line with his gun pointed." *Id*.

In an interview that Ms. Johnson gave in 2014 to a local Columbus TV news program on WBNS- Channel 10, Ms. Johnson gave the following more detailed account of the shooting, which was consistent with her prior handwritten statement:

> Bryan was behind the teller line initially, and um, after the first shots were fired—and I had talked about the silence that I had heard and I came out from under my desk, I had looked around and *I did see Bryan out from behind the teller line, um, in front of the teller line where the customers would be and he was aimed and ready. You know, he was in that, that stance.* And so, okay, I thought, Bryan's out there, we're okay. We're going to be okay. He's out there. I'm going to go back under my desk. We're going to be okay. *And I saw him, I saw him ready.* So I knew, in my heart, I knew that he was there protecting us and I just went back under the desk. I don't want to sound like a coward but that's–I didn't want to get in his way. He was the one that's prepared to handle these situations, not me. And so I went back under my desk. *But I did see him out from behind the teller line in that ready position,* ready to do what he needed to do to make sure we were safe.

Exh. 110 (emphasis added).[61] In an interview conducted on November 16, 2015, as part of the postconviction investigation, Ms. Johnson confirmed that days after the incident, she gave the same account to law enforcement in 2005 as the one that she gave during her 2014 news interview. *See* Exh. 7 at ¶¶ 9-10.

### 2. The Government has not disclosed statements made by Ms. Johnson regarding the shooting.

Although Ms. Johnson confirmed that she had a "sit down" meeting with law enforcement and was interviewed about what she witnessed shortly after the incident, *see* Exh. 7 at ¶ 9, no such record of an interview, or account of the statement she provided during that

---

document was received by trial counsel on February 10, 2006 – over a year after it was written and three days before the start of jury selection.

[61] It appears that the interview was conducted on or around February 26, 2014. *See* *http://www.10tv.com/content/stories/2014/02/26/columbus-bank-robberies-tellers-story-6pm.html* (last visited on 12/1/15). The news station posted a video of the extended interview, which the undersigned copied onto a disc as an ".avi" file and has attached as an exhibit to this Motion. The portion that is transcribed above begins at approximately the nine-minute mark of the video.

interview, was ever provided to trial counsel. No Columbus Police Department reports or FBI-302 reports were disclosed concerning interviews with Ms. Johnson; indeed, it appears that she may have been the only bank employee who was at the 2005 Fifth Third Bank shooting for whom no such report was disclosed.

Moreover, at the February 10, 2006 hearing, the Government stated that "we interviewed everybody at the bank," TT 2-10-06 Hearing at 31, which would presumably include Ms. Johnson, yet no such interview has ever been disclosed. In that same February 10, 2006 hearing, AUSA Michael Burns stated that he interviewed the bank witnesses in March 2005, which presumably included Michelle Johnson, yet no records of these interviews were disclosed.[62]

The only statement by Ms. Johnson that the Government disclosed was her short, handwritten statement submitted to the bank as part of its internal investigation. Based on the fax header on the document, it appears that this document was provided to trial counsel on February 10, 2006, at 12:49 PM–that is, just after the in-court hearing on discovery matters that was convened that day, which concluded at 12:34 PM, and just three days before jury selection was set to begin. TT 2-10-2006 Hearing at 101-02. As Ms. Johnson confirmed, she gave a more detailed account of the incident during her interview with law enforcement, and this account matched the details that she provided during her 2014 TV news interview. *See* Exh. 7 at ¶¶ 9-10.

---

[62] It appears that AUSA Michael Burns personally interviewed all the bank witnesses in March of 2005, except for one of the tellers:

> MR. BURNS: Your Honor, I spoke to Ms. Goodman in March of '05 when I went to the bank and interviewed all but one of the tellers who were willing to come meet. One of the tellers has never been interviewed by anybody on the prosecution team. She hasn't even gone back into the bank since January of '05. At that time, I spoke to her. She talked to me at some length and was having --
>
> THE COURT: "She" meaning Ms. Goodman?
>
> MR. BURNS: And she indicated she was having some personal problems.

TT 2-10-06 Hearing at 83.

3. Ms. Johnson's account of the shooting was material because it indicates that Officer Hurst was most likely shot from a distance after he came out from behind the teller line, rather than at point-blank range while crouched behind the teller line.

It is indisputable that after the shooting, Officer Hurst was found in the hallway south of the teller area that leads out to the lobby. According to the Government, Officer Hurst "stumbled" out into the hallway and collapsed there after having been fatally shot from point-blank range while crouched behind the teller line.[63] This account, however, is contradicted by what Ms. Johnson witnessed. She did not see a fatally wounded officer stumble out into the hallway and collapse, but instead witnessed an alert officer emerge from the hallway into the area where customers would be (i.e., the lobby area in front of the teller line), assume a firing stance, and appear ready to respond to the threat in the bank.

Ms. Johnson was thus a critical eyewitness whose account of Officer Hurst's movement was corroborative of other forensic and physical evidence that suggested that Officer Hurst was shot from a distance while positioned near the hallway:

- *The autopsy results*: The path that the bullet traveled through Officer Hurst's body was consistent with a person standing and leaning forward in a shooting stance, which is the position Ms. Johnson saw Officer Hurst assume when he came out of the hallway.[64]

- *The spent 45 caliber shell casings*: The pattern of the shell casings ejected from Officer Hurst's gun was consistent with him moving south from the teller area into the hallway, and at least two of the spent shell casings are consistent with him having fired his weapon in or near the hallway area.[65]

- *The bullet strikes in the southern and southeastern areas of the bank*: The location of the bullet strikes indicates that at some point during the shootout, Mr. Lawrence was

---

[63] TT V 6 at 26 ("Bryan stumbles from the area he was in, right around here (indicating), into this foyer, and collapses.") The Government referred to the hallway as a "foyer," but that same area is referred to as a hallway by the witnesses at trial.
[64] Exh. 5 at ¶ 11; Exh. 5 at ¶¶ 9-11.

[65] Exh. 8 at 16, 29-31.

shooting toward the hallway area, which is consistent with the idea that Officer Hurst moved to that area during the course of the shootout.[66]

- *The forensic examination of Officer Hurst's shirt*: The lack of gunpowder propellant particles on the shirt indicates that Officer Hurst was shot from a distance of at least three feet or greater, not from close-range, which is consistent with him being shot while positioned in the hallway, with Mr. Lawrence to the north of him along the teller line.[67]

- *The medical evidence*: The nature and extent of Officer Hurst's wound makes it highly unlikely that he was fatally shot prior to entering the hallway, as he most likely would have collapsed immediately after sustaining the gunshot.[68]

- *The bank surveillance footage*: Images from the Teller 5 camera are consistent with Mr. Lawrence firing in a southeastern and southern direction – toward the hallway area – just before exiting the bank.[69]

4. *There is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.*

As noted in Claim 2, *supra*, the Government's contention that Officer Hurst was fatally shot at point-blank range while crouched behind the teller line was one that it relied upon throughout Mr. Lawrence's trial. It was one of the principal arguments the Government made during the eligibility phase to urge the jury to find that Mr. Lawrence intentionally killed Officer Hurst, per the statutory gateway intent factors, and that he killed him in order to get to the bank vault, per the statutory "pecuniary gain" aggravating factor. Moreover, this focus on Mr. Lawrence's intent was also a critical issue during the penalty phase; as the Sixth Circuit held, it was the key reason why the jury sentenced Mr. Lawrence to death on Count 8 but not Count 7. Thus, there is a reasonable probability that evidence that undermined the Government's account of the incident as an execution-style shooting in which Mr. Lawrence fatally shot Officer Hurst

---

[66] Exh. 8 at 8, 29-31.

[67] Exh. 8 at 17, 29-31; Exh. 4 at ¶¶ 18-20.

[68] Exh. 5 at ¶¶ 11-15.

[69] Exh. 8 at 8-9, 29-31.

at point-blank range while crouched defensively behind the teller counter would have led to a different result in the proceeding. These arguments have been made more fully in Claim 2, *supra*, and are incorporated here by reference.

### C. The Government May Have Shirked its *Brady* Obligations in Other Respects as Well.

Given the foregoing, Mr. Lawrence has a good faith basis for asserting that the Government failed to comply with its obligation to disclose exculpatory and impeachment information, and he was prejudiced by the Government's failure to do so.

#### *1. Undisclosed interviews with other bank witnesses*

The Government's failure to comply with *Brady* and *Giglio* may well extend to matters beyond just Ms. Johnson's statement, as the Government's own statements at the February 10, 2006 hearing and during trial[70] indicate that there were additional interviews conducted with the Fifth Third Bank employees which were not disclosed to trial counsel. Many of the bank witnesses testified to facts that were materially different from their pretrial statements, and all of the changes were uniformly helpful to the Government's case. For example, Marian Large's account of the shooting prior to trial was that Officer Hurst reacted quickly to the commotion that was coming from the entrance to the bank, "ripped" his gun from his holster, and that she specifically did not know who fired first.[71] At trial, however, Ms. Large testified that she saw

[70] With some of the witnesses, the Government confirmed during their testimony that they had previously met with members of the prosecution team. *See, e.g.,* TT V 6 at 242-43 (Angela Karst confirming that she met with prosecutors and reviewed evidence with them); TT V 6 at 139 (Heather Clifton confirming that she met with prosecutors and reviewed evidence with them); TT V 6 at 188-89 (Andrea Ross confirming that she met with prosecutors "a couple of times" prior to trial).

[71] On the day of the shooting, Ms. Large prepared a handwritten statement and did not report seeing Officer Hurst crouched behind the counter, but did state that Officer Hurst "ripped" his gun from his holster. Exh. 81. Days after the shooting when she was interviewed by the FBI, Ms. Large stated that she heard a commotion near the front door, heard yelling, and "the next thing" she saw was Officer Hurst pulling his gun and firing at the suspect. She then "saw both the suspect and Hurst firing at each other from a short distance and over the top of the teller counter. They were 'face to face, gun to gun.'" The

Officer Hurst crouched and "struggling" to take his gun out of the holster. TT V 6 at 228. She also testified to hearing a very particular sequence of sounds that indicated that Mr. Lawrence shot first: a gunshot, and then Velcro being pulled apart. TT V 6 at 230. As the Government later argued to the jury to great effect, the Velcro was from an attachment on Officer Hurst's belt, and what Ms. Large heard was compelling evidence that Officer Hurst had not yet unholstered his gun when Mr. Lawrence shot at him. TT V 10 at 25, 29, 64-65.[72]

Similarly, Heather Clifton gave statements right after the shooting indicating that it was only after she was on the ground that she heard the gunshots start, and that she heard a total of 4 or 5 shots. Exh. 83, Exh. 89. At trial, Ms. Clifton testified that she heard the first gunshot going off on the right side of her ear, "coming from the suspect," just as she came through the doorway into the bank, that she had heard three gunshots before she had even gotten down on the ground, and that she had counted a total of 15 shots in her head. TT V 6 at 143-45, 158. Another witness, Andrea Ross, provided a handwritten statement on the day of the shooting stating that she heard a variety of noises as she was trying to get down on the floor, including gun shots and glass shattering, but "had no idea where the sound was coming from." Exh. 82. At trial, however, Ms. Ross testified that she heard the first shots come from behind her and over her right shoulder, suggesting that Mr. Lawrence fired first. TT V 6 at 196, 199.

In each of these instances, the trial testimony of the witnesses became more damning than their previous statements and more closely conformed to the details of the Government's theory of the case. To the extent that these new, inconsistent statements had been made in meetings with

---

FBI interview states specifically, "Large did not know who fired first nor did she see the suspect. The only thing Large focused on were the guns." Exh. 90.

[72] The Government even encouraged the jurors to put the gun belt on themselves, crouch down, and reach for the holster to verify that the Velcro attachment would be flipped open by such a series of movements. TT V 10 at 25.

the prosecution team prior to trial, rather than for the first time on the witness stand, these inconsistent statements should have been disclosed to counsel, because the nature of the inconsistencies constituted impeachment material.

*2. The FBI Animated Re-creation Video*

There is an additional reason to believe that the Government knew, or reasonably should have known, that Officer Hurst was not fatally shot while crouched behind the teller line, and more likely was shot in the area of the hallway. Sometime in the fall of 2005, the FBI's Investigative and Prosecutive Graphic Unit (IPGU) prepared an animated re-creation of the shooting incident inside Fifth Third Bank, which the Government anticipated that it might introduce as an exhibit at trial. Exh. 109; Exh. 66. The video purports to show Mr. Lawrence's movement in the bank during the incident, from his first-person perspective. Specifically, the animation has Mr. Lawrence running east toward the teller line, peering over the teller counter, and then *running to the south end of the bank and to the hallway before exiting the bank*. It is unclear why the FBI placed Mr. Lawrence in the hallway area as part of this re-creation video; the bank surveillance camera certainly does not show Mr. Lawrence running to the hallway before exiting, and the Government and FBI had that surveillance footage prior to the production of the FBI animated re-creation video.

The fact that the FBI animated re-creation video indicates that Mr. Lawrence ran to the hallway before exiting raises the strong inference that the Government and/or FBI were in possession of information that, at the very least, suggested to them that Officer Hurst was shot in the hallway, not behind the teller line. This would be clearly inconsistent with the Government's account at trial, and is instead consistent with the physical and forensic evidence suggesting that Officer Hurst was standing near the hallway during the shootout. Moreover, it would support the

theory that Officer Hurst was shot at a distance during the brief and chaotic shootout, and not at point-blank range while crouched defensively behind the teller line; it is clear from the bank surveillance camera footage that any shots Mr. Lawrence fired toward the hallway would have had to have been fired from a distance[73]given his position at the teller line and its relative distance from the hallway area, so if Officer Hurst sustained his fatal injury while in the hallway, the fatal shot could not have been fired at close-range.[74]

### D. Conclusion

This is a death penalty case. The Government is bringing its resources to bear against Daryl Lawrence in an effort to secure his execution. The prosecution is held to the highest standard of ensuring that all of its constitutional obligations are met, whether relevant to guilt or punishment. As exculpatory evidence exists that contradicts the Government's theory as to the nature of the crime and as to Mr. Lawrence's moral culpability for it, he respectfully submits that has not yet occurred in this case.

## V. THE GOVERNMENT PRESENTED FALSE AND MISLEADING EVIDENCE, AND ASKED JURORS TO RELY ON THIS EVIDENCE, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

### A. Introduction and Summary of Argument

Mr. Lawrence was denied due process because the Government presented misleading, inaccurate and prejudicial testimony at his trial.

---

[73] Based on the Government's scale diagram of the bank, the distance between where Mr. Lawrence would have been standing at the teller line and the hallway to the south of him appears to be approximately 15 feet, if not greater. Exh. 72.

[74] Mr. Lawrence cannot plead this, or any other claim, regarding the Government's failure to disclose material exculpatory and impeachment information with any more particularity at this time because the factual bases for such claims rests on information known only to the Government. Prior to filing his § 2255 Motion, Mr. Lawrence attempted to obtain this information through a series of motions for discovery of exculpatory and impeachment information, *see* ECF Doc. Nos. 320, 321, and 323, but those motions were denied by the Court as premature. ECF Doc. No. 327 at 5 (denying discovery motions because "federal courts do not have authority to order pre-petition discovery."). If evidence is disclosed that supports additional *Brady* claims Mr. Lawrence will plead them at the appropriate time.

Prosecutors violate due process by presenting material testimony that is false, by presenting material testimony that creates a false impression, or by allowing such testimony to stand uncorrected. *See, e.g.*, *Mooney v. Holohan*, 294 U.S. 103 (1935) (presenting knowingly false testimony violates due process); *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements which are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957).

In order to prevail on a claim of prosecutorial misconduct under this line of cases, Mr. Lawrence need only establish the following three elements: (1) the testimony in question was false or, taken as a whole, gives a false impression; (2) the Government knew or should have known the testimony was false; and (3) the testimony was material. In order to establish materiality, one must demonstrate "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, (1976) (emphasis added). Those elements are met here with respect to forensic and photographic evidence introduced at trial, eyewitness testimony, and argument made by the Government.

**B. The Government Made Representations to the Jury at Trial It Knew, or Should Have Known, Based on Interviews with Eyewitnesses to the Crime and Photographic Evidence, Were False or Left a False Impression with the Jury.**

The Government's account of events, set out in its opening statement at the guilt-innocence phase, was that Mr. Lawrence fired his gun on his way into the bank, fired three times over the teller counter, and one of those close-range shots hit Officer Hurst in the chest while he was crouched behind the teller desk. According to this account, Officer Hurst was "able"

nonetheless to return fire. Within two seconds, Officer Hurst "fires seven rounds as he's squatting down and firing," two of which hit Mr. Lawrence in the hand, causing him to flee. TT V 6 at 25. According to the Government, Officer Hurst managed to fire one round at Mr. Lawrence as he was fleeing but "misses the defendant and shatters some glass above the window, which loosens up the glass." TT V 6 at 26. Mr. Lawrence trips, goes through the bottom pane of glass, and runs out. At this point, according to the Government, Officer Hurst "stumbles" from behind the teller desk, into the hallway next to it, and collapses. TT V 6 at 26. The Government repeated this account through each stage of the trial.

The Government knew, or had reason to know, that elements of this account, material to the issue of Mr. Lawrence's intent and to proof of the "pecuniary gain" aggravating circumstance, were contradicted by the evidence.

First, still images from the bank's surveillance cameras show that the glass door the Government referred to in its account were shattered by the time Mr. Lawrence reached the teller counter. Side-by-side time-stamped pictures from two different cameras show the glass is already shattered in the window in one frame at the same time Mr. Lawrence is leaning on the teller counter. Exh. 8 at 14. Thus, Officer Hurst did not shoot at the door as Mr. Lawrence was fleeing; he shot it before Mr. Lawrence leaned over the teller counter.

This was not a casual error. The Government had access to these surveillance videos from shortly after the offense happened. The FBI produced an animated sequence (which it then did not use at trial) that must have relied on the surveillance video. The Government showed the surveillance videos to eyewitnesses pretrial. The Government used the videos, both running them as videos and displaying the still images from them, over and over at trial. The Government nevertheless told the jury something that was patently false. The jury was left with the incorrect

impression that Officer Hurst fired shots at Mr. Lawrence only after Mr. Lawrence had first shot and fatally wounded him, and that Mr. Lawrence fled only as a result of the officer having shot him in the hand *after* Mr. Lawrence had delivered several close-range shots, including the fatal one.

This false account was necessary to support the aggravating circumstance that Mr. Lawrence had killed in expectation of pecuniary gain. It was also an important factor in proving that Mr. Lawrence killed Officer Hurst deliberately and intentionally. Hence, this deception was material.[75]

Second, the Government told the jury that Officer Hurst had been shot behind the teller desk and had "stumbled" out into the hallway. The surveillance videos did not capture anything that happened behind the teller area or in the hallway. The only person who saw Officer Hurst come out from behind the teller desk was Michelle Johnson, who reported that he came out from the teller desk and began firing (something that also contradicted the Government's account). Exh. 77. This was not simply a matter of the Government embellishing its story for the jury: the Government had affirmative reason to know its account was false. This, too, constituted prosecutorial misconduct.[76]

Third, the Government was in possession of two statements provided by Brian Dickerson, a bank customer who was just outside the bank doors as Mr. Lawrence was retreating. Mr.

---

[75] It is, unfortunately, impossible to tell the full extent to which the Government may have used these video images in ways that materially misled that jury because the record leaves this so unclear. Although the video is shown repeatedly, both as a visual "aid" during witness testimony and during the Government's arguments, there is no indication what parts of the videos are being shown or what still images have been displayed.

[76] This misconduct was compounded by the fact that the Government has never produced any statements Ms. Johnson made to law enforcement after the incident, although she remembers having given such a statement. Ms. Johnson recalls that her statement was consistent with a television interview she gave years later that gave a more detailed description of the events. Exh. 7 at ¶¶ 9-10. (The prosecutor did not call Ms. Johnson as a witness at trial, nor did it identify her statement as *Brady* material, despite the fact that it contradicted the Government's account of the shooting sequence.).

Dickerson reported that he saw someone running away from the teller desk, firing his gun behind himself, and that this person then fell through the glass door, got up and fled. Exhs. 75, 76.

These eyewitness accounts also contradicted the Government's arguments at trial about the manner in which the shooting occurred. Mr. Dickerson, the only eyewitness who had a view of what was happening and was not face down on the floor, saw Mr. Lawrence firing as he retreated. But the Government told the jury during argument to use its "common sense" to draw the conclusion that spent shell casings on the floor of the lobby must have meant that Mr. Lawrence was firing his gun on his way into the bank, not on his way out. The Government was well aware in making this assertion that this witness had actually reported seeing Mr. Lawrence firing his gun on the way *out* of the bank, and firing it behind himself as he ran. This, too, was a material misrepresentation that the Government knew or should have known was false. (The Government did not call Mr. Dickerson as a witness at trial, either.)

Finally in this regard, the Government did call as witnesses six people who had been in the bank the morning of the shooting. Of these six, three of them – Marian Large, Heather Clifton, and Andrea Ross—testified to facts that were materially different from, and completely contradicted by, what they had self-reported immediately after the event, and what they had reported in police and FBI interviews.

The Government made clear in its questioning that prosecutors had met with some of the bank witnesses sometime shortly after the offense and again, within the weeks leading up to trial, when prosecutors had, at the very least, shown some of these witnesses the surveillance videos.[77] It appears, under the circumstances, that these witnesses provided prosecutors with information

[77] *See, e.g.,* TT V 6 at 242-43 (Angela Karst confirming that she met with prosecutors and reviewed evidence with them); TT V 6 at 139 (Heather Clifton confirming that she met with prosecutors and reviewed evidence with them); TT V 6 at 188-89 (Andrea Ross confirming that she met with prosecutors "a couple of times" prior to trial).

pretrial that was inconsistent with their earlier reports to law enforcement and material, in which case the prosecutors were obligated under *Brady* to provide these statements to the defense, but failed to do so. Alternatively, these witnesses made material assertions for the first time at trial, after having been interviewed on more than one occasion by police and prosecutors pretrial, that prosecutors had reason to believe were false. If so, the Government had the obligation under *Napue* to correct them. Either way, the Government committed prosecutorial misconduct.[78]

The Government, as the prosecuting authority, is not permitted to win at any cost; its first obligation is to do justice. In *Berger v. United States*, 295 U.S. 78 (1935), the Supreme Court cautioned:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Id.* at 88. In this case, where an execution is at issue, the failure of the United States Attorney to live up to these obligations should not be lightly excused.

### C. The Government Presented Forensic Evidence at Trial It Knew, or Had Reason to Know, Was False.

The Government presented scientific forensic evidence through its expert witness, Mark Hardy,[79] that went to several issues at trial. This evidence was either false or was presented in a highly misleading light.

First, Mr. Hardy testified at trial that he had examined Officer Hurst's shirt for traces of gun powder particles around the entrance wound. The presence or absence of such particles was critical in establishing whether the fatal gunshot wound had been delivered at close-range, as the Government argued at trial, or at distant range, as the defense hoped to show.

---

[78] The testimony of these witnesses and their earlier inconsistent statements are described in greater detail at Claim II, *supra*.

[79] Mr. Hardy was identified at trial as a "criminalist," a civilian employee of the CPD.

Pretrial, Mr. Hardy filed a report noting that there was no evidence on the shirt of a close-range shot. Exh. 73. At trial, he testified that he had examined the shirt macroscopically and microscopically and had not detected any gun powder particles on it. He went on to say, however, that this did not rule out the possibility that the shot had been fired at close-range because the gun powder particles might have been shaken off of the garment. TT V 8 at 39, 78.

This was a false or misleading statement. Gun powder particles travel at a high velocity and at a high enough temperature that they burn into fabric and embed themselves in the weave. Exh. 4 at ¶¶ 18-19. While some particles from a close gunshot might fall off, it is false to suggest they all could have. Moreover, because the particles leave burns in the fabric, these burn marks are visible as well. Exh. 4 at ¶ 19; Exh. 8 at 17, Exh. 5 at ¶ 9. An experienced criminalist, as Mr. Hardy was described to be at trial, would have known this, and presumably Mr. Hardy did know this.

The Government expert also testified that there was no value in conducting chemical testing for the presence of nitrites or lead on the shirt, other signs of a close-range shot, because Mr. Lawrence's weapon had not been recovered. This testimony was also misleading at best. Such chemical testing could have been done and, if the tests were positive for nitrites or lead, it would have indicated the shot had been fired, from muzzle to target, at a distance of three feet or less. Exh. 4 at ¶ 12. In other words, this testing could have ruled out a close-range shot if no nitrites or lead showed up. Exh. 4 at ¶ 12.

Similarly, Mr. Hardy testified that he could not say what the ejection pattern was of the gun Mr. Lawrence used without having the actual weapon used in the offense. TT V 8 92. This statement, too, was false or materially misleading. A replica of the gun – in other words, another 40 caliber Mini Firestorm – would have yielded reliable and representative results, and would at

the very least have enabled Mr. Hardy to tell that, like most other semi-automatic pistols, it ejects spent shell casings up, backward and to the right when fired at a 0 degree angle. Exh. 4 at ¶ 6; Exh. 8 at 6. By claiming he could not make any such statements without recovering the actual gun Mr. Lawrence used, the Government was able to urge the jury at trial to use its "common sense" to infer that Mr. Lawrence had fired his gun on the way into the bank because of the location of spent shell casings north of the entrance door. In fact, the ejection pattern of the gun would have indicated (consistent with the video and Brian Dickerson's account) that those shots were fired as Mr. Lawrence was leaving the bank, thus countering the suggestion that the spent shell casings in the lobby were the result of Mr. Lawrence firing his gun as he came into the bank.

Finally, Mr. Hardy testified that only the same gun that fired the shell casings that were recovered at Fifth Third Bank in 2005 could have fired the shell casing that was recovered at Sky Bank in 2004, and that therefore the two incidents were linked by a common gun. TT V 8 at 63. The Government relied on this evidence to subsequently argue that Mr. Lawrence should be sentenced to death based on the underlying facts of the Sky Bank robbery, both because it established a gateway intent factor in the eligibility phase, and because it established the non-statutory aggravating factor of the prior robberies.TT V 12 at 12, 38; TT V 17 at 64.

Once again, however, there was no basis for Mr. Hardy's testimony that the relevant shell casings were "fired by the same weapon" or that such an opinion could be rendered "within a reasonable degree of scientific certainty." Exh. 4 at ¶¶ 21-23. The lack of statistical empirical evidence for the underlying premise of firearm and toolmark analysis was just as true at the time of Mr. Lawrence's trial as it is today. Exh. 4 at ¶¶ 22-24.

The Government knew or should have known that such testimony was false, or at the very least that it was misleading; at the time of Mr. Lawrence's trial, the Government was engaged in litigation in various criminal cases where this very same *Daubert* challenge was being raised, and where hearings were held documenting the significant deficiencies of firearm and toolmark analysis. *See United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005); *United States v. Kain*, Crim No. 03-573-1 (E.D. Pa. 2004).[80] The fact that the particular challenges were litigated by U.S. Attorney's Offices in other jurisdictions is not legally relevant under a *Napue* analysis. See *United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing."); *United States v. Barkett*, 530 F.2d 189 (8th Cir. 1976) ("[O]ne office within a single federal agency must know what another office of the same agency is doing. … This is no more than to hold the Government to the same standard of conduct as governs private individuals in transmitting notice from agent to principal.")[81]

The materiality standard is met here as well. As noted above, the expert testimony that the relevant shell casings matched was the heart of the Government's cases for conviction on Counts 5 and 6. Moreover, the Government dwelled repeatedly on the Sky Bank robbery throughout the course of the proceedings to establish the statutory intent factors, the statutory aggravating factor of pecuniary gain, and the non-statutory aggravating factor concerning prior

[80] At the *Daubert* hearing in *Kain*, Judge Anita M. Brody commented on the implications of the defense *Daubert* challenge and noted that: "This is an issue that has great moment for the Department of Justice." Before the judge could rule on the *Daubert* challenge, though, the Government offered the defendant "a plea bargain that was too good to refuse." *See* Adina Schwartz, *A Systematic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 Colum. Sci. & Tech. L. Rev. 2 (2005).

[81] Under the law, Mr. Lawrence need not demonstrate that the prosecutors who tried his case were personally aware of the falsity of Mr. Hardy's testimony. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). This is because the underlying purpose of *Napue* and *Giglio* is not to punish prosecutors for the misdeeds of a witness, but rather to ensure that the jury is not misled by any falsehoods. *See, e.g., United States v. Meinster*, 619 F.2d 1041, 1044 (4th Cir. 1980).

bank robberies. And as is evident from the prior discussion of the closing arguments, the Government specifically (and frequently) invoked the Sky Bank robbery as a reason for why the jury should sentence Mr. Lawrence to death. Given that the jury clearly did not believe that the Government had established an overwhelming case for death, as evidenced by its split verdict, there is a reasonable likelihood that the false expert evidence *could* have affected the judgment of the jury. *See, e.g., Hennon v. Cooper*, 109 F.3d 330, 332 (7th 1997) (due process precludes a prosecutor from making an argument which misleads the jury); *Bragan v. Morgan*, 791 F. Supp. 704, 713 (M.D.Tenn. 1992) (*Napue* violation found where prosecutor misled jury in argument).

## VI. THE DEVELOPMENT AND PRESENTATION OF EVIDENCE FOR THE PUNISHMENT PHASE OF MR. LAWRENCE'S TRIAL FELL SHORT OF CONSTITUTIONAL STANDARDS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

One of the most prejudicial errors made at Daryl Lawrence's trial was the failure of his trial counsel to investigate and present evidence of brain damage. As explained above, this evidence would have fundamentally altered both the defense presentation and the ability of the prosecution to make the case for death that it did. But the deficiencies in the team's preparation to save their client's life went beyond this grave omission. Despite their best intentions, a number of factors conspired to deprive Mr. Lawrence of the representation to which he was entitled.

### A. Trial Counsel's Failure to Request and Obtain Readily Available Records and to Recognize Red Flags in Records They Did Obtain Undermined their Case in Mitigation.

Trial counsel failed to request and obtain readily available documentation about Mr. Lawrence, his family, and others who knew him. Such records included, among others, vital, medical, educational, social service, court, prison, military, and employment documents. Pursuing these contemporaneous records was a necessary element of the social history

investigation, and trial counsel's failure to do so fell below the professional standard of care in capital defense cases. *Williams v. Taylor,* 529 U.S. 362, 395-396 (2000) (trial counsel ineffective for failing to pursue, as part of their investigation of mitigating circumstances, readily available records documenting defendant's "nightmarish childhood" and impaired intellectual functioning).

Trial counsel also failed to recognize red flags pointing up the need for further investigation in the records they did obtain. This oversight also fell below well-established professional standards of care for capital cases. *See Wiggins v. Smith*, 539 U.S. 510, 525 (2003); *Rompilla v. Beard*, 545 U.S. 374, 391 (2005).

**1. There were important available records that went uncollected by the defense.**

The scope of records the trial team requested was unreasonably narrow and limited for a capital case, and record gathering on family members appears to have focused almost exclusively on documenting their "criminality."

The records trial counsel failed to collect contained information that provided richer detail about Mr. Lawrence and his familial history, was directly relevant to trial counsel's ability to prepare and retain experts, and was independently mitigating. For example, available records for various family members, including but not limited to Mr. Lawrence's biological mother, Leondra Lawrence, maternal aunt Florencia Walker, and maternal grandmother Florence Perkins, documented diagnoses and symptoms of serious mental illness. Detailed evidence like this of a family history of mental illness was relevant to the risks Mr. Lawrence faced as a child and was critical to a reliable mental health assessment. *See* Exh.3 at 13 ("Mr. Lawrence was at high risk to develop a major psychiatric disorder, as a number of close family members have been diagnosed with conditions which have a high genetic load and aggregate in families.").

Counsel's failure to obtain any social service or medical records for Mr. Lawrence's biological mother or pursue a complete set of her probation records ultimately deprived jurors of the ability to weigh mitigating circumstances relating to her in the context of anything more than her delinquency, and prevented counsel from being able to counter the oversimplified and inaccurate assertion that she was never around Mr. Lawrence. TT V 17 at 58 (Prosecutor DeVillers arguing that information about Leondra was unimportant because "He had little to no contact with his mother").

The available records documented that Mr. Lawrence's biological mother suffered from psychosis, had been taking a cocktail of antidepressants and psychotropic medications, and had tried to commit suicide. Exhs. 30, 31. They also revealed a more complicated relationship with her son than trial counsel and thus the jurors were aware of. Had counsel pursued the available records and adequately investigated family members' reports about this sensitive topic, they would have learned that she did in fact have a relationship with her son. Mr. Lawrence was at various times as an infant and toddler left in his biological mother's care; more than once was returned to Mrs. Lopez with physical injuries sustained while with his mother; and continued to see his mother throughout her life at, for example, family gatherings, before her sudden death in 2003 from complications related to pancreatic cancer. Exhs. 60, 61 Mr. Lawrence's contacts with his biological mother could have given the jury the important insight that Daryl was not completely estranged from his mother, could have been influenced by her, and certainly would have been acutely aware of her decision not to raise him as she had some of his siblings. The jury also could have understood Mr. Lawrence's estrangement and isolation within his own family and how that contributed to and reinforced the trauma in his life.

The records were, moreover, necessary for a thorough and reliable assessment of Mr. Lawrence's impairments and illnesses. Exh. 3 at 13; Exh. 1 at ¶ 38 ("The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation."); *id.* at ¶ 40 (citing to 1988 article calling for providing psychologists in capital cases with "all of the records of the client's history") (quotation marks omitted).

Trial counsel also failed to obtain readily available records that provided intrinsically credible documentation corroborating oral accounts of defense witnesses, the absence of which allowed the prosecution to raise doubts in the jurors' minds about the veracity of the defense mitigation presentation. For example, a wealth of information existed documenting the family's struggles with mental illness. This evidence would have provided independent support for family members' reports of multigenerational patterns of substance addiction and severe mental illness in addition to being necessary for any comprehensive and accurate mental health assessment. In Mr. Lawrence's case, such corroboration would have informed the findings and conclusions of a medical doctor and complex trauma expert relating to his lifelong impairments. Vital records for Mr. Lawrence's great uncle, Algenon Lopez, who was reported by a family member to have a "drug problem," indicated he died of renal failure, liver failure, and cirrhosis. TT V 15 at 61; Exh. 62. Reams of medical records from various hospitals and probate records document the psychiatric history of Aleta Lopez, Mr. Lawrence's cousin, adoptive sister, and one of his primary caregivers when he was a child, showing she was diagnosed with a number of psychotic disorders. Exh. 28. The records, for example, note "bizarre behavior…patient talks with me in a sweet nice voice and turns her head and yells at her sister in a mean voice," which sheds light on the kind of painful, warped, and confusing relationship Mr. Lawrence had as a child with this adult caregiver. Exh. 28.

Records establish also that Aleta Lopez was declared incompetent; could not function alone; assaulted two mental health care providers, her mother, and two members of her church prior to one of her admissions; was "physically combative at times"; and was admitted after Mrs. Lopez, another of Mr. Lawrence's caregivers, reported she was physically assaulted by her daughter. Exhs. 28-29. This documentation was available but never pursued. As one of the few adult caregivers consistently at home with Mr. Lawrence, these and other records pertaining to Aleta Lopez would have given the jurors a far more accurate and compelling presentation of the true nature of Mr. Lawrence's experience in his home environment that was relevant to their understanding of his compromised childhood development and the absence of protective factors in his life.

In addition, evidence of the extent of Mr. Lawrence's caregivers' dire financial circumstances was available in Social Security Administration records for Mr. Lawrence's caregivers, which could have corroborated family reports that they were poor and "money was hard to come by." TT V 14 at 114; Exh. 1 at ¶¶ 55, 142. This was especially important given Ms. Menashe's emphasis in her opening statements to jurors on the "pure and utter poverty" of Mr. Lawrence's childhood. TT V 13 at 128. The records were also relevant to the jury's understanding of the absence of protective factors in Mr. Lawrence's life. Yet trial counsel inexplicably failed to obtain them.

Readily available evidence documenting Mr. Lawrence's neighborhoods at the time he grew up was also never obtained.[82] Documents show that violence was a fixture in the neighborhoods of Mr. Lawrence's childhood. Driving Park, where he spent the first ten years of his life, was plagued with violent crime. In 1980, the neighborhood of around 7000 residents,

---

[82] Inexplicably, trial counsel collected and presented crime statistics for some neighborhoods from the mid-1990s to the mid-2000s when Mr. Lawrence was already in his 20s.

had 12 murders, 21 rapes, and 132 stolen vehicles, making it one of the higher crime districts in the city according to the Columbus Dispatch. Exh. 52.

A final example of trial counsel's failure to obtain credible documentation corroborating information that defense witnesses reported in interviews and in their testimony pertains to Mr. Lawrence's probation records. Had counsel obtained the available set of Mr. Lawrence's records from Franklin County Adult Probation Services, they could have provided support from an independent source that Mr. Lawrence was trying hard to find employment following his prior conviction. The probation records show that his probation officer at the time observed he "seemed eager to find work, but has had no luck," and described Mr. Lawrence's attempts to find or maintain a number of different jobs between September 2001 and July 2002. Exh. 63.

With an independent corroborative source such as the contemporaneous probation records, trial counsel could have more effectively defended Mr. Lawrence against the prosecution's emphasis on his "greed and his unwillingness to work for a living." TT V 17 at 16. Instead, this was left to family members whom the prosecutor – and the jurors – could more easily discount. These records were but a phone conversation away and should have been obtained.

**2. Counsel overlooked red flags in records they had obtained.**

Mr. Lawrence's school records are full of leads signaling the need for further investigation as well as corroboration for lay witnesses' accounts of Mr. Lawrence's behavior and functioning. For example, Mr. Lawrence's St. Charles Preparatory School records reveal a number of incomplete and failing grades, as well as three school weeks' worth of absences and 45 days tardy, as well as documented physical injury, all red flags demanding further investigation and follow-up. Exh. 56; Exh. 3 at 5, 8 (citing school records as documenting

learning problems that Mr. Lawrence's family members also recounted); *id.* at 5 (citing school records as reporting that Mr. Lawrence had disciplinary problems in school, resulting in corporal punishment); *id.* at 7 (referring to head injuries documented in school records). The St. Charles records also document disciplinary problems resulting from Mr. Lawrence's fight with another student, another indication that perhaps Mr. Lawrence's private school experience was not as straightforward a "squandered opportunity" as the prosecution suggested.[83] Exh. 56; TT V 17 at 59. Mr. Lawrence's Sonshine Christian Academy records are also full of troubling signs: over two school weeks' worth of absences in Fourth Grade; five school weeks' worth of absences in Fifth Grade; and two school weeks' worth of absences in Sixth Grade; mostly Ds and Fs in Eighth Grade. Exh. 57. Records show that Mr. Lawrence was also disciplined by "paddling" at least five times at Sonshine. Exh. 57. Even as early as Kindergarten, school records show that Daryl Lawrence was struggling. Exh. 59 (listing thirty-three days absent that year; fifteen days absent in First Grade, nine tardy; twenty-two days absent in Second Grade, five tardy; thirteen days absent in Third Grade, twelve tardy).

A young child's failure to attend school regularly or to attend it on time can be a reflection of serious problems with his home life or caregivers; in Daryl's case, he was living in a dilapidated, chaotic, sometimes violent home dominated by the mental illness of his adoptive sister and the deficits of his loving but impaired adoptive mother. He escaped that home every chance he got and was left to spend time in his violent neighborhood streets, unsupervised. His adoptive family was not apparently capable of providing Daryl with the medical, mental health, and academic support he would have needed to succeed in school. Exh. 3 at 12 ("[I]t appears that

---

[83] This was a point Ms. Menashe tried to make in her redirect examination of Dr. Anderson, suggesting that Mr. Lawrence's status as one of a few black students at St. Charles might have complicated matters. TT V 13 at 169. She failed, however, to investigate or present further evidence of the difficulty she suggested. In fact, the prosecution mocked Dr. Cunningham for ignoring Mr. Lawrence's private school education. TT V 17 at 59.

Mr. Lawrence's caregivers, health care providers, and educational administrators never identified him as suffering from the effects of TBI, and therefore never provided him with appropriate treatment or intervention."). Mr. Lawrence's lawyers either failed to notice these facts or to further investigate them to find out what was actually going on in the Lopez household that led to such an inauspicious beginning to Daryl's school years.

**B. Trial Counsel Failed to Insure Adequate Time to Investigate Mitigation.**

As discussed elsewhere, Mr. Lawrence's case proceeded to trial in a time well below the national average for federal capital cases, thirteen months, when the average is twenty-eight. Mr. Lawrence also lost nearly a month of that time when his initially-appointed lawyer withdrew. This compressed time was also exacerbated by trial counsel's numerous other commitments in other serious criminal cases, including at least two other capital ones. The defense team's mitigation specialist was not working on Mr. Lawrence's case for many months of that pretrial year, and as a result, Ms. Menashe was forced to don the hat of mitigation specialist while also working very hard to prepare many other parts of the trial. In addition, because of the turnover of mitigation team members, the defense was woefully short of mitigation interviews in the weeks leading up to the trial, with most witnesses who testified doing so after being interviewed once, twice, or not at all by the trial team, and most of those interviews taking place in December 2005 or later. Dr. Mark Cunningham, the principal mitigation witness and expert, did not begin work in earnest on Mr. Lawrence's case until November, conducting his only meeting with Mr. Lawrence in early December, and interviewing eleven mitigation witnesses over two days during the same trip. Although Dr. Cunningham was expected to conduct a global mitigation workup, he was not asked to evaluate Mr. Lawrence for any mental illness or impairment, and he clearly did not review his records with an eye toward identifying red flags for mitigation in those areas.

Moreover, the most active months of mitigation interviewing—December 2005 and February 2006, the month trial began—consisted of several first-time interviews at trial counsel's offices, with family members and other potential witnesses, many of whom ended up testifying at the penalty phase with little preparation or understanding of what kind of information was being sought. Ten of these interviews took place on one day at Ms. Menashe's office with Dr. Cunningham. On the eve of trial, the consequences of counsel's breach of the well-established protocols of mitigation investigation in capital cases was evident and social history investigation remained woefully incomplete.

As described elsewhere herein, because of these oversights, the jury was deprived of compelling testimony and other evidence that could have provided an additional reason to spare Mr. Lawrence's life. These witnesses could have attested to his *in utero* substance exposure, agonizing earliest first months of life, head injuries, medical symptoms, limitations at school, at home, and when he was older in domestic life and at work. These witnesses could have described for the jury how Mr. Lawrence was, in fact, worse off than his peers, even those who also grew up poor and in the same neighborhood, because he was functioning with limitations those peers did not have. Had these important witnesses been interviewed with the care and attention required as part of any thorough mitigation investigation, jurors could have heard the real humanizing story of Daryl Lawrence from those closest to him, and there is a reasonable probability that at least one juror would have voted to spare his life.

### C. The Trial Team Did Not Adequately Prepare Testifying Expert Dr. Mark Cunningham.

Trial counsel retained Dr. Mark Cunningham to pull together a mitigation case that was already on shaky ground. Unfortunately, due to the shortfalls of the investigation and a lack of preparation, Dr. Cunningham's presentation was not the powerful tool counsel may have hoped

for. His testimony summarizing risk factors related to Mr. Lawrence's adverse life events was sometimes inaccurate, frequently misleading to the jury, and easily discredited on cross-examination. Had counsel been able to conduct an adequate mitigation investigation to begin with, and provide Dr. Cunningham with available mitigating evidence from lay witnesses, corroborative records, and expert medical and mental health experts explaining the origins, consequences, and extent of Mr. Lawrence's brain injuries and trauma, Dr. Cunningham could have better withstood attack from the prosecution.

[redacted]

By October 20, 2005, the preparation of the mitigation case was already in disarray. Only a limited number of interviews had been conducted as of that point. *See* Claim 3; Exh. 1 at ¶ 52. When Dr. Cunningham was hired for his mitigation role, the work of Martha Phillips, counsel's retained mitigation specialist, had largely fallen off, and the team was well behind in compiling Mr. Lawrence's social history, leaving the burden to fall on Ms. Menashe to be both the mitigation investigator and the attorney with primary responsibility for preparing Mr. Lawrence's penalty phase presentation as well as other aspects of the case.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

This declaration might have provided a road map for preparing Dr. Cunningham properly, but trial counsel's missteps led Mr. Lawrence away from such a presentation. When Dr. Cunningham's "mitigation work-up" began in the case, the necessary rapport had not been built with Mr. Lawrence's family members and acquaintances to overcome barriers to disclosure; key records of immediate and extended family members and of Mr. Lawrence himself had not been requested or obtained; and neither a medical doctor nor a trauma expert had been consulted despite red flags in the records that had been collected and in the limited interviews conducted.

**1. Counsel failed to provide Dr. Cunningham with critical social history records on Mr. Lawrence's family and community.**

With counsel depending on Dr. Cunningham, in the midst of his own busy docket of preparing and testifying for the defense in other capital cases across the country, to make up for months lost in developing Mr. Lawrence's case in mitigation, they organized a whirlwind of interviews that took place on two days in early December. TT V 16 at 96; [redacted] Exh. 26. Dr. Cunningham spent six hours with Mr. Lawrence on the first of the two days and conducted one family interview, and the next day met with ten of Mr. Lawrence's relatives in Ms. Menashe's office. Exh. 26.[84] On average, he had less than an hour with each witness. Among the witnesses were Mr. Lawrence's adoptive mother, Eileen Lopez, Mr. Lawrence's maternal aunt and one of his earliest caregivers in infancy, Florencia Walker, and other members of Mr. Lawrence's family, several of whom testified at the penalty phase.

**2. Counsel failed to adequately prepare Dr. Cunningham with evidence of Mr. Lawrence's medical condition, brain injuries, and exposure to complex trauma.[85]**

Trial counsel counted on Dr. Cunningham to repackage their chaotic and ultimately deficient mitigation investigation into an all-encompassing presentation of risk factors for criminal violence seen in Mr. Lawrence's life, based on U.S. Department of Justice-sponsored research of the sort he had provided in other federal capital cases. Dr. Cunningham spent the vast majority of his testimony taking jurors through these risk factors and applying them to a grossly incomplete profile of Daryl Lawrence. In order for Dr. Cunningham to have provided a fuller, more accurate portrait, counsel should have discovered and shared with him available evidence

---

[84] Dr. Cunningham also spoke with one other witness, Ricky Lopez, one of Mr. Lawrence's adoptive mother's sons, over the phone the day before he (Dr. Cunningham) took the stand. Exh. 26.

[85] Mr. Lawrence incorporates by reference all the facts, allegations, and arguments made elsewhere in this Motion as they relate to Mr. Lawrence's medical condition, brain injuries, and exposure to complex trauma.

of their client's neurological deficits, brain damage, symptoms of traumatic stress, and serious blood disorder. They should have investigated and supplied him with evidence of the extreme level of community violence their client witnessed as a child; his exposure to complex trauma from birth, and the consequences of that exposure; the poverty Mr. Lawrence endured (far more serious than what he or the jurors learned); and the evidence that he was raised in a home environment with severely impaired caregivers.

### 3. Counsel's failure to adequately prepare Dr. Cunningham prejudiced Mr. Lawrence.

Had trial counsel taken reasonable steps to prepare Dr. Cunningham, his presentation would have looked markedly different. His testimony would not have hinged on "classic mental illness kinds of things," "rampant personality disorder," "criminality," and "bad parenting," TT V 16 at 154-55, because he would have been informed with data gleaned from multiple interviews with family members and social history records about serious mental illness and impairments in the family, in Mr. Lawrence's lineage and among his childhood caregivers. The social history records would have also kept him from being so easily discredited by the prosecution as having "diagnosed the entire family…without testing, without evaluation, without looking at other people's records and reports." TT V 17 at 26.

Dr. Cunningham's testimony about these risk factors could have hewed closely to research on outcomes for individuals like Mr. Lawrence, who experienced life-changing brain injuries from the time he was born; suffered from neurological deficits; and exhibited symptoms of post-traumatic stress from a very young age. Jurors, who were unfairly asked to trust him as an expert on everything affecting Mr. Lawrence's "trajectory," would have then heard more focused testimony on research associated, for example, with brain insults in infancy, instead of testimony that hedged by necessity about whether Mr. Lawrence was in fact brain-damaged. TT

V 16 at 107-108; Exh. 1 at ¶¶ 118-119, 141. Dr. Cunningham would have had the relevant information from a qualified expert about Mr. Lawrence's brain injuries and consequences flowing from those injuries.

If counsel had adequately prepared Dr. Cunningham with social history data, evidence flowing from a constitutionally sound mitigation investigation, and the evaluations of the appropriately trained and specialized experts, there is at least a reasonable probability that the outcome of Mr. Lawrence' case would have been different. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

**D. Trial Counsel's Failure to Adequately Prepare Testifying Expert Dr. Elijah Anderson Constituted Ineffective Assistance.**

Trial counsel put on sociologist Dr. Elijah Anderson apparently to attempt to explain the behavior of certain African-American men from inner city impoverished backgrounds. Unfortunately, trial counsel failed to ensure that Dr. Anderson was prepared to testify. As a result, he presented the jury with theories whose applicability to Mr. Lawrence's life history were easily discredited. In fact, despite clear signs that Dr. Anderson might not be prepared to provide useful testimony, trial counsel failed to make certain that Dr. Anderson was equipped to answer questions that required basic knowledge of Mr. Lawrence's social history or about the city of Columbus. The result was that the Government was able to render even the limited testimony Dr. Anderson was able to offer meaningless by suggesting that many of Dr. Anderson's theories about inner-city life were not applicable in Columbus and not relevant to Mr. Lawrence. This left the jury with the impression that none of the social factors that Dr. Anderson testified to applied to Mr. Lawrence. Moreover, because of investigative shortcomings, trial counsel failed to provide to Dr. Anderson profound and readily available reasons for Mr. Lawrence's inability to succeed in school, at work, or in building a stable household with

anyone—limitations wrought by brain damage and lifetime exposure to complex trauma. As a result, his academic testimony seemed uninformed, or, at best, irrelevant.

Had trial counsel ensured that Dr. Anderson was prepared to answer questions that depended on elementary knowledge of Mr. Lawrence's life history and actual limitations, his testimony could have looked very different. Trial counsel's failure to prepare Dr. Anderson for his testimony constituted deficient performance and prejudiced the outcome of Mr. Lawrence's capital trial. *See Strickland v. Washington*, 466 U.S. 668 (1984).

**1. Trial counsel's performance regarding this expert was deficient.**

The evolution of Dr. Anderson's involvement in Mr. Lawrence's case is rife with signals that he was woefully ill-prepared to testify for the purposes which trial counsel intended.

[redacted]

[redacted]

Notwithstanding counsel's representations that Dr. Anderson's work on his case would include information pertinent to Mr. Lawrence's own background and the Columbus community in which he grew up, by the time of trial it was clear that this would not happen, and none of Dr. Anderson's testimony addressed anything specific to Mr. Lawrence's childhood and upbringing. TT V 13 at 134 (Ms. Menashe's opening statement that Dr. Anderson will not testify specifically about Mr. Lawrence). Also contrary to Ms. Menashe's pretrial representations, Dr. Lawrence never met Mr. Lawrence before he testified. TT V 13 at 145. In fact, Dr. Anderson's testimony began with a disavowal, lest his testimony be misinterpreted as an attempt to "exonerate" Mr. Lawrence. TT V 13 at 146, 147.

As noted previously, Dr. Anderson's testimony was academic and void of any knowledge about Columbus, much less about the near-East Side, Poindexter Village, Driving Park, and the violent streets in which Mr. Lawrence grew up and experienced unspeakable trauma. This was perhaps unsurprising given that it appears that trial counsel was only able to spend very little time talking with the expert prior to his testimony. Ms. Menashe sent Dr. Anderson materials on November 4 and December 1 and asked that he advise her on what else he needed as she was "defer[ring] to you as to what information is necessary." Exhs. 15, 17.

In addition, correspondence shows that there were numerous lapses in communication between Ms. Menashe and Dr. Anderson at critical junctures of trial preparation as counsel tried

repeatedly to reach her expert. *See* Exhs. 16, 18 (asking Dr. Anderson on January 25, 2006 for a call to "discuss if you are still willing and able (based on your review of the information I sent) to testify as to your area of expertise"). On February 20, 2006, a week after jury selection started and three weeks before he would testify, Ms. Menashe wrote Dr. Anderson, "If you would, as soon as possible please email me an outline of what you intend to testify to and/or present in this case. I am growing a bit uneasy given that you and I have not spent much time talking about how, if at all you can contribute." Exh. 20; s*ee also* Exh. 19. (email from counsel to Dr. Anderson in which she asked: "Let's be in touch this week. . . I am a bit apprehensive of what your testimony will consist of—what you envision. If you would please email me an outline of what you intend to present I would greatly appreciate it.").

Dr. Anderson did not meet trial counsel until the day he testified. TT V 18 at 146. [redacted]

**2. The failure to adequately prepare Dr. Anderson for his presentation in his capital case prejudiced Mr. Lawrence.**

Trial counsel's failure to ensure that Dr. Anderson was prepared to offer testimony helpful and relevant to Mr. Lawrence's case was evident. TT V 13 at 152 (the Court admonishing Dr. Anderson that he needed to focus his testimony); TT V 13 at 155. It also set a terrible tone for defense counsel's presentation to spare Mr. Lawrence's life, as Dr. Anderson was the first defense witness.

First, it was apparent that Dr. Anderson was ill-prepared to address the economic conditions prevalent in the Columbus neighborhood in which Mr. Lawrence spent his life or to factor into his testimony Mr. Lawrence's actual employment history. Dr. Anderson testified that his sociological research was based on cities that experienced "tremendous deindustrialization,"

leaving people in the inner city without jobs. TT V 13 at 148. He went on to explain that many inner city people lack the human capital (skills, education, and opportunity) to make a decent living in the competitive "new economy" of service and high-tech industries. TT V 13 at 149, 150, 152. Dr. Anderson mentioned the emergence in certain communities of a substitute, "underground economy" of illicit activity like drug dealing, but again, without any apparent connection to Mr. Lawrence. TT V 13 at 149.

Next, Dr. Anderson described the difficulty for some African-American, inner-city men to build families because in order to do so, "you need a job, you need an opportunity in capital, and you need to be able to take care of a home." TT V 13 at 153. Dr. Anderson theorized that some men, unable to "control the household" simply "abdicate" and choose not to marry women with whom they have children. TT V 13 at 153. Without further explanation, the jury was left to conclude that such was the case with Mr. Lawrence.

The same went for Dr. Anderson's testimony about a lack of role models, particularly religious ones, which Dr. Anderson explained was another factor in the average inner-city African-American man's inability to maintain a household. TT V 13 at 154, 155. Dr. Anderson distinguished young men who because of the "luck" of having been "touched by religion" or "in the form of a good job" were able to succeed against the odds. TT V 13 at 156. Others, not so fortunate, might buy into an "oppositional culture" or "code of the street" that led them to "commit horrible acts such as murder." TT V 13 at 157. At more than one point during his testimony, Dr. Anderson distinguished between "decent" people and "street" people, who "act out in ways that are profoundly disturbing," TT V 13 at 149, 158-59, implying that the individual on whose behalf he was testifying was indecent.

Because trial counsel failed to ensure that Dr. Anderson was prepared to testify, the Government was able to drive home to the jury that Mr. Lawrence had in fact been bestowed with the very "luck" Dr. Anderson described. The prosecutor handily discredited Dr. Anderson's theories' applicability to Mr. Lawrence when he pointed out that Mr. Lawrence did have the opportunity to work in white-collar jobs and also had attended prestigious private schools, and even had (religious) role models. TT V 13 at 162-63 (Dr. Anderson answering affirmatively Mr. DeVillers's cross-examination question about whether if someone had a well-paying white collar job and was not fired from it, that person might have a better chance of escaping a "bad" neighborhood and staying with the "decent" people); TT V 13 at 167-68 (Mr. DeVillers's questioning Dr. Anderson about the influence of religious role models and coaches, whom Dr. Anderson readily acknowledged were important role models); TT V 13 at 168 (Dr. Anderson's agreeing that having coaches or teachers from a prep or Catholic school with smaller classes "would make a big difference" and attending such schools would help give someone a "different perspective on life"). The expert appeared to know very little about the case in which he was testifying.

Although records about crime statistics in Mr. Lawrence's neighborhood were made available to Dr. Anderson by Ms. Menashe, trial counsel's failure to make sure that their witness was informed and prepared to testify again damaged his testimony.[86] For example, they should have provided him with historical data of the actual conditions in Mr. Lawrence's neighborhood

[86] In early December 2005, Ms. Menashe sent crime statistics and other relevant data to Dr. Anderson, compiled by trial counsel's mitigation specialist, both for the neighborhood in which Mr. Lawrence was raised and for other suburban neighborhoods in Columbus for comparison purposes. This was information not only that Ms. Menashe believed would be "vital" to Dr. Anderson in his discussion of inner city youth, norms, and what life was like for Mr. Lawrence in the particular Columbus neighborhood where he grew up, but also that Dr. Anderson himself requested. Exhs. 16, 17. Yet, Dr. Anderson made no mention in his testimony of any of this data specific to Columbus neighborhoods.

in the near-East Side of Columbus, and Poindexter Village, a community rich with local history and one where Mr. Lawrence spent most of his youth. Such information could have helped Dr. Anderson provide informed responses to Mr. DeVillers's questions. *See*, *e.g.*, House, Home, Community: The History of Poindexter Village, *available at* https://ehistory.osu.edu/exhibition/history-of-poindexter-village, last checked 11/24/15 (summarizing historical documents available at the time of trial and describing the effects on the near-East Side of loss of industrial jobs when Buckeye Steel closed; the exodus of middle-class African Americans from the neighborhood and overall population decline citywide; increased poverty rates; decreases in funding for subsidized housing on the welfare of low-income families; demolition of public housing and its impact on community identity). Such data would have allowed Dr. Anderson to, at the least, leave the jury with an accurate understanding of the applicability of his ideas to the streets where Mr. Lawrence actually spent his time and where he witnessed unspeakable violence, even if his sociological theories would have still fallen far short of explaining Mr. Lawrence's actual life circumstances and organic deficits.

Instead, the Government successfully underscored that Dr. Anderson knew nothing about Columbus and left the jury with the false impression that none of Dr. Anderson's characterizations of inner-city poverty were applicable in the community in which Mr. Lawrence was forced to survive. TT V 13 at 161 (Dr. Anderson testifying that he is not "that familiar with Columbus, I must say," in response to Mr. DeVillers's characterization of the city as one that has "always" been white collar or service-oriented); TT V 13 at 165 (Mr. DeVillers's cross-examining Dr. Anderson about his theories of middle class flight out of inner cities and contrasting them with African Americans' staying in Columbus, or moving back in, and contributing to a "rebirth" of the city); TT V 13 at 166 (prosecutor's questioning Dr. Anderson

about his theory concerning the impact of a lack of role models and whether finding out that the mayor, police chief, city council and board of education were all "comprised" of African Americans that would "boost [inner-city African Americans'] ability" to have positive role models, to which Dr. Anderson answered affirmatively).

Counsel's redirect was limited to one transcript page of hypothetical questions about the alienation an "African American male" might feel if he was taken from a poor community and put into a private school with white students and racial tension, which Dr. Anderson testified might cause "people [to] act out in strange ways." TT V 13 at 169-70.

Trial counsel's failure to discover the real bases for Mr. Lawrence's failure to maintain consistent work or to set up households with women with whom he had children, and resultant failure to present such evidence to Dr. Anderson, or to ensure that he was prepared at the very least to set the record straight in response to Mr. DeVillers's questions, left the jury with the impression that Mr. Lawrence simply squandered opportunities that should have made all the difference for him, carelessly walked away from legitimate employment options, and opted instead for street life in a criminal underworld. As National Mitigation Coordinator Russell Stetler has attested

> Although Dr. Anderson provided a hypothetical context based on his research in other cities, he offered nothing to humanize or individualize Mr. Lawrence-and no information specific to his neighborhood, or even to the city of Columbus. Ultimately, when viewed in the light of the rest of the penalty phase testimony, Dr. Anderson's testimony only reduced Mr. Lawrence to a faceless ghetto stereotype.

Exh. 1 at ¶ 86. The truth of Mr. Lawrence's tragic demise, and the story the jury would have heard had trial counsel conducted a reasonable investigation and properly prepared mitigation experts is detailed elsewhere herein. But for their failures, there is a reasonable probability the

result of Mr. Lawrence's capital sentencing would have been different. *Strickland v. Washington*, 466 U.S. at 694.

### E. Trial Counsel's Penalty-Phase Ineffectiveness Includes Their Failure to Move for a Continuance in Order to Properly Prepare and Present a Case in Mitigation.

Mr. Lawrence's case went to trial thirteen months after his arrest and five months after the Justice Department's notice of intent to seek the death penalty. This timeline was astonishingly short by federal capital standards.[87] Even though Mr. Lawrence's trial counsel behaved early on in the pretrial year as though it was a foregone conclusion that the DOJ would notice its intent to seek death and that the case would proceed to a penalty phase, at least four circumstances should have made clear to them that they could not be prepared to put on a competent case for Mr. Lawrence's life in the time initially made available.

First, after Mr. Lawrence's initial counsel, Steven Nolder, withdrew, appointed counsel had a little over one year in which to write and file all pretrial motions, investigate the Government's case, hire and consult with relevant experts, and develop and prepare a case in mitigation to counter the prosecution's push for death. Second, Mr. Lawrence's mitigation specialist did not work on the case at all for several months of the year leading up to trial, leaving attorney Diane Menashe to attempt to fill the dual roles of mitigation specialist and counsel principally responsible for preparing Mr. Lawrence's penalty phase, not to mention preparing for the guilt-phase case. Third, both Ms. Menashe and Mr. Gatterdam, were preparing for a number of other very serious criminal trials, including more than one other capital case on a parallel track with Mr. Lawrence's. Finally, Dr. Mark Cunningham, [redacted] did

[87] Some of the facts relevant to this issue are pled in the general claim regarding the failure to support a motion for continuance and, to avoid repetition, are incorporated herein. *See* Claim 3.

not begin working on Mr. Lawrence's team until just over three months before he testified at trial.

Notwithstanding all these challenges to thorough preparation of their penalty-phase case, Mr. Lawrence's counsel only asked for a continuance once, the Friday before the Monday that jury selection was set to begin. On that Friday, February 10, 2005, Mr. Gatterdam argued for a continuance solely on the basis of an "avalanche" of discovery that the Government had recently provided, TT 2-10-2006 Discovery Hearing at 25, and ultimately conceding no single item's disclosure or intended introduction at trial was prejudicial to the defense. TT 2-10-2006 Discovery Hearing at 94-95. During his argument, Mr. Gatterdam never mentioned a need for more time to prepare for the penalty phase.

Yet, the basic work that needed to be done to prepare for Mr. Lawrence's penalty phase, collecting and analyzing life-history records and conducting multiple, in-person, mitigation interviews, was far from complete. *See* Exh. 1 at ¶¶ 3, 55. Record collection and analysis "involve a slow and time-intensive process," routinely taking months, and generating additional sources that need to be pursued, cyclical work that takes "[g]reat diligence." Exh. 1 at ¶ 27. By the time of trial, Mr. Lawrence's team had only collected criminal records on his family members, no other life-history records for anyone but Mr. Lawrence himself, not even available medical records documenting close relatives' psychiatric disorders or substance abuse. *See* Exh. 1 at ¶¶ 55, 122. The team had also gathered some of Mr. Lawrence's employment records but not "the single most important summary of his work history," his Social Security earnings records, or those of his caretakers, which would "have provided hard and credible documentation of family income during his developmental years." Exh. 1 at ¶ 55. Nor did defense counsel have the

time to assess the significance of some of the records in their possession, including those pointing to Mr. Lawrence's chronic medical issues.

Basic mitigation work-product suffered because of the shortage of time. Through no fault of Ms. Menashe's, Ms. Phillips abdicated a key responsibility of a capital mitigation specialist, preparing Mr. Lawrence's life history chronology. The team began to prepare one only after Dr. Cunningham requested it, even though it is "a standard working document in the mitigation tool kit that mitigation specialists routinely prepare without being asked." Exh. 1 at ¶ 72. Ms. Menashe asked Ms. Phillips to produce the timeline, which Ms. Phillips failed to do, admitting that she "really screwed up." Exh. 12. Ms. Menashe, who had her hands full with other trial preparation, was forced to create the timeline herself. Unfortunately, Ms. Menashe's lack of time resulted in a document that "cited no sources and ignored . . . the need for multigenerational detail. . . It was superficial, missing [a history of headaches and head injuries] in the Children's Hospital records"; it also misreported basic facts, such as the year Mr. Lawrence's adoptive father died. Exh. 1 at ¶ 73. Because Mr. Lawrence's mitigation investigation was in Ms. Menashe's words "very far from being complete," Exh. 13, his mitigation specialist was absent from his case, and time was running out to prepare the principal mitigation expert, the principal social history chronology, basic work product on which a mitigation case depends, suffered. *See* Exh. 1 at ¶ 73 (describing chronologies that reflect a thorough multigenerational mitigation investigation as "typically over a hundred single-spaced pages—and often longer," as compared to Ms. Menashe's seven-page document).

Witness interviews also suffered as a result of the trial team's lack of time, which was compounded by mitigation specialist Martha Phillips's absence during long stretches of the single pretrial year. Ms. Phillips conducted nine of her thirteen total mitigation interviews

between February and April 2005. Between late April and early October 2005, Ms. Phillips conducted a single mitigation interview, which occurred in July. The vast majority of mitigation witness investigation took place in or after December 2005, after Dr. Cunningham joined the team: indeed, when Ms. Menashe was setting up witness interviews for Dr. Cunningham, it was apparent that no one from Mr. Lawrence's defense team had talked with most of those witnesses before. This was yet another good reason and missed opportunity to request more time. [redacted]

Unfortunately, the failure to seek adequate time resulted in rushed witness preparation that was far from what is expected in a federal death penalty case. As Russell Stetler has noted, "mitigation investigation requires multiple, in-person, face-to-face, one-on-one interviews with life-history witnesses." Exh. 1 at ¶ 47. Not a single mitigation witness who testified can be said to have been prepared according to this standard protocol of capital case preparation. *See* Exh. 1 at ¶¶ 46-47, 50 (describing phone interviews of mitigation witnesses and group interviews of mitigation witnesses at attorneys' offices and explaining that proper mitigation investigation requires multiple in-person interviews in witnesses' homes).

The prejudice to Mr. Lawrence from the failure to obtain the time to prepare a thorough mitigation case is evident in the presentation ultimately made to the jury. Lay witness testimony was brief, superficial, and in some places contradictory. As noted, the very first mitigation witness, one of two defense penalty-phase experts, Dr. Elijah Anderson, was ill-prepared to

testify and offered academic theories about the sociology of African-American inner-city men, whose relevance to Mr. Lawrence the Government handily discredited. The main defense expert, Dr. Mark Cunningham, gave testimony on important points that was not corroborated by lay witnesses or records. *See*, *e.g.*, Exh. 1 at ¶¶ 118-119 (discussing Dr. Cunningham's testimony about Mr. Lawrence's *in utero* alcohol exposure and the vague lay witness testimony about Mr. Lawrence's biological mother's alcohol consumption and explaining that a "thorough investigation of fetal alcohol and drug exposure would have required interviews with multiple witnesses who knew Leondra at the time of her pregnancy and could discuss her drinking in detail," lay witness testimony on Leondra's drinking while pregnant, as well as collection of relevant records and review of them by qualified experts); Exh. 1at ¶¶ 118, 120-121 (discussing Dr. Cunningham's "checking boxes" and referral to hypotheticals in lieu of the Constitutional requirement of individualized capital sentencing).

As a result, the Government was able to undermine the credibility of his conclusions by suggesting, among other things, that Dr. Cunningham was blaming Mr. Lawrence's "decent"-seeming family for his criminality, TT V 17 at 9-10; that Mr. Lawrence's biological parents' criminality and neglect had little effect on him because of the Lopezes' influence and those of related role models, TT V 17 at 12-13, 14; that Mr. Lawrence's relatives who grew up in the same neighborhood without fathers were not out robbing banks, TT V 17 at 16; that Dr. Cunningham was relying on Mr. Lawrence's uncorroborated self-report about his substance addiction, TT V 17 at 20, and was essentially arguing that Daryl Lawrence was "predestined to kill." TT V 17 at 11. The Government also drove home the point that the mitigation case depended entirely on Dr. Cunningham, Mr. Lawrence, and the same witnesses whom Dr. Cunningham "implie[d] are morally responsible for [Mr. Lawrence] turning out the way he did—

his family." TT V 17 at 29. Mr. DeVillers left the jury with the last word about Dr. Cunningham, "He's a box checker." TT V 17 at 56.

Unfortunately, the defense's rushed, superficial mitigation presentation could not stand up to that criticism. Critical pieces of a mitigation case were never explored,[88] and Dr. Cunningham's lengthy presentation folded under adversarial testing. As Mr. Stetler has explained:

> The sentencing phase presentation was a quantitative illusion: thirty witnesses, an expert with 266 PowerPoint slides, and a list of forty-nine mitigating factors. Beneath this illusion was a reality that lacked consistent and thorough investigation, in-depth mitigation interviews, basic multigenerational record gathering, and effective consultation with experts appropriate to the specific needs of the case.

Exh. 1 at ¶ 3. The time it would have taken Mr. Lawrence's trial counsel to perform according to this well-established standard of capital case representation was far more than the time they had. Their failure to move for a continuance prejudiced the outcome of Mr. Lawrence's capital sentencing.

Trial counsel were not prepared for a penalty phase in March of 2006. They were never served properly by their mitigation specialist; perhaps because of that, they neither collected all necessary records nor became sufficiently familiar with the records in their position; they neglected to prepare their two experts for their testimony; and they should have asked for more time in order to address the holes in their case. However well-intentioned and caring his capital counsel, Mr. Lawrence's penalty phase ultimately suffered the effects of these errors.

## VII. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO IMPROPER INSTRUCTIONS AND AN IMPROPER VERDICT FORM AT THE

[88] Had counsel sought the time needed, they might have come to recognize the importance of some of the records they collected, the extent to which their client had been exposed over and over to traumatic experiences, and the need for a medical expert. The failure to seek out an expert who could talk to the jurors about the trauma Mr. Lawrence had endured or one who would have identified his brain damage was especially prejudicial and is discussed elsewhere in this pleading.

**ELIGIBILITY PHASE OF THE PROCEEDINGS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

The jury received improper instructions and an improper verdict form at the eligibility phase. Specifically, both the instructions and the verdict form instructed the jury that it could not find that the Government had failed to prove an eligibility factor unless it did so unanimously. This was plainly improper. It was the Government's sole burden to prove the existence of the eligibility factors beyond a reasonable doubt. Thus, if a single juror disagreed that the Government had met its burden, then the eligibility factor would not be proven. However, by imposing a unanimity requirement on the *non-existence* of an eligibility factor, the Court impermissibly shifted the burden to Mr. Lawrence to *disprove* the eligibility factor. Trial counsel unreasonably failed to object to these plainly improper instructions and verdict form, and Mr. Lawrence was prejudiced by trial counsel's deficient performance.

### A. The Verdict Form and Jury Instructions were Constitutionally Defective.

The verdict form used in the eligibility phase contained the following formulation as to each gateway intent factor:

> We, the jury, being duly empaneled and sworn, find that the Defendant (DID) (DID NOT) intentionally kill Bryan Hurst.
> CIRCLE YOUR ANSWER IN INK
> (All must agree)
>
> We, the jury, being duly impaneled and sworn, find that the Defendant (DID) (DID NOT) intentionally inflict serious bodily injury that resulted in the death of Bryan Hurst.
> CIRCLE YOUR ANSWER IN INK
> (All must agree)
>
> We, the jury, being duly impaneled and sworn, find that the Defendant (DID) (DID NOT) intentionally participate in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Bryan Hurst died as a direct result of the act.
> CIRCLE YOUR ANSWER IN INK
> (All must agree)

> We, the jury, being duly impaneled and sworn, find that the Defendant (DID) (DID NOT) intentionally and specifically engage in an act of violence knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Bryan Hurst died as a direct result of the act.
> CIRCLE YOUR ANSWER IN INK
> (All must agree)

The verdict form repeated this formulation with respect to the two alleged statutory aggravating factors:

> We, the jury, being duly impaneled and sworn, find that the Defendant (DID) (DID NOT) in the commission of the offense of killing in the course of an attempted armed bank robbery as charged in Count 7 or in escaping apprehension for the violation of such offense, knowingly created a grave risk of death to one or more persons in addition to Bryan Hurst.
> CIRCLE YOUR ANSWER IN INK
> (All must agree)
>
> We, the jury, being duly impaneled and sworn, find that the Defendant (DID) (DID NOT) kill Bryan Hurst in the expectation of the receipt of anything of pecuniary value.
> CIRCLE YOUR ANSWER IN INK
> (All must agree)

The formulation on the verdict form with respect to these eligibility factors was plainly incorrect. First, the form required that the jury be unanimous as to the *non-existence* of each eligibility factor. As the verdict form instructed, in order for the jury to circle the "did" or "did not" option, the jury had to be unanimous –"All must agree." This was plainly incorrect; although the finding of the existence of an eligibility factor must be unanimous, a jury does not need to agree unanimously regarding the non-existence of an eligibility factor. Because the burden is on the Government to prove the eligibility factors beyond a reasonable doubt, the Government fails to meet that burden if one juror is not convinced; a finding that an eligibility factor has not been proven need not be unanimous. The formulation on the verdict form thus

resulted in impermissible burden-shifting: it required the jury to be unanimous before it could find that the Government had *failed* to meet its burden.

Second, the verdict form instructed the jury to find whether Mr. Lawrence "did" or "did not" display the requisite intent or commit a particular act. This was clearly improper: the jury's role was solely to determine whether *the Government had proved beyond a reasonable doubt* that Mr. Lawrence possessed the requisite intent or engaged in the activity specified in the alleged statutory aggravating factor. The verdict form, however, made no mention that it was the Government's burden to prove these factors. Moreover, the verdict form failed to instruct that a finding as to the existence of any factor had to be made beyond a reasonable doubt.

The errors in the verdict form were made worse by the jury charge. The jury was explicitly instructed that a finding regarding the non-existence of an eligibility factor must be unanimous:

> *After you have arrived at your verdicts, which must be unanimous,* the foreperson and all jurors will sign the verdict forms on the lines as indicated. I have now outlined for you the applicable rules of law. *I want to remind you once more that your verdicts must be unanimous.* If you come to a unanimous verdict, you must indicate as such on the appropriate verdict form. *Either way, whether you find the existence or the nonexistence of the alleged eligibility factors, your verdict must be unanimous.*

TT V 12 at 73-74 (emphasis added).[89] The Court then went through the verdict form with the jury, and in discussing the sections of the verdict form pertaining to the intent factors, the Court emphasized that in order to make any finding as to each intent factor, "all must agree." TT V 12 at 78-79.

---

[89] A similar instruction was also given at the beginning of the charge: "[I]n this Eligibility Phase, you must determine the existence *or nonexistence* of the following three factors unanimously and beyond a reasonable doubt." TT V 12 at 52 (emphasis added).

### B. Trial Counsel Unreasonably Failed to Object to the Improper Instructions and Verdict Form.

Trial counsel were given an opportunity to object to both the jury instructions and the verdict form at a charge conference on March 1, 2006. Trial counsel had filed a proposed set of eligibility phase instructions that correctly noted that if one or more jurors did not agree that the Government had proven an eligibility factor beyond a reasonable doubt, "then you must sign the verdict form indicating that you cannot unanimously agree that the government has proven that factor beyond a reasonable doubt." ECF Doc. No. 156 at 9. The proposed instructions did not include any of the improper language requiring the jury to unanimously find the *non-existence* of an eligibility factor. Despite this fact, trial counsel raised no objections and took no exceptions to the Court's variation from the defense's proposed instructions. TT V 11 at 207-12.

Trial counsel erred in failing to object to the verdict form and jury instructions. The instructions and verdict form impermissibly lessened the Government's burden of proof and shifted the burden onto Mr. Lawrence to *disprove* the existence of the eligibility factors. Trial counsel's failure to challenge the verdict form and instructions was objectively unreasonable; there is no conceivable strategic benefit to lessening the Government's burden as to the eligibility factors while simultaneously taking on the burden of having to unanimously disprove the existence of the eligibility factors. The instructions were thus plainly unconstitutional, and trial counsel unreasonably failed to challenge them. *See Sandstrom v. Montana*, 442 U.S. 510 (1979) (presumptions that shift burden from State to defendant in criminal proceeding unconstitutional); *Francis v. Franklin*, 471 U.S. 307, 319 (1985) (mandatory rebuttable presumption of malice instruction unconstitutional because it shifts burden from State to defendant); *Rose v. Clark*, 478 U.S. 570, 575 (1986) (same); *Yates v. Evatt*, 500 U.S. 391, 401-02 (1991) (courts not to assume such mandatory rebuttable presumptions are harmless error).

### C. Trial Counsel's Deficient Performance Was Prejudicial.

Trial counsel's failures to challenge the improper verdict form and instructions were prejudicial. First, the eligibility factors were akin to elements of the offense at the guilt phase; the Government bore sole responsibility for proving their existence, and absent proof beyond a reasonable doubt to the unanimous satisfaction of the jury, the Government could not have established that Mr. Lawrence was eligible for a death sentence, and the trial could not have proceeded to a penalty phase. *See* 18 U.S.C. §§ 3591, 3592, 3593. By impermissibly lowering the Government's burden of proof as to the eligibility factors, as well as imposing on Mr. Lawrence the burden of *disproving* these factors, the instructions and verdict form turned the eligibility determination on its head.

Second, the prejudice that in this case was demonstrated by the jury note that the Court received after the charge had been given. After four hours of deliberation during the eligibility phase, the jury sent the following question: "What if we are not in agreement on one of the intent factors?" TT V 12 at 84. The Court convened a conference with counsel, at which Mr. Lawrence was also present, to discuss the matter. During that conference, the Court stated how it preferred to respond to the question:

> And to be honest with you, I thought the verdict forms led them right through it, no matter what, and I think what I would do here is simply say, "Please follow the directions not only in the instructions, but on the verdict forms."

TT V 12 at 85-86. Both parties stated on the record that they had no objection to such an instruction. TT V 12 at 86. Immediately thereafter, the Court went off the record, and when it went back on the record, it stated the following:

> Counsel and I have consulted with regard to the questions, written questions submitted, and our answers are as follows: … With regard to being unable to agree on one of the intent factors, please follow the written instructions and the directions on each verdict form.

TT V 12 at 86. Counsel again stated on the record that they were in agreement with that instruction. TT V 12 at 86-87. Unfortunately, this instruction only emphasized the improper requirement that in the form all jurors had to agree to any finding.

Counsel's failure to properly object to the initial instructions, the verdict form, and the supplemental instructions in response to the jury's question was prejudicial. The question from the jury clearly indicated that it could not unanimously agree on an intent factor. Rather than request that the jury be instructed that a lack of unanimity required that the jury find that the intent factor had not been proven, trial counsel compounded their initial deficient performance by acquiescing to a supplemental jury charge that merely instructed the jury to re-read the original erroneous jury charge and verdict form.

Both the jury instructions and verdict form could have reasonably been understood by the jury as creating a mandatory rebuttable presumption that shifted to the defense the burden of persuasion on the question of the eligibility factors; indeed, that is what the jury note appeared to indicate, as the jury was unable to properly determine from the jury instructions and charge that non-unanimity on an eligibility factor *required* it to find that the factor was not proven beyond a reasonable doubt. Instead, the jury may have reasonably believed, based on the charge and the verdict form, that unless it was unanimous as to the non-existence of the eligibility factor, it could not vote "no."[90]

The error here was especially pernicious because the issue of intent played such a crucial role in the jury's ultimate sentencing verdict. As the Sixth Circuit Court of Appeals noted, a rational explanation for why the jury sentenced Mr. Lawrence to death on Count Eight but not on

---

[90] To the extent that the jury was not persuaded that the gateway intent factors were proven to the satisfaction of every juror beyond a reasonable doubt – and from the jury's question, it reasonably appears that this was the case – the jury charge and verdict form were particularly prejudicial because they precluded the jury from noting that disagreement on the form; indeed, the jury was repeatedly and explicitly instructed that *only* unanimous findings were permitted.

Count Seven was because "the degree of criminal culpability involved in the two offenses differed." *United States v. Lawrence*, 555 F.3d 254, 268 (6th Cir. 2009). As the Court further explained,

> [T]he Count Eight offense implicated greater moral culpability than the Count Seven offense. Under Count Eight, the jury found that Lawrence, while using or carrying a firearm during an attempted armed bank robbery, *murdered* Bryan Hurst (i.e., with malice aforethought). Under Count Seven, the jury found that Lawrence, during an attempted armed bank robbery, placed another's life in jeopardy and *killed* Bryan Hurst. The Count Eight malice aforethought element, according to the instructions, required proof beyond a reasonable doubt that Lawrence either killed Hurst "deliberately and intentionally" or acted "with callous and wanton disregard for human life." JA 116. The jury was not required to find malice aforethought to find Lawrence guilty under Count Seven.

*Lawrence*, 555 F.3d at 265-66 (emphasis in original). In other words, Count Eight required that the jury find that Mr. Lawrence displayed a greater level of intentionality in his conduct than Count Seven.

Indeed, Mr. Lawrence's level of culpability was one of the most critical and disputed issues during the eligibility phase. During that phase of the trial, the Government focused almost exclusively on the gateway intent factor that established the greatest level of culpability – "intentionally killed" – in its closing argument to the jury. As the Government stated at the outset of its argument:

> I'm going to concentrate on the fact that this was an intentional killing, and not that it was one of the other intent factors which the Court will define for you and for which you'll have verdict forms.…The intentional killing is at the top.

TT V 12 at 6. The Government then repeated that theme – that this was an intentional killing, per the first gateway intent factor –throughout its closing argument. *See* TT V 12 at 11-12 ("Use your reason and common sense when you consider the intent factor. Of course this is an intentional killing."); *id.* at 12 ("He took a loaded, cocked, semiautomatic pistol into a bank with the intent to rob it. And when he was confronted by an armed police officer, he leveled his gun at

him, charged him, fired seven shots, and killed him. Of course this is an intentional killing."); *id.* at 14 ("He knew what he was doing when he charged the officer. This wasn't an accidental shooting."); *id.* at 14 ("This is an intentional killing, ladies and gentlemen."). The Government even played the bank security camera footage to the jury frame by frame, and argued that Mr. Lawrence's intent to kill could be gleaned in each frame that documented Mr. Lawrence's movement from the entrance of the bank towards the teller counter.[91]

By contrast, the defense argued in closing that the killing was not intentional, but rather occurred during a panicked and chaotic shootout after Mr. Lawrence had already abandoned his plan to rob the bank and was merely returning fire in order to give himself cover to flee:

> Daryl Lawrence's intent was to get out of there alive. He didn't intend to cause, inflict, serious bodily injury, didn't intend to harm anybody, tried to get him down, tried to put the weapon away. He reacted to being confronted with a gun and being shot himself.

TT V 12 at 36.

> Daryl Lawrence was confronted with an officer, who had a weapon, drawing a bead on him. Shot and returned fire. He reacted at the spur of the moment to get out alive. This is not an intentional killing, and the aggravating factors have not been proven beyond a reasonable doubt.

TT V 12 at 37.[92] As evidence of the lack of intent, the defense also highlighted Mr. Lawrence's videotaped post-arrest statement to Detective McCoskey. TT V 12 at 28. Specifically, trial counsel focused on Mr. Lawrence's statements that he was not expecting an officer to be inside the bank, that he panicked when the officer drew his weapon and fired at him, and that he never intended to hurt anyone. TT V 12 at 29-30.

---

[91] *See* TT V 12 at 7 ("There is a sequence of photographs from the bank surveillance video which I believe clearly establishes what the defendant's intent was. They start at the front door camera, and they continue, in sequence, to the Teller 5 camera."); *id.* at 7-9, 49.

[92] *See also* TT V 12 at 21, 25, 27, 29, 35-38 (arguments by defense counsel that the killing was not intentional).

The jury's focus on the question of intent can also be seen in its request for an additional viewing of particular evidence: when it sent back its note regarding its inability to agree on the intent factor, it *also* asked in that same jury note that the bank security camera footage and Mr. Lawrence's videotaped statement be replayed for the jury, too. TT V 12 at 84. [redacted]

Given the focus of the parties during their respective arguments and the scope of the jury's questions and requests to review video evidence, there is very little doubt that the level of Mr. Lawrence's intent was a focus of the jury's deliberation. The requirement, then, that the jury be unanimous as to the *non-existence* of an eligibility factor, such as whether Mr. Lawrence intentionally killed Officer Hurst, would thus have had profound implications not only at the eligibility stage, but also on the jury's subsequent penalty phase deliberations. If a juror reasonably believed that in choosing the appropriate punishment, he or she could not consider doubt about Mr. Lawrence's level of intentionality unless that doubt was unanimous, then that juror would have been improperly precluded from considering an issue that was, according to the Sixth Circuit, dispositive of Mr. Lawrence's death sentence on Count Eight. *Houston v. Dutton*, 50 F.3d 381 (6th Cir. 1995) (instruction shifting burden of disproving malice to defendant violated *Sandstrom v. Montana*, 442 U.S. 510 (1979), and was not harmless error because instruction infected jury's findings of premeditation and deliberation as well as malice.). Mr.

Lawrence was prejudiced by trial counsel's failure to object to the improper instructions and verdict form.

Additionally, trial counsel (who also served as appellate counsel) should have raised these same errors on appeal. Had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Lawrence's rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *Smith v. Robbins*, 528 U.S. 259 (2000).

## VIII. TRIAL COUNSEL FAILED TO SECURE REASONABLY NECESSARY EXPERT ASSISTANCE TO CHALLENGE MR. LAWRENCE'S POST-ARREST STATEMENT ADMITTING GUILT FOR THE CHARGED OFFENSES, IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

Shortly after Mr. Lawrence's arrest on January 9, 2006, he made various inculpatory statements to members of law enforcement regarding his involvement in the charged offenses, including a videotaped interrogation conducted by Detective James McCoskey and FBI Agent Harry Trombitis at the Columbus Police Department. On August 29, 2005, trial counsel filed a motion to suppress those statements, ECF Doc. No. 55 at 5, and the Court held a hearing on the motion on September 26, 2005. TT V 09-26-05 Hearing at 9-75.

At the hearing, trial counsel attempted to establish that Mr. Lawrence – who was suffering from gunshot wounds sustained during the exchange of gunfire three days earlier[93] – was in severe pain during the interrogation, and that the pain interfered with his ability to validly waive his right against self-incrimination and to give a voluntary statement. The Government presented three witnesses at the hearing: (1) Officer Darrell Fitzpatrick, who was one of the

[93] Mr. Lawrence had lost part of his ring finger from a gunshot, had no movement in another finger, had a bullet still lodged in his body, and had the remainder of his ring finger amputated in Washington, D.C.

officers who arrested Mr. Lawrence; (2) Officer Nichole Prysock, who transported Mr. Lawrence to Columbus Police headquarters after his arrest; and (3) Detective McCoskey.

During the hearing, trial counsel attempted to elicit from each Government witness testimony that he or she observed Mr. Lawrence in pain on the day of his arrest and subsequent interrogation. With respect to Officer Fitzpatrick, trial counsel elicited that at the time of the arrest, Mr. Lawrence appeared to be in pain from his injuries. TT V 09-26-05 Hearing at 25-26. With respect to Officer Prysock, trial counsel elicited that at the time of Mr. Lawrence's arrest, he was wearing a soft cast around his left arm. *Id.* at 36-37. Trial counsel also elicited from Officer Prysock that in her estimation, Mr. Lawrence appeared to be in pain and uncomfortable during the 15-minute trip to police headquarters, *id*. at 39, and that he had spontaneously mentioned that he had a bullet in his forearm and was missing a finger. *Id.* at 41. Officer Prysock also testified on cross examination that Mr. Lawrence needed assistance exiting the vehicle once they arrived at headquarters, and that he appeared to be in pain and discomfort. *Id.* at 43. With respect to Detective McCoskey, trial counsel elicited that during his interrogation of Mr. Lawrence, Detective McCoskey observed that Mr. Lawrence was in pain, and that during the interrogation he gasped and winced in pain. *Id.* at 61. Detective McCoskey also testified that Mr. Lawrence told him he needed to get to a hospital. *Id.* at 62.

Trial counsel only called one witness at the hearing, Molly Marie Konkler, a nurse who treated Mr. Lawrence on January 9, after his interrogation. Ms. Konkler prepared an Admission Assessment form based on what Mr. Lawrence told her at the time of the assessment. *Id*. at 69–70. Ms. Konkler listed on her Admission Assessment form that Mr. Lawrence's pain was nine out of ten. *Id*. p.70. She further indicated that the pain was constant and burning. *Id*. She noted in the form that Mr. Lawrence had problems with cognition/perception. *Id*. Ms. Konkler took this

assessment at 9:20 p.m., which was almost twelve hours after Mr. Lawrence's arrest and almost eleven hours after the commencement of the interrogation. *Id*. at 71.

Trial counsel filed a supplemental memorandum on October 3, 2005. ECF Doc. No. 84. In that memorandum, trial counsel argued that based on the facts developed at the hearing, Mr. Lawrence's statements should be suppressed because he was in such severe pain at the time that his "will was overborne due to the pain and the refusal to take him to the hospital until the questioning was over." *Id*. at 11.

On October 28, 2005, the Court entered an order that, with the exception of one statement made by Mr. Lawrence prior to his videotaped interrogation, denied his motion to suppress. ECF Doc. No. 120. The Court stated that in the videotape, Mr. Lawrence appears to be sober and that he "appears to be alert, his voice is strong, and he does not slur his words." *Id*. at 12. The Court also found that the videotape disputed trial counsel's contention that Mr. Lawrence's injuries and resulting pain prevented him from voluntarily waiving his right against self-incrimination. *Id*. at 13. Specifically, the Court found:

> After initially showing some symptoms of pain or discomfort when the Officers were not present in the interrogation room, Defendant at no other time indicated to the officers or showed any signs of pain during the interview. To the contrary, Defendant was alert and answered all of the officers' questions. Although he was given the opportunity to take breaks, Defendant declined to do so. Defendant never requested any medical attention and, from the videotape, the Court concludes that he did not need any medical attention. Nurse Konkler's report of Defendant eleven hours later does not persuade this Court to the contrary.

*Id*.

Defense counsel raised this issue on appeal, but the Sixth Circuit denied it, holding that this Court's determination that Mr. Lawrence voluntarily, knowingly, and intelligently waived his *Miranda* rights was not clearly erroneous. *United States v. Lawrence*, 735 F.3d 385, 438 (6th

Cir. 2011). The Sixth Circuit further held that it found no basis for holding that the district court clearly erred in its factual findings,[94] and that:

> there is no evidence to support Lawrence's argument that the police prohibited him from receiving medical attention. McCoskey acknowledged that Lawrence appeared to be in pain, but Lawrence did not ask for immediate medical attention or indicate that he was in such pain that it affected the voluntariness of his statement. Lawrence was shot on January 6, treated at a hospital on January 7, and questioned on January 9. The fact that he told a nurse several hours later that he was in considerable pain does not establish how much pain he was in while being questioned ten or eleven hours earlier.

*Id*.

Trial counsels' argument for suppression was wholly dependent on Mr. Lawrence's medical condition. Their argument relied upon the state of Mr. Lawrence's recovery from a gunshot wound and the only witness called by the defense was a nurse, who referred to hospital intake notes but had no independent recollection of the event. *Id*. at 71-72. Under these circumstances, it would have been reasonably necessary to consult with a medical doctor to fully understand the medical issues in play and determine whether any other factors supported the argument to suppress the statement.[95]

As explained elsewhere herein, had they consulted a medical doctor they would have discovered that Mr. Lawrence had suffered from Polycythemia Vera since early childhood. A medical doctor, such as Dr. Nadkarni who consulted with postconviction counsel, could have

---

[94] Both this Court and the Sixth Circuit held that the facts at the hearing established that Mr. Lawrence never requested medical attention during the course of his videotaped interrogation. However, Detective McCoskey testified at the hearing on the motion to suppress that Mr. Lawrence told him he needed to get to a hospital. TT 9-26-05 Hearing at 62. Moreover, the videotape of the interrogation clearly reflects that in response to being asked whether he needs to take a break, Mr. Lawrence responds: "I just need to get to the hospital so we can get this over with. I've been sucking it up for this many days. I mean it's hell."

[95] Mr. Lawrence has discussed in detail the "red flags" present in Mr. Lawrence's childhood medical records that should have prompted trial counsel to consult with a medical doctor in preparation for a possible punishment phase. *See* Claim 1, 2. Thus, even if counsel did not seek a physician solely for the suppression hearing, a competent medical doctor reviewing Mr. Lawrence's records would have noted the issue.

explained that PV is a blood disease—rare in children—that results in the production of an abnormal increase of red blood cells in the blood. Exh. 3 at 11. This can be seen in increased hematocrit levels in a blood panel.

In addition, a medical doctor could have informed counsel that PV had a very important and critical impact on his health at the time of his confession:

> [Mr. Lawrence's] concentration of red blood cells ("hematocrit") at that time according to hospital records was relatively low, documented at 33.9 at 1:57 p.m. on January 9, 2005 and 24.2 on the afternoon of January 10, 2005. [Exh. 71.] This number is abnormally low for men with normal blood who do not suffer from Polycythemia Vera. For someone whose hematocrit normally runs in the mid-50's…it is extremely low and indicates a severe loss of blood over a very short period of time. Normal hematocrits for most men are around 40 – 45 and a drop of 10 points acutely (over days) would certainly lead to many symptoms, especially cognitive ones. Mr. Lawrence most likely lost around 20 points given his baseline hematocrit. Losing that much as fast as he did, especially in someone with special oxygenation needs such as those produced by Polycythemia, is devastating. A drop of 3 points of hematocrit acutely is a hematologic emergency and, if repeated, often requires a blood transfusion. Three points or 3% drop in hematocrit generally requires at least "1 unit" of blood (most units are 300 cc's and 3 points correlates more with 500 cc's). Losing 20 points, or, at least six times that much, as Mr. Lawrence did when he was wounded, would require 7 – 8 units of blood for transfusion for him to be able to perfuse his tissues, including his brain, for them to function at a baseline level. It is very likely that a person whose hematocrit level had fallen as rapidly as Mr. Lawrence's appears to have would have been markedly encephalopathic or "delirious." Although such symptoms may not be obvious to a person not medically trained, such a large drop of hematocrit would result in symptoms such as hypotension and an acute change of mental status. A patient in such a condition would be far from his or her normal state of mind, very confused, and in no position to make complex decisions. This change in mental status would be further compounded by pain from physical injury.

Exh. 3 at 11-12.

This missing information was crucial for this Court to have a full understanding of why Mr. Lawrence's statement should have been suppressed and shows that the *Strickland* prejudice is met.

[redacted]

96 [redacted]

[redacted]

## X. TRIAL COUNSEL BELATEDLY OBJECTED TO THE PRESENCE OF UNIFORMED POLICE OFFICERS DURING JURY SELECTION, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

On February 13, 2006, the first day of jury selection, trial counsel filed a pleading styled as "Defendant's Caselaw On Officer In Court Issue." ECF Doc. No. 183. The pleading read as follows:

> In response to an issue raised by Counsel for Defendant in a status conference, Defendant submits the following authority on the issue of the District Court's authority to exclude uniformed police officers from attending the trial, unless they are on the witness stand testifying.
>
> 1. *United States v. Rios*, 579 F.2d 670 (1st Cir. 1978).
>
> 2. *United States v. Rutherford*, 371 F.3d 634 (9th Cir. 2004).
>
> 3. *Woods v. Dugger*, 923 F.2d 1454 (11th Cir. 1991).
>
> 4. *People v. Pennisi*, 563 N.Y.S.2d 612 (NY, 1990).

ECF Doc. No. 183 at 1. Copies of the cited cases were appended to the pleading.

On February 14, 2006, which was the second day of jury selection, the Court discussed the matter with counsel, noting: "I didn't recognize [this issue] was going to come up this quickly." TT V 2 at 206. The Court stated that it would formally rule on the request to prohibit

police officers from attending the proceedings in uniform by the next day, but would provisionally exclude officers from attending the proceedings in uniform in the meantime out of an abundance of caution. TT V 2 at 206. Unfortunately, uniformed officers were already present in the courtroom and had been seen by at least one, and possibly two, panels of prospective juror TT V 2 at 206-07.

On February 15, 2006, the Court orally announced its order to exclude police officers from attending the proceedings while in uniform. TT V 3 at 5-6. The Court also entered a written order, which stated in part:

> After considering the arguments of the parties, and for the reasons given on the record on February 15, 2005, the Court concludes that the presence of uniformed police officers in the courtroom may have an intimidating effect on the jurors. *See United States v. Rios*, 579 F.2d 670 (1st Cir. 1978). Thus, police officers may attend the trial but may not wear their uniforms.

ECF Doc. No. 185 at 1.

**A. Trial Counsel Failed to Timely Raise Their Objection.**

Trial counsel should not have waited until jury selection had already begun to move to exclude uniformed police officers from the courtroom. As noted in trial counsel's motion, counsel were clearly aware of the prejudicial effect that the presence of uniformed police officers would have on the jurors and had even raised the issue with the Court in a status conference prior to jury selection. Indeed, as the Court subsequently acknowledged when it ruled on the motion on February 15, 2006, there was a Columbus Police Department substation located across the street from the courthouse, and uniformed police officers had already attended some of the pretrial proceedings. TT V 3 at 4-5. Trial counsel were clearly on notice that uniformed police officers might attend the jury selection proceedings as well. Making this motion *after* jury selection had started was unreasonable, as there was no conceivable strategic reason for waiting.

### B. The Failure to Object in a Timely Fashion Was Prejudicial.

Trial counsel's failure to timely raise their objection was prejudicial. As the Court noted when ruling upon the motion:

> I can tell you that the arraignment in this matter proved to this Court that many officers are interested in the case and will appear because we had a considerable amount of officers in uniform at the arraignment. This Court finds that the appearance of the officers in the courtroom in uniform may have an intimidating effect upon the jurors. And there is no good reason why the officers that want to attend cannot change into civilian clothes at the police station and come over, if they wish, or change anywhere and come in.
>
> It is, therefore, ordered that the police officers want to attend this proceeding not appear in uniforms in this case. And this is simply out of an abundance of caution with regard to an intimidating factor, which is maybe just perceived at this point in time, but I'm afraid if we continue to allow it, we can't put the genie back in the bottle later. So, I think it would be better if we issued that ruling right now. It is so ordered.

TT V 3 at 5-6 (emphasis added). Unfortunately, the genie was already out of the bottle at that point: before the Court issued its provisional ruling excluding uniformed police officers from the courtroom, at least three of the veniremembers who ultimately sat on Mr. Lawrence's jury had been brought in for panel questioning: Jurors 68, 81, and 91. TT V 2 at 47, 95, 157.

Given the relevant case law and the reasoning behind the Court's February 15 order on the motion, there is little doubt that the Court would have reached the same ruling prior to the start of jury selection if counsel had timely filed such a motion. Instead, jurors who sentenced Mr. Lawrence to die for killing a police officer came into a courtroom with colleagues of the dead officer present and in uniform. Mr. Lawrence was prejudiced by trial counsel's unreasonable decision to wait until after jury selection had already begun to object to this extraneous influence on the decision makers.

## XI. TRIAL COUNSEL UNREASONABLY FAILED TO OBJECT TO THE GOVERNMENT'S EVIDENCE THAT THE GUN USED IN THE SKY BANK ROBBERY AND THE FIFTH THIRD HOMICIDE WERE ONE AND THE SAME, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

In Counts 5 and 6 of the indictment, Mr. Lawrence was charged with the 2004 robbery of Sky Bank. In order to establish that Mr. Lawrence was guilty of those counts, the Government relied largely on the expert testimony of Mark J. Hardy, a criminalist with the Columbus Division of Police who worked in the firearms examination and identification unit of the crime laboratory. TT V 8 at 29.[97] During the Sky Bank robbery, the perpetrator accidentally discharged his gun and left behind a spent 40 caliber shell casing that was later recovered by the Columbus Police Department. TT V 7 at 101-02. Mr. Hardy testified that he compared that spent 40 caliber shell casing with the spent 40 caliber shell casings recovered at the Fifth Third Bank in January 2005, and that in his expert opinion, the Sky Bank casing "was fired by the same weapon that fired the previously discussed 40 caliber casings" recovered at Fifth Third Bank in January 2005. TT V 8 at 62-63, 47. Mr. Hardy further testified that this opinion was "within a reasonable degree of scientific certainty." TT V 8 at 63.

### A. Counsel Failed to Subject Mr. Hardy's Testimony to Proper Scrutiny.

Trial counsel should have objected to this testimony. At the time of Mr. Lawrence's trial, the premise underlying firearms and toolmark identification—that firearms leave unique marks

[97] The single eyewitness who testified about that bank robbery, Lucas Hunter, was not able to identify Mr. Lawrence as the perpetrator. TT V 6 at 116. While Mr. Lawrence's statement to law enforcement did attest to his presence at the other bank robberies, the prosecution clearly did not find the statement sufficient since it brought in Mr. Hardy as one of only two expert witnesses for the jury's consideration and questioned the expert about his casing "match." Moreover, as noted elsewhere in this motion, there was compelling evidence available, but unexplored by trial counsel, which could have precluded the admission of the statement as well.

on ammunition components—had never been proven.[98] Indeed, such evidence was being successfully challenged in courts around the country. *See, e.g.*, *United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005) (Memorandum and order re: Motion to exclude ballistics testimony) (recounting problems inherent in firearm and toolmark identification and prohibiting firearms examiner from testifying that the match he found allows for identification "to the exclusion of every firearm in the world"); *Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002) (firearms identification testimony held inadmissible where expert testified that toolmarks on shell casings had been made by the same magazine, even though, because no weapon had been recovered, expert had only compared the toolmarks on the casings and had not examined the suspect magazine); *cf. Ramirez v. State*, 810 So. 2d 836 (Fla. 2001) (toolmarks expert's identification of the expert's knife as the murder weapon, to the exclusion of all others, was unreliable and inadmissible).

Trial counsel should have filed a pretrial motion to exclude this evidence on the ground that the field of firearms and toolmarks identification is not based on sufficiently reliable methods to satisfy the threshold requirements for admissibility under Rule 702 of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Government's evidence would not have met the *Daubert* standard, as the underlying premise of firearm and toolmark identification lacks an adequate statistical empirical foundation to be considered scientifically valid. However, even if the Court had declined to reach the question of the underlying scientific validity of firearm and toolmark identification, at a minimum, there is a

[98] At the time of Mr. Lawrence's trial – and in the years since—there was never a firm statistical empirical foundation for the claim that firearms leave unique toolmarks on ammunition components such that a firearms examiner can make a positive "match" based on such toolmarks. See Adina Schwartz, A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmarks Identification, 6 Colum. Sci. & Tech. L. Rev. 2 (2005) (discussing lack of adequate statistical empirical foundations for firearms and toolmarks identifications).

reasonable probability that under a *Daubert* analysis, the Government's expert would have been precluded from testifying definitively that the shell casings were "fired from the same weapon" or that this opinion was rendered "within a reasonable degree of scientific certainty." *See, e.g., United States v. Green,* 405 F. Supp. 2d 104 (D. Mass. Dec. 20, 2005); *Sexton v. State,* 93 S.W.3d 96 (Tex. Crim. App. 2002); *cf. Ramirez,* 810 So. 2d 836 (Fla. 2001).[99]

Trial counsel also unreasonably failed to object to Mr. Hardy's qualification as an expert on this issue. The witness testified that he had worked as a criminalist in the Columbus Police Department since 1982 and that his qualifications as a firearms examiner were based on his years spent working under the direction of Richard Fisher, who was the prior firearms examiner. TT V 8 at 30. Mr. Fisher's qualifications were never described. As to Mr. Hardy, the Government presented no evidence about his training in the area; whether it was consistent with any national standards or practices of certifying organizations, such as the Association of Firearm and Toolmark Examiners (AFTE); whether he had ever attempted certification by the AFTE; whether his many examinations had been found accurate; whether his laboratory was certified by any organization; or other indicia of expertise. Had trial counsel objected on these grounds, there is a reasonable probability that he would not have been found qualified to offer an opinion about the purported match in shell casings.

---

[99] The National Academy of Sciences ("NAS") issued a report in 2009 that identified two main problems with firearms and toolmarks identification: (1) the validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks had not yet been fully demonstrated; and (2) a lack of a precisely defined process or protocol concerning the specific features to be examined and compared between toolmarks, and the level of agreement that must exist in the pattern of two sets of marks before an examiner can determine with a degree of confidence that there is a correlation between the items being examined. *See* National Academy of Sciences, *Strengthening Forensic Science: A Path Forward* at 154-55 (February 2009) (available online at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf) (last visited November 22, 2015). Although the NAS report was published in 2009, the basis for the report's criticisms of firearms and toolmarks identification existed at the time of Mr. Lawrence's trial—i.e., the *lack* of any empirical foundation for the underlying premise that firearms leave unique marks, and the *lack* of any objective national standards governing the subjective determinations of firearms and toolmarks examiners.

Trial counsel additionally unreasonably failed to cross examine Mr. Hardy about the basis for his expert opinion. He was not questioned about which toolmarks he observed on the 40 caliber casings that he considered to be unique characteristics, how many points of agreement he found, whether the type of gun at issue leaves unique markings on ammunition. Rather, Mr. Hardy simply testified as to his opinion that the shell casings matched, without any explanation about the scientific basis for his opinion. Given the gaps in his testimony, there is a reasonable probability that if trial counsel had subjected his opinion to such scrutiny, the jury would have rejected his expert conclusion.

Finally, trial counsel unreasonably failed to present available expert evidence of its own to rebut Hardy's testimony. Trial counsel had retained the services of John Nixon, a well-trained firearms expert certified by the AFTE. At a minimum, Mr. Nixon could have provided testimony both at a *Daubert* hearing and, if necessary, at trial that there was no scientific basis for Hardy's conclusion that the relevant shell casings were "fired by the same weapon" or that such a conclusion could be rendered "within a reasonable degree of scientific certainty." As Mr. Nixon explains in his attached declaration, at the time of Mr. Lawrence's trial, firearm examiners were exercising caution about making such statements due to a recognition of the lack of statistical empirical data establishing that a firearm produces unique, reproducible markings on ammunition components every time a firearm is fired. Exh. 4 at ¶ 22. As Mr. Nixon further explains, as of 2006, there was no scientific basis for claiming that two shell casings had definitively been fired from the same weapon, or that one could reach such a conclusion within a reasonable degree of scientific certainty. Exh. 4 at ¶¶ 21-23. Calling a defense expert such as Mr. Nixon would have allowed trial counsel to prevail at a *Daubert* hearing or in challenging the Government's evidence before the jury. Exh. 4 at ¶ 24.

### B. The Failure to Exclude or Challenge Mr. Hardy's Testimony Prejudiced Mr. Lawrence at All Three Phases of Trial.

Trial counsel's failure to subject this evidence to scrutiny prejudiced Mr. Lawrence.

In its closing argument at the guilt phase, the Government told the jury that Mr. Hardy's expert testimony established Mr. Lawrence's involvement in the 2004 Sky Bank robbery. "Mark Hardy says that 40 caliber casing [recovered from Sky Bank] is the same as the 40 caliber casings found at the Fifth Third Bank on January 6th." TT V 10 at 20; *see also id*. at 19 ("And that casing is significant because it connects the defendant to the 40 caliber casings found at Fifth Third Bank where Officer Hurst was murdered."). Significantly, the prosecution also relied on the evidence in an effort to establish the requisite intent factors required at the eligibility phase of trial. Mr. Lawrence's participation in the 2004 Sky Bank robbery was introduced at the eligibility phase to establish the statutory intent factors under 18 U.S.C. § 3591(a)(2) and the statutory aggravating of pecuniary gain, as well as at the selection phase to establish a non-statutory aggravating factor regarding Mr. Lawrence's prior bank robberies. The prosecutor argued: "Of course this is an intentional killing. What Daryl Lawrence did that day was nothing more than a fulfillment of what he said he would do to Heidi Litten and Wendy Sues at the Key Bank and Lucas Hunter at the Sky Bank if they don't go along with the program and let him take the bank's money." TT V 12 at 12; *see also* TT V 10 at 17-18.

> What's his intention? His intention is to get to that vault where money is. His intention is to get there any way he can. And his intention, that he previously expressed at the Sky Bank to Lucas Hunter is, I'm not going to hurt you unless I have to, unless you make me. And right here (indicating) he has the intention of murdering Officer Bryan Hurst because he is the only thing between him and the vault.

TT V 10 at 27.

The Government also relied on the Sky Bank robbery to establish the pecuniary gain aggravating factor. The prosecution argued that the timing of the Sky Bank robbery lined up with

the date on which Mr. Lawrence retrieved some items he had previously pawned, and that this fact established that the reason Officer Hurst was killed was so that Mr. Lawrence could get to the money in the vault in order to continue living his "lavish lifestyle." TT V 11 at 38-40.

Finally, during the selection phase, the Government specifically referenced the Sky Bank robbery and the accidental discharge of the firearm as a reason warranting a death sentence during its rebuttal closing argument:

> The first one being contemporaneous findings of guilt, being the other three bank robberies. Numerous victims to those bank robberies. Put those in a cup. … Put in the Sky Bank, put in Lucas Hunter, put in a man who had to beg for his life because he thought he was going to be killed and for a brief second probably thought he was.

TT V 17 at 64.

Unlike the other two non-fatal bank robberies, the Sky Bank robbery involved an accidental discharge of the weapon that could have severely injured, and potentially killed, a bank employee. Indeed, the Government specifically focused on that fact and Lucas Hunter's testimony about the fear he experienced during that robbery to argue that Mr. Lawrence deserved the death penalty. TT V 17 at 63-64. Thus, trial counsel's failure to challenge the only physical evidence connecting Mr. Lawrence to the Sky Bank robbery was objectively unreasonable and prejudiced Mr. Lawrence at his penalty phase proceeding.

## XII. TRIAL COUNSEL FAILED TO TIMELY CHALLENGE THE COMPOSITION AND SELECTION OF THE GRAND AND PETIT JURY VENIRES IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

### A. Trial Counsel's Failure to Timely Challenge the Composition and Selection of the Grand and Petit Jury Venires Constituted Deficient Performance.

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), a challenge to the grand jury venire must be made before trial commences. Failure to raise such a challenge before the start of trial results in a waiver of the claim. *United States v. Ovalle*, 136 F.3d 1092, 1107 (6th Cir.

1998). Trial counsel for Mr. Lawrence failed to challenge the process whereby grand juries in the Eastern Division of the Southern District of Ohio underrepresent African Americans, Hispanics, and women and, thus, failed to preserve a meritorious claim.

It cannot be disputed that the defense bar recognized the ability to challenge the grand jury process, as such a challenge had been available for years prior to Mr. Lawrence's trial, *see, e.g., Castaneda v. Partida*, 430 U.S. 482 (1977) (successful challenge to grand jury system). including in the Sixth Circuit. *See Rose v. Mitchell*, 443 U.S. 545 (1979) (acknowledging that discrimination in the selection of grand jury constitutes reversible error). In 2005 and 2006, at the time of Mr. Lawrence's indictment and trial, the composition of Southern District of Ohio grand juries raised serious concern. Indeed, Mr. Lawrence's trial counsel argued on direct appeal before the Sixth Circuit that the prosecution of Mr. Lawrence was improperly based on the prosecution's desire to "dilute the presence of African Americans in the jury pool." *United States v. Lawrence*, 735 F.3d 385, 438 (6th Cir. 2013).[100] This argument, supported in part by statistical evidence, shows that the claim was available and should have been raised prior to trial. Such a challenge was never investigated nor pursued before trial began. Trial counsel's failure to challenge the grand and petit jury venires deprived Mr. Lawrence of effective assistance of counsel. *See Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982) (ineffective assistance for failing to raise grand jury claim); *Hollis v. Davis*, 912 F.2d 1343 (11th Cir. 1990) (ineffective assistance in failing to challenge grand jury composition). As discussed below, a timely

[100] The heading of the direct appeal claim asserts, in part, that Mr. Lawrence was "deprived of his Sixth Amendment right to a fair and impartial jury" because he was tried in federal court. This claim, and the statistical evidence supporting it, was not raised prior to trial, and the Sixth Circuit disposed of the claim solely as one based on selective prosecution. *See United States v. Lawrence*, 735 F.3d at 439. If this Court believes counsels' pleading of this claim on direct appeal sufficiently preserved the issue, it should review the claim *de novo* because of the Sixth Circuit's failure to address it.

challenge to the grand and petit juries would have succeeded, and Mr. Lawrence's indictment would have been dismissed.[101]

### B. Mr. Lawrence Was Prejudiced by Trial Counsels' Failures Because the Process by Which Grand and Petit Juries are Selected Produces an Unconstitutional Under-representation of African Americans, Hispanics and Women, in Violation of The Fifth, Sixth, and Eighth Amendments.

Had counsel timely raised a challenge to the grand and petit jury venires, Mr. Lawrence could have established that his rights under the Fifth and Sixth Amendments to the United States Constitution were violated by the process which brought about his indictment and conviction. The Sixth Amendment guarantees criminal defendants "a speedy and public trial, by an impartial jury..." This language has been interpreted to require that the panels from which petit juries are selected be drawn from a "fair cross section" of the community in which the proceedings are held. *See, e.g.*, *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975) (citing *Brown v. Allen*, 344 U.S. 443 (1953)). In jurisdictions where a grand jury system is employed, the fair cross section requirement applies to this process as well. *Alexander v. Louisiana*, 405 U.S. 625, 635-637 (1972) (Douglas, J. concurring) (relying on *Carter v. Jury Commission*, 396 U.S. 320, 330 (1970); and *Brown v. Allen*, 344 U.S. 443, 474 (1953)); *Machetti v. Linahan*, 679 F.2d 236, 239 (11th Cir. 1982), *cert. denied*, 457 U.S. 1127 (1983).

In addition to the Sixth Amendment fair cross section requirement, the equal protection clause of the Fifth Amendment prohibits the discriminatory selection of the panel from which a grand jury is drawn if that process produces disproportionately unrepresentative results. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977); see *also, e.g.*, *United States v. Ovalle*, 136 F.3d 1092, 1104 (6th Cir. 1998) (recognizing *Castaneda*'s application to Fifth Amendment violation); *United States v. Miller*, 562 Fed. Appx. 272, 279 (6th Cir. 2014) (same).

[101] A claim of racial discrimination in the grand jury process, moreover, is not subject to harmless error analysis. *See Rose v. Mitchell*, 443 U.S. 545 (1979).

Since a movant need not be a member of the underrepresented group in question to have standing to raise a Sixth or Fifth Amendment claim, there is no dispute that Mr. Lawrence, an African American man, has standing to mount these challenges. *Campbell v. Louisiana*, 523 U.S. 392 (1998); *Taylor v. Louisiana*, 419 U.S. 522, 526 (1975) (male raising gender claim); *see also Duren v. Missouri*, 439 U.S. 357, 359 n.1 (1979); *Peters v. Kiff*, 407 U.S. 493 (1972) (white male raising claim of African Americans' absence from jury); *Powers v. Ohio*, 493 U.S. 1068 (1991); *Dobbs v. Kemp*, 790 F.2d 1499, 1510-11 (11th Cir. 1986), *cert. denied*, 481 U.S. 1059 (1987) (male defendants have standing to raise equal protection claim that women were underrepresented on grand jury).

### C. At an Appropriately Scheduled Evidentiary Hearing, Mr. Lawrence Can Present Proof Sufficient to Establish a *Prima Facie* Showing of Underrepresentation.

To establish a *prima facie* claim that the Government has violated the fair cross section requirement, a movant must show:

- that the group alleged to be excluded is a "distinctive" group in the community;
- that the representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
- that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).[102]

Proving a *prima facie* showing of discrimination under the equal protection clause requires similar proof. A claimant must show "the procedure employed resulted in substantial underrepresentation of his race or identifiable group," by demonstrating:

[102] Under this standard, "systematic" is defined by showing that the pattern recurred over time and was "inherent to the particular jury selection process utilized." *Id.* at 366.

- the group is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied";
- underrepresentation of the group in the grand jury process *over a significant period of time*; and
- a selection procedure "that is susceptible of abuse *or* is not racially neutral."

*Castaneda*, 430 U.S. at 494 (emphasis added).[103]

Mr. Lawrence can demonstrate a *prima facie* case of discriminatory underrepresentation, under both the Fifth and Sixth Amendments, of African Americans, Hispanics and women on grand jury and petit jury panels in the Eastern Division of the Southern District of Ohio.

**1. African Americans, Hispanics and women are distinct classes in the community which merit constitutional protection.**

It is clear that Mr. Lawrence satisfies the first prong of the *prima facie* showing. African Americans, Hispanics and women have long been recognized by the courts as "distinct classes," the exclusion of whom from possible jury service and the rest of the criminal justice system is constitutionally suspect. *See Castaneda v. Partida*, 430 U.S. at 495; *Hernandez v. Texas*, 347 U.S. 475 (1954) (Hispanics are distinct class); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (women are protected class); *Batson v. Kentucky*, 476 U.S. 79 (1986) (reaffirming that African Americans are distinct class).

**2. Underrepresentation**

Although the Supreme Court has "never announced mathematical standards for determining the significance of underrepresentations," *Alexander v. Louisiana*, 405 U.S. 625, 630 (1972), the Sixth Circuit has recognized both an examination of absolute disparity and, where the underrepresented group is a small portion of the community, a test of comparative

---

[103] Under the equal protection clause, the claimant must also prove intentional discrimination, *see Duren*, *supra*, 439 U.S. at 368 n.26, while the Sixth Amendment fair cross-section requirement "forbids any substantial underrepresentation of minorities, regardless of whether the State's motive is discriminatory." *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir. 1986), *cert. denied*, 479 U.S. 1084 (1987).

disparity. *Smith v. Berghuis*, 543 F.3d 326, 336-39 (6th Cir. 2008), *rev'd on other grounds*, 559 U.S. 314 (2010).

Under the comparative disparity test, the court must first compare the actual number of the distinct class on the grand or petit juries with the expected number based on total population over a significant portion of time. The measure of the predicted fluctuations from the expected value is the standard deviation, defined as the square root of the product of the total number in sample times the probability of selecting a member of the distinct class times the probability of selecting a non-member of the distinct class. *Castaneda*, 430 U.S. at 496 n. 17. In instances where the "difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Id*. Such situations establish a *prima facie* case of discrimination.

The Eastern Division of the Southern District of Ohio is comprised of the following counties: Athens, Belmont, Coshocton, Delaware, Fairfield, Fayette, Franklin, Gallia, Guernsey, Harrison, Hocking, Jackson, Jefferson, Knox, Licking, Logan, Madison, Meigs, Monroe, Morgan, Morrow, Muskingum, Noble, Perry, Pickaway, Pike, Ross, Union, Vinton, and Washington. *See* Plan of the United States District Court For the Southern District of Ohio For the Random Selection of Grand and Petit Jurors at 1. In the period prior to Mr. Lawrence's trial, the total population of those counties combined was 2,735,831. The African American population was 296,625 or 10.84% of the total population. The Hispanic population was 74,560 or 2.73% of the population.

Mr. Lawrence alleges that the actual numbers of these protected classes on petit and grand jury venires does not meet constitutional muster.[104]

**3. This underrepresentation is the product of an unconstitutional selection process.**

Mr. Lawrence alleges that the underrepresentation of African Americans, Hispanics and women is inherent in the particular process by which the petit and grand juries are selected.

## XIII. TRIAL COUNSEL'S ACTIONS DURING JURY SELECTION FAILED TO ENSURE A PROCESS THAT SAFEGUARDED MR. LAWRENCE'S RIGHTS TO A FAIR AND IMPARTIAL JURY AND A RELIABLE DETERMINATION OF GUILT AND PUNISHMENT, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

The jury selection process employed by the defense failed to identify jurors whose views about the death penalty, mitigation, or mitigating factors would have resulted in their exclusion through challenges for cause. Further, the selection process failed to elicit the basic information about prospective jurors' views on these and other topics necessary for counsel to make effective decisions about who to strike with peremptory challenges. As a result, trial counsel's approach to jury selection fell short of constitutional requirements.

First, a prominent issue in this case was that the victim was a law enforcement officer. Neither the jury questionnaires nor the voir dire included questions targeted to prospective jurors' attitudes about the loss of a police officer or how they might weigh that fact as a sentencing consideration; instead, that critical fact was buried in questions about other issues. *See*, *e.g.*, TT V 3 at 46. The absence of direct questions about such important issues precluded defense counsel from collecting the information necessary to choose a fair and impartial jury.

---

[104] Mr. Lawrence has been informed that grand jury information is not accessible without permission of the Court. He intends to file a motion seeking this information at a time when discovery is allowed by this Court. Mr. Lawrence has also been seeking the forms (labelled AO 12) wherein a district court clerk collects data of the race of jurors each time a pool is drawn from the wheel as required by 28 U.S.C. § 1863(a). Mr. Lawrence was informed by the jury deputy in the Southern District of Ohio that the information he seeks could not currently be released and Mr. Lawrence has yet to receive it.

Second, jurors who were potentially impaired pursuant to *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and those who would have been excludable under *Morgan v. Illinois*, 504 U.S. 719, 739 (1992), were treated differently without objection. In other words, Mr. Lawrence's counsel allowed for-cause strikes of jurors who registered equivocal views about the death penalty rather than the substantial impairment that *Witherspoon* requires. *See, e.g.*, TT V 2 at 155-56; TT V 4 at 81-84, 102-105 116-18. Yet, at the same time, prospective jurors who stated on questionnaires or in open court that they would vote for death for any intentional murder were accepted by the defense without in-depth questioning much less motions to exclude for cause under *Morgan*. Indeed, members of the venire who opined that keeping killers alive was a waste of taxpayer funds were allowed to decide Mr. Lawrence's fate. Exh. 93. Another who ultimately sat stated that the death penalty should be used more than it is and for "most" intentional crimes. Exh. 94. Counsel failed to question these and other jurors adequately about such views.

In addition, counsel allowed the prosecution to question and strike prospective jurors who, while expressing strong support for the death penalty, evinced a reluctance to "sign" a death verdict. TT V 1-4, *passim.* There is no constitutional requirement that prospective capital jurors be willing to sign a death verdict, and the prosecution's inquiries in that vein elevated the requirements that veniremembers be able to consider imposing the death penalty to the level of a litmus test that distorted the spirit and letter of *Witherspoon* and *Wainwright v. Witt*, 469 U.S. 412 (1984) beyond recognition.[105] Yet, Mr. Lawrence's counsel made no attempt to preclude such questioning on the one hand or on the other to at least explain what "signing" involved. Indeed, at least one juror declared that she could not sign a "death *warrant*," TT V 3 at 69 (emphasis added); no one explained the difference between death warrants and verdict forms,

[105] Nor is there a statutory requirement that jurors sign any form other than the certification about an absence of racial bias.

and, as questioning was not done individually, this confusion likely tainted fellow veniremembers' understanding as well.

Trial counsel allowed other stated views to go unaddressed on voir dire. They did not attempt to question or educate a potential juror who said that experts should not be used if the defendant doesn't have "prior mental health issues" and that a psychologist should not testify who "doesn't know the person." Exh. 93. Given that Dr. Cunningham neither knew Mr. Lawrence nor would be discussing his "prior mental health issues," counsel should have foreseen that a juror such as this would not be a favorable one for Mr. Lawrence's mitigation case. Trial counsel also accepted as jurors and without questioning individuals who promised to "back law enforcement in every way," Exh. 114, and those who had bank executives, robbery victims, or law enforcement officers in their families. *See* Exh. 95. Counsel should have at the very least inquired further of these possible jurors and asked them about their ability to consider potential mitigating circumstances.

Finally, counsel failed to provide the advocacy required during jury selection when they sought to litigate a motion to pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). The prosecution eliminated African-American veniremembers remaining after cause strikes, leaving Mr. Lawrence to be tried by an all-white jury. Defense counsel pointed out the pattern of strikes, and the Court requested the Government's race-neutral reasons. This Court ultimately accepted the proffered reasons, and the Sixth Circuit, on the basis of the record before it, affirmed. *United States v. Lawrence*, 735 F. 3d 385, 444-45 (6th Cir. 2013). However, counsel made no attempt to prove that the prosecution's proffered reasons were pretextual, especially as to Juror 115. Neither did Mr. Lawrence's lawyers attempt to prove a history of discrimination, or otherwise seek to bolster their prima facie case, which would have heightened the need for particularly

strong and persuasive reasons at the third stage. Their failures in this regard prejudiced Mr. Lawrence in that a stronger case and proof of pretext would have led to acceptance rather than denial of his well-taken *Batson* motion.

Capital defendants are constitutionally required to be sentenced by an impartially-chosen panel of jurors who are not "mitigation-impaired." Mr. Lawrence was entitled to a panel of twelve, each of whom could give full consideration to his evidence, despite the fact that the victim was a police officer. His trial counsel should have pursued the red flags raised by a number of answers on juror questionnaires, objected to the exclusion of veniremembers who were able to consider death as an option, and otherwise conducted a rigorous voir dire of potential jury members. Their failure to do so deprived Mr. Lawrence of rights secured him by the Fifth, Sixth and Eighth Amendments in this federal death penalty case. *See also American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* 31 Hofstra Law Rev. 913, 926 (2003), Guideline 10.10.2.

## XIV. APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO SEEK REVIEW OF ALL POTENTIALLY MERITORIOUS CLAIMS ON DIRECT APPEAL IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

Mr. Lawrence hereby re-alleges and incorporates by reference the facts and arguments alleged in Claims 1 through 30. To the extent that appellate counsel could have raised these claims on appeal based on objections made at trial and the extant record, appellate counsel were ineffective for failing to raise them. With respect to all claims raised herein alleging that trial counsel were ineffective for failing to object to trial errors, counsel should have also raised those claims on direct appeal and sought to have those unpreserved errors reviewed under the "plain error" standard. Had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was

extant authority establishing that Mr. Lawrence's rights were violated, as articulated throughout this motion. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *Smith v. Robbins*, 528 U.S. 259 (2000).

## XV. TRIAL COUNSEL FAILED TO ADEQUATELY PRESERVE ISSUES FOR APPEAL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

Counsel failed to object to numerous errors at trial that subsequently required appellate issues to be raised under the "plain error" standard of review. These included the following issues that were briefed on appeal:

1. Whether it was error for the jury to not return a certification under 18 U.S.C. § 3593(f) stating that each individual juror would have made the same sentencing recommendation no matter what the race, color, religious belief, national origin, or sex of Lawrence or the victim. (Claim One)

2. Whether it was error for the District Court to instruct the jury in Count Eight of the options of death and life, but not of the available option of a lesser sentence for a violation of 18 U.S.C. § 924(c) and (j). (Claim Two)

3. Whether Mr. Lawrence's death sentence for violating 18 U.S.C. §924(c) and (j) should be vacated because a greater minimum sentence of "any term of years" was provided by another provision of law, namely a life sentence under 18 U.S.C. § 2113(e). (Claim Five)

4. Whether the sentences for Count Seven and Count Eight, or the sentences for Counts One through Six, must be vacated pursuant to the Double Jeopardy Clause because, due to the "contemporaneous finding of guilt" non-statutory aggravating factor, Lawrence was prosecuted and sentenced twice for the same offenses. (Claim Fourteen)

5. Whether the District Court properly instructed on the definition of "malice aforethought" by not requiring the Government to prove an intent willfully to act in callous and wanton disregard for human life. (Claim Seventeen)

6. Whether Mr. Lawrence's right to a fair trial was violated where, during closing arguments, the prosecutor urged jurors to protect community values and to deter future lawbreaking. (Claim Eighteen (D))

7. Whether Lawrence's right to a fair trial was violated where, during closing arguments, the prosecutor denigrated Lawrence's mitigation expert witness. (Claim Eighteen (E))

Mr. Lawrence was prejudiced twofold by counsel's omissions: once at the time of trial, when counsel failed to raise these objections at a time when there was a reasonable probability that the Court could have corrected these errors, and a second time on appeal, when Mr. Lawrence was deprived of more favorable standards of review for his legal claims, and was instead subjected to the much more onerous "plain error" standard.

## XVI. TRIAL COUNSEL FAILED TO INVESTIGATE AND PROPERLY CHALLENGE AGGRAVATING EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

Trial counsel failed to investigate and properly challenge the Government's aggravating evidence, including evidence relied upon at sentencing relating to Mr. Lawrence's prior bank robberies; an unadjudicated robbery of the Kentucky Check Cashing establishment; and allegations made by a former girlfriend, Renee Anderson, including that Mr. Lawrence threatened her with a gun, which was documented in domestic violence-related police reports. Counsel's failure to make reasonable efforts to investigate and challenge this evidence was constitutionally deficient. *Rompilla v. Beard*, 545 U.S. 374, 377 (2005). This aggravating evidence was rebuttable, and counsel's deficiencies prejudiced Mr. Lawrence.

Furthermore, at Mr. Lawrence's capital sentencing, the Government introduced evidence in the form of police reports in which a former girlfriend of Mr. Lawrence, Renee Anderson, alleged, among other acts of domestic violence, that he threatened her with a gun. Trial counsel should have objected to the evidence regarding Renee Anderson on grounds that it violated his Sixth Amendment right to confront the witnesses against him. The contents of the police reports constituted testimonial hearsay from witnesses that were not determined to be unavailable, and Mr. Lawrence had no prior opportunity to cross examine the witnesses. *See, e.g.*, *Crawford v.*

*Washington*, 541 U.S. 36 (2004). Mr. Lawrence was thus sentenced to death based on evidence that was proven only by testimonial hearsay.

Counsel had a duty to object to this otherwise damaging evidence but unreasonably failed to do so. This constitutional deficiency prejudiced Mr. Lawrence.

## XVII. THE PRESENTATIONS TO THE DEPARTMENT OF JUSTICE IN OPPOSITION TO AUTOHRIZATION OF A CAPITAL PROSECUTION WERE LACKING IN MEANINGFUL ADVOCACY, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

Mr. Lawrence's trial lawyers made two presentations to the Department of Justice before the DOJ decided to authorize the case for death, one to the United States Attorney for the Southern District of Ohio, Gregory Lockhart, and one to the DOJ's Death Penalty Review Committee in Washington, DC ("the Committee"). Exhs. 67, 68. The presentation to Mr. Lockhart was via letter dated June 2, 2005, and the one before the Committee took place in-person with Mr. Gatterdam and Ms. Menashe making an oral presentation in Washington on July 25, 2005.

The three-page letter to Mr. Lockhart made six points: that the shooting elapsed in less than 30 seconds; that Mr. Lawrence lacked a prior violent criminal history; that Mr. Lawrence immediately accepted responsibility and was remorseful; that Mr. Lawrence's background, including his having been born in prison, raised by an adoptive family that lacked necessary resources, discipline and time to devote to Mr. Lawrence's upbringing, was mitigating; that Mr. Lawrence had two children whose lives he could impact; and that Mr. Lawrence was unlikely to be a high-risk inmate. Exh. 67.

Mr. Lockhart was apparently not persuaded, so trial counsel then made their argument to the Committee. Based on their outline of that presentation, they made the following points: that Mr. Lawrence had no intent to kill Officer Hurst, and that the entire incident took less than thirty

seconds, and he intended only to avoid being killed himself; that the pecuniary gain aggravating factor was inappropriate for a case in which someone goes into a bank, gets into a gunfight, and someone is killed; that the grave risk to one or more persons aggravating factor did not apply because everyone else in the bank was down on the ground during the gunfight, otherwise the aggravating factor would apply to every case involving a gun where death results, which would be too arbitrary; that Mr. Lawrence ought to be prosecuted in state court since the case involved a local police officer doing private security work; that Mr. Lawrence was already facing life in prison on the non-capital counts; and that the federal death penalty was costly and racially disparate. Exh. 68 at 1-4. The mitigation piece of the presentation included the same points made to Mr. Lockhart, with a few additions such as Mr. Lawrence's biological mother's death, his lack of knowledge of his father, and his being a gifted athlete. Exh. 68 at 4-5.

The mitigation evidence that the defense team presented to DOJ was minimal. This is despite their engagement of Dr. Bob Stinson to conduct a pre-authorization evaluation of Mr. Lawrence, which as described elsewhere herein, remained incomplete and uninformed among other things about critical medical records which trial counsel had received in late May and could have provided to Dr. Stinson well before the Committee presentation. As noted elsewhere herein, those records turned out to contain red flags of Mr. Lawrence's serious medical disorder and head injuries, two contributors to his brain damage. Had his lawyers requested more time before they were forced to make their presentations to DOJ; had they provided their expert with relevant records; and had they also sought out the expertise of a medical doctor for myriad reasons also outlined elsewhere herein, they would have been armed with much more persuasive evidence against the appropriateness of Mr. Lawrence's case for capital prosecution than the bare

arguments they were able to present, given the state of their case at the time they had to present it to the Department of Justice.

## XVIII. THE CUMULATIVE EFFECT OF COUNSEL'S INEFFECTIVENESS IN MR. LAWRENCE'S CASE, IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS, WARRANTS POSTCONVICTION RELIEF.

Deficient performance under the Sixth Amendment is proved by showing "that counsel's representation fell below an objective standard of reasonableness." *Strickland* at 688. A movant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*. *Strickland* thus requires a court to assess the totality of counsel's acts and omissions when deciding whether the representation was deficient.

Similarly, *Strickland* requires that this Court consider the cumulative effect of counsel's deficient performance when determining prejudice. *Id.* at 695. *Strickland* repeatedly describes a single ineffective assistance of counsel claim as consisting of multiple errors or omissions that result in prejudice. *See, e.g., Strickland*, 466 U.S. at 693 ("Even if a defendant shows that *particular errors* of counsel were unreasonable…the defendant must show that *they* actually had an adverse effect on the defense.") (emphasis added); *id.* at 694 (holding that a petitioner must show "a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different") (emphasis added).

The Sixth Circuit has agreed that *Strickland* claims must be examined cumulatively, *see United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) ("[E]xamining an [IAC] claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'") (quoting *Lundgren* v. *Mitchell*,

440 F.3d 754, 770 (6th Cir. 2006)), as have courts reviewing capital § 2255 cases. *See Johnson v. United States*, 860 F.Supp.2d 663, 756 (N.D. Iowa 2012) ("*Strickland* stands for the proposition that a multifaceted claim of ineffective assistance of counsel must be treated as a single claim.").

These holdings are also confirmed by the Supreme Court's post-*Strickland* decisions. In *Williams v. Taylor*, 529 U.S. 362 (2000), the Court identified multiple categories of mitigating evidence omitted by trial counsel's deficient mitigation investigation. Nevertheless, those omissions were treated collectively as part of the singular failure of "trial counsel [to] fulfill their obligation to conduct a thorough investigation of the defendant's background." *Id.* at 396. In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Sixth Amendment violation was predicated on multiple investigatory omissions, including a failure to investigate the facts behind a social service report and to commission a detailed social history. *See id.*at 525, 538. Yet *Wiggins* treated the investigatory omissions and multiple categories of evidence as a single IAC claim: "In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's *failures* prejudiced his defense." *Id.* at 534 (emphasis added). And, more recently, in *Porter* v. *McCollum*, 558 U.S. 30 (2009), the Court addressed an IAC claim in which counsel failed to learn about the client's "abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity[.]" 558 U.S. at 33. *Porter* grouped all categories of mitigating evidence together *both* for the deficiency and prejudice analyses. *See id.* at 40 (finding single deficiency in "fail[ure] to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service"); *id.* at 40–41 (considering whether "that deficiency" prejudiced Porter by considering "the totality of the available mitigation evidence") (internal quotations omitted).

Each of the individual assertions of ineffective assistance of counsel in Mr. Lawrence's § 2255 motion establish *Strickland* prejudice. Cumulatively, they confirm that Mr. Lawrence is entitled to postconviction relief.

## XIX. THE CUMULATIVE EFFECT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL AND THE GOVERNMENT'S *BRADY* VIOLATIONS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, UNDERMINE CONFIDENCE IN THE RESULT OF MR. LAWRENCE'S TRIAL.

Even where individual error is insufficient to raise a probability that the outcome of a trial would have been different, the cumulative impact of *Brady* and *Strickland* error can suffice to warrant habeas relief. *See Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989) (relying on "errors" language from *Strickland* to find that "*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced"); *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) (adopting the reasoning from *Kubat*); *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (finding that "totality of the circumstances" language from *Strickland* mandates an aggregate error analysis); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2007) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby."); *Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001) (remanding for cumulative prejudice analysis of *Brady* and *Strickland* error); and *Gonzales v. McKune*, 247 F.3d 1066, 1078 n. 4 (10th Cir. 2001), *vacated in part on other grounds*, 279 F.3d 922, 925–26 (10th Cir. 2002) (en banc) (noting that language from *Strickland* "makes it clear that all acts of inadequate performance may be cumulated in order to conduct the prejudice prong").

Each of the *Brady* and *Strickland* errors in Mr. Lawrence's case was sufficiently prejudicial to warrant habeas relief. Taken together they require this Court grant his § 2255 motion.

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

---

106 [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## XXI. THE PRESENCE OF NUMEROUS LAW ENFORCEMENT PERSONNEL IN AND AROUND THE COURTROOM DEPRIVED MR. LAWRENCE OF A FAIR TRIAL AND SENTENCING, AND AN IMPARTIAL JURY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

Mr. Lawrence alleges that the presence of law enforcement personnel attending Mr. Lawrence's trial, in the streets around the courthouse and police station, and in the courthouse itself influenced the verdict in his trial. A basic principle defining the right to a fair trial is that a criminal defendant is entitled to a verdict based only upon the evidence introduced at trial. *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (holding that the verdict must be based upon the evidence developed at trial "regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies"). To ensure that right, courts must guard against "intrusion of factors into the trial process that tend to subvert its purpose." *Estes v. Texas*, 381 U.S. 532, 560 (1965). Specifically, courts should prevent "the atmosphere in and around the courtroom [becoming] so hostile as to interfere with the trial process, even though ... all the forms of trial conformed to the requirements of law...." *Id.* at 561; *see also Woods v. Dugger*, 923 F.2d 1454, 1456-57 (11th Cir. 1991).

Because the victim in this case was a member of the Columbus Police Department, there was understandably a great interest in the outcome of the proceedings, and a huge outpouring of support by and for members of the law enforcement community. Mr. Lawrence alleges that because of the hostile atmosphere that pervaded the trial in his case, jurors and some witnesses

alike were affected. Mr. Lawrence alleges that he can demonstrate both actual and inherent prejudice based on the totality of circumstances in his case and that he is entitled to postconviction relief.

**XXII.** [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted] [redacted]

---

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

### XXIII. MR. LAWRENCE WAS DEPRIVED OF DUE PROCESS AND A FAIR TRIAL BY THE DENIAL OF HIS RIGHT TO BE PRESENT AT EVERY STAGE OF THE PROCEEDINGS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

A person charged with a felony has a fundamental right to be present at every stage of the trial. *Illinois v. Allen*, 397 U.S. 337, 338 (1970). This includes the right to be present at the voir dire and empanelling of the jury. *Diaz v. United States*, 223 U.S. 442, 455 (1912). The right of presence derives from the Confrontation Clause of the Sixth Amendment and the Due Process

Clauses of the Fifth and Fourteenth Amendments. *United States v. Gagnon*, 470 U.S. 522, 526, (1985) (*per curiam*).

### A. Mr. Lawrence Had a Fundamental Right to Be Present During Bench Conferences with Prospective Jurors.

On the first day of jury selection, during a bench conference between counsel and the Court, Mr. Gatterdam informed the Court that he waived Mr. Lawrence's presence at any bench conferences. TT V 1 at 27. It does not appear from the record, however, that Mr. Lawrence was ever canvassed by the Court as to whether he consented to the waiver. Over the course of the next five days of jury selection, numerous bench conferences were then held where the Court and counsel questioned prospective jurors at the bench without Mr. Lawrence being present.

The right to be present at jury selection includes bench conferences with prospective jurors. *United States v. Reyes*, 764 F.3d 1184, 1189-90 (9th Cir. 2014); *United States v. Cuchet*, 197 F.3d 1318, 1319-20 (11th Cir. 1999); *United States v. Ford*, 88 F.3d 1350, 1369 (4th Cir. 1996); *United States v. Washington*, 705 F.2d 489, 497, 227 U.S. App. D.C. 184 (D.C. Cir. 1983) (*per curiam*); *see also* Federal Rule of Criminal Procedure 43(a). Thus, there is no question that Mr. Lawrence had a right to be present during the questioning of prospective jurors that was conducted at the bench with the Court and counsel.

### B. Mr. Lawrence's Right Was Violated.

Mr. Lawrence's purported waiver of his right to be present at bench conferences was not made in open court, but rather during a bench conference at which he also was not present. TT V 1 at 26-27. The entirety of the waiver was as follows:

> MR. GATTERDAM: Judge, I also need to waive Mr. Lawrence's presence at these side bars, here, which I will do at this time.
>
> THE COURT: Thank you. I appreciate that.

*Id*. at 27. The Court never inquired of counsel to determine whether Mr. Lawrence consented to the waiver, or if he had even discussed the issue with Mr. Lawrence prior to making the waiver on his behalf. Nor did the Court subsequently question Mr. Lawrence himself to determine whether he did, in fact, waive his right to be present during the questioning of prospective jurors at the bench. Indeed, the record does not even indicate that Mr. Lawrence was ever informed of this, whether by counsel or the Court. Thus, any purported waiver of that right cannot be said to be knowing and voluntary.

### C. The Denial of This Right Was Prejudicial.

Over a dozen prospective jurors were questioned outside of Mr. Lawrence's presence.[113] Considering that this was a capital trial, the denial of Mr. Lawrence's right cannot be deemed harmless; unlike a non-capital trial, the jurors who sat on his case would not only make a determination as to his guilt, but also as to whether he would live or die as part of their legally binding sentence. As such, Mr. Lawrence's right to participate during jury selection was critical so that he could make informed decisions with his counsel about who would be sitting on the jury that would literally determine whether he lived or died. The violation of this fundamental right warrants a new trial.

### D. Mr. Lawrence Was Deprived of His Right to Be Present at Bench Conferences During the Trial.

After jury selection, the Court held numerous bench conferences during the course of the trial. Mr. Lawrence was not present at any of those bench conferences. It does not appear that Mr. Lawrence waived his right to be present at bench conferences once evidence commenced at

---

[113] *See, e.g.*, TT V 1 at 218-219 (Juror 230); TT V 3 at 13-17 (Juror 145); TT V 3 at 17-22 (Juror 141); TT V 3 at 22-29 (Juror 136); TT V 3 at 29-32 (Juror 191); TT V 3 at 182-85 (Juror 199); TT V 3 at 186-88 (Juror 188); TT V 3 at 188-190 (Juror 196); TT V 4 at 10-12 (Juror 105); TT V 5 at 42-44 (Juror 86); TT V 5 at 68-71 (Juror 65); TT V 5 at 75-77 (Juror 115); TT V 5 at 79-82 (Juror 83); TT V 5 at 94-98 (Juror 67); TT V 5 at 137-40 (Juror 212); TT V 5 at 163-65 (Juror 115).

his trial. Unfortunately, many of those bench conferences were not transcribed.[114] The extant record, however, does not conclusively establish that Mr. Lawrence's presence was unnecessary at those bench conferences, and Mr. Lawrence asserts that he was prejudiced by the deprivation of his right to be present.

### E. Mr. Lawrence Was Deprived of His Right to Be Present at Pretrial Status Conferences and Hearings.

The Court also held several pretrial status conferences and *ex parte* hearings prior to jury selection. Mr. Lawrence was not present at these status conferences or *ex parte* hearings. Many of the status conferences were not attended by a court reporter and were not transcribed.[115] On September 26, 2005, prior to the commencement of a hearing on Mr. Lawrence's suppression motion, the Court placed on the record Mr. Lawrence's waiver of his right to be present at all future *and past* status conferences and hearings. This waiver was invalid. Mr. Lawrence's waiver cannot be deemed to be knowing and intelligent, especially with respect to the hearings that had already taken place and for which there was no formal record for Mr. Lawrence to review and give valid retrospective consent regarding his lack of presence. Moreover, the extant record does not conclusively establish that the presence of Mr. Lawrence was unnecessary at those hearings and conferences, and Mr. Lawrence asserts that he was prejudiced by the deprivation of his right to be present.

---

[114] *See*, *e.g.*, TT V 6 at 187; TT V 6 at 254; TT V 7 at 60; TT V 7 97; TT V 7 at 213; TT V 8 at 19; TT V 8 at 55; TT V 8 at 125; TT V 9 at 36; TT V 9 at 84.

[115] Status conferences were held on the following dates: February 2, 2005; March 25, 2005; June 10, 2005; August 18, 2005; October 28, 2005; December 14, 2005; January 6, 2006; January 20, 2006; and February 6, 2006. There are no formal transcripts for any of these proceedings, and thus no complete record of the issues raised or any statements made by counsel and the Court during these conferences or any other untranscribed conferences as yet unknown to Mr. Lawrence.

## XXIV. THE GOVERNMENT COMMITTED REVERSIBLE ERROR BY INFORMING THE JURY OF FALSE SCIENCE DURING CLOSING ARGUMENT IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

During punishment phase closing argument, the Government belittled a portion of the defense's case, arguing that the abuse experienced by Mr. Lawrence's forefathers was irrelevant:

> We heard testimony, heartbreaking testimony about his mother's sisters and his mother's mother and his mother's family and all this stuff, this terrible abuse and neglect. It did happen to them – before the defendant was even conceived or born.
>
> It would be like my father, he was in Vietnam, he had traumatic experiences. And then he gave birth to me, and therefore, I have got those traumatic experiences. In fact, it is one step removed from that, ladies and gentlemen. It is like my father had traumatic experiences in Vietnam, had me, gave me up for adoption, and I had no contact with him. And yet somehow that all comes to me? How ladies and gentlemen? How? Check that box.

TT Vol 17 at 58.

Contrary to the Government's argument, scientific research has shown for years that the effects of traumatic events are in fact passed from generation to generation. Research has been available for decades demonstrating that even family members who had not been born when the traumatic events occurred can develop PTSD-like symptoms secondary to dealing with the traumatic symptoms of family members or loved ones.[116] Specific research shows that children of Vietnam veterans with PTSD, for example, exhibit impaired self-esteem, poor reality testing, hyperactivity, and aggressive behavior, and have problems coping with their own feelings, especially fear, rage, guilt and mistrust. *Compassion Fatigue: Coping with Secondary Traumatic Stress Disorder in Those Who Treat the Traumatized*, Charles R. Figley, ed. (New York: Brunner/Mazel, 1995), p. 210; Harkness, Laurie Leydie; "Transgenerational Transmission of

[116] Had trial counsel consulted with and presented a trauma expert at trial, the Government would not have been able to influence the jury with these scientifically disproven statements. *See* Claim I, VI *supra*. As a separate matter, they also should have been prepared to show that their client did in fact spend time in the company of his mentally ill relatives.

War Related Trauma" in *International Handbook of Traumatic Stress Syndrome*, eds. John P. Wilson and Beverley Raphael (New York: Plenum Press, 1993), p. 36.

More recent research has revealed that the mechanism by which that trauma is passed can be biological and thus not dependent on any contact with the ancestor who suffered the trauma. Whether those genetic predispostions reveal themselves in one's life depends on many other factors, such as physical health, emotional support, access to community resources such as medical treatment etc. But it is contradicts modern science to suggest trauma cannot be passed intergenerationally.

As the Department of Justice has explicitly cautioned:

> Investigations and prosecutions based in whole or in part upon forensic science must be based on sound science – from the crime scene to the courtroom to post-conviction reviews and each step along the way. When science informs criminal investigations and prosecutions or forms the basis for the Department's litigation position in a civil matter, it is vital that the information relied upon be credible.

*U.S. Department of Justice Scientific and Research Integrity Policy* at 1.

This Court should grant Mr. Lawrence's motion because the Government's erroneous argument led the jury to improperly discount evidence presented by Mr. Lawrence in mitigation.

## XXV. THE STATUTE UNDER WHICH MR. LAWRENCE WAS CONVICTED DOES NOT CONSTITUTE A "CRIME OF VIOLENCE" AND CANNOT SERVE AS THE BASIS FOR THE DEATH SENTENCE THAT WAS IMPOSED ON HIM UNDER COUNT 8 OF THE INDICTMENT.

### A. Introduction and Summary of Argument

Mr. Lawrence was sentenced to death pursuant to 18 U.S.C. § 924(j). This provision authorizes imposition of a death sentence upon conviction under 18 U.S.C. § 924(c). One can be found guilty of § 924(c) only if he or she committed a "crime of violence." Recent case law has changed the way "crime of violence" can be defined in such a manner that the offenses of which

Mr. Johnson was convicted do not qualify as "crimes of violence." As such, his offenses cannot be punished by death and his death sentence must be vacated.

Section 924(c)(3) defines "crime of violence" in either of two ways. It must be a felony that:

> (A) Has as an element the use, attempted use, or threatened use of physical force against the person or property of another [the "force" clause], *or*
>
> (B) By its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense [the "residual" clause].

The residual clause (§ 924(c)(3)(B)) must be deemed unconstitutionally vague because the Supreme Court has held substantially identical language of the Armed Career Criminal Act unconstitutional for vagueness. *See, e.g., Johnson v. United States*, 135 S.Ct. 2551 (2015); *Dimaya v. Lynch*, 803 F.3d 1110, 1111 (9th Cir. 2015). Thus, armed bank robbery cannot be deemed a crime of violence under the residual clause.[117]

Nor does armed bank robbery, as defined by federal statute and explained below, constitute a "crime of violence" under the "force" clause found in § 924(c)(3)(A). Courts have interpreted a crime as one of violence if the most *innocent* conduct penalized by a statute constitutes a "crime of violence." Moreover, the element must require the Government to prove conduct that is intentional and force that is strong physical force capable of causing physical pain or injury.

---

[117] A Supreme Court decision applies retroactively to cases on collateral review if it announces a "new" rule that is "substantive." *Schiro v. Summerlin*, 542 U.S. 348, 351 (2004). *United States v. Johnson*, *supra*, satisfies both requirements. *Johnson* must be deemed "new" because it expressly overruled prior decisions. *Johnson*, 135 S.Ct. at 2563 ("Our contrary holdings in *James* and *Sykes* are overruled."). Moreover, the Johnson holding is "substantive" because it narrows the class of persons that the law can punish, and because it "narrow[s] the scope of a criminal statute by interpreting its terms." *Schiro*, 542 U.S. at 351-352. Any future Supreme Court decision holding the residual clause of § 924(c)(3)(B) unconstitutional would likewise satisfy both requirements.

**B. The Residual Clause Found in 18 U.S.C. § 924 (c)(3)(B) Is Unconstitutionally Vague.**

The Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), contains a residual clause that is nearly identical to the residual clause defined in § 924(c)(3)(B). Earlier this year, in *Johnson v. United States*, 135 S.Ct. 2551 (2015), the Supreme Court held that ACCA's "residual clause" definition of a "violent felony" is unconstitutionally vague. The ACCA provision defined a "violent felony" as "any crime punishable by imprisonment for a term exceeding one year [i.e., a felony] … that …*involves conduct that presents a serious potential risk of physical injury to another*." 18 U.S.C. 924(e)(2)(B)(ii)(emphasis added).

Subsequent to *Johnson*, the Ninth Circuit held in *Dimaya v. Lynch*, *supra*, 803 F.3d at 1111, that, in the immigration context, the "crime of violence" definition in 18 U.S.C. § 16(b) "suffers from the same indeterminacy as ACCA's residual clause" and is therefore also unconstitutionally vague in violation of the Due Process Clause. 18 U.S.C. § 16(b) defines "crime of violence" in language identical to that of § 924 (c)(3)(B), as an offense "that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Moreover, the Solicitor General has acknowledged that the wording of 18 U.S.C. § 16(b) is "equally susceptible to [the] central objection to the residual clause." *Johnson v. United States*, S.Ct. No. 13-7120, Supplemental Brief of Respondent United States at 22-23 (available at 2015 WL 1284964 at *22-*23).

Because the residual clause found in § 924(c)(3)(B) is identical to that found in 18 U.S.C. § 16(b), it is just as susceptible to a finding of unconstitutionality for vagueness. Under principles of statutory construction, a term is given the same meaning "when Congress uses the same language in two statutes having similar purposes." *Smith v. City of Jackson*, 544 U.S. 228,

233 (2005) (plurality opinion); *see also Northcross v. Board of Ed. of Memphis City Schools*, 412 U.S. 427, 428 (1973) (*per curiam*); *Gomez-Leon*, 545 F.3d 777, 788 (9th Cir. 2008) (definitions of "crime of violence" using the same language are subject to the same construction). The statutes at issue here—18 U.S.C. § 924(c) and 18 U.S.C. § 16—serve the same purpose of identifying violent crimes and subjecting defendants who commit them to harsher sanctions.

In *Dimaya*, 803 F.3d at 1114, the Ninth Circuit explained why § 16(b), as incorporated into the Immigration and Nationality Act, is—like the ACCA's residual clause—unconstitutionally vague:

> Importantly, both the provision at issue here and ACCA's residual clause are subject to the same mode of analysis. Both are subject to the categorical approach, which demands that courts "look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." *Leocal v. Ashcroft*, 543 U.S. 1, 7 [] (2004). Specifically, courts considering both § 16(b) and the residual clause must decide what a "'usual or ordinary' violation" of the statute entails and then determine how great a risk of injury that "ordinary case" presents. *Rodriguez–Castellon v. Holder*, 733 F.3d 847, 854 (9th Cir. 2013) (quoting *United States v. Ramos–Medina*, 706 F.3d 932, 938 (9th Cir. 2013)).

The *Dimaya* Court noted the Supreme Court's recognition of "two features of the ACCA's residual clause that 'conspire[d] to make it unconstitutionally vague.'" 803 F.3d at 1115 (citing *Johnson*, 135 S. Ct. at 2557). First, the clause left "'grave uncertainty' about 'deciding what kind of conduct the 'ordinary case' of a crime involves,'" and thus "'denie[d] fair notice to defendants and invite[d] arbitrary enforcement by judges' because it 'tie[d] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements.'" *Id.* Second, the "ACCA's residual clause left 'uncertainty about how much risk it takes for a crime to qualify as a violent felony.'" *Id.* (citing *Johnson*, 135 S. Ct. at 2558).

The *Dimaya* Court held that "because of the same combination of indeterminate inquiries, § 16(b) is subject to identical unpredictability and arbitrariness as ACCA's residual

clause" and is therefore also void for vagueness. *Id.* As the *Dimaya* Court concluded, these vagueness concerns rise to the level of a Due Process violation in the immigration context because of the harsh consequences of deportation. *Id*. at 1113. Due Process concerns, however, are even more pronounced in the context of a criminal statute like § 924(c), under which a conviction subjects the defendant to a complete deprivation of liberty. *Johnson*, 135 S. Ct. at 2557.

Courts interpret § 924(c)(3)(B) in exactly the same manner as they interpret § 16(b) in the immigration context. *See Park v. INS*, 252 F.3d 1019, 1021-22, 1025 (9th Cir. 2001) (relying on § 924(c)(3)(B) case, *United States v. Springfield*, 829 F.2d 860 (9th Cir. 1987), in holding that an offense is a crime of violence under § 16(b) as incorporated into the INA), *overruled on other grounds*, *Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121 (9th Cir. 2006). Indeed, this court have held that § 16(b) is the "equivalent" of § 924 (c)(3)(B). *See United States v. Mendez*, 992 F.2d 1488, 1492 (9th Cir. 1993).

As with § 16(b), courts use the categorical approach to determine as a matter of law whether an offense qualifies as a crime of violence under § 924(c)(3)(B). Both § 16(b) and 924(c)(3)(B) require courts to discern what the ordinary case of a crime is by examining the elements using a categorical approach. *See e.g. United States v. Butler*, 496 Fed. Appx. 158, 161 n. 4 (3d Cir. 2012); *Evans v. Zych*, 644 F.3d 447, 453 (6th Cir. 2011); *United States v. Serafin*, 562 F.3d 1104, 1108 (10th Cir. 2009); *United States v. Green*, 521 F.3d 929, 932 (8th Cir. 2008); *United States v. Acosta*, 470 F.3d 132, 134 (2d Cir. 2006); *United States v. Amparo*, 68 F.3d 1222, 1225 (9th Cir. 1995).

Courts may not consider the factual means of committing any given offense, but must consider the nature of the offense in the "ordinary case," regardless of whether § 924(c)(3)(B), §

16(b), or the ACCA is at issue. *See, e.g., United States v. Fuertes*, 2015 U.S. App. LEXIS 14475. *28-*30 (4tn Cir. Aug. 18, 2015); *United States v. Naughton*, 2015 U.S. App. LEXIS 15592 ,*14-*19 (4th Cir. Sept. 2, 2015).

Accordingly, the "residual" clause found in 18 U.S.C. § 924(c) must be deemed unconstitutionally vague and cannot support a finding that the crime for which Mr. Lawrence was convicted was a "crime of violence" subject to the enhanced punishment of death under 18 U.S.C. § 924(j).

**C. Armed Bank Robbery, As Defined by 18 U.S.C. § 2113 (a), (d), and (e), Is Not a Crime of Violence Under the "Force" Clause of § 924(c)(3)(A), Because It Does Not Have As An Element, the Use, Attempted Use, or Threatened Use of Physical Force Against the Person or Property of Another.**

1. The principles of analysis

To determine whether a crime constitutes a "crime of violence," such that it may be subject to enhanced sentencing, courts must adhere to the following fundamental principles:

First, the courts apply a "categorical" approach to determining whether a crime is or is not a crime of violence. It makes no difference how the crime was actually committed in the particular case. The court may only look to whether the crime's *elements* require the use of force. *See Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013); *United States v. Royal*, 731 F.3d 333, 341-42 (4th Cir. 2014); *see also United States v. Serafin*, 562 F.3d 1105, 1107-08 (10th Cir. 2009); *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006). This approach requires that courts "look only to the statutory definitions – i.e., the elements – of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a "crime of violence." *Descamps*, 133 S. Ct. at 2283 (citation omitted); *Royal*, 731 F.3d at 341-42; *Serafin*, 562 F.3d at 1107; *Acosta*, 470 F.3d at 135.

Second, under the categorical approach, an offense can only qualify as a "crime of violence" if the most innocent conduct encompassed by the elements constitutes a "crime of violence." *United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012).

Third, the force contemplated by the statute is "physical force." "Physical force" has been interpreted by the courts to mean "*violent* force" – that is "strong physical force," which is "capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (emphasis in original).

Fourth, the use of force must be intentional. Indeed, every circuit has held this to be the case. Thus, if one can violate the statute by using force in a manner that does not require intentionality, the crime does not constitute a crime of violence for purposes of 18 U.S.C. § 924(c). The Courts of Appeals have almost uniformly held that recklessness is not sufficient. *See United States v. Palomino Garcia*, 606 F. 3d 1317, 1335-1336 (11th Cir.2010); *Jimenez-Gonzalez v. Mukasey*, 548 F. 3d 557, 560 (7th Cir. 2008); *United States v. Zuniga-Soto*, 527 F. 3d 1110, 1124 (10th Cir. 2008); *United States v. Torres-Villalobos*, 487 F. 3d 607, 615-616 (8th Cir. 2007); *United States v. Portela*, 469 F. 3d 496, 499 (6th Cir. 2006); *Fernandez-Ruiz v. Gonzales*, 466 F. 3d 1121, 1127-1132 (9th Cir. 2006) (*en banc*); *Garcia v. Gonzales*, 455 F. 3d 465, 468-469 (4th Cir. 2006); *Oyebanji v. Gonzales*, 418 F. 3d 260, 263-265 (3d Cir. 2005) (Alito, J.); *Jobson v. Ashcroft*, 326 F. 3d 367, 373 (2d Cir. 2003); *United States v. Chapa-Garza*, 243 F. 3d 921, 926 (5th Cir. 2001). *But see United States v. Booker*, 644 F. 3d 12, 19-20 (1st Cir. 2011) (noting that the First Circuit had not resolved the recklessness issue).

Mr. Lawrence was charged in Count 8 with attempted armed bank robbery under 18 U.S.C. § 2113 (a), (d), and (e). Here, armed bank robbery fails to qualify as a crime of violence

because it does not have, as an element, the intentional use, attempted use, or threatened use of strong physical force against a person or property of another.

2. Unarmed bank robbery is not a crime of violence

a. *No element of unarmed bank robbery requires the intentional use of force.*

Section 2113 (a) defines the crime of unarmed bank robbery as requiring that it be proved that the defendant:

> by force and violence, *or* by intimidation, takes, or attempts to take, from the person or presence of another, … any property or money or any other thing of value belonging to, or in the care, custody and control, management, or possession of, any bank …

(Emphasis added). Unarmed bank robbery does not require the necessary intentional mens rea. "Intimidation" may be satisfied under the bank robbery statute "whether or not the defendant actually intended the intimidation," as long as "an ordinary person in the [victim's] position reasonably could infer a threat of bodily harm from the defendant's acts." *United States v. Woodrop*, 86 F.3d 359, 363 (4th Cir. 1996). *See also United States v. Yockel*, 320 F.3d 818, 821 (8th Cir. 2003) (upholding bank robbery conviction even though there was no evidence the defendant intended to put teller in fear of injury); *United States v. Kelley*, 412 F.3d 1240, 1244 (11th Cir. 2005) ("Whether a particular act constitutes intimidation is viewed objectively … and a defendant can be convicted under [federal bank robbery statute] even if he did not intend for an act to be intimidating."); *United States v. Foppe*, 993 F.2d 1444, 1451 (9th Cir. 1993) (same). In other words, a defendant may be found guilty of federal bank robbery even though he did not intend to put another in fear of injury, so long as the victim reasonably fears injury from the defendant's actions. *See, e.g., Garcia v. Gonzales*, 455 F.3d 465, 468 (4th Cir. 2006).

b. *Unarmed bank robbery does not require the use of strong physical force capable of causing physical harm.*

In addition, federal bank robbery does not meet the requirement of having an element of "physical force," as defined in *Johnson v. United States*, *supra*, 559 U.S. at 140, because it can be accomplished by "intimidation." Intimidation can be proved without requiring the use, attempted use, or threatened use of "violent force."

Intimidation under the federal bank robbery statute only occurs when "an ordinary person in the [victim's position] reasonably could infer a threat of bodily harm from the defendant's acts." *Woodrop*, *supra*, at 364; *see also United States v. Yockel*, 320 F.3d 818, 824 (8th Cir. 2003); *United States v. Higdon*, 832 F.3d 312, 315 (5th Cir. 1987). Applying this intimidation definition here, even assuming that the act of placing another in fear of bodily harm constitutes a threat of physical injury, it still fails to qualify as a "crime of violence" under the force clause because it does not require the use or threatened use of "violent force" against another. In *United States v. Torres –Miguel*, 701 F.3d 165 (4th Cir. 2012), the Fourth Circuit held that "[a]n offense that *results* in physical injury, but does not involve the *use or threatened use* of force, simply does not meet the Guidelines definition of crime of violence." *Id.* at 168 (emphasis added). According to *Torres-Migues*, "a crime may result in death or serious injury without involving use of physical force." *Id. See also, Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d. Cir. 2003); *United States v. Perez-Vargas*, 414 F.3d 1282, 1287 (10th Cir. 2005).[118]

[118] The Government recently conceded before the Fourth Circuit Court of Appeals that Maryland common law robbery is not a violent felony under the ACCA force clause, which is nearly identical to the § 924(c)(3)(A) force clause. *See* Br. of Appellee, at 73, *United States v. Louis Martin*, No. 14-4779 (4th Cir. Sept. 14, 2015). Because unarmed federal bank robbery, like Maryland robbery, can be accomplished by intimidation – putting another in fear of injury – it follows that unarmed federal bank robbery also fails to qualify as a "crime of violence" under the "force" clause. *See Cole v. State*, 821 A.2d 389, 397 (Md. 2003) (finding that Maryland robbery's intimidation element is the same as that in federal bank robbery).

Because the full range of conduct covered by the bank robbery statute does not require "violent force," the statute as a whole does not qualify as a "crime of violence" under § 924(c)(3)'s force clause.

3. Armed bank robbery does not qualify as a "crime of violence" under the force clause.

To prove the more serious offense of armed bank robbery under § 2113(d), the Government must establish that, during the commission of the robbery, the defendant "either assaulted another person by the use of a dangerous weapon or device, or the defendant put another person's life in jeopardy by the use of a dangerous weapon or device." *See* Modern Federal Jury Instructions, 53-14. "Use of a dangerous weapon" means "brandishing, displaying or even referring to the weapon." *Id.* The Government may prove either that the defendant assaulted another person by use of a dangerous weapon, or that he put another person's life in jeopardy by use of a dangerous weapon or device; it need not prove both. *Id.* Neither of these means satisfies the force clause of § 924(c)(3)(A).

a. *Putting another person's life in jeopardy by the use of a dangerous weapon does not require the intentional use or threat of violent force.*

Armed bank robbery fails to qualify as a "crime of violence" because putting another person's life in jeopardy can be accomplished without the use or threatened use of violent physical force. "To put another's life in jeopardy is to expose that person to a risk of death by the use of a dangerous weapon or device." *See* Modern Federal Jury Instructions, 53-14. In other words, this means the "defendant placed someone in a state of danger" by "display[ing] or brandish[ing] what appears to be a dangerous weapon during the robbery." *Id.*

Again, under these terms, a defendant can put another in danger through the use or threatened use of poison or hazardous chemicals. *See Torres-Miguel*, 701 F.3d at 168, and

*Perez-Vargas*, 414 F.3d at 1286. The fact that this conduct could threaten someone's life does not change the result. *See Torres-Miguel*, 701 F.3d at 168 ("Of course, a crime may result in death or serious injury, without involving use of physical force.").

Under § 2113(d), the Government only need prove that the defendant put someone's life in jeopardy; it does not require the Government to prove the defendant had the intent to put someone's life in jeopardy. One can place someone in a state of physical danger by displaying or brandishing what appears to be a dangerous weapon during a robbery, without intending to do so. For example, a robber can display a gun during an armed bank robbery because the gun gives the robber a sense of security, not because he *intends* to place someone in a state of danger or to cause him or her physical harm. He may simply believe the presence of the gun will keep anyone from shooting at him. Carrying a gun into a bank for one's own sense of security during an attempted robbery may certainly constitute reckless, or even callous and wanton, disregard for human life, but it does not satisfy the requirement of intentionality necessary to deem this a "crime of violence." *See, e.g., United States v. Bennett*, 678 F.2d 596 (4th Cir. 1982); *United States v. Whitfield*, 695 F.3d 288, 301 (4th Cir. 2012).

b. *Assaulting another person by the use of a dangerous weapon or device does not require the threat or use of violent physical force.*

First, *Torres-Miguel* dictates that the act of assaulting another person by the use of a dangerous weapon or device does not require the use or threat of violent physical force. Such an act can be accomplished by "inflict[ing] or attempt[ing] to threaten to inflict physical harm on [a] person by the immediate use of a dangerous weapon." Modern Federal Jury Instructions, 53-14. "Dangerous weapon," in turn, is broadly defined as "anything capable of inflicting serious bodily harm or injury upon another person." *Id*. However, in *Torres- Miguel*, the Fourth Circuit has squarely held that threatening or actually inflicting physical injury, serious physical injury, or

even death can be accomplished by actions without the use or threat of violent physical force. Therefore, the "physical harm" and "serious bodily harm or injury" requirements of § 2113(d) may be satisfied without the use or threat of violent physical force. For example, one could be convicted of armed bank robbery by threatening to poison or expose the teller to hazardous gas – conduct several circuits have held does not equal violent physical force. *Torres-Miquel*, 701 F.3d at 168-69 (citing *United States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010)); *Perez-Vargas*, 414 F.3d at 1285-86 (intentionally exposing someone to hazardous chemicals does not require physical force).

4. Bank robbery under § 2113 (e) fails to qualify as a "crime of violence" under the force clause.

Section 2113(e) of this statute also fails to qualify as a crime of violence under the categorical approach. This section defines the prohibited conduct by reference to a defendant who, "in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense … kills any person … ." 18 U.S.C. § 2113(e). The Government need not prove under this provision that the defendant had an intent to kill. Nor must the Government prove that the defendant killed by the application of "violent physical force." *See, e.g., United States v. Dixon*, 2015 WL 7422615 (9th Cir. Nov. 20, 2015) (California robbery convictions did not constitute "crimes of violence" under the ACCA because it was possible to violate the statute by accidentally using force).

Thus, 18 U.S.C. § 2113(e) does not qualify as a crime of violence under the force clause.

**D. Conclusion**

For all the foregoing reasons, Mr. Lawrence's convictions do not qualify as "crimes of violence" under 18 U.S.C. § 924(c). Hence, they cannot be used as sentence enhancers under 18

U.S.C. § 924(j). Accordingly, Mr. Lawrence's death sentence, which was imposed pursuant to 18 U.S.C. § 924(j), must be deemed invalid and vacated.

## XXVI. THE ARBITRARY NATURE OF THE DECISION TO CHARGE AND SEEK THE DEATH PENALTY IN FEDERAL COURT AGAINST MR. LAWRENCE VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

The Supreme Court has long demanded that a "capital sentencing scheme must…provide a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not. This means that if a State wishes to authorize capital punishment it has *a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty*." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (plurality opinion) (emphasis added) (alteration in original) (citation and internal quotation marks omitted). The Government's decision to charge and seek the death penalty for Mr. Lawrence was based on upon arbitrary and capricious considerations and did not comport with the strictures of the Eighth Amendment.

Although the fact that Mr. Lawrence was charged for the robbery of an FDIC-insured bank invokes jurisdiction in a federal court, this fact alone is not dispositive of whether the decision to charge and seek the death penalty complies with the Eighth Amendment. In Mr. Lawrence's case, clear evidence demonstrates that arbitrary factors entered into the death penalty authorization process in violation of constitutional mandates.

### A. The Process Whereby Mr. Lawrence Was Charged and the Decision to Seek Death Were Susceptible to Constitutionally Impermissible Factors.

Mr. Lawrence's case was pursued federally during a particularly unique time at the Department of Justice. His case was charged during the waning months of the administration of Attorney General John Ashcroft, and the death penalty authorization was issued in the first year of the Alberto Gonzalez Administration. During this period, Attorney General Ashcroft began an

"aggressive campaign…to extend the federal death penalty – particularly into jurisdictions without death-penalty statutes of their own." Liliana Segura, "Prosecutors and the Death Penalty," *The Nation*, Mar. 29, 2007. Attorney General Alberto Gonzalez continued this campaign. To achieve this goal, Attorney General Ashcroft revised rules and regulations that had previously been in place to give guidance on when federal interests were in play. For example, as Donald K. Stern, former U.S. Attorney for Massachusetts, explained, Attorney General Ashcroft "dropped regulations enacted by [Attorney General Janet] Reno, which had prohibited federal prosecutors from seeking the death penalty solely because the state where the crime occurred didn't have the death penalty…By dropping that regulation, according to Stern, Ashcroft has signaled prosecutors that it's 'fair game' to pull a state case into federal court in a bid to win a death sentence." Shelley Murphy, "Death Penalty Foes Rap Ashcroft," Shelley Murphy, *The Boston Globe*, Sept. 20, 2003.

The changes to the charging protocol were so drastic and had such broad-reaching implications on the exercise of federal jurisdiction that federal district judge and former federal prosecutor John Gleeson was prompted to write: "In a federal system that rightly accords great deference to states' prerogatives, the federalization of the death penalty should be limited to cases in which there is a heightened and demonstrable federal interest, one that justifies the imposition of a capital prosecution on communities that refuse to permit them in their own courts." Hon. John Gleeson, *Supervising Federal Capital Punishment: Why the Attorney General Should Defer When US Attorneys Recommend Against the Death Penalty*, 89 Va. L. Rev. 1697, 1716 (2003).

Attorney General Ashcroft's policy changes also affected federal court charging decisions. In 1995, the Judicial Conference adopted policies encouraging Congress to conserve

the federal courts as a distinctive judicial forum of limited jurisdiction and emphasized that criminal activity should be prosecuted in a federal court only in those instances in which state court prosecution is not appropriate or where federal interests are paramount. Attorney General Ashcroft, however, in 2003, issued a memo to all United States Attorneys instructing them that "in all federal criminal cases, federal prosecutors must charge and pursue the most serious, readily provable offense or offenses that are supported by the facts of the case. . . The most serious offense or offenses are those that generate the most substantial sentence under the Sentencing Guidelines." Ashcroft Memo, "Memo Regarding Policy On Charging Of Criminal Defendants," September 22, 2003. This memo was reflective of a new general policy reversing course from the previous administration by making charging decisions mandatory (here, changing "should" to "must") and eliminating existing language that called for an "individualized assessment" of each case.

The cumulative effect of these policy decisions was to remove virtually all limiting principles and essentially eliminate the close individual scrutiny needed to ensure that federal law is applied locally in a manner consistent with national standards, thereby avoiding the arbitrary and capricious infliction of the death penalty. The edict from Main Justice that all U.S. Attorneys must charge and pursue the most serious possible offense and punishment in every case creates a situation where what distinguishes who is charged and sentenced to death from who is spared depends, not on a uniform national policy as the mandate might on its face suggest but rather on the personal proclivities of the local attorneys about what is considered the most serious possible offense. In this case, that decision was based on at least one arbitrary factor: an evidentiary windfall that allowed the prosecution to put on victim impact evidence in federal court that would have been impermissible in state court.

**B. Mr. Lawrence's Federal Death Penalty Prosecution Was Driven by a Local, Rather Than a Federal Interest.**

The primary reason the prosecution pursued Mr. Lawrence's death penalty case in federal court was to allow the prosecution to present the jury with a wealth of information about the victim, Officer Bryan Hurst. To be admissible under state law, victim impact evidence (even post-*Payne v. Tennessee*, 501 U.S. 808 (1991)) must fall within certain limitations:

> [T]his court has held that capital sentencing juries are permitted to review victim-impact evidence if the evidence is relevant to the circumstances of the murder, the existence of the statutory aggravating circumstances that permit the death penalty, and the nature and circumstances of the statutory aggravating circumstances, if the evidence is introduced to attempt to refute or rebut the mitigating evidence offered, or if the defendant requests a presentence investigation report.

*State v. White*, 709 N.E.2d 140, 153-54 (Ohio 1999).

In stark contrast, the Government was able to introduce (and, in fact, structure their entire punishment phase case on) virtually unfettered victim impact testimony. Despite defense counsel's protestations, the Government was allowed to present witness after witness for the purpose of testifying about victim impact testimony. Every single witness in the Government's case-in-chief at punishment phase was solely introduced to provide the jury with additional victim impact evidence. Witnesses told the jury that Officer Hurst was "a true American hero" and gave detailed accounts of his childhood. Witnesses described in detail about how Officer Hurst grew up in a broken home, with an alcoholic mother, yet made the choice to be a "productive citizen." Likewise every piece of evidence introduced during the Government's case-in-chief had the same focus, culminating in a photograph shown to the jury of Officer Hurst's small daughter placing flowers on his grave. Govt. Trial Exh. 55-17.

Closing argument underscored the Government's strategy to make victim impact testimony the centerpiece of its case. The Government interspersed arguments about the defense's proposed mitigating factors with comparisons to Officer Hurst's family ("Like Ted

Kaczorowski did for Bryan Hurst…" TT V 17 at 12; "Bryan Hurst was a father for a short period of time" TT V 17 at 24; "[I]t is work to [be a father] every day. Ask Ted Kaczorowski." TT V 17 at 25). In final summation, the Government again reminded the jury about Officer Hurst's life, spending almost the entire last five pages of the argument transcript talking about the victim impact testimony. TT V 17 at 65-70.

The vast amount of victim impact testimony as well as the Government's focus on that evidence during argument plainly demonstrates the reason they charged the case in federal court. Basing the exercise of federal power on the fortuity of an evidentiary rule injected an arbitrary factor into the process and violated the Eighth Amendment.

Other facts about the charging decision highlight the arbitrariness. Despite the unfettered discretion created by Attorney General Ashcroft's general mandate to seek the highest charge and punishment in every case, some guiding principles did exist to assist the local U.S. Attorney's office in deciding whether to prosecute a case where concurrent jurisdiction existed. The U.S. Attorney Manual (USAM) Section 9-27.240 instructed that to determine whether a prosecution should be declined because the person can effectively be prosecuted in another jurisdiction, the Government should consider:

1. The strength of the other jurisdiction's interest in prosecuting;
2. The other jurisdiction's ability and willingness to prosecute effectively; and
3. The probable sentence or other consequences if the person is convicted in the other jurisdiction.

USAM 9-27.240.

There is little dispute that the State of Ohio was willing and able to prosecute the case. In fact, as discussed *infra*, the local prosecutor did actually prosecute the case after being authorized to appear in federal court. Moreover, the State of Ohio had successfully prosecuted bank robbery

cases in the past and there were several capital offenses available under state law (including the murder of a law enforcement officer).

The primary historical consideration was how to balance the federal and state interest in the prosecution. The USAM provides guidance here too, noting "Some offenses, even though in violation of Federal law, are of particularly strong interest to the authorities of the state or local jurisdiction in which they occur, either because of the nature of the offense, the identity of the offender or victim, the fact that the investigation was conducted primarily by state or local investigators, or some other circumstance." *Id*. at 1.

The reason Mr. Lawrence's case was charged in federal court had nothing to do with a federal interest. In contrast, the state interest in this case was paramount because the victim, Officer Bryan Hurst, was a state and not a federal officer. Almost every aspect of the Government's case reflected the strong interest of the local jurisdiction. The case was tried jointly with the Franklin County Prosecutor's Office, and Franklin County Prosecutor Ron O'Brien, was heavily involved in the investigation and development of Mr. Lawrence's case. Witnesses at trial mentioned that he met with them a year earlier with the federal prosecutor and that he was involved in preparing them for trial. TT V 6 at 138. Mr. O'Brien was even given special authority to appear as counsel in federal court with the Assistant U.S. Attorneys and he examined key witnesses and presented argument. Indeed, Mr. O'Brien has since explicitly stated the reason Mr. Lawrence's case was tried in federal court:

> O'Brien opted to allow the federal government to charge Lawrence because of a difference in how the second phase of a death penalty case is handled by the federal courts. There, in contrast to Ohio law, jurors are allowed to hear victim impact statements from relatives of a slain individual as they weigh their decision. Such testimony is prohibited in state courts for fear it will unnecessarily inflame jurors' emotions. O'Brien's gamble worked: Lawrence was sentenced to death.

Andrew Welsh-Huggins, “The Death of the Death Sentence,” *Columbus Monthly*, Dec. 2011; *see also* Bruce Cadwallader, “Death Sentences Rare for Local Juries,” *Columbus Dispatch*, April 8, 2007 (Bryan Hurst’s “killer’s case was tried in federal court to give his family more of a voice in the proceedings, O’Brien said, and the killer got a death sentence”).

In addition to submitting a nonstatutory aggravating factor based on the impact of Officer Hurst’s death on the community, the Government’s focus on victim impact testimony at the punishment phase heavily underscored that this case overwhelmingly concerned a state interest. One need only to briefly peruse the Government’s closing argument to understand that the focus of the case was on the local community and local law enforcement. *See e.g.* TT V 17 at 69 (“[T]ell the other police officers, tell your community what weight you give their loss, to their plight, to their ability to fight fear and do their job”); *id*. at 69 (“[M]ake it loud and clear that the community will not tolerate this conduct, the community will not tolerate a man dying because of money.”).

Though every life is certainly precious and valuable and every victim has a story that changes our view of the crime once we know it, avenging the deaths of sympathetic victims is not a federal interest. Charging a death penalty case in federal court to take advantage of the laxity of evidentiary rules does nothing to further a federal interest but rather injects an inappropriate arbitrariness to the process that violates the Fifth and Eighth Amendments.

### C. Trial Counsel Failed to Raise an Eighth Amendment Challenge to the Decision to Charge and Seek the Death Penalty Against Mr. Lawrence in Federal Court.

Mr. Lawrence believes this Court may adjudicate *de novo* his Eighth Amendment claim regarding the arbitrary decision to charge and seek the death penalty against Mr. Lawrence in federal court. However, should this Court believe that any principles of default apply to this

claim, Mr. Lawrence asserts, in the alternative, that his trial counsel unreasonably failed to timely raise this claim. Trial counsel aggressively sought to exclude or limit the victim impact testimony at Mr. Lawrence's trial. Counsel sought to strike the proposed victim impact aggravating factor and filed several motions related to victim impact testimony. At hearings, counsel objected to the content of the victim impact testimony and sought further limitations on that type of evidence. Given trial counsel's recognition of how central the victim impact testimony was to the Government's case and the effort they made to exclude it, there can be no strategic reason that counsel would have decided to forego the Eighth Amendment challenge pled *supra*.

The prejudice of counsel's oversight is demonstrated by the merits discussion *supra* and that argument is incorporated herein.

**XXVII. MR. LAWRENCE'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS IMPERMISSIBLY BASED ON HIS RACE, *MCCLESKY V. KEMP*, 481 U.S. 279 (1987), IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

It is well established that the Government may not seek, base, or otherwise justify a death sentence on the race of either a defendant or a victim. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) (holding that one of the constraints on prosecutorial discretion is that "the decision whether to prosecute may not be based on an unjustifiable standard, such as race, religion or other arbitrary classification"); *McCleskey v. Kemp*, 481 U.S. 279, 291 n.8 (1987) (defendant had standing to raise a claim of discrimination based on the race of the victim); *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986) ("[A] conviction is void under the Equal Protection Clause if the prosecutor deliberately charged the defendant on account of his race."); *United States v. Roman*, 931 F. Supp. 960, 965-66 (D.R.I. 1996) (holding that a capital defendant who suspects that racial considerations influenced the decision to seek the death penalty may bring a

claim for selective prosecution). When the Government acts with a discriminatory purpose, it violates the Constitution. *See McCleskey v. Kemp*, 481 U.S. at 291-98.

Here, the decision to prosecute Mr. Lawrence in federal court had racial implications. It is well-known that Franklin County juries are more diverse than the federal jury pool and that they are reluctant to return death sentences. In this politically and racially charged prosecution, a death sentence was far more likely in federal court. Prosecutor Ron O'Brien has stated on the record that Franklin County juries are reluctant to impose death, in his estimation because they are "deprived" of victim impact evidence, and that the authorities pursued Daryl Lawrence's prosecution federally in order to give Officer Hurst's family more of a "voice" in the trial than would have been available in state court. *See* Bruce Cadwallader, "Death Sentences Rare for Local Juries," *Columbus Dispatch*, Apr. 8, 2007 ("The federal court system allows survivors to testify about how the slaying of a loved one affected them before jurors decide the sentence, as in the 2005 shooting death of Columbus Police Officer Bryan Hurst. His killer's case was tried in federal court to give his family more of a voice in the proceedings, O'Brien said, and the killer got a death sentence.").

Mr. Lawrence was then put on trial before an all-white jury. *See* Claim Thirteen, *supra*. Studies have demonstrated that, independent of the constitutional error in removing people from service on the basis of race, all-white juries produce verdicts that are less reliable than in cases where the juries are diverse and representative of the community at large. *See, e.g.*, William J. Bowers et al., Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition, 3 U. Pa. J. Const. L. 171, 188 (2001) (tendency for black defendants to be treated more harshly than white defendants grows with the number of whites on jury; increase holds especially for black-defendant/white-victim cases); *see also*

William J. Bowers et. al, Crossing Racial Boundaries: A Closer Look at the Roots of Racial Bias in Capital Sentencing When the Defendant is Black and the Victim is White, 53 DePaul L. Rev. 1497, 1531 (2004) (finding tendency of jurors on diverse juries to acknowledge how race affects their perspective and that of other jurors). This is true in death penalty cases where the jurors decide whether a person deserves a sentence of less than death. *See* Crossing Racial Boundaries, *supra*, at 1520, 1532 (2004) (finding that mitigation is considered more carefully by racially diverse juries). AUSA Burns argued the Government's non-statutory aggravating factor of the "impact of Officer Hurst's murder upon his family, friends and community, based on his personal characteristics of his life," and ensured that the jury knew that that or any one of the non-statutory aggravators alone could justify a death sentence. TT V 17 at 9; *id.* at 31-32, 33-34 (drawing direct comparisons between the worth of the lives of Bryan Hurst and Daryl Lawrence); *id.* at 65-67 (AUSA DeVillers making comparative worth argument); *id.* at 67-68 ("Tell Marissa [Hurst] through your verdict that they did do the right things in life. Tell Marissa what weight you put on the impact of her husband's death."). Before an all-white jury, such arguments about the worthiness of some lives over others would have taken on particular meaning and significance which, unfortunately, one cannot deny very likely included considerations of race. The prosecutors' choice of venue, their choice of jurors, and their choice of argument all included that factor.

This violates Mr. Lawrence's rights under the Fifth and Eighth Amendments, and the death sentence that has resulted is due to be reversed.

## XXVIII. THE IMPOSITION OF THE DEATH PENALTY ON DARYL LAWRENCE WAS BASED ON RACE AND GEOGRAPHY, TWO CONSTITUTIONALLY IMPERMISSIBLE SENTENCING FACTORS, IN VIOLATION OF HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.

Mr. Lawrence was deprived of his Fifth, Sixth, and Eighth Amendment rights when the Department of Justice ("DOJ"), through United States Attorney General Alberto Gonzales, approved federal capital prosecution for Mr. Lawrence. The imposition of the death penalty on Mr. Lawrence was based in part on both his race and the race of the victim, as well as the geographic location where his crime occurred. Had certain basic demographic facts been different in Mr. Lawrence's case – were Mr. Lawrence not a black defendant in the state of Ohio, charged in the death of a white man – he may not have received a sentence of death. The Constitution does not tolerate a system in which capital-charging decisions are based in any part on the arbitrary fact of a defendant or victim's race or the geographic location where a defendant is prosecuted. *McCleskey v. Kemp*, 481 U.S. 279 (1987); *Gregg v. Georgia*, 428 U.S. 153 (1976); *United States v. Armstrong*, 517 U.S. 456 (1996).

### A. The Attorney General's Decision to Seek the Death Penalty Based on Both Mr. Lawrence's Race and the Race of the Victim Violates His Constitutional Rights.

The arbitrary application of the federal death penalty based on consideration of the race of the defendant and victim has been well-documented. Most notably, in September 2000, the DOJ released a study (the "*September 2000 Study*") on its imposition of the federal death penalty in the late twentieth century. The September 2000 Study presented evidence of both racial bias and a lack of geographical uniformity. *See* U.S. Dep't of Justice, *The Federal Death Penalty System: A Statistical Survey (1988-2000)* (Sept. 12, 2000). With regard to race, the DOJ found that U.S. Attorneys were more than twice as likely to seek death against a black defendant than they were for a white defendant. Furthermore, white defendants were almost twice as likely as

non-white defendants to receive plea agreements that removed the death penalty from consideration. *Id.* at 12, 32. At the same time, the DOJ also sought the death penalty in a disproportionately larger proportion of cases in which the victim was white, and a disproportionately smaller proportion of cases in which the victim was black. *See* Kevin McNally, *Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse*, 53 Depaul L. Rev. 1615, 1626 (2004). This was true at the time of Mr. Lawrence's indictment; it was true when his death sentence was returned; and it remains true today as he awaits execution.

### B. The Attorney General's Decision to Seek the Death Penalty Based on Geographic Location Violates Mr. Lawrence's Constitutional Rights.

The Government also acted in violation of Mr. Lawrence's constitutional rights when it authorized federal prosecutors to seek a sentence of death based in part on consideration of geography. In its September 2000 Study, the DOJ found a significant lack of geographical uniformity in its imposition of the death penalty. According to the study, forty-two percent of the cases submitted to the Attorney General came from five of the ninety-four total federal districts; in contrast, U.S. Attorneys from forty districts had never sought the death penalty. *See* U.S. Dep't of Justice, *The Federal Death Penalty System: A Statistical Survey (1988-2000)*, at 12. As of December 31, 2005, the state of Ohio was fifth in the U.S., ranked just above Alabama, for the number of overall prisoners under a sentence of death. *See* U.S. Dep't of Justice, Office of Justice Programs, *Bureau of Justice Statistics Bulletin: Capital Punishment, 2005* (2006), at 1. At the time, approximately 70% of all death-row prisoners in the seven death-eligible states of the Midwest were sentenced in Ohio. *Id.*, at 5. Roughly half of Ohio's death-sentenced inmates were black, compared with an average of just over one-third across the rest of the region. *Id.*, at 5. Mr. Lawrence, by virtue of having committed his crime in Ohio rather than elsewhere in the Midwest or across the county, was more likely to receive a sentence of death. Mr. Lawrence's

misfortune of falling subject to the arbitrary imposition of the death penalty based on geography stands in violation of his Fifth, Sixth, and Eighth Amendment rights.

Moreover, to the extent that trial and appellate counsel should have raised these issues regarding race and geography, the undersigned incorporate by reference the preceding facts and law and allege that prior counsel's failure to raise such issues constitutes ineffective assistance of counsel, and furthermore, that Mr. Lawrence was prejudiced by counsel's deficient performance in this regard, in violation of his constitutional rights under the Fifth, Sixth, and Eighth Amendments.

**XXIX. THE FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PROVIDE A SINGLE TRIBUNAL TO REVIEW DEATH SENTENCES, RESULTING IN ARBITRARY AND INCONSISTENT RESULTS NATIONWIDE, IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

In *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court found the death penalty unconstitutional, *inter alia*, because it was arbitrarily and capriciously imposed. In reinstating death statutes in 1976 and thereafter, an important feature of the new statutes was the right to automatic review by the highest court in the jurisdiction. This was deemed critical to ensure that all death-sentencing conducted under the same law and set of rules proceeded in an orderly and consistent fashion, and that the highest court put its imprimatur on every death sentence.

> By providing prompt judicial review of the jury's decision in a court *with statewide jurisdiction*, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution [under *Furman*].

*Jurek v. Texas*, 428 U.S. 262, 276 (1976) (quoting *Furman v. Georgia*, 408 U.S. at 308 (STEWART, J., concurring.) *See also Gregg v. Georgia*, 428 U.S. 153, 198 (1976) ("As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court.").

The Federal Death Penalty Act has no such provision. There is no right to automatic direct review by the United States Supreme Court of death sentences imposed under the FDPA. This is so even though procedural rules of the Circuit Courts of Appeals differ substantially from one another, the interpretations of substantive provisions of the law differ among the circuits, and the standards of review differ widely. The result is that nationwide there is great inconsistency in the manner and the standards under which death is imposed pursuant to federal statute, and no single court is in a position to monitor or correct this situation.

Many problems flow from this lack of a singular review.

While all federal cases are theoretically tried under the same procedural scheme, implementation of these rules varies considerably among the circuits. For example, under the federal rules, even in a capital case, the Government is not required to provide a witness list or Jencks Act materials until the time of trial. The Government is never required to produce a list of eyewitnesses to the crime. But local and circuit rules provide for broader pretrial disclosure in some places, giving defendants much greater access to discovery and the ability to interview witnesses pretrial.

Because some circuits comprise states which either do not have the death penalty or seldom use it, the amount of experience the circuit courts of appeals have differs markedly. The First and Second Circuits, for example, which rarely see a capital case, have little experience with issues of capital jurisprudence that are a regular diet for judges in other circuits around the country. This in turn means that few judges in the First and Second Circuits have had to grapple with issues such as the adjudication of claims under *Atkins v. Virginia*, 536 U.S. 304 (2002) or what constitutes mitigating evidence for purposes of death sentencing.

The interpretation of federal law differs from one circuit to the next. Thus, for example, the Fourth Circuit interprets what constitutes a "crime of violence" differently from this circuit in ways that could spell the difference between whether Mr. Lawrence is subject to the enhancement of sentence from life imprisonment to death, or not, under 18 U.S.C. § 924 (c) and (j). While a non-death sentenced prisoner can serve his or her sentence while waiting for a case to be accepted by the Supreme Court to resolve conflicts among the circuits in the interpretation of federal law, a death-sentenced inmate may not have that luxury.

A central function of uniform review is to ensure that a death sentence has not been imposed based on undue sympathy or passion. One of the more significant potential sources of undue sympathy is victim impact evidence. The FDPA does not specifically restrict the introduction of victim impact evidence, beyond the limits of what is constitutionally permissible under *Payne v. Tennessee,* 501 U.S. 808 (1991). In Mr. Lawrence's case, for example, the victim impact evidence was extensive. Every Government witness called at the penalty phase was a victim impact witness. This included not just family members but members of the police force as well. The prosecution even showed a photo montage at the penalty phase. While trial counsel fought hard to restrict the amount of victim impact evidence at trial, they were unsuccessful, and the Sixth Circuit found no error in its introduction. Yet other circuits interpret *Payne* more restrictively. Without a single high court to review the introduction of victim impact evidence, the standards for what is permissible constitutionally and when a death sentence has been imposed as a result of undue sympathy or passion can easily vary from one case to another and one circuit to another.

Another function of uniform review is to ensure that death sentences are not imposed in an arbitrary fashion. Following *Furman*, the federal death penalty was reinstated in 1988. The

first post-Furman capital sentencing provisions were included as part of the Anti-Drug Abuse Act of 1988 and authorized the death penalty for a defendant convicted in federal court of a murder while engaging in a continuing criminal enterprise. This limited use of the death penalty may have been sufficient to guard against arbitrary imposition of death sentences. With the 1994 expansion, however, 60 federal crimes were made death-eligible. This increased dramatically the potential for arbitrary imposition of death under the federal system. Without the oversight of a single reviewing tribunal, the federal death penalty has returned to the days of unchecked arbitrariness and caprice.

The problem of arbitrariness is compounded by the fact that the level of funding for these cases differs from one circuit to another. In some, funds for the defense are decided by the trial judge; in some, by committee; in some, by a budgeting attorney. Funds are granted more generously in some circuits than in others. Some defendants are represented by large, well-resourced defense teams and others by solo practitioners without staffs or colleagues.

Appointment of counsel differs from one circuit to another, as well. Some circuits welcome appointment of defense lawyers with federal capital experience from around the country. Other circuits have a strong preference for local lawyers, regardless of their federal capital experience. As a result, the level of experience is often quite different and the circuit courts' expectations of what constitutes the effective assistance of counsel is correspondingly different.

The lack of uniform review means that no court has the ability to monitor, review or correct the issues that result in arbitrary imposition of the federal death sentence.

At least one additional factor impedes the consistent application of standards to death sentencing. That is, a prisoner who has been sentenced to death is only entitled to review by a

three-judge panel of the circuit court, assuming first that a certificate of appealability has been granted; no right exists to review by the *en banc* court.[119] Thus, a federally death-sentenced prisoner is not even entitled to review of his sentence by a single tribunal at the circuit level. As a result, even when it comes to the most basic function of the reviewing court – ensuring that sentences within the jurisdiction are applied evenhandedly and without passion or prejudice – no single group of judges is even permitted to adjudicate this.

All of these factors conspire to make the imposition of the federal death penalty so arbitrary and capricious, it must be deemed to violate the Fifth, Sixth and Eighth Amendments to the United States Constitution.

## XXX. EXECUTING SOMEONE WITH BRAIN DAMAGE AND THE IMPAIRMENTS FROM WHICH MR. LAWRENCE SUFFERS WOULD VIOLATE THE EIGHTH AMENDMENT.

Daryl Lawrence is markedly brain-damaged and has been "since early childhood at least." Exh. 3 at 9. As a result, he has serious neuropsychiatric disorders that cause him to suffer from cognitive impairment, poor decision-making, impulsivity, marked poor judgment, and trouble modulating his emotions. Exh. 3 at 12. Mr. Lawrence also suffers from functional impairments in learning and memory. Exh. 3 at 8. "He is unable to assess situations correctly, has a difficult time adjusting to unexpected stimuli or changes which he is not expecting, is more likely to act without being able to fully evaluate his options and alternatives, and is more likely to act reflexively and impulsively." Exh. 3 at 12. This was all true at the time of his trial. According to neurologist Dr. Siddhartha Nadkarni, at least six factors in Mr. Lawrence's life – his blood disorder, Polycythemia Vera; multiple traumatic head injuries; history of physical

[119] It should be noted, too, that there is a wide variation in practice among the circuits with regard to the granting of certificates of appealability, necessary to obtain review in all postconviction proceedings. In some circuits, the certificates are granted routinely; in others, they are denied routinely.

trauma and exposure to violence; neurological and psychiatric symptoms; *in utero* exposure to substances; and poverty and neglect – have coalesced to produce physical, psychiatric, neurological, social, and neurocognitive impairments. Exh. 3 at 14. In short, Dr. Nadkarni has concluded, based on his examination of Mr. Lawrence and review of social history and records, that Mr. Lawrence is "markedly brain injured and . . . disabled by diffuse brain damage," and that these longstanding conditions were present both well before and at the time of his trial. Exh. 3 at 14.

Executing someone like Mr. Lawrence who suffers from brain damage that results in impaired cognition, judgment, impulse-control, and decision-making would violate the Eighth Amendment. In each case in which the Supreme Court has reversed capital sentences for ineffective assistance of counsel based on failure to conduct mitigation investigation, the Court has noted mental disorders or impairments that bear the hallmarks of those from which Mr. Lawrence suffers. *See Williams v. Taylor*, 529 U.S. 362, 370 (2000) (describing petitioner as possibly having "mental impairments organic in origin"); *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (relying on social services records that documented impairments and "difficulty coping with demanding situations"); *Rompilla v. Beard*, 545 U.S. 374, 391 (2005) (reporting test scores showing "third grade level of cognition after nine years of schooling" and organic brain damage); *Porter v. McCollum*, 558 U.S. 30, 36 (2009) (per curiam) (finding trial counsel ineffective for failing to discover substantial difficulties with reading, writing, and memory, as well as cognitive deficits; finding that state postconviction experts could not rule out "brain abnormality"); *Sears v. Upton*, 561 U.S. 945, 949 (2010) (per curiam) (describing significant frontal lobe damage suffered as a child, plus drug and alcohol abuse in teens, problems with "planning, sequencing and impulse control" as well as "pronounced frontal lobe pathology").

By the same token, the Supreme Court's Eighth Amendment cases prohibiting the death penalty for certain categories of offenders rely heavily on neuroscience to explain why people with particular deficits, attributable either to developmental neurological stage or organic brain disorder, are not eligible for execution. *See Roper v. Simmons*, 543 U.S. 551 (2005) (barring execution of people who committed capital offenses as juveniles); *Atkins v. Virginia*, 536 U.S. 304 (2002) (barring execution of the intellectually disabled). The Supreme Court described in *Roper* and *Atkins* the characteristics of capital offenders that led to these exclusions: disabilities in reasoning, judgment, and impulse control, as well as an underdeveloped sense of responsibility and vulnerability to negative influences. *See Atkins*, 536 U.S. at 320; *Roper*, 543 U.S. at 569. In other words, the Supreme Court has recognized that precisely the sorts of impairments that Mr. Lawrence exhibits as a result of his brain damage exempt capital offenders from execution.

Our highest court has also held that capital punishment must be "limited to those offenders who commit 'a narrow category of the most serious crimes,' and whose extreme culpability 'makes them the most deserving of execution.'" *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (citing *Roper v. Simmons*, *supra*, at 568 and quoting *Atkins v. Virginia*, *supra*, at 319). Mr. Lawrence's actions on January 6, 2005, certainly resulted in tragedy, the loss of Officer Bryan Hurst's life. But it is difficult to imagine counting Mr. Lawrence – a man whose badly damaged brain was further compounded by relentless exposure to a lifetime of trauma – as the kind of offender with a level of culpability deserving of execution. Executing someone with Mr. Lawrence's impairments would violate the Eighth Amendment.

## CONCLUSION

A jury convicted and sentenced Daryl Lawrence to die knowing nothing of the effects of the brain damage and trauma that have influenced every aspect of his life since birth. The jurors remained ignorant of this history because his defense team, out-resourced by the prosecution, short of time and lacking in investigative assistance, were unable to develop or present it. Mr. Lawrence's brain injuries, caused most likely by his chronic blood disease, his pregnant mother's drug addiction and withdrawal, and severe blows to his head, shifted the course of his development and profoundly altered how he thinks and behaves.

Jurors deciding whether to remove an individual from the human community deserve to know why he lived as he did. They also should learn all the facts they can about how the crime occurred. "Circumstances of the offense" are central to any capital sentencing decision, and in this case they were hotly contested. Yet missing from the jury's consideration was forensic evidence that would have strongly supported the defense's efforts to counter the depiction of a greedy, depraved Daryl Lawrence shooting Officer Hurst so he could get to the vault. The Government hampered counsel's efforts as well, failing to disclose eyewitness statements and other evidence contrary to its own theory of the crime.

The law, even in death penalty cases, does not require a perfect trial, but it does demand a reliable one. The outcome here was not reliable. This Court now possesses an opportunity to reevaluate Mr. Lawrence's culpability in the fullness of a properly investigated record. The conviction and the sentence in this case should be reversed.

## PRAYER FOR RELIEF

WHEREFORE, Movant Daryl Lawrence respectfully requests that this Court provide the following relief:

1. Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion;
2. Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings in the United States District Courts, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;
3. Permit Movant to file a Reply to the Respondent's answer, responding to any affirmative defenses raised by the Answer;
4. Permit Movant to Amend this Motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion;
5. Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Motion, or by Movant's Reply to any affirmative defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;
6. Permit Movant to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

7. Permit oral argument as appropriate and required;

8. Vacate Movant's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

9. Grant such further and additional relief as may be just and proper.

Respectfully submitted, this 7th day December, 2015.

/s/ Miriam Gohara
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender
265 Church St., Suite 702
New Haven, CT 06510
301.344.2337 (phone)
301.344.0019 (fax)
E-mail: Miriam_Gohara@fd.org

**CERTIFICATION PURSUANT TO RULE 2(b)(5)**
**OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS**

The undersigned, being authorized to sign for the movant, declares under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: December 7, 2015

/s/ Miriam Gohara
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender
265 Church St., Suite 702
New Haven, CT 06510
301.344.2337 (phone)
301.344.0019 (fax)
E-mail: Miriam_Gohara@fd.org

# CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing was sent through the Court's ECF system to:

David DeVillers, Esq.
United States Attorney's Office
303 Marconi Blvd, Suite 200
Columbus, Ohio 43215
Email: dave.devillers@usdoj.gov

/s/ Miriam Gohara_________
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender, District of
Maryland CT Office
265 Church St., Suite 702
New Haven, CT 06510
301.344.2337 (phone)
301.344.0019 (fax)
E-mail: Miriam_Gohara@fd.org